**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>iHeartMedia, Inc., *et al.*,[1]<br><br><br>       Debtors. | Chapter 11<br><br>Case No. 18-31274 (MI)<br><br>(Jointly Administered) |
| Wilmington Savings Fund Society, FSB, solely in its capacity as successor indenture trustee to the 6.875% Senior Notes due 2018 and 7.25% Senior Notes due 2027, and not in its individual capacity,<br><br>       Plaintiff,<br><br>       vs.<br><br>iHeartCommunications, Inc., f/k/a Clear Channel Communications, Inc., AMFM Broadcasting Licenses, LLC, AMFM Broadcasting, Inc., AMFM Operating, Inc., AMFM Radio Licenses, LLC, AMFM Texas Broadcasting, LP, AMFM Texas Licenses, LLC, AMFM Texas, LLC, Capstar Radio Operating Company, and Capstar TX, LLC,<br><br>       Defendants. | Adversary No. 18-_____<br><br>**COMPLAINT** |

Wilmington Savings Fund Society, FSB ("***Plaintiff***"),[2] solely in its capacity as successor

indenture trustee to the 2018 Legacy Notes (defined below) and the 2027 Legacy Notes (defined

below), and not in its individual capacity, by and through its undersigned attorneys,

---

[1] Because of the large number of Debtors in these jointly administered Chapter 11 Cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2] The defined term "Plaintiff" as used herein includes, as and where applicable, Plaintiff's predecessor in interest as indenture trustee, The Bank of New York Mellon Trust Co., N.A.

White & Case LLP, Pryor Cashman LLP, and Andrews Kurth Kenyon LLP, hereby files this adversary complaint (the "*Complaint*") in connection with the above-captioned jointly administered chapter 11 cases (the "*Chapter 11 Cases*") against iHeartCommunications, Inc., f/k/a Clear Channel Communications, Inc. ("*iHeart*"), and AMFM Broadcasting Licenses, LLC, AMFM Broadcasting, Inc., AMFM Operating, Inc., AMFM Radio Licenses, LLC, AMFM Texas Broadcasting, LP, AMFM Texas Licenses, LLC, AMFM Texas, LLC, Capstar Radio Operating Company, and Capstar TX, LLC (collectively, the "*Subsidiary Debtor Defendants*," and together with iHeart, the "*Defendants*"), and alleges as follows:

## I.

### <u>INTRODUCTION</u>

Plaintiff is the successor indenture trustee for the Legacy Notes (defined below), which are the only class of debt in the Debtors' capital structure that was issued prior to the disastrous 2008 leveraged buyout (the "*LBO*"), which over-levered iHeart and ultimately led to its bankruptcy. When a solvent iHeart issued the Legacy Notes in 1997, holders of Legacy Notes (the "*Legacy Noteholders*") agreed to be unsecured, but only subject to a clear right, spelled out in the indenture, to be equally and ratably treated with any future secured debt. This adversary proceeding involves an effort by Defendants to wrongfully deprive the Legacy Noteholders of the benefit of that bargain.

Despite the Legacy Noteholders' undisputed right to equal and ratable treatment, Defendants engaged in a series of secret and deceptive transactions that provided Mortgages (defined below) for the benefit of holders of Priority Guarantee Notes (the "*PGNs*," and the holders, the "*PGN Holders*"), which were both hidden from and denied to the Legacy Noteholders. The indenture governing the Legacy Noteholders' bonds prohibits iHeart and

2

certain of its subsidiaries (the "***Restricted Subsidiaries***"), including the Subsidiary Debtor Defendants, from granting "Mortgages" on "Principal Property" and certain other assets to secure debt issued to other creditors without ensuring that the Legacy Noteholders are secured "equally and ratably" with such debt.  Plaintiff recently learned, however, that Defendants secretly arranged for the Subsidiary Debtor Defendants to grant Mortgages encumbering those assets (the "***Hidden Encumbrances***") for the benefit of the PGN Holders at the time each series of PGNs was issued: in 2011, 2012, 2013, 2014, and 2015.  Although these transactions were publicly announced and almost all of the relevant deal documents were made available, one thing was kept secret: the existence of the Principal Properties Security Agreements (defined below), which provided that, upon the occurrence of a certain condition, the PGN Holders would have a lien on substantially all of the Subsidiary Debtor Defendants' assets.  iHeart then took actions to prevent that condition from occurring, at least in appearance, to circumvent its obligation to provide equal security to the Legacy Noteholders as had already been provided to the PGN Holders.

Providing this security to the PGN Holders without also elevating the Legacy Noteholders to secured status *pari passu* with the PGN Holders was a breach of the Legacy Noteholders' indenture with iHeart, and all Defendants knew that.  Indeed, the PGN transactions, which required the Principal Properties Security Agreements, were structured with the specific intent to deprive the Legacy Noteholders of their contractual rights, thus benefiting Defendants at Plaintiff's and the Legacy Noteholders' expense.  It was only in the last few months, as the Debtors were headed into bankruptcy, that a group of PGN Holders made a group of Legacy Noteholders aware (who in turn, advised Plaintiff) of the Hidden Encumbrances in an effort to convince them that they should accept a lower recovery.  That group of Legacy Noteholders (the

"***Ad Hoc Group of Legacy Noteholders***") immediately demanded that iHeart cause the Subsidiary Debtor Defendants to grant them equal and ratable Mortgages, but iHeart refused.

This left the Ad Hoc Group of Legacy Noteholders and the predecessor indenture trustee, The Bank of New York Mellon Trust Co., N.A. ("***BNY***"),[3] with no option but to file suit against iHeart.  Because of the shortness of time between the commencement of that action and these Chapter 11 Cases, the Legacy Noteholders were unable to secure relief in that case, which is now stayed.  Accordingly, Plaintiff now seeks to protect the Legacy Noteholders' rights through this adversary proceeding.

## II.

## PARTIES

1.      Plaintiff Wilmington Savings Fund Society, FSB is a federal savings bank with its principal place of business in Wilmington, Delaware.

2.      Defendant iHeartCommunications, Inc., formerly known as Clear Channel Communications, Inc., is a Texas corporation with its corporate headquarters and principal place of business in San Antonio, Texas.

3.      Defendant AMFM Broadcasting Licenses, LLC is a Delaware limited liability company with its principal place of business in San Antonio, Texas.

4.      Defendant AMFM Broadcasting, Inc. is a Delaware corporation with its principal place of business in San Antonio, Texas.

5.      Defendant AMFM Operating, Inc. is a Delaware corporation with its principal place of business in San Antonio, Texas.

---

[3] Plaintiff was appointed as successor indenture trustee for the Legacy Notes on March 13, 2018.  BNY previously served as the indenture trustee.

6.      Defendant AMFM Radio Licenses, LLC is a Delaware limited liability company with its principal place of business in San Antonio, Texas.

7.      Defendant AMFM Texas Broadcasting, LP is a Delaware limited partnership with its principal place of business in San Antonio, Texas.

8.      Defendant AMFM Texas Licenses, LLC is a Texas limited liability company with its principal place of business in San Antonio, Texas.

9.      Defendant AMFM Texas, LLC is a Delaware limited liability company with its principal place of business in San Antonio, Texas.

10.     Defendant Capstar Radio Operating Company is a Delaware corporation with its principal place of business in San Antonio, Texas.

11.     Defendant Capstar TX, LLC is a Texas limited liability company with its principal place of business in San Antonio, Texas.

## III.

## <u>JURISDICTION AND VENUE</u>

12.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

13.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and *In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012).

14.     This adversary proceeding relates to *In re iHeartMedia, Inc.*, Case No. 18-31274 (MI) (Jointly Administered), under chapter 11 of the Bankruptcy Code, pending in the Houston Division of the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***").

15.    Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

16.    Pursuant to Bankruptcy Local Rule 7008-1, Plaintiff does not consent to the entry of final orders or judgment by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

17.    All Defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7020, because the right to relief asserted against all Defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and questions of law and fact common to all Defendants and/or certain categories of Defendants will arise in this action.

## IV.

## <u>NATURE OF THE CASE</u>

### A.    <u>General Background</u>

18.    iHeart is a media company based in San Antonio, Texas and owns over 850 radio stations across the United States.  iHeart also operates an outdoor advertising business through its subsidiary, Clear Channel Outdoor Holdings, Inc.

19.    Plaintiff is the indenture trustee for the Legacy Notes issued by iHeart, and acts on behalf of itself as trustee and on behalf of all Legacy Noteholders in accordance with the Legacy Indenture (defined below).[4]

20.    This dispute is based on Defendants' fraudulent and otherwise wrongful actions that have deprived the Legacy Noteholders of their right to be treated "equally and ratably" to the PGN Holders.

---

[4] A true and correct copy of the Legacy Indenture is attached hereto as Exhibit "A."

21.     The Legacy Indenture prohibits Defendants from granting creditors a "Mortgage" on "Principal Property" or any stock or indebtedness of the Restricted Subsidiaries (collectively, the "***Springing Lien Collateral***") unless iHeart grants or causes the Restricted Subsidiaries to grant an equal and ratable Mortgage for the benefit of the Legacy Noteholders.  *See* Legacy Indenture § 1006 (the "***Equal and Ratable Clause***").  A "Mortgage" is defined broadly, to include "any mortgage, pledge, lien, encumbrance, charge or security interest *of any kind*" (any such interest, a "***Mortgage***").  *See id.* § 101 (emphasis added).

22.     All of the Defendants were well aware of the Legacy Noteholders' rights under the Legacy Indenture at the time the PGNs were issued, beginning in 2011 and continuing through 2015.

23.     Despite the clear requirements of the Legacy Indenture, Defendants intentionally structured the PGN transactions so as to secretly provide the PGN Holders with the Hidden Encumbrances without providing the Legacy Noteholders the equal and ratable Mortgages to which they are entitled (the "***Equal and Ratable Mortgages***").  The plain language of the Equal and Ratable Clause makes clear that, upon the granting of any Mortgage on any Springing Lien Collateral, the Legacy Noteholders are entitled to be elevated to secured status *pari passu* with the PGN Holders.

24.     Plaintiff believes that between 2011 and 2015, the Subsidiary Debtor Defendants entered into five security agreements for the benefit of the PGN Holders and then actively hid this fact from Plaintiff and the Legacy Noteholders so as to deprive them of the opportunity to enter into similar security agreements.  This was designed to, and in fact did, cause a breach by iHeart of its obligations to the Legacy Noteholders under the Legacy Indenture.  This breach has caused damage to the Legacy Noteholders, on behalf of whom Plaintiff acts.

7

B.      **The iHeart Capital Structure**

25.     For years, the Debtors have faced financial difficulties as a result of their sizable debt obligations.

26.     The Debtors are financed by more than $16 billion in debt, involving various large creditors.  In 2008, iHeart was acquired by two private equity firms as part of the LBO.  As a result, iHeart took on an immense amount of debt in addition to the debt obligations already on its books, creating an unsustainable capital structure that ultimately led to the filing of the Chapter 11 Cases.[5]

27.     iHeart issued three categories of debt that are relevant to this adversary proceeding: (i) notes issued before the LBO (the "*Legacy Notes*"); (ii) loans incurred in connection with the LBO (the "*Term Loans*"); and (iii) the PGNs, which were issued after the LBO in five series, each year from 2011 to 2015, to refinance indebtedness that financed the LBO.  The holders of these three types of notes are collectively referred to herein as the "*Springing Lien Creditors*."   Besides these three categories, iHeart and its subsidiaries owe billions of dollars in other debt.

1.      The Legacy Notes

28.     The first relevant category of debt is the Legacy Notes.  Three series of Legacy Notes are relevant to this adversary proceeding, including: (a) the 5.5% Senior Notes due 2016 ("*2016 Legacy Notes*"); (b) the 6.875% Senior Notes due 2018 ("*2018 Legacy Notes*"); and (c) the 7.25% Senior Notes due 2027 ("*2027 Legacy Notes*").  Additional series of Legacy Notes were also issued but are not relevant to this action.

---

[5] Plaintiff and the individual Legacy Noteholders reserve all rights to investigate the LBO and, with any necessary Court approval, take action as may be appropriate to maximize value for the benefit of the Debtors' estates.

29.     Each of these three series of Legacy Notes was issued pursuant to a single Senior Indenture dated October 1, 1997 (as supplemented from time to time, the "***Legacy Indenture***"). The Legacy Indenture governs each series of Legacy Notes and lays out the rights and obligations of iHeart and the Legacy Noteholders.

30.     The three relevant series of Legacy Notes—the 2016, 2018, and 2027 Legacy Notes—were each issued at different times, for different amounts, with different maturity dates.

31.     The 2016 Legacy Notes were issued on December 16, 2004, in the amount of $250 million pursuant to a supplemental indenture.  The 2016 Legacy Notes matured as of December 15, 2016.

32.     The 2018 Legacy Notes were issued on June 16, 1998, pursuant to a supplemental indenture.  The 2018 Legacy Notes have a total amount outstanding of $175 million, with a maturity date of June 15, 2018.

33.     The 2027 Legacy Notes were issued on October 15, 1997, pursuant to a certificate signed by iHeart's Senior Vice President and Chief Accounting Officer.  The 2027 Legacy Notes have a total amount outstanding of $300 million, with a maturity date of October 15, 2027.

34.     Between the 2018 and 2027 Legacy Notes, $475 million of Legacy Notes currently remain outstanding.

### 2.     The Term Loans

35.     The next category of debt is the Term Loans, which were incurred by iHeart in connection with the LBO.  The Term Loans are governed by a Credit Agreement dated May 13, 2008, which was amended and restated on February 23, 2011, and amended several times thereafter (the "***Credit Agreement***").

        3.        <u>The PGNs</u>

36.    Finally, to refinance certain Term Loans used to finance the LBO, iHeart issued five series of PGNs each governed by indentures (the "***PGN Indentures***"): (a) 9% Priority Guarantee Notes due 2019; (b) 9% Priority Guarantee Notes due 2021; (c) 11.25% Priority Guarantee Notes due 2021; (d) 9% Priority Guarantee Notes due 2022; and (e) 10.625% Priority Guarantee Notes due 2023.

**C.**      **<u>iHeart's Contractual Obligations</u>**

37.    The Legacy Indenture (governing the Legacy Notes), the Credit Agreement (governing the Term Loans), and the PGN Indentures (governing the PGNs) contain provisions addressing iHeart's obligations to each of the Springing Lien Creditors, as described below.

        1.        <u>The Springing Lien</u>

38.    In connection with its incurrence of the Term Loans and issuance of the PGNs, iHeart agreed to grant the lenders under the Term Loans (the "***Term Loan Lenders***") and the PGN Holders a contingent security interest in the Springing Lien Collateral (the "***Springing Lien***") that would arise when no more than $500 million of the Legacy Notes remained outstanding (the date of such occurrence, the "***Springing Lien Trigger Date***").  This $500 million amount was driven by the Legacy Indenture's Equal and Ratable Clause and represents a commercial decision as to the amount of legacy debt that the Term Loan Lenders were willing to permit to be secured equally and ratably with the Term Loans.  This structure carried through to the PGN Indentures, which were each issued to refinance the original Term Loans incurred to finance the LBO.  For this reason, the Equal and Ratable Clause was central to the structuring of the PGN transactions and all parties to those transactions (including all Defendants) were aware of that provision.

39.     Under the Credit Agreement, iHeart was required to grant the Springing Lien to the Term Loan Lenders within 60 days of "satisfaction of the Existing Notes Condition."  *See* Credit Agreement § 6.11(f).  The "Existing Notes Condition" is satisfied upon "the repayment of [Legacy] Notes such that no more than $500,000,000 aggregate principal amount of [Legacy] Notes remains outstanding."  *Id.* § 1.01.[6]

40.     Similarly, under the PGN Indentures, iHeart must grant the Springing Lien to the PGN Holders within "60 days after the Springing Lien Trigger Date."  *See* PGN Indentures § 4.18(b).  The "Springing Lien Trigger Date" is defined as the date on which the "amount of the Legacy Notes outstanding is $500,000,000 or less."  *Id.* § 1.01.

41.     The Springing Lien would attach to the Springing Lien Collateral, which includes any radio broadcasting, television broadcasting, or outdoor advertising property located in the United States owned or leased by iHeart or any subsidiary (the "***Principal Property***")[7] and capital stock and indebtedness of the Restricted Subsidiaries.

2.     The Equal and Ratable Clause

42.     Subject to certain limited exceptions, the Legacy Indenture forbids iHeart and the Restricted Subsidiaries (including the Subsidiary Debtor Defendants) from granting the Term Loan Lenders, PGN Holders, or any other creditor any Mortgage on the Springing Lien

---

[6] Term Loans up to a principal amount equal to 15% of consolidated stockholder equity of the Debtors are secured by Principal Property.  This is permitted under the Equal and Ratable Clause, which contains a permitted Mortgage basket allowing Principal Property to be collateral for debt equal to that amount.  The security documents granting Mortgages to secure the Term Loans are carefully crafted to ensure that Term Loans in excess of that amount will not be secured by Mortgages on Principal Property.  Each of the Mortgages granted on Principal Property under the security documents granting Mortgages to secure the PGNs do not fall within that carve out, as the Term Loans exhausted its capacity, leaving no availability for the PGNs.

[7] "Principal Property" is more fully defined in the Legacy Indenture and includes the property described above, subject to limited exceptions not applicable here.  *See* Legacy Indenture § 101.  "Principal Property" is subject to the limitation on Mortgages set forth in Section 1006 of the Legacy Indenture, as discussed below.  "Principal Property" is defined the same way in the Legacy Indenture as in the Credit Agreement and PGN Indentures.

Collateral without also granting an "equal and ratable" Mortgage for the benefit of the Legacy Noteholders on all assets pledged for the benefit of any such creditor.

43.     Specifically, Section 1006 of the Legacy Indenture, entitled "Limitation on Mortgages," limits the ability of iHeart and the Restricted Subsidiaries to grant other creditors a "Mortgage" on the Springing Lien Collateral.

44.     The Legacy Indenture defines "Mortgage" to mean "any mortgage, pledge, lien, encumbrance, charge or security interest of *any kind*." *See* Legacy Indenture § 101 (emphasis added).

45.     Accordingly, an "encumbrance" as used within the definition of "Mortgage" encompasses more than fully matured and attached security interests; it includes contingent security interests and other burdens encumbering property that do not take effect until the occurrence of a specified trigger date.  An encumbrance includes *any* burden or impediment on property that lessens its value, including any burden or impediment the imposition of which may be subject to certain conditions.  As such, any conditional burden or impediment on property constitutes a Mortgage as such term is defined in the Legacy Indenture.

46.     The Equal and Ratable Clause therefore prevented iHeart and the Restricted Subsidiaries from granting even a contingent security interest encumbering the Springing Lien Collateral, "without . . . making effective provision whereby all of the [Legacy Notes] outstanding shall be directly secured equally and ratably with such Debt." *See* Legacy Indenture § 1006.

47.     In other words, the moment that the Subsidiary Debtor Defendants granted the Hidden Encumbrances on the Springing Lien Collateral for the benefit of the PGN Holders, the

Subsidiary Debtor Defendants were required to provide Mortgages to or for the benefit of the Legacy Noteholders. That is, they were required to grant them Equal and Ratable Mortgages.[8]

### D.   Defendants Secretly Grant the Hidden Encumbrances

48.     In violation of its contractual obligations, iHeart allowed the Subsidiary Debtor Defendants to grant the Hidden Encumbrances for the benefit of the PGN Holders without informing Plaintiff or the Legacy Noteholders, or providing them similar security.

49.     Unknown to Plaintiff until recently, the Subsidiary Debtor Defendants entered into Principal Properties Security Agreements (the "*Principal Properties Security Agreements*") for the benefit of the PGN Holders, granting the Hidden Encumbrances.

50.     The Principal Properties Security Agreement dated as of February 26, 2015 (the "*February 2015 Principal Properties Security Agreement*") was not disclosed to the Legacy Noteholders until November 2017, when a group of PGN Holders informed the Ad Hoc Group of Legacy Noteholders that because the PGN Holders had obtained the Principal Properties Security Agreements and the Legacy Noteholders had not, the Legacy Noteholders' position in the Chapter 11 Cases would be prejudiced. The Ad Hoc Group of Legacy Noteholders then brought the matter to Plaintiff's attention. Although only the February 2015 Principal Properties Security Agreement was disclosed to the Ad Hoc Group of Legacy Noteholders (who in turn informed Plaintiff), Plaintiff alleges on information and belief that the Subsidiary Debtor Defendants entered into substantially identical Principal Properties Security Agreements in connection with each of the PGN issuances.

---

[8] The language and structure of the Equal and Ratable Clause reveals that, upon the granting of any Mortgage on the Springing Lien Collateral, the Legacy Noteholders are entitled to receive Equal and Ratable Mortgages on any collateral that secures the obligations under the PGNs and the PGN Indentures. *See* Legacy Indenture § 1006 (providing that the Legacy Noteholders are entitled to receive Equal and Ratable Mortgages securing the "Debt" benefitting from Mortgages on the Springing Lien Collateral, and not just on the Springing Lien Collateral itself).

51.     The Principal Properties Security Agreements grant security interests on certain property other than "Excluded Assets."[9]   *See* February 2015 Principal Properties Security Agreement § 3.01(a).   The "Excluded Assets" include the Springing Lien Collateral, at least initially.   *See* February 2015 Principal Properties Security Agreement § 1.02 (including in clauses (f), (g), and (j), respectively, of the definition of "Excluded Assets": "Equity Interests in any Person or . . . Principal Propert[y]"; "intercompany notes between [iHeart] and its Restricted Subsidiaries or between any Restricted Subsidiaries"; and "unless and until the Springing Lien Trigger Date has occurred, any assets if pledging or creating a security interest in such assets . . . would require the grant of equal and ratable security to or for the benefit of the holders of any Legacy Notes").   However, upon the Springing Lien Trigger Date, when the aggregate principal amount of the Legacy Notes outstanding drops to $500 million or below, the security interest granted thereunder automatically extends to cover certain "Excluded Assets," including the Principal Property and other Springing Lien Collateral.   *See* February 2015 Principal Properties Security Agreement § 3.01(a) (providing that "upon the occurrence of the Springing Lien Trigger Date, the assets specified in clauses (f) and (g) of the definition of Excluded Assets shall constitute Collateral hereunder and shall no longer constitute Excluded Assets").

52.     In addition, the Principal Properties Security Agreements authorize the collateral agent under the PGN Indentures (the "***PGN Collateral Agent***") to file financing statements to perfect the security interests granted thereunder.   The PGN Collateral Agent has filed financing statements that, upon the Springing Lien Trigger Date, purport to perfect the security interests in the Principal Property and other Springing Lien Collateral.   No such opportunity was given to the Legacy Noteholders.

---

[9] Plaintiff's allegations with respect to the content of Principal Properties Security Agreements besides the February 2015 Principal Properties Security Agreement are based on information and belief.

53.     When the Subsidiary Debtor Defendants entered into the Principal Properties Security Agreements, this imposed an "encumbrance" on the Springing Lien Collateral.  *See* Legacy Indenture § 101.  An "encumbrance" or "security interest of any kind," even one that is conditional or contingent, constitutes a "Mortgage," which triggers the Equal and Ratable Clause of the Legacy Indenture and requires iHeart to grant the Legacy Noteholders the Equal and Ratable Mortgages.  *See id.* §§ 101, 1006.

54.     As described more fully below, the Springing Lien Trigger Date occurred on December 15, 2016, when the 2016 Legacy Notes matured and less than $500 million of the 2016 Legacy Notes remained truly outstanding.

55.     Even if the Springing Lien Trigger Date had not occurred, iHeart and the Subsidiary Debtor Defendants were still obligated to provide the Equal and Ratable Mortgages based on their granting of the Hidden Encumbrances through the Principal Properties Security Agreements.  Regardless of whether the Springing Lien Trigger Date occurred, the Hidden Encumbrances granted under the Principal Properties Security Agreements lessen the value of the Springing Lien Collateral, and therefore constitute "Mortgages" on the Springing Lien Collateral, which are prohibited unless iHeart grants the Legacy Noteholders the Equal and Ratable Mortgages.

56.     Despite these significant implications, Defendants did not notify Plaintiff or the Legacy Noteholders that the Subsidiary Debtor Defendants had entered into the Principal Properties Security Agreements for the benefit of the PGN Holders.

57.     Defendants purposefully concealed this information.  As an initial matter, iHeart's 8-K reports filed with the Securities and Exchange Commission (the "*SEC*"), discussing the transactions in which the PGNs were issued, disclosed that iHeart issued the new PGNs but

failed to disclose or attach copies of any Principal Properties Security Agreement.  Further, the PGN Indentures did not contain any reference to a Principal Properties Security Agreement.  On the contrary, in the SEC filings, iHeart stated that the PGNs were *not* secured by the Principal Property.  iHeart then sent BNY, the then-serving trustee under the Legacy Indenture, a series of certifications that incorrectly stated iHeart had complied with all of its contractual obligations.

58.     Defendants' intent to conceal the Hidden Encumbrances and mislead Plaintiff, and the Legacy Noteholders on whose behalf Plaintiff acts, is further evidenced by the fact that the PGN Indentures only require that security be granted within "60 days *after* the Springing Lien Trigger Date."  *See* PGN Indentures § 4.18(b) (emphasis added).  By all indications, Defendants would not enter into security agreements immediately at the time of the PGN issuances, but instead only after the Springing Lien Trigger Date, if and when that occurred.  By privately granting the Hidden Encumbrances immediately at the time of the PGN issuances, while publicly including language in the PGN Indentures indicating that there was no requirement or expectation to do so, Defendants actively misled Plaintiff and the Legacy Noteholders.

### E.     iHeart's Attempt to Prevent the Springing Lien

59.     Although there is no doubt that a breach of the Legacy Indenture occurred the moment the Hidden Encumbrances were granted, that breach became even more clear on December 15, 2016, when iHeart attempted, unsuccessfully, to manipulate the Springing Lien Trigger Date.  In an attempt to evade the Springing Lien Trigger Date and thus the obligation to grant the Equal and Ratable Mortgages, iHeart devised a plan for its subsidiary to purchase, and then decline to redeem at maturity, enough 2016 Legacy Notes to create the appearance that over $500 million of the Legacy Notes still remained outstanding.  Presently, Clear Channel Holdings,

Inc. ("*CC Holdings*"), a wholly owned subsidiary of iHeart, holds $57.1 million of the 2016 Legacy Notes (the "*Repurchased 2016 Legacy Notes*").  The Repurchased 2016 Legacy Notes were first purchased by CC Finco, LLC ("*CC Finco*"), a wholly owned indirect subsidiary of iHeart and a direct subsidiary of CC Holdings, for approximately $55.5 million, before being transferred to CC Holdings.  *See* iHeartCommunications, Inc., Quarterly Report (Form 10-Q), p. 11 (Oct. 28, 2014).

60.     iHeart noted the purchase of the Repurchased 2016 Legacy Notes in its quarterly report filed with the SEC dated October 28, 2014, and additionally stated that the "notes purchased by CC Finco were not cancelled and *remain outstanding*."  *See* iHeartCommunications, Inc., Quarterly Report (Form 10-Q), p. 11 (Oct. 28, 2014) (emphasis added).[10]

61.     Had iHeart either cancelled or repaid the Repurchased 2016 Legacy Notes when they matured on December 15, 2016, the amount of 2016 Legacy Notes outstanding would have fallen to $475 million, thereby triggering the Springing Lien, and in turn, the obligation to grant the Equal and Ratable Mortgages.

62.     Instead, iHeart failed to repay the Repurchased 2016 Legacy Notes on the December 15, 2016 maturity date.  iHeart did repay all 2016 Legacy Notes held by third parties.

63.     iHeart, CC Holdings, and the Subsidiary Debtor Defendants purposefully sought to evade iHeart's obligation to grant the Springing Lien, and in turn, the Equal and Ratable Mortgages, in several steps as part of a fraudulent scheme to defeat the rights of the Springing Lien Creditors.

---

[10] On that same Form 10-Q, iHeart disclosed that CC Finco had repurchased certain Legacy Notes due 2014 and that CC Finco *had* cancelled such notes, evidencing a specific intent to treat the Repurchased 2016 Legacy Notes differently.

64.     First, iHeart informed CC Holdings that it would not repay the Repurchased 2016 Legacy Notes on their maturity date.  Then, in response, CC Holdings chose not to enforce its rights or pursue any remedies in respect of the Repurchased 2016 Legacy Notes.  To effectuate this scheme, iHeart changed the CUSIP solely on the Repurchased 2016 Legacy Notes. According to iHeart, as a result of this insider arrangement, even after the scheduled maturity of the 2016 Legacy Notes, more than $500 million of Legacy Notes still remained outstanding and the Springing Lien Trigger Date never occurred.

65.     Finally, iHeart and certain of its affiliates, including CC Holdings, commenced lawsuits in the 57th District Court of Bexar County, Texas, seeking declarations that, under the relevant debt documents, the Repurchased 2016 Legacy Notes would remain outstanding until cancelled or repaid, that the Springing Lien Trigger Date had not occurred, and that there was no obligation to grant the Springing Lien (or, for that matter, the Equal and Ratable Mortgages). *See iHeartCommunications, Inc. v. U.S. Bank National Association, et al.*, Cause No. 2016-CI21286; *iHeartCommunications, Inc. v. The Bank of New York Mellon Trust Co., N.A.*, Cause No. 2016-CI21289 (together, the "***Declaratory Judgment Actions***").

66.     Although iHeart asserts that more than $500 million of Legacy Notes remain outstanding, several representations made to the market in iHeart's own SEC filings contradict that assertion.  For example, in its 2015 annual report filed with the SEC, iHeart reported $192.9 million of the 2016 Legacy Notes outstanding, which did not include the $57.1 million amount of the Repurchased 2016 Legacy Notes that was purchased by CC Finco.  *See* iHeartCommunications, Inc., Annual Report (Form 10-K), p. 49 (Feb. 25, 2016).  The exchange

prospectuses relating to the PGNs also contain language suggesting that the Repurchased 2016 Legacy Notes should not be viewed by investors as outstanding.[11]

67.    The PGN Holders strenuously disagree with iHeart's interpretation and have argued that the Springing Lien Trigger Date has occurred and that they are secured creditors. *See* U.S. Bank National Association's Answer & Countercls. at ¶¶ 34 & 45, *iHeart Communications, Inc. v. Citibank, N.A.*, No. 17-00025 (W.D. Tex. filing made Apr. 12, 2017), ECF No. 48 (alleging that "iHeart has taken the erroneous position that . . . the 2016 Legacy Notes held by CC Holdings . . . remain outstanding" and seeking a declaration "that the 'Springing Lien Trigger Date' as defined in the PGN Indentures occurred no later than December 16, 2016").

68.    iHeart, CC Finco, and CC Holdings wrongfully engaged in this scheme to purchase and then refrain from enforcing remedies regarding the Repurchased 2016 Legacy Notes, for the purpose of depriving the Term Loan Lenders and PGN Holders of their rights, and in turn, the Legacy Noteholders of their Equal and Ratable Mortgages.

69.    In fact, the Repurchased 2016 Legacy Notes are no longer outstanding.  The Springing Lien Trigger Date occurred when the Repurchased 2016 Legacy Notes matured, thus triggering the PGN Holders' and Term Loan Lenders' rights to receive the Springing Lien.

70.    Once the right to receive the Springing Lien was activated, this in turn triggered the Legacy Noteholders' rights to receive the Equal and Ratable Mortgages.

---

[11] For example, the prospectus states: "Based solely on the current maturity schedule of our Legacy Notes, *without giving effect to any voluntary repurchases or redemptions of our Legacy Notes*, we would have less than $500 million aggregate principal amount of Legacy Notes outstanding after December 15, 2016, when our 5.5% Senior Notes due 2016 mature."  *See* iHeartCommunications, Inc., Prospectus - Exchange Offer for $950,000,000 10.625% Priority Guarantee Notes due 2023 (Form S-4) (p. 181) (June 30, 2015) (emphasis added).

F.     **Plaintiff Learns of Defendants' Actions**

71.     Due to Defendants' false and misleading statements and secret granting of the Hidden Encumbrances, Plaintiff only recently learned of the Principal Properties Security Agreements, and not from Defendants.

72.     Plaintiff first became aware of one of the Principal Properties Security Agreements through the Ad Hoc Group of Legacy Noteholders, who themselves only learned of its existence in November 2017 when counsel for a group of PGN Holders sent them the February 2015 Principal Properties Security Agreement in an effort to convince them that their rights under the Equal and Ratable Clause would not protect them in bankruptcy.

73.     Immediately upon confirming the existence of the Hidden Encumbrances, the Ad Hoc Group of Legacy Noteholders demanded relief including the granting of the Equal and Ratable Mortgages.  It was not until February 23, 2018 that Defendants informed the Ad Hoc Group of Legacy Noteholders that they would not do so.

G.     **The New York Action**

74.     On February 26, 2018, the first business day after Defendants denied the Ad Hoc Group of Legacy Noteholders' formal request for Equal and Ratable Mortgages, BNY and the Ad Hoc Group of Legacy Noteholders (the "*New York Action Plaintiffs*") filed suit against iHeart in the Supreme Court of the State of New York (the "*New York State Court*") seeking specific enforcement of the Legacy Noteholders' rights under the Legacy Indenture (the "*New York Action*").  At the same time, the New York Action Plaintiffs also sought preliminary injunctive relief in the form of provisional Equal and Ratable Mortgages on the Springing Lien Collateral.  The New York Action Plaintiffs instituted the New York Action and sought the

extraordinary remedy of mandatory injunctive relief in an effort to mitigate the harm done by Defendants' wrongful conduct.

75.     The New York State Court agreed to hear the request for a preliminary injunction and set a hearing for Wednesday, February 28, 2018, but just two hours before the hearing time, iHeart removed the matter to the District Court for the Southern District of New York (the "**New York Federal Court**").

76.     The following day, Thursday, March 1, 2018, the New York Federal Court found the removal to be improper and remanded the case.  At that point, the New York State Court had just one business day left before iHeart's anticipated bankruptcy filing to rule on the request for emergency injunctive relief.[12]

77.     The New York State Court ultimately declined to issue a mandatory injunction, but did not reach the merits of the New York Action Plaintiffs' request for specific performance. In denying preliminary injunctive relief, the New York State Court specifically noted that iHeart's counsel had expressly acknowledged the Legacy Noteholders' rights and that those rights could be vindicated through the bankruptcy proceedings.

78.     As a result of the Debtors' bankruptcy filings, the New York Action has been automatically stayed pursuant to section 362 of the Bankruptcy Code.

## V.

## FIRST CAUSE OF ACTION

### (UNJUST ENRICHMENT AGAINST SUBSIDIARY DEBTOR DEFENDANTS)

79.     Plaintiff re-alleges and incorporates by reference the allegations set forth in other paragraphs of this Complaint as if fully stated herein.

---

[12] It was originally anticipated that iHeart would file for bankruptcy on Monday, March 5, 2018.  The actual filing date was briefly delayed as a result of forbearance agreements entered into between iHeart and certain of its creditors.

80.     Between (as early as) 2011 and February 26, 2015, in connection with iHeart's issuances of the PGNs, the Subsidiary Debtor Defendants and the PGN Collateral Agent entered into the Principal Properties Security Agreements, pursuant to which the Subsidiary Debtor Defendants imposed the Hidden Encumbrances on the Springing Lien Collateral for the benefit of the PGN Holders.

81.     The Subsidiary Debtor Defendants provided the Hidden Encumbrances without granting the Legacy Noteholders the Equal and Ratable Mortgages to which they are entitled. Additionally, the Subsidiary Debtor Defendants authorized the PGN Collateral Agent to file financing statements purporting to perfect the security interests granted under the Principal Properties Security Agreements, without providing any such opportunity to the Legacy Noteholders.  The Subsidiary Debtor Defendants knew that this violated iHeart's contractual obligations under the Legacy Indenture.

82.     Due to the Subsidiary Debtor Defendants' acts and omissions, the Subsidiary Debtor Defendants obtained the benefit of evading additional pledges of their assets in favor of the Legacy Noteholders.  As a result, the Legacy Noteholders have suffered substantial harm in the form of a loss of their Mortgages.

83.     By failing to grant the Equal and Ratable Mortgages, the Subsidiary Debtor Defendants obtained such benefits at the expense of the Legacy Noteholders.  The Subsidiary Debtor Defendants purposely evaded granting—and iHeart purposely evaded having the Subsidiary Debtor Defendants grant—the Equal and Ratable Mortgages as part of a scheme to deprive the Legacy Noteholders of their rights and interests.  Defendants purposefully concealed the Hidden Encumbrances from Plaintiff and the Legacy Noteholders, who were thereby denied their right to receive and perfect security interests in the Springing Lien Collateral before the

filing of the Chapter 11 Cases.  The Hidden Encumbrances granted to the PGN Holders under the Principal Properties Security Agreements provide the PGN Holders with preferential treatment, and are designed to permit the Subsidiary Debtor Defendants to evade their obligation to grant the Equal and Ratable Mortgages at the Legacy Noteholders' expense.

84.     In equity and good conscience, the Court should grant an equitable lien, constructive trust, and any and all additional or alternative remedies in equity or law that the Court deems just and proper, to prevent the Subsidiary Debtor Defendants from retaining the benefits by which they have unjustly enriched themselves at the Legacy Noteholders' expense.

## SECOND CAUSE OF ACTION

### (TORTIOUS INTERFERENCE WITH CONTRACT AGAINST SUBSIDIARY DEBTOR DEFENDANTS)

85.     Plaintiff re-alleges and incorporates by reference the allegations set forth in other paragraphs of this Complaint as if fully stated herein.

86.     The Subsidiary Debtor Defendants tortiously, illegally, and/or otherwise improperly interfered with the Legacy Indenture, which is a valid and enforceable contract that is binding on Plaintiff and iHeart.

87.     At all relevant times, the Subsidiary Debtor Defendants have had actual, constructive, or other knowledge of the existence of the Legacy Indenture and its terms.  The Subsidiary Debtor Defendants have known that under the Equal and Ratable Clause of the Legacy Indenture, iHeart was required to provide the Legacy Noteholders with Equal and Ratable Mortgages as compared to those granted to other creditors including the PGN Holders. The Principal Properties Security Agreements make explicit reference to the Legacy Indenture and the obligation to grant Equal and Ratable Mortgages to the Legacy Noteholders.

88.     The Subsidiary Debtor Defendants willfully, intentionally, and/or maliciously procured iHeart's breach of the Legacy Indenture by granting security interests to the PGN Holders while not granting the Equal and Ratable Mortgages owed to the Legacy Noteholders, in whose interest Plaintiff acts.  The Subsidiary Debtor Defendants' conduct was not justified.

89.     The Subsidiary Debtor Defendants' interference with iHeart's performance of its obligations under the Legacy Indenture proximately caused the Legacy Noteholders' harm.

90.     Due to the Subsidiary Debtor Defendants' tortious interference with the Legacy Indenture, the Legacy Noteholders have suffered damages in an amount no less than $475 million, plus interest, costs, legal fees and expenses.  Accordingly, Plaintiff requests that this Court award damages, an equitable lien, constructive trust, and any and all additional or alternative remedies in equity or law that the Court deems just and proper to remedy the harm the Legacy Noteholders have suffered as a result of the Subsidiary Debtor Defendants' tortious interference with iHeart's obligations and the Legacy Noteholders' rights under the Legacy Indenture.

## THIRD CAUSE OF ACTION

### (EQUITABLE LIEN AGAINST IHEART & SUBSIDIARY DEBTOR DEFENDANTS)

91.     Plaintiff re-alleges and incorporates by reference the allegations set forth in other paragraphs of this Complaint as if fully stated herein.

92.     In connection with its incurrence of the Legacy Notes, iHeart agreed that if it or any Restricted Subsidiary were to grant any other creditor, including the PGN Holders, a Mortgage on any of the Springing Lien Collateral, they would provide the Equal and Ratable Mortgages for the benefit of the Legacy Noteholders.

93.     As a result of the execution of the Principal Properties Security Agreements, the passing of the Springing Lien Trigger Date, or both, the PGN Holders received a Mortgage on the Springing Lien Collateral.  This triggered obligations of iHeart and the Subsidiary Debtor Defendants to provide the Equal and Ratable Mortgages.

94.     iHeart and the Subsidiary Debtor Defendants refused to execute a security agreement for the benefit of Plaintiff and the Legacy Noteholders or otherwise provide the Equal and Ratable Mortgages to which they are entitled.

95.     Plaintiff has no adequate remedy at law for that harm.

96.     Equity will give to the transaction the result that it was intended to produce and treat as done that which the parties intended to be done.

97.     Accordingly, this Court should impose an equitable lien on the Springing Lien Collateral such that the Legacy Noteholders will share in such collateral, up to and limited to the amount of their claims, equally and ratably as compared to the PGN Holders, as the Legacy Indenture requires.

## FOURTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST AGAINST IHEART & SUBSIDIARY DEBTOR DEFENDANTS)

98.     Plaintiff re-alleges and incorporates by reference the allegations set forth in other paragraphs of this Complaint as if fully stated herein.

99.     iHeart is the issuer of the Legacy Notes under the Legacy Indenture and, accordingly, owes a duty to Plaintiff and the Legacy Noteholders on behalf of whom Plaintiff acts.

100.    Under the Legacy Indenture, iHeart agreed not to grant or permit its Restricted Subsidiaries (including the Subsidiary Debtor Defendants) to grant a Mortgage on any of the

25

Springing Lien Collateral without also granting Equal and Ratable Mortgages for the benefit of the Legacy Noteholders.

101.    Under the PGN Indentures, iHeart agreed to grant a Springing Lien to the PGN Holders within 60 days of the Springing Lien Trigger Date.

102.    As a result of entering into the Principal Properties Security Agreements, Defendants granted a Mortgage in favor of the PGN Holders that became effective immediately upon the Springing Lien Trigger Date.

103.    As part of a fraudulent scheme to prevent the occurrence of the Springing Lien Trigger Date, iHeart directed CC Finco, a special purpose indirect subsidiary, to purchase $57.1 million of the 2016 Legacy Notes from the open market before the 2016 Legacy Notes matured on December 15, 2016.  CC Finco later transferred the notes to its parent CC Holdings, a direct subsidiary of iHeart.

104.    When the notes matured, and at all times thereafter, CC Holdings did not demand repayment under the 2016 Legacy Notes nor did iHeart pay CC Holdings under the 2016 Legacy Indenture.

105.    In December 2016, iHeart was insolvent or in the zone of insolvency.  This gave rise to a duty on the part of iHeart to act in the interests of its creditors, including the Legacy Noteholders, on behalf of whom Plaintiff acts.

106.    iHeart's clear intention in undertaking and directing these actions was to prevent the occurrence of the Springing Lien Trigger Date.

107.    Notwithstanding iHeart's assertions to the contrary, the Springing Lien Trigger Date occurred when the 2016 Legacy Notes matured on December 15, 2016 and the true amount remaining outstanding thereon fell below $500 million.

108.    As a result of the Principal Properties Security Agreements, the occurrence of the Springing Lien Trigger Date, or both, a Mortgage vested in favor of the PGN Holders. Accordingly, the PGN Holders are secured by the Springing Lien Collateral, but without the Equal and Ratable Mortgages, the Legacy Noteholders are not.

109.    iHeart and the Subsidiary Debtor Defendants have been unjustly enriched by retaining interests in the Springing Lien Collateral that should have been granted in favor of Plaintiff, for the benefit of the Legacy Noteholders.

110.    In equity and good conscience, the Court should grant a constructive trust, up to and limited to the amount of the Legacy Noteholders' claims, to prevent iHeart and the Subsidiary Debtor Defendants from retaining the benefits by which they have improperly enriched themselves at the Legacy Noteholders' expense.

## VI.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor as follows:

1.    For imposition of a constructive trust or an equitable lien over the Springing Lien Collateral, up to and limited to the amount of the Legacy Noteholders' claims, against iHeart and the Subsidiary Debtor Defendants;

2.    For general, compensatory, and consequential damages against the Subsidiary Debtor Defendants in a sum to be determined by this Court;

3.    For prejudgment and post-judgment interest at the legal rate;

4.    For the costs of this suit, including reasonable attorneys' fees; and

5.    For such other and further relief, at law or in equity, as the Court deems just and proper.

Dated:  Houston, Texas
       March 21, 2018

Respectfully submitted,

*/s/ Timothy A. Davidson II*
Robin Russell (TX Bar No. 17424001)
Timothy A. Davidson II (TX Bar No. 24012503)
Ashley L. Harper (TX Bar No. 24065272)
**ANDREWS KURTH KENYON LLP**
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-3810
Facsimile:   (713) 220-4285
Email:   rrussell@andrewskurth.com
         taddavidson@andrewskurth.com
         ashleyharper@andrewskurth.com

*Co-Counsel  for Plaintiff Wilmington Savings
Fund Society, FSB, as indenture trustee*

-and-

Seth H. Lieberman (admitted *pro hac vice*)
Patrick Sibley (admitted *pro hac vice*)
Matthew W. Silverman (admitted *pro hac vice*)
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036
Telephone:  (212) 421-4100
Facsimile:   (212) 326-0806
Email:   slieberman@pryorcashman.com
         psibley@pryorcashman.com
         msilverman@pryorcashman.com

*Co-Counsel  for Plaintiff Wilmington Savings
Fund Society, FSB, as indenture trustee*

Thomas E Lauria (TX Bar No. 11998025)
Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email:   tlauria@whitecase.com
         jzakia@whitecase.com
         erin.rosenberg@whitecase.com

-and-

Christopher Shore (admitted *pro hac vice*)
Harrison L. Denman (admitted *pro hac vice*)
Michele J. Meises (admitted *pro hac vice*)
Mark P. Franke (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:   cshore@whitecase.com
         harrison.denman@whitecase.com
         michele.meises@whitecase.com
         mark.franke@whitecase.com

*Co-Counsel  for Plaintiff Wilmington Savings
Fund Society, FSB, as indenture trustee*