## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| iHeartMedia, Inc., et al.,[1] | Case No. 18-31274 (MI) |
| Debtors. | (Jointly Administered) |
| Wilmington Savings Fund Society, FSB, solely in its capacity as successor indenture trustee to the 6.875% Senior Notes due 2018 and 7.25% Senior Notes due 2027, and not in its individual capacity, | |
| Plaintiff, | Adversary No. 18-03052 |
| vs. | |
| iHeartCommunications, Inc., f/k/a Clear Channel Communications, Inc., AMFM Broadcasting Licenses, LLC, AMFM Broadcasting, Inc., AMFM Operating, Inc., AMFM Radio Licenses, LLC, AMFM Texas Broadcasting, LP, AMFM Texas Licenses, LLC, AMFM Texas, LLC, Capstar Radio Operating Company, and Capstar TX, LLC, | |
| Defendants. | |

## DEFENDANTS' EMERGENCY MOTION FOR PROTECTIVE ORDER

Pursuant to Federal Rule of Civil Procedure 26(c), as incorporated through Rule 7026 of

the Federal Rules of Bankruptcy Procedure, Defendants iHeartCommunications, Inc., f/k/a Clear

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

Channel Communications, Inc., AMFM Broadcasting Licenses, LLC, AMFM Broadcasting, Inc., AMFM Operating, Inc., AMFM Radio Licenses, LLC, AMFM Texas Broadcasting, LP, AMFM Texas Licenses, LLC, AMFM Texas, LLC, Capstar Radio Operating Company, and Capstar TX, LLC (collectively, "Defendants"), submit this Emergency Motion for Protective Order.

## INTRODUCTION

1.      Defendants seek a protective order narrowing the scope of two of Plaintiff's documents requests (out of a total of 42 document requests made by Plaintiff).  Plaintiff seeks production of an overbroad set of documents relating to (i) iHeart's solvency, including detailed documents related to iHeart's payroll, staff operations, and office space, and (ii) the formation and maintenance of the subsidiary Defendants as separate entities (despite there being no allegations of veil piercing or substantive consolidation in this case).

2.      In response to each of these requests, Defendants have agreed to produce (and have already made a substantial production of) a voluminous set of responsive documents.  However, the parties are at impasse over Plaintiff's demands that iHeart exponentially expand the scope of these productions.  In order to allow Defendants to complete their production by the August 10th deadline and preserve the trial date, Defendants ask that this court narrow the scope of these two requests.

## BACKGROUND

3.      There are two central questions at issue in this case: (i) whether "springing liens" granted to the senior creditors triggered the equal and ratable clause of the Legacy Indenture, and (ii) whether the outstanding amount of Legacy Notes ever fell below $500 million, triggering the "Springing Lien Trigger Date."  While the parties disagree on the legal effect of certain actions, there are few, if any disputed facts.  The nature of the "springing liens is primarily a legal question,

and the Defendants have already produced all of the final loan documents related to the springing lien.

4.      With respect to the Springing Lien Trigger Date, it is undisputed that a subsidiary of iHeart holds tens of millions of dollars of Legacy Notes (the "Repurchased Notes").  In 2016, iHeart was aware that if the outstanding Legacy Notes owned by its subsidiary were redeemed, the total outstanding amount of Legacy Notes would fall below $500 million.  To address this issue, iHeart formed an independent Special Committee that was tasked with reaching a recommendation as to whether iHeart should redeem the Repurchased Notes (potentially triggering the springing lien) or leave the Repurchased Notes outstanding.  Consistent with the recommendation of the Special Committee, iHeart determined not to redeem the Repurchased Notes.  This set of facts is all undisputed.

5.      Despite this lack of factual dispute, Plaintiff has served discovery requests seeking 42 individual categories of documents covering a wide range of topics.  Defendants have worked diligently to comply with these broad requests.  This has included telephonic meet and confers with Plaintiff's counsel on July 3rd and July 9th and exchanging letters and emails regarding these topics.  (*E.g.*, Ex. 1, 7/16/18 Y. French Ltr. to C. West.)

6.      Defendants have consistently agreed with Plaintiff's requests to produce documents.  A table demonstrating the categories of documents that Defendants have agreed to locate and produce is attached as Exhibit 2.  But at a high level, Defendants have agreed to produce documents related to the springing liens, the PPSAs, the equal and ratable clause, the acquisition of the Repurchased Notes by iHeart's affiliates, the decision not to repay the Repurchased Notes in 2016, and the mechanics of "splitting the note" associated with the decision not to repay the

Repurchased Notes.  *See* Ex. 2.  In short, Defendants are locating and producing all documents that Plaintiff will reasonably need to litigate the issues in this case.

7.     Defendants are collecting and reviewing documents from many sources.  Given the breadth and scope of the requests, this has required collecting documents not only from the Defendants themselves, but also from the records of Kirkland & Ellis (for certain requests related to the decision not to repay the Repurchased Notes), from Akin Gump (for documents related to the negotiation of the Legacy Indenture), and from the independent directors on the Special Committee and their counsel Munger, Tolles & Olson.

8.     Defendants have also accepted the broad search terms requested by Plaintiff to locate potentially relevant documents within Defendants' employees' email.  In total, these terms have hit on over 90,000 documents, which Defendants' counsel are diligently reviewing right now. By expending extraordinary amounts of time and effort, Defendants are on pace to complete their production by the August 10th production deadline.

## DISPUTED REQUESTS

9.     Of the 42 set document requests, there are two for which Defendants seek a protective order.  For both of these requests, Defendants have agreed to produce a large set of responsive documents, but as set forth below the Plaintiff is insisting on much broader productions. Defendants are simply unable to accommodate these overbroad requests and maintain the current schedule.  And these requests are especially disproportionate given the minimal relevance that they have to Plaintiff's claims.  A demonstrative summarizing the disputed requests, and the parties' respective positions, is attached as Exhibit 3.

10.     ***First***, Plaintiff has requested "[d]ocuments sufficient to show whether iHeart was insolvent or in the zone of insolvency as of December 2016."  (Ex. 4, Pls.' Second Set of Doc. Requests at Request No. 4.)  Defendants have agreed to provide their 2016 balance sheet, as well

4

as their financial reports for this time period. These documents contain a detailed snapshot of Defendants' assets, liabilities, as well as forward looking projections regarding their business operations.   For example, the 2016 10-K contains detailed analysis of "risk factors for indebtedness." *See* Ex. 5, 2016 10-K pp. 24-27.  In addition, it contains 3 pages of going concern analysis, which contains a discussion of whether the company will be able to meet its obligations as they come due:

> Management believes the refinancing or extension of the maturity of the receivables based credit facility is probable of being executed as the Company has successfully extended the maturity date of this receivables based credit facility in the past, and the facility has a first-priority lien on the accounts receivable of iHeartCommunications and certain of its subsidiaries (see Footnote 5). Management's plan to refinance or extend the due date of the receivables based credit facility, combined with current funds and expected future cash flows, are considered to be sufficient to enable the Company to meet its obligations as they become due in the ordinary course of business for a period of 12 months following the date these financial statements are issued.

*Id* pp. 86-89.   Moreover, iHeart has publicly traded bonds so Plaintiff has market-tested information about the financial health of the company that can supplement the financial statements.

11.    In addition, Defendants have agreed to produce solvency opinions or marketing reports that affirmatively analyze iHeart's solvency in December 2016.  Ex. 1, p. 3.

12.    However, Plaintiff is demanding that iHeart also produce the following broad set of documents:

> "documents regarding: fair market value (as opposed to book value) of iHeartCommunications, Inc. (including, but not limited to, valuation reports; marketing reports; and any documents concerning the value of the company in a marketing process); whether iHeartCommunications, Inc. was paying debts as they become due (including, but not limited to, documents showing whether iHeartCommunications, Inc. was making late payment on debts, was defaulting on loans or other obligations, reducing support staff, downsizing office space, increasing its borrowings on lines of credit, not making dividends to shareholders, cancelling services, or selling assets to raise cash); and any documents stating, representing, or opining that iHeartCommunications, Inc. was either solvent or insolvent."

Ex. 6, 7/9/18 C. West Ltr. pp. 2-3

13.    ***Second***, Plaintiff has requested "[a]ll Documents regarding the formation and maintenance of each of the Defendants as separate and distinct entities, including Documents

regarding the control (or lack thereof) exercised by iHeart over the Subsidiary Debtor Defendants."
(Ex. 4, Pls.' Second Set of Doc. Requests at Request No. 9.)

14.    Defendants have agreed to produce all of the operating agreements, certificates of
formation, and other similar formational documents for all Defendants.  In addition, Defendants
have agreed to produce the board minutes of iHeart Communications, as well as the annual officer
authorizations and annual director or manager authorizations for each of the subsidiary
Defendants.  Beyond these authorizations, the subsidiary Defendants do not conduct separate
board meetings or create board minutes.

15.    Again, Plaintiff is demanding that Defendants make a much broader production of
documents.  Plaintiff insists that Defendants produce:

> "records approving any loans to any Subsidiary Debtor  Defendants or any manager
> of    any    Subsidiary    Debtor    Defendants;    loan    agreements    between
> iHeartCommunications, Inc. and any of the Subsidiary Debtor Defendants; bylaws
> and resolutions approving same; records of affirmative votes or decision by
> directors, including those done by unanimous written consent; documents showing
> the money or property or other capitalization contributed to the Subsidiary Debtor
> Defendants in exchange for common stock or any other ownership interest in the
> Subsidiary Debtor Defendants, and the documents showing the issuance of such
> common stock or other ownership interest; the identity of the directors of each
> Defendant; the identity of the officers and managers of each Defendant; how the
> entities interacted; how each entity made decisions generally and specifically with
> respect to whether to enter into the Principal Property Security Agreements; records
> of dividends paid by the Subsidiary Debtor Defendants; documents either showing
> discretion exercised by the Subsidiary Debtor Defendants or obeying instructions
> from their parent; commingling of funds of any of iHeartCommunications and the
> Subsidiary Debtor Defendants; payment by a Subsidiary Debtor Defendant of
> iHeartCommunication, Inc.'s expenses; or whether any of the Subsidiary Debtor
> Defendants."

Ex. 6, 7/9/18 C. West Ltr. p. 4

16.    Both of these requests are overbroad, unduly burdensome, and disproportionate
given the minimal relevance they have to this lawsuit.  And as a practical matter, it is not possible

for Defendants to locate and produce all of these records by the August 10th deadline.  Defendants thus ask this court to issue a protective order, narrowing the scope of these two requests.

## **ARGUMENT**

17.     Under Rule 26(c), "the court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" including through "forbidding the disclosure of discovery."  Fed. R. Civ. P. 26(c).  Under Rule 26, information is only discoverable to the extent that it "is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Here, the Court should grant Defendants' request for a protective order with respect to Request Nos. 4 and 9, as these Requests seek documents that are not relevant to the parties' claims or defenses and, in any event, the requests are not in any way proportional to the needs of this case.

   **A.     The Documents Sought By Request No. 4 Are Irrelevant and Not Proportional To The Needs of the Case.**

18.     Request No. 4 generally seeks documents related to the solvency of iHeart in December 2016.  These documents are not relevant to any claim or defense in this matter. Defendants' solvency is not an element of *any* of Plaintiff's claims; neither unjust enrichment, tortious interference, equitable lien nor constructive trust look to the solvency of the Defendant. *See In re RONFIN Series C Bonds Sec. Interest Litig.*, 182 F.3d 366 (5th Cir. 1999); *In re Primera Energy, LLC*, 579 B.R. 75, 183 (Bankr. W.D. Tex. 2017) ("the fact that a defendant may be

insolvent is not grounds for finding that there is not an adequate remedy at law.")  Accordingly, the protective order on this Request should be granted.[2]

19.     In addition to being irrelevant and disproportionate, the requested documents are unduly burdensome for Defendants to produce.  For example, Plaintiff requests "documents showing whether iHeartCommunications, Inc. was making late payment on debts"— producing such documents would call for iHeart to produce documents related to *every payment* it made on account of *any debt* (including ordinary course transactions like the payment of vendors) for a period around December 2016.  Such an undertaking is not proportional to the importance of this issue in light of its marginal relevance, and in light of the fact that Plaintiff already has access to iHeart's publicly-filed financial documents, which contain balance sheet information and forward-looking business projections.  *Callas v. Callas*, No. CV 14-7486 (JMV), 2017 WL 3448107, at *8 (D.N.J. Aug. 11, 2017) ("Accordingly, although the Court acknowledges that the LLC's post-February 23, 2013 financial information may bear some minimal relevance to Defendants' accounting claim, the Court finds that any relevance in negligible and not proportional to the needs of this case."); *Sahibi v. Gonzales*, No. 115CV01581LJOMJSPC, 2017 WL 1348959, at *5 (E.D. Cal. Apr. 5, 2017) ("And, even if the materials do contain some minimal relevance, the burdens of producing and appropriately redacting those materials are not proportional to the needs of the case.").

20.     Likewise, it makes no sense in this lawsuit to require the Defendants to identify and produce all documents regarding iHeart's support staff, the size of its offices, its provision of services or its routine asset sales.  iHeart is a nationwide company and these documents would be

---

[2] Defendants have asserted an affirmative defense that any rights granted to the Legacy Noteholders would be a fraudulent transfer subject to avoidance.  (Docket No. 132 at 31.)  But this affirmative defense is limited to a claim that if the Court grants the Legacy Noteholders an equitable lien *in the future* (*i.e.*, when the Court enters such an order), that lien will be subject to avoidance at that time (because iHeart is obviously insolvent in these proceedings).

impossible to produce in the time required for this adversary proceeding.  And they would add no value to the trier of fact's decisions regarding Plaintiff's claims.

> **B.      The Documents Sought By Request No. 9 Are Irrelevant and Not Proportional To The Needs of the Case.**

21.    The documents called for by Request No. 9—documents related to the formation and maintenance of each of the Defendants as separate entities—seeks similarly irrelevant documents.   Importantly, Plaintiff does not have ***any allegations*** relating to veil piercing, substantive consolidation, or any other legal theory that would implicate or question the separateness of the Defendants.  In the absence of such an allegation, there are no grounds for finding that these documents are relevant.

22.    Notwithstanding this lack of relevance, Defendants have made substantial efforts to compromise on this issue by agreeing to produce documents related to the formation of Defendants (including the articles of incorporation, registration statement, and similar documents). In addition, Defendants have agreed to produce the Board of Director meeting minutes from iHeartCommunications, Inc.  The Defendant subsidiaries have annual officer certifications that authorize the officers to act on their behalf, and annual authorizations for directors and managers, which are all being produced.  But, beyond this, the Defendant subsidiaries do not conduct board meetings and do not have board minutes.

23.    The overbroad categories of documents that Plaintiff requests are not proportional to the needs of this case.  This case will not turn on the issuance of Defendants' common stock, or whether the Defendants commingled funds.   Neither will trial bear on payment of iHeart's operating expenses or dividend payments.   This request should be limited to the voluminous categories of documents Defendants have agreed to produce, which are more than sufficient to

document the relationship among the affiliated Defendants.  *Callas*, 2017 WL 3448107, at *8;

*Sahibi*, 2017 WL 1348959, at *5.

## **CONCLUSION**

For the foregoing reasons, Defendants ask that the Court GRANT this motion for protective

order and narrow the scope of document requests 4 and 9 to the documents Defendants have agreed

to produce for these categories.

Dated:  July 19, 2018

/s/ *Patricia B. Tomasco*
Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth Freeman (TX Bar No. 2400922)
Matthew D. Cavenaugh (TX Bar No. 24062656)
JACKSON WALKER L.L.P.
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          ptomasco@jw.com
                efreeman@jw.com
                mcavenaugh@jw.com

Co-Counsel to the Debtors
and Debtors in Possession

James H.M. Sprayregen, P.C. (admitted pro hac vice)
Anup Sathy, P.C. (admitted pro hac vice)
Brian D. Wolfe (admitted pro hac vice)
William A. Guerrieri (admitted pro hac vice)
Stephen C. Hackney, P.C. (admitted pro hac vice)
Rickard U. S. Howell (admitted pro hac vice)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP 300
North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                anup.sathy@kirkland.com
                brian.wolfe@kirkland.com
                will.guerrieri@kirkland.com
                shackney@kirkland.com
                rhowell@kirkland.com

                -and-

Christopher J. Marcus, P.C. (admitted pro hac vice)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          christopher.marcus@kirkland.com

Co-Counsel to the Debtors
And Debtors in Possession

# EXHIBIT 1

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654
United States

Yates French
To Call Writer Directly:
+1 312 862 7055
yates.french@kirkland.com

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

July 16, 2018

Colin T. West
White & Case LLP
1221 Avenue of the Americas
New York, NY  10020-1095

Dear Colin:

I am writing in response to your letter of July 9, 2018 and to further follow up on our meet and confer calls of July 3rd and July 9th and to summarize our discussions to this point.

**Background**.  Over the past several weeks, the Defendants have undertaken substantial efforts to work closely with you to identify and produce records responsive to your discovery requests.  During this time, we have worked together professionally and effectively to negotiate the scope of our production.  After responding to both sets of your RFPs, we engaged in meet and confers on July 3rd and 9th.  Through those calls and related correspondence, we agreed to every change you requested to our search terms (save one, noted below, which you have agreed to withdraw).  In addition, we have agreed to expand the scope of responsive documents, including now agreeing that any non-privileged document identified using the search terms that mentions or references the PPSAs, Section 1006 or 1004 of the Indenture, or the Existing Notes Condition will be produced.

We have also undertaken the substantial task of collecting the set of responsive and potentially responsive documents from several sources.  Given the breadth of the requests, this has required coordinating collection efforts with our clients (of both ESI and of specifically-identified responsive documents), from the records of Kirkland & Ellis (for certain requests related to the decision not to repay the Repurchased Notes) and from Akin Gump (for documents related to the negotiation of the Legacy Indenture, which they have been unable to locate).  In addition, we have coordinated with counsel at Munger, Tolles & Olson, who represented the Special Committee, to ensure a production of responsive, non-privileged documents from the Special Committee.  Beyond these specific efforts, we have also engaged a team of 23 contract attorneys to review the approximately 90,000 documents that hit on the agreed-upon search terms for the agreed-upon custodians.  In total, this contract attorney team will end up working more than three weeks exclusively on this review.

## KIRKLAND & ELLIS LLP

Colin T. West
July 16, 2018
Page 2

Despite all this, the Defendants remain on track to meet the August 10, 2018 production deadline in this case.

**Specific Discussions**.  Moving now to the specific issues, I will first address your July 9th letter.  Regarding search terms, thank you for your agreement to remove the term "holdings" from the searches we are running.  On the point about the date range, we continue to believe that searching for documents that post-date December 12, 2016 (the date of filing for the Texas declaratory judgment actions) will unnecessarily expand the review volume while identifying very few, if any, responsive and non-privileged documents.  This request is particularly inappropriate given the extremely condensed time-frame that Debtors have to review this quantity of documents.  Nonetheless, in an effort to avoid burdening the Court with this dispute, we will agree to search for documents through June 2018 (the time of our collection).

Second, with respect to the specific requests from your second set of requests to the Debtors, we agree with the positions as laid out in your letter for Request Nos. 1-3, 5, 7, and 11-13.  We only note with respect to these requests that your letter states, for several such identifying, that your agreement is "subject to the right to revisit this request as future discovery may warrant."  I would like to emphasize that given the schedule in this case, any attempt to substantially modify or add to the search terms that we have agreed to will greatly prejudice the Debtors' ability to complete their document production on the current schedule.  The Debtors reserve their right to oppose any requested expansion of the searches on the grounds that the parties have agreed to these search terms.  Below I have laid out the issues/responses for the other requests discussed in your letter.

**Request No. 4.**    This request seeks documents sufficient to show whether iHeartCommunications, Inc. was solvent or in the zone of insolvency in December 2016.

As I also articulated on our meet and confer call, we do not see how iHeart's solvency or insolvency in December 2016 relates to any of the claims or defenses in this case.  You have sued for an equitable lien and constructive trust, neither of which implicates solvency.  And our counterclaim for fraudulent transfer is limited to any court ordered relief that may occur in the future, and has no connection to December 2016.  In light of the little/zero relevance of such documents, your demands for extensive document production are disproportionate under FRCP 26/BRCP 7026.

Your letter requests a host of other documents in response to this request including among other things:  (1) valuation and marketing reports; and (2) documents that show "whether iHeartCommunications, Inc., was paying debts as they become due" including documents showing whether iHeart was "making late payments on debt . . . reducing support staff, downsizing office

# KIRKLAND & ELLIS LLP

Colin T. West
July 16, 2018
Page 3

space, increased its borrowings on lines of credit, not making dividends to shareholders, cancelling services, or selling assets to raise cash."

We will not agree to produce all of the requested documents. This request is so overly broad that it would effectively require production of every document relating to iHeart's business. The request for such documents is disproportionate to the needs of the case, particularly when the company's financial state is already discernible from publicly available financial documents, which include both a consolidated balance sheet as well as forward looking business projections. These are documents sufficient to determine iHeart's solvency.

As a compromise, we will work to identify and produce any non-privileged solvency opinions or marketing reports that affirmatively analyze solvency in December 2016 to the extent they exist, but we are otherwise at impasse on this request.

**Request No. 6.** This request seeks documents related to the negotiation of the Equal and Ratable Clause in the Legacy Indenture. We have asked Akin Gump to look for these documents, and Akin has informed us that, to date, they have not located any responsive documents. But they are continuing their search, and we will update you with any findings.

**Request No. 8.** This request seeks documents related to the formation and decision making process of the special committee. As we have told you on both of our meet and confer calls, we are taking a dual track to this request. First, Munger, Tolles and Olson, counsel for the special committee, is reviewing the documents of the special committee. We have asked them whether it is feasible to run the requested search terms across the Committee Members' emails.

Second, we will produce any non-privileged documents related to the formation or decision making of the special committee that we identify using the agreed-upon search terms.

**Request No. 9.** This request seeks documents related to the formation and maintenance of each of the defendants as separate and distinct entities.

Again, this request is disproportionate under FRCP 26/BRCP 7026 because you have failed to allege any veil piercing or substantive consolidation claim in this case; such documents are not relevant to any claim or defense in this case.

Despite the irrelevance of such documents, we agreed to produce documents related to the formation of the defendants (including the articles of incorporation, registration statements, and similar documents). Your letter calls for us to produce not only these, but a very broad set of additional documents.

## KIRKLAND & ELLIS LLP

Colin T. West
July 16, 2018
Page 4

To wit, you are demanding that we also produce:

"minutes of the boards of directors; resolutions of the boards of directors; operating agreements; records approving any loans to any Subsidiary Debtor Defendants or any manager of any Subsidiary Debtor Defendants; loan agreements between iHeartCommunications, Inc. and any of the Subsidiary Debtor Defendants; bylaws and resolutions approving same; records of affirmative votes or decision by directors, including those done by unanimous written consent; documents showing the money or property or other capitalization contributed to the Subsidiary Debtor Defendants in exchange for common stock or any other ownership interest in the Subsidiary Debtor Defendants, and the documents showing the issuance of such common stock or other ownership interest; the identity of the directors of each Defendant; the identity of the officers and managers of each Defendant; how the entities interacted; how each entity made decisions generally and specifically with respect to whether to enter into the Principal Property Security Agreements; records of dividends paid by the Subsidiary Debtor Defendants; documents either showing discretion exercised by the Subsidiary Debtor Defendants or obeying instructions from their parent; commingling of funds of any of iHeartCommunications and the Subsidiary Debtor Defendants; payment by a Subsidiary Debtor Defendant of iHeartCommunication, Inc.'s expenses; or whether any of the Subsidiary Debtor Defendants employed employees separate from iHeartCommunications, Inc."

In addition to being unreasonable and disproportionate, this production would be impossible to actually make before the October trial date in this case (let along the August production deadline). We decline to delay trial simply so that you may explore issues that are absent from your complaint. As a compromise, we will agree to produce board minutes for iHeart Communications from 2015-2017, but we are otherwise at impasse on this request.

**Request No. 10.** This request seeks documents sufficient to detail the steps iHeart took to prevent redemption of the Repurchased Notes, and you've asked that we detail the steps we took in identifying such document. We have followed the following parameters: Kirkland & Ellis attorneys met with the lead partner and other staff who were involved in advising iHeart on the steps taken to prevent the redemption of the Repurchased 2016 Legacy Notes. We then undertook a targeted collection of files from those attorneys who advised iHeart on the non-redemption and reviewed applicable correspondence. This targeted collection has captured the applicable documents drafted, letters sent and received, and pertinent communications (from Kirkland, iHC, CCH, and other applicable entities) concerning actions to prevent redemption.

In addition, the below summarizes where we stand on your first set of requests to defendants after our meet and confer on July 9th.

# KIRKLAND & ELLIS LLP

Colin T. West
July 16, 2018
Page 5

We confirmed that we would produce non-privileged documents in the below categories (subject to these documents being identified by using the agreed-upon search terms for the agreed-upon custodians):

- We will produce any documents that reference either the PGN PPSAs or the Term Loan PPSA. We can again confirm that we are not aware of any other document or instrument which purported to create a security interest in the Principal Property.

- We will produce any document related to the Existing Notes Condition, the Springing Lien Trigger Date, or Section 1006 of the Legacy Indenture.

- We will produce any document related to Section 1004 of the Legacy Indenture.

- We will produce any communications that discuss the impact of the filing of financing statements on the Legacy Noteholders. We will not produce documents with *de minimis* references to UCC filings.

- We will produce documents related to the repurchase of the Repurchased Notes by the Debtors and the decision not to repay the Repurchased Notes.

- To the extent we come across documents that reflect items or documents that were considered in the process of drafting the Rule 1004 certifications, we will produce such documents.

With respect to go-forward items, we agreed to consider:

- The existence/extent of any common interest privilege with the Senior Creditors with respect to the declaratory judgment action or the Adversary Proceedings. We are asserting common interest privilege with respect to your claims that the PPSAs constitute a "Mortgage" and/or triggered the equal and ratable clause in the Legacy Indenture. We are not asserting common interest privilege with respect to communications regarding whether the collateral flip up/trigger occurred.

- We have confirmed that the Debtors do not maintain any non-privileged document that purports to identify all Principal Property.

And to confirm what I said on the call, the Debtors do not have in their custody or control a complete set of closing documents related to the Credit Agreement.

## KIRKLAND & ELLIS LLP

Colin T. West
July 16, 2018
Page 6


Finally, with respect to the requests on which we are at impasse (Request Nos. 4 & 9, discussed above) the Defendants intend to seek a protective order.  Please let us know by July 19 whether you will agree to accept our proposed limitations to these requests.

Sincerely,

Yates French

# EXHIBIT 2

**Exhibit 2**

**Summary of Documents Defendants have Agreed to Produce[1]**

| Category of Documents | Document Request # |
|---|---|
| Communications and documents regarding the equal and ratable clause/Section 1006 of the Legacy Indenture | Set 1: RFPs 7, 8, 15, 28<br><br>Set 2: RFP 2 |
| Documents and communications concerning any assessment or consideration of whether to disclose the PPSAs to the Legacy Noteholders or the public | Set 1:  RFP 6 |
| Communications and documents regarding the annual certifications delivered pursuant to Section 1004 of the Legacy Indenture | Set 1:  RFPs 23, 24, 25, 26 |
| Documents related to the Existing Notes Condition | Set 1: RFP 4<br><br>Set 2: RFP 7 |
| Documents related to the Springing Lien Trigger Date | Set 1: RFP 5 |
| PGN Note financing statements | Set 1: RFP 10 |
| All Principal Property Security Agreements, including non-privileged drafts | Set 1: RFP 1 |
| Documents related to the Principal Property Security Agreements | Set 1: RFPs 6, 9 |
| Final loan documents for the PGN Notes | Set 1: RFP 3<br><br>Set 2: RFP 5 |
| Documents related to the negotiation of the senior loan documents. | Set 2:  RFP 7 |

---

[1] This table is a summary of Defendants' responses set forth in more detail in Defendants' discovery responses and objections, as well as subsequent meet and confer correspondence.  The exact scope of Defendants objections and production is governed the Defendants' pleadings and correspondence.  Defendants and Plaintiff have likewise negotiated specific custodians and search terms to use in locating responsive records.

| Category of Documents | Document Request # |
|---|---|
| Documents related to the formation and decision making of the Special Committee (the committee which made the decision not to repay the 2016 Legacy Notes) | Set 1: RFP 17<br><br>Set 2: RFPs 8, 10, 11, 13 |
| Documents showing the "splitting the note" and documenting the mechanics of iHeart's 2016 decision not to repay the 2016 Legacy Notes | Set 1: RFPs 13, 14, 16, 17, 18, 19<br><br>Set 2: RFPs 10, 11, 13 |
| Documents regarding iHeart's acquisition of the 2016 Notes, and the company's bond buy-back program | Set 1: RFP 12 |
| Communications with third parties regarding the decision not to repay the 2016 Legacy Notes | Set 1: RFP 19<br><br>Set 2: RFPs 12, 13 |
| Final loan documents for the Term Loan | Set 1: RFP 2<br><br>Set 2: RFP 5 |
| Current and historic balance sheets | Set 1: RFP 27<br>Set 2: RFPs 1, 3, 4 |
| SEC filings | Set 2: RFPs 1, 3,4 |
| Communications regarding SEC filings | Set 1: RFPs 11, 14, 21 |
| The incorporational and formation documents for each Defendant | Set 2: RFP 9 |
| Board minutes for iHeart Communications | Set 2: RFP 9 |
| Annual officer and director authorizations for the subsidiary Defendants | Set 2: RFP 9 |
| Solvency reports, going concern opinions, market or reports or other final analyses relating to solvency in December 2016 | Set 2: RFP 4 |

# EXHIBIT 3

**Exhibit 3**

**Disputed Requests**

| Document Request | Defendants' Position | Plaintiff's Position |
|---|---|---|
| **Set 2:  RFP 4**<br><br>Documents sufficient to show whether iHeart was insolvent or in the zone of insolvency as of December 2016. | Defendants will produce their 2016 balance sheet, 2016 SEC filings (which contain analysis of credit risk, business operations, and iHeart as a going concern), as well as any solvency opinions or marketing reports that affirmatively analyze solvency in December 2016. | Plaintiff also requests:<br><br>"[D]ocuments regarding: fair market value (as opposed to book value) of iHeartCommunications, Inc. (including, but not limited to, valuation reports; marketing reports; and any documents concerning the value of the company in a marketing process); whether iHeartCommunications, Inc. was paying debts as they become due (including, but not limited to, documents showing whether iHeartCommunications, Inc. was making late payment on debts, was defaulting on loans or other obligations, reducing support staff, downsizing office space, increasing its borrowings on lines of credit, not making dividends to shareholders, cancelling services, or selling assets to raise cash); and any documents stating, representing, or opining that iHeartCommunications, Inc. was either solvent or insolvent."<br><br>7/9/18 C. West Ltr. pp. 2-3 |
| **Set 2:  RFP 9**<br><br>All Documents regarding the formation and maintenance of each of the Defendants as separate and | Defendants will produce all incorporational and formation documents for all Defendants, including operating agreements, | Plaintiff also requests:<br><br>"[R]ecords approving any loans to any Subsidiary Debtor Defendants or any manager of any Subsidiary Debtor Defendants; loan agreements between |

| Document Request | Defendants' Position | Plaintiff's Position |
|---|---|---|
| distinct entities, including Documents regarding the control (or lack thereof) exercised by iHeart over the Subsidiary Debtor Defendants. | certificates of formation, etc…<br><br>Defendants will also product the board minutes for iHeart Communications, as well as the annual officer authorizations for the subsidiary defendants.<br><br>Beyond these materials, the subsidiary defendants do not independently conduct board meetings or create board minutes. | iHeartCommunications, Inc. and any of the Subsidiary Debtor Defendants; bylaws and resolutions approving same; records of affirmative votes or decision by directors, including those done by unanimous written consent; documents showing the money or property or other capitalization contributed to the Subsidiary Debtor Defendants in exchange for common stock or any other ownership interest in the Subsidiary Debtor Defendants, and the documents showing the issuance of such common stock or other ownership interest; the identity of the directors of each Defendant; the identity of the officers and managers of each Defendant; how the entities interacted; how each entity made decisions generally and specifically with respect to whether to enter into the Principal Property Security Agreements; records of dividends paid by the Subsidiary Debtor Defendants; documents either showing discretion exercised by the Subsidiary Debtor Defendants or obeying instructions from their parent; commingling of funds of any of iHeartCommunications and the Subsidiary Debtor Defendants; payment by a Subsidiary Debtor Defendant of iHeartCommunication, Inc.'s expenses; or whether any of the Subsidiary Debtor Defendants."<br><br>7/9/18 C. West Ltr. p. 4 |

# EXHIBIT 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br>iHEARTMEDIA, INC., *et al*.,[1]<br>           Debtors. | Chapter 11<br><br>Case No. 18-31274 (MI)<br><br>(Jointly Administered) |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, solely in its capacity as successor indenture trustee to the 6.875% Senior Notes due 2018 and 7.25% Senior Notes due 2027, and not in its individual capacity,<br>           Plaintiff,<br><br>and<br><br>DELAWARE TRUST COMPANY, solely in its capacity as successor indenture trustee under that certain indenture dated June 21, 2013 for those certain 2021 Notes,<br>           Intervenor Plaintiff,<br><br>           vs.<br><br>iHEARTCOMMUNICATIONS, INC., f/k/a Clear Channel Communications, Inc., AMFM Broadcasting Licenses, LLC, AMFM Broadcasting, Inc., AMFM Operating, Inc., AMFM Radio Licenses, LLC, AMFM Texas Broadcasting, LP, AMFM Texas Licenses, LLC, AMFM Texas, LLC, Capstar Radio Operating Company, and Capstar TX, LLC,<br>           Defendants, | Adversary No. 18-03052 (MI) |

---

[1] Because of the large number of Debtors in these jointly administered Chapter 11 Cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

and

Davidson Kempner Distressed Opportunities Fund LP, Davidson Kempner Distressed Opportunities International Ltd., Davidson Kempner Institutional Partners, L.P., Davidson Kempner International, Ltd., Davidson Kempner Partners, Franklin Custodian Funds - Franklin Income Fund, Franklin Mutual Series Funds – Franklin Mutual Beacon Fund, Franklin Mutual Series Funds – Franklin Mutual Global Discovery Fund, Franklin Mutual Series Funds – Franklin Mutual Shares Fund, Franklin Mutual Series Funds – Franklin Mutual Quest Fund, Franklin Templeton Variable Insurance Products Trust - Franklin Income VIP Fund, Gordel Capital Limited, Midtown Acquisitions L.P., M.H. Davidson & Co., OZ Credit Opportunities Master Fund, Ltd., OZ Enhanced Master Fund, Ltd., OZ GC Opportunities Master Fund, Ltd., OZ Master Fund, Ltd., OZSC II, L.P., PIMCO Balanced Income Fund (Canada), PIMCO Bermuda Trust II: PIMCO Bermuda Income Fund (M), PIMCO Bermuda Trust IV: PIMCO Global High Yield Strategy Fund, PIMCO Global Income Opportunities Fund, PIMCO Horseshoe Fund, LP, PIMCO Monthly Income Fund (Canada),

Intervenor Defendants.[2]

**PLAINTIFF WILMINGTON SAVINGS FUND SOCIETY, FSB'S
SECOND REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
IHEARTCOMMUNICATIONS, INC., ET AL**

Pursuant to Rules 7026, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure

and Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Wilmington Savings Fund

Society, FSB, solely in its capacity as successor indenture trustee to the 6.875% Senior Notes

---

[2] The above-captioned Intervenor Defendants are referred to as the "Senior Creditors." The following Intervenor Defendants have filed a Motion to Withdraw as Intervenor-Defendants in this action [Docket No. 135]: Franklin Mutual Series Funds – Franklin Mutual Beacon Fund, Franklin Mutual Series Funds – Franklin Mutual Global Discovery Fund, Franklin Mutual Series Funds – Franklin Mutual Shares Fund, and Franklin Mutual Series Funds – Franklin Mutual Quest Fund.

due 2018 and 7.25% Senior Notes due 2027, and not in its individual capacity ("Plaintiff"), by its undersigned counsel, hereby requests that iHeartCommunications, Inc., et al. (the "Defendants") produce for inspection and copying the documents and things requested below no later than **July 6, 2018** at the offices of White & Case, LLP, 1221 Avenue of the Americas, New York, NY 10020-1095, attention J. Christopher Shore, or such other time and place as the parties shall agree.

## DEFINITIONS

1.      Each reference to a corporation, partnership, joint venture, unincorporated association, government agency or other fictitious person shall be deemed to include each and all of its subsidiaries, affiliates, predecessors and successors, and with respect to each of such entities, its officers, directors, shareholders, employees, partners, limited partners, representatives, agents, accountants, attorneys and any other person who acted on its behalf.

2.      Each reference to a natural person shall be deemed to include that person's agents, attorneys and any other person who acted on that person's behalf.

3.      References to the singular shall include the plural and references to the plural shall include the singular; the conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive; and the present tense shall include the past tense and the past tense shall include the present tense.

4.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

5.      "Any," "all," and "each" shall be construed broadly, and shall mean each, any, and all as necessary to bring within the scope of the discovery request all responses that

otherwise could be construed to be outside of its scope.

6.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

7.      "Communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries or otherwise) including, without limitation, all discussions, dialogues, conversations, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, correspondence, facsimiles, electronic mail, or other forms of written or verbal interchange, however transmitted, including reports, notes, memoranda, lists, agenda, proposals, opinions and other Documents and records of communication.

8.      "Concerning," "referencing," "in connection with," "relating to," and/or "referring to" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

9.      "Credit Agreement" means the Amended and Restated Credit Agreement dated as of May 13, 2008, among Clear Channel Communications, Inc., Clear Channel Capital I, LLC, and certain other borrowers, Citibank, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, and certain other lenders, as the same has been amended and/or restated from time to time.

10.      "Debtors" means, collectively, all or each of iHeartMedia, Inc., AMFM Broadcasting Licenses, LLC, AMFM Broadcasting, Inc., AMFM Operating, Inc., AMFM Radio Licenses, LLC, AMFM Texas Broadcasting, LP, AMFM Texas Licenses, LLC, AMFM Texas, LLC, Capstar Radio Operating Company, Capstar TX, LLC, CC Broadcast Holdings, Inc., CC

Finco Holdings, LLC, CC Licenses, LLC, Christal Radio Sales, Inc., Cine Guarantors II, Inc.,

Citicasters Co., Citicasters Licenses, Inc., Clear Channel Broadcasting Licenses, Inc., Clear

Channel Holdings, Inc., Clear Channel Investments, Inc., Clear Channel Metro, LLC, Clear

Channel Mexico Holdings, Inc., Clear Channel Real Estate, LLC, Critical Mass Media, Inc.,

iHeartCommunications, Inc., iHeartMedia + Entertainment, Inc., iHeartMedia Capital I, LLC,

iHeartMedia Capital II, LLC, iHeartMedia Management Services, Inc., iHM Identity, Inc., Katz

Communications, Inc., Katz Media Group, Inc., Katz Millennium Sales & Marketing, Inc., Katz

Net Radio Sales, Inc., M Street Corporation, Premiere Networks, Inc., Terrestrial RF Licensing,

Inc., TTWN Media Networks, LLC, and TTWN Networks, LLC, and any advisors, agents,

attorneys, accountants, consultants, officers, directors, employees, experts, investment bankers,

representatives, and other persons acting, or who have acted, on behalf of the foregoing entities

or individual referenced in this definition, including Kirkland & Ellis, LLP, and Jackson Walker,

LLP.

11.    "Declaratory Judgment Actions" means the lawsuits commenced in the 57th

District Court of Bexar County, Texas, styled as *iHeartCommunications, Inc. v. U.S. Bank*

*National Association, et al.*, Cause No. 2016-CI21286; *iHeartCommunications, Inc. v. The Bank*

*of New York Mellon Trust Co., N.A.*, Cause No. 2016-CI21289. These are the lawsuits

commenced by iHeartCommunications, Inc., and certain of its affiliates, including Clear

Channel Holdings, Inc., seeking declarations that, under the relevant debt documents, the

Repurchased 2016 Legacy Notes would remain outstanding until cancelled or repaid, that the

Springing Lien Trigger Date had not occurred, and that there was no obligation owed to Plaintiff

under Section 1006 of the Legacy Indenture.

12.    "Defendants" means iHeartCommunications, Inc., f/k/a Clear Channel

Communications, Inc., AMFM Broadcasting Licenses, LLC, AMFM Broadcasting, Inc., AMFM Operating, Inc., AMFM Radio Licenses, LLC, AMFM Texas Broadcasting, LP, AMFM Texas Licenses, LLC, AMFM Texas, LLC, Capstar Radio Operating Company, and Capstar TX, LLC.

13.    "Document" is used in the broadest sense and means any written, typed, printed, graphic or recorded matter of any kind or character, however produced or reproduced; any electronically or magnetically recorded matter of any kind or character, however produced or reproduced; and any other matter of any kind or character constituting a recording upon any medium by any means of communication or representation. The foregoing includes, but is not limited to, all originals, including drafts, masters, duplicates or copies of: papers, conversations, letters, correspondence, memoranda, summaries, messages, voice mail messages, e-mail messages, Communications, data, databases, minutes, notes, transcripts, statements, circulars, manuals, treatises, books, notebooks, catalogs, pamphlets, flyers, advertisements of any kind, books of account, ledgers, balance sheets, bank deposit slips, bank checks, canceled checks, wire transfers, financial Documents of any kind, files, diaries, diary entries, telephone logs, appointment books, desk or other calendars and similar records of any kind, sound or visual recordings on film, tape, disc, drum, wire or other medium, transcriptions of the foregoing, photographs, sketches, diagrams, drawings, microfilm or microfiche, agreements, contracts, teletype, telegrams, cables, memorials or oral Communications, whether by telephone or face-to- face, notices, bulletins, polls, surveys, findings of fact, observations of facts or circumstances, reports, studies, tables, statistics, pleadings, objects, any data, information or statistics contained within any data storage modules, tapes, discs or other memory device or other information retrievable from storage systems, including without limitation computer

generated reports and print-outs. The term "Document" also includes data compilations or databases, including metadata, from which information can be obtained, and translated, if necessary, through detection devices in a reasonably usable form. If any Document has been modified by the addition of notations or otherwise, or has been prepared in multiple copies which are not identical, each modified copy or non-identical copy is a separate "Document."

14.     "Existing Notes Condition" has the meaning ascribed to in the Credit Agreement Section 1.01.

15.     "Federal Rules" means the Federal Rules of Civil Procedure.

16.     "iHeart" means iHeartCommunications, Inc.

17.     "Including" means including, without limitation, or in any way qualifying, limiting or restricting the foregoing.

18.     "Legacy Indenture" means that Senior Indenture dated October 1, 1997, between Clear Channel Communications, Inc. and the Bank of New York.

19.     "Legacy Noteholders" means the holders of notes issued under the Legacy Indenture.

20.     "Legacy Notes" means all notes issued by iHeart under the Legacy Indenture.

21.     "Person" or "Persons" means all natural persons, corporations, partnerships or other business associations and all other legal or governmental entities or associations.

22.     "PGN" means Priority Guarantee Notes as governed by the PGN Indentures.

23.     "PGN Collateral Agent" means the collateral agent authorized under the Principal Properties Securities Agreement to file financing statements to perfect the security interests granted under the PGN Indentures.

24.     "PGN Holders" means the holders of Priority Guarantee Notes under the PGN

Indentures.

25.      "PGN Indenture Trustee" means the trustee(s) named in the PGN Indentures.

26.      "PGN Indentures" means the indentures that govern the five series of Priority Guarantee Notes issued to refinance the Term Loans: (a) 9% Priority Guarantee Notes due 2019; (b) 9% Priority Guarantee Notes due 2021; (c) 11.25% Priority Guarantee Notes due 2021; (d) 9% Priority Guarantee Notes due 2022; and (e) 10.625% Priority Guarantee Notes due 2023.

27.      "Principal Properties Security Agreements" means all agreements entered into by any Debtor granting any security interest, contingent or otherwise, in the Principal Property.

28.       "Principal Property" has the meaning ascribed to it in the Legacy Indenture Section 101.

29.      "Repurchased 2016 Legacy Notes" means the Legacy Notes repurchased in 2016 by CC Finco, LLC, and subsequently transferred to Clear Channel Holdings, Inc.

30.      "SEC" means the United States Securities and Exchange Commission and its agents, employees, representatives, and other persons acting, or who have acted, on behalf of the foregoing entity or individuals referenced in this definition.

31.      "Senior Creditors" means the intervening defendants in this adversary proceeding, including: PIMCO Balanced Income Fund (Canada), PIMCO Bermuda Trust II: PIMCO Bermuda Income Fund (M), PIMCO Bermuda Trust IV: PIMCO Global High Yield Strategy Fund, PIMCO Global Income Opportunities Fund, PIMCO Horseshoe Fund, LP, PIMCO Monthly Income Fund (Canada), Franklin Mutual Series Funds – Franklin Mutual Shares Fund, Franklin Mutual Series Funds – Franklin Mutual Quest Fund, Franklin Mutual Series Funds – Franklin Mutual Beacon Fund, Franklin Mutual Series Funds – Franklin Mutual Global Discovery Fund, Franklin Custodian Funds - Franklin Income Fund, Franklin Templeton Variable Insurance Products Trust - Franklin Income VIP Fund, OZ Credit Opportunities Master Fund, Ltd., OZSC II, L.P., OZ Master Fund,

Ltd., OZ GC Opportunities Master Fund, Ltd., OZ Enhanced Master Fund, Ltd., Gordel Capital Limited, Midtown Acquisitions L.P., M.H. Davidson & Co., Davidson Kempner Partners, Davidson Kempner Institutional Partners, L.P., Davidson Kempner International, Ltd., Davidson Kempner Distressed Opportunities Fund LP, and Davidson Kempner Distressed Opportunities International Ltd.

32.      "Springing Lien Trigger Date" shall have the meaning ascribed to it in Section 1.01 of the PGN Indentures.

33.      "Term Loans" means the loans issued under the Credit Agreement.

34.      "Term Loan Lenders" means the lenders under the Term Loans.

35.      "You" or "Your" means iHeartCommunications, Inc. and the other Defendants, including without limitation its respective officers, directors, parents, subsidiaries, divisions, affiliates, predecessors, successors, employees, accountants, agents and representatives.

36.      "2016 Legacy Notes" means the 5.5% senior Legacy Notes governed by the Legacy Indenture due 2016.

## **INSTRUCTIONS**

37.      Pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7026 and Federal Rule of Civil Procedure 26(e), these requests for production shall be deemed continuing in nature so as to require You to file supplementary responses if You obtain new or different information up to and including the time of trial of this action.

38.      You are to produce the original and all non-identical copies, including all drafts, of each Document requested. If You are not able to produce the original of any document, please produce the best available copy and all non-identical copies, including drafts.

39.      When Documents, data, knowledge, or information in Your possession are

requested, such request includes the knowledge of Your attorneys, accountants, agents, representatives, and experts, and any professional employed or retained by You, concerning any of the facts or issues involved in this matter.

40.     Each request herein extends to all Documents and Communications in the possession, custody or control of You or anyone acting on Your behalf.  A Document is deemed to be in Your possession, custody, or control if it is in Your physical custody, or if it is in the physical custody of any other person and You: (1) own such Document in whole or in part; (2) have a right, by contract, statute or otherwise, to use, inspect, examine or copy such Document on any terms; (3) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms; or (4) as a practical matter, have been able to use, inspect, examine, or copy such Document when You sought to do so.  If any requested Document was, but no longer is, in Your control, state the disposition of each such Document.

41.     In responding to each request, You are to review and search all relevant files of appropriate entities and persons.

42.     All Document requests shall be deemed to include requests for any and all transmittal sheets, cover letters, enclosures, or any other annexes or attachments to the Documents.

43.     Notwithstanding anything else to the contrary herein, each word, term or phrase is intended to have the broadest meaning permitted under the Federal Rules and the Bankruptcy Rules.

44.     To the extent that You deem or consider any request to be ambiguous, You should construe the request to require the fullest and most complete disclosure of all information and

requested Documents.

45.    The Documents responsive to this request shall be produced in such a fashion as to indicate clearly the (i) identity of the party making such production and (ii) the identity of the file from which the Documents were produced.

46.    *Emails*: E-mails shall be produced as single-page TIFF images accompanied by Document-level full text and Relativity and opticon load files. The following metadata shall be produced for each e-mail: starting bates, ending bates, to, from, other recipients (cc and bcc), date sent, subject, body, attachments, begattach, endattach, source, and any applicable confidentiality designation (e.g., Confidential, Highly Confidential). E-mail attachments shall be handled according to the provisions stated below applicable to other electronic Documents.

47.    *Other electronic Documents*: Parties shall produce Excel Documents in native form accompanied by Document-level full text and load files. Word and other electronic Documents shall be produced as single-page TIFF images accompanied by Document-level full text and Relativity and opticon load files. The following metadata shall be produced for each electronic Document: starting bates, ending bates, author, source, date created, last modified date, extracted text, original filename, source, and any applicable confidentiality designation (e.g., Confidential, Highly Confidential).

48.    *Hard copy Documents*: All hard copy Documents shall be produced as single-page TIFF images accompanied by Document-level full text and Relativity and opticon load files. The following metadata shall be produced for each Document: starting Bates, ending Bates, custodian, and any applicable confidentiality designation (e.g., Confidential, Highly Confidential).

49.    *TIFF images generally*: Any TIFF images produced shall consist of (a) single

page, black and white, group IV TIFF images, one per image named after the bates number with extension ".tif"; and (b) text files, one file per Document (doc level text files with page breaks), named after the starting bates number of the Document, with extension ".txt". The .tiff and .txt files shall reside in the same directory. Metadata shall be provided in a Relativity-format delimited file with a .DAT file extension and ASCII 020 and 254 delimiters for column break and text qualifier. The first line shall be the header with field names, and each subsequent line shall contain the fielded data for each Document. All images should be 300 dpi resolution, all black and white images should be single page Group IV TIFF (.tif), and all color images should be JPEG (.jpg). For each Document, a Document-level text file should be provided in addition to the TIFFs. The text of native files should be extracted directly from the native file and each text file should be named using its corresponding image files (e.g., MSC000001.TXT).

50.    The Documents responsive to this request shall be produced as they have been kept in the usual course of business or shall be organized and labeled to correspond with the enumerated categories in this request.

51.    If there are no Documents responsive to a particular Request, state so in writing.

52.    If any Document is withheld under any claim of privilege, including, without limitation, attorney-client privilege and attorney work product, You should provide the following information with respect to such Document:

      (1)    The date of the Document;

      (2)    The title of the Document;

      (3)    The name of its author(s) or preparer(s) and an identification by employment and title of each such person;

      (4)    The name of each person who was sent or furnished with,

received, viewed or has custody of the Document or a copy thereof together with an identification by employment and title of each such person;

(5) The request to which the Document relates;

(6) The title and description of the Document sufficient to identify it without revealing the information for which privilege is claimed;

(7) The claim of privilege under which it is withheld; and

(8) A description of the subject matter of the Document in sufficient detail to support Your contention that the Document is privileged.

53. If any Document responsive to these requests is known to have existed and cannot now be located, or has been destroyed or discarded, set forth a complete statement of the circumstances surrounding such loss or destruction, including:

(1) a description of the Document, including the date, a summary of its contents and the identity of its author and the person(s) to whom it was sent or shown;

(2) the last known custodian;

(3) whether the Document is missing or lost or was destroyed or discarded;

(4) the date of loss, destruction or discard;

(5) the manner of destruction or discard;

(6) the reason(s) for destruction or discard;

(7) the person(s) authorizing or carrying out such destruction or

discard; and

(8)     the efforts made to locate lost or misplaced Documents.

54.     If after exercising due diligence to secure them, You cannot provide some or any of the requested Documents, so state and provide all Documents to the extent possible, specifying the reason for Your inability to produce the remainder of the Documents, and stating whatever information or knowledge You have concerning each Document not produced.

55.     If any requested Document or other Document potentially relevant to this action is subject to destruction under any Document retention or destruction program, the Document should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this action or unless otherwise permitted by the Court.

56.     If an objection is made to any request, state Your objection and the ground or grounds with particularity in Your written response. If an objection is made only to part of the request, identify that part in Your written response and state Your objection and the ground(s).

57.     An objection or claim of privilege directed to part of a request does not constitute an excuse for failure to respond to the parts of a request for which no objection or claim of privilege is made. No part of any Request should be left unanswered merely because an objection is interposed to another part of the Request. If a partial or incomplete answer is provided, You shall state that the answer is partial or incomplete.

58.     Unless otherwise indicated in a particular request, the time period covered by these requests is from January 1, 2008 to the present date and shall encompass all Documents and information concerning in whole or in part such period, or events or circumstances during such period, even though dated, prepared, generated or received prior to that date.

## DOCUMENT REQUESTS

1.      Information sufficient to show the value of the preferential transfer that you allege in your Counterclaim III occurred or would occur.

2.      All Documents and Communications regarding Defendants' decision not to grant the Equal and Ratable Mortgages at any and all pertinent times, including but not limited to upon the demand made by the Ad Hoc Group of Legacy Noteholders as referenced in paragraph 73 of the Complaint.

3.      Statements of assets and liabilities as of (i) the date each Principal Properties Security Agreement was executed, (ii) December 15, 2016, and (iii) the date of each annual compliance certificate delivered in the fiscal year following the incurrence of each issue of PGNs.

4.      Documents sufficient to show whether iHeart was insolvent or in the zone of insolvency as of December 2016.

5.      All Documents showing any mortgage, pledge, lien, encumbrance, charge or security interest of any kind, including a conditional or contingent lien, on the Springing Lien Collateral, in favor of the PGN Holders, from January 1, 2011 to present.

6.      All Documents relating to the negotiation of the Equal and Ratable Clause in the Legacy Indenture, without date restriction.

7.      All Documents relating to the negotiation of the Existing Notes Condition in the Credit Agreement and the Springing Lien Condition in the PGN Indentures, without date restriction.

8.      All Documents regarding the formation and decision-making process of the special committee of independent directors who decided that iHeart would not repay the

Repurchased 2016 Legacy Notes, including all documents showing whether the special committee was aware at the time of its decision that Clear Channel Holdings, Inc. would not demand repayment.

9.     All Documents regarding the formation and maintenance of each of the Defendants as separate and distinct entities, including Documents regarding the control (or lack thereof) exercised by iHeart over the Subsidiary Debtor Defendants.

10.     All Documents and information sufficient to detail each step that the iHeart and the Subsidiary Debtor Defendants took to prevent the redemption of the 2016 Legacy Notes held by the Subsidiary Debtor Defendants.

11.     All Documents concerning the steps taken by Clear Channel Holdings, Inc., iHeart, and the Subsidiary Debtor Defendants in connection with decision by iHeart not to repay the Repurchased 2016 Legacy Notes and/or the act of not repaying the Repurchased 2016 Legacy Notes, including without limitation any Documents or Communications by or between Clear Channel Holdings, Inc., iHeart, and/or any other Subsidiary Debtor Defendants concerning the same.

12.     All Documents and Communications with any third parties (including without limitation, the Depositary Trust Company, indenture trustees, administrative or other agents under any of iHeart or the Subsidiary Debtor Defendants' debt instruments) concerning the decision by iHeart not to repay the Repurchased 2016 Legacy Notes and/or the act of not repaying the Repurchased 2016 Legacy Notes.

13.     All Documents, resolutions, meeting minutes, or other proceedings recorded by any of iHeart and the Subsidiary Debtor Defendants' boards of directors or any committee thereof concerning the decision by iHeart not to repay the Repurchased 2016 Legacy Notes

and/or the act of not repaying the Repurchased 2016 Legacy Notes.

Dated:  Houston, Texas
June 22, 2018

*/s/Timothy A. Davidson*

Robin Russell (TX Bar No. 17424001)
Timothy A. Davidson II (TX Bar No. 24012503)
Ashley L. Harper (TX Bar No. 24065272)
**HUNTON ANDREWS KURTH LLP**
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-3810
Facsimile:  (713) 220-4285
Email:
rrussell@HuntonAK.com
taddavidson@HuntonAK.com
ashleyharper@HuntonAK.com


Seth H. Lieberman (admitted *pro hac vice*)
Patrick Sibley (admitted *pro hac vice*)
Matthew W. Silverman (admitted *pro hac vice*)
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036
Telephone:  (212) 421-4100
Facsimile:  (212) 326-0806
Email:
slieberman@pryorcashman.com
psibley@pryorcashman.com
msilverman@pryorcashman.com

Thomas E Lauria (TX Bar No. 11998025)

Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email:
tlauria@whitecase.com
jzakia@whitecase.com
erin.rosenberg@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Harrison L. Denman (admitted *pro hac vice*)
Mark P. Franke (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:
cshore@whitecase.com
harrison.denman@whitecase.com
mark.franke@whitecase.com

***Counsel for Plaintiff Wilmington Savings Fund Society, FSB, as indenture trustee***

# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 10-K

[X]  Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
     For the fiscal year ended December 31, 2016, or
[ ]  Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
     For the transition period from _____ to _____.

Commission File Number 000-53354

## IHEARTMEDIA, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 26-0241222 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| 200 East Basse Road, Suite 100 | |
| San Antonio, Texas | 78209 |
| (Address of principal executive offices) | (Zip code) |

(210) 822-2828
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: None
Securities registered pursuant to Section 12(g) of the Act: Class A common stock, $0.001 par value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES [ ] NO [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. YES [ ] NO [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES [X] NO [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).YES [X] NO [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. Large accelerated filer [ ] Accelerated filer [ ] Non-accelerated filer [X] Smaller reporting company [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). YES [ ] NO [X]

As of June 30, 2016, the aggregate market value of the common stock beneficially held by non-affiliates of the registrant was approximately $15.5 million based on the closing sales price of the Class A common stock as reported on the Over-the-Counter Pink Sheets.

On February 20, 2017, there were 31,192,123 outstanding shares of Class A common stock (including 111,291 shares owned by a subsidiary and excluding 391,008 shares held in treasury), 555,556 outstanding shares of Class B common stock and 58,967,502 outstanding shares of Class C common stock.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of our Definitive Proxy Statement for the 2017 Annual Meeting, expected to be filed within 120 days of our fiscal year end, are incorporated by reference into Part III.

**IHEARTMEDIA, INC.**
**INDEX TO FORM 10-K**

| | | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 17 |
| Item 1B. | Unresolved Staff Comments | 28 |
| Item 2. | Properties | 28 |
| Item 3. | Legal Proceedings | 28 |
| Item 4. | Mine Safety Disclosures | 29 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 32 |
| Item 6. | Selected Financial Data | 34 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 36 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 79 |
| Item 8. | Financial Statements and Supplementary Data | 80 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 123 |
| Item 9A. | Controls and Procedures | 123 |
| Item 9B. | Other Information | 125 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 126 |
| Item 11. | Executive Compensation | 126 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 126 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 126 |
| Item 14. | Principal Accounting Fees and Services | 126 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statements Schedules | 127 |
| Item 16. | Form 10-K Summary | 138 |

# PART I

## ITEM 1. BUSINESS

### The Company

We were incorporated in May 2007 by private equity funds sponsored by Bain Capital Partners, LLC ("Bain Capital") and Thomas H. Lee Partners, L.P. ("THL," and together, the "Sponsors") for the purpose of acquiring the business of iHeartCommunications, Inc., a Texas corporation ("iHeartCommunications"). The acquisition was completed on July 30, 2008 pursuant to the Agreement and Plan of Merger, dated November 16, 2006, as amended on April 18, 2007, May 17, 2007 and May 13, 2008 (the "Merger Agreement"). As a result of the merger, each issued and outstanding share of iHeartCommunications, other than shares held by certain of our principals that were rolled over and exchanged for shares of our Class A common stock, was either exchanged for (i) $36.00 in cash consideration or (ii) one share of our Class A common stock. Prior to the consummation of our acquisition of iHeartCommunications, we had not conducted any activities, other than activities incident to our formation and in connection with the acquisition, and did not have any assets or liabilities, other than those related to the acquisition.

Our corporate headquarters are in San Antonio, Texas and we have executive offices in New York, New York. Our headquarters are located at 200 East Basse Road, Suite 100, San Antonio, Texas 78209 (telephone: 210-822-2828).

### Our Business Segments

We are a diversified media and entertainment company with three reportable business segments: iHeartMedia ("iHM"); Americas outdoor advertising ("Americas outdoor"); and International outdoor advertising ("International outdoor"). Our iHM segment provides media and entertainment services via broadcast and digital delivery and also includes our national syndication business. Our Americas outdoor and International outdoor segments provide outdoor advertising services in their respective geographic regions using various digital and traditional display types. Our Americas outdoor segment consists of operations primarily in the United States, Canada and Latin America. Our International outdoor segment consists of operations primarily in Europe and Asia. Our "Other" category includes our full-service media representation business, Katz Media Group ("Katz Media"), as well as other general support services and initiatives that are ancillary to our other businesses. For the year ended December 31, 2016, the iHM segment represented 54% of total revenues. For the year ended December 31, 2016, Americas outdoor represented 20% and International outdoor represented 23% of total revenues.

We specialize in broadcast radio, digital, out-of-home, mobile, live events and on-demand information services for national audiences and local communities while providing premium opportunities for advertisers. Through our strong capabilities and unique collection of assets, we have the ability to deliver compelling content as well as innovative, effective marketing campaigns for advertisers and marketing, creative and strategic partners in the United States and internationally.

We focus on leveraging our national reach and on building the leadership position of our diverse global assets and maximizing our financial performance while serving our local communities. We continue to invest strategically in our digital platforms, including the development of continued enhancements to iHeartRadio, our integrated digital radio platform, and the ongoing deployment of digital outdoor displays. In addition, we have implemented automated/programmatic sales infrastructure and capability in each of our business segments. We intend to continue to execute our strategies while closely managing expenses and focusing on achieving operating efficiencies across our businesses.

For more information about our revenue, gross profit and assets by segment and our revenue and long-lived assets by geographic area, see Note 11 to our Consolidated Financial Statements located in Item 8 of Part II of this Annual Report on Form 10-K.

### iHM

Our iHM operations include broadcast radio, digital online and mobile platforms and products, program syndication, entertainment, traffic and weather data distribution and music research services. Our radio stations and content can be heard on AM/FM stations, HD digital radio stations, satellite radio, at iHeartRadio.com and our radio stations' websites, and through our iHeartRadio mobile application on smart phones and tablets, on gaming consoles, via in-home entertainment, in enhanced automotive platforms and navigation systems.

As of December 31, 2016, we owned 855 domestic radio stations servicing over 160 U.S. markets, including 45 of the top 50 markets and 84 of the top 100 markets. We are also the beneficiary of Aloha Station Trust, LLC, which owns and operates 14 radio stations, all of which we were required to divest in order to comply with Federal Communication Commission ("FCC") media ownership rules, and which are being marketed for sale.

In addition to our local radio programming, we also operate Premiere Networks ("Premiere"), a national radio network that produces, distributes or represents more than 100 syndicated radio programs and serves more than 5,900 radio station affiliates. We also deliver real-time traffic and weather information via navigation systems, radio and television broadcast media and wireless and Internet-based services through our traffic business, Total Traffic & Weather Network.

We also curate, promote, produce and televise nationally-recognized iHeartRadio-branded live music events for our listeners and advertising partners, including the iHeartRadio Music Festival, the iHeartRadio Music Awards, the iHeartRadio Ultimate Pool Party, the iHeartRadio Jingle Ball Tour, the iHeartCountry Festival and the iHeartRadio Fiesta Latina.

*Strategy*

Our iHM strategy centers on delivering entertaining and informative content across multiple platforms, including radio broadcasting, online, mobile, digital and social media, podcasts, personalities and influencers, live events, syndication, music research services and independent media representation. We strive to serve our listeners by providing the content they desire on the platform they prefer, while supporting advertisers, strategic partners, music labels and artists with a diverse platform of creative marketing opportunities designed to effectively reach and engage target audiences. Our iHM strategy also focuses on improving the operations of our stations by providing valuable programming and promotions, as well as sharing best practices across our stations in marketing, distribution, sales and cost management.

*Promote Broadcast Radio Media Spending.* Given the extensive reach and metrics of both the broadcast radio industry in general and iHM in particular, as well as our depth and breadth of relationships with both media agencies and national and local advertisers, we believe we can drive broadcast radio's share of total media spending by using our dedicated national sales team to highlight the value of broadcast radio relative to other media. We have made and continue to make significant investments in research and to enable our clients to better understand how our assets can successfully reach their target audiences and promote their advertising campaigns; broadened our national sales teams and initiatives to better develop, create and promote their advertising campaigns; invested in technology to enhance our platform and capabilities; and continue to seek opportunities to deploy both our free iHeartRadio digital radio service and our newly-launched on demand subscription services - iHeartRadio Plus and iHeartRadio All Access - across both existing and emerging devices and platforms. We are also working closely with advertisers, marketers and agencies to meet their needs through new products, events and services developed through optimization of our current portfolio of assets, as well as to develop tools to determine how effective broadcast radio is in reaching their desired audiences. Through its programmatic initiative, iHeartMedia has centralized all the inventory across all of its stations nationwide and can access them immediately and tie it directly to key data of advertising partners.

*Promote Local and National Advertising.* We intend to grow our iHM businesses by continuing to develop effective highly-rated programming, creating new solutions for our advertisers and agencies, fostering key relationships with advertisers and improving our local and national sales teams. We intend to leverage our diverse collection of assets, our programming and creative strengths, and our consumer relationships to create live music events, such as one-of-a-kind local and national promotions that benefit our listeners and advertisers, and develop new, innovative programmatic and data-focused technologies and products to promote advertising. We seek to maximize revenue by closely managing our advertising opportunities and pricing to compete effectively in local markets. We operate price and yield information systems, which provide detailed inventory information. These systems enable our station managers and sales directors to adjust commercial inventory and pricing based on local market demand, as well as to manage and monitor different commercial durations (60 second, 30 second, 15 second and five second) in order to provide more effective advertising for our customers at what we believe are optimal prices given market conditions.

*Continue to Enhance the Listener Experience.* We intend to continue enhancing the listener experience by offering a wide variety of compelling content and methods of delivery. We will continue to provide the content our listeners desire on their preferred platforms. Our investments have created a collection of leading on-air talent. For example, Premiere offers 109 syndicated radio programs and services for more than 5,900 radio station affiliates across the United States, including popular programs featuring top talent such as Ryan Seacrest, Big Boy, Rush Limbaugh, Sean Hannity, Glenn Beck, Steve Harvey, Elvis Duran, Bobby Bones, Breakfast Club and Delilah. Our distribution capabilities allow us to attract top talent and more effectively utilize programming, sharing our best and most compelling content across both iHM's and other companies' radio stations.

*Continue to Deliver Nationally-Recognized Live Events.* We intend to continue to deliver nationally-recognized live events to our listeners, such as the iHeartRadio Music Festival, the iHeartRadio Music Awards, the iHeartRadio Ultimate Pool Party, the iHeartRadio Jingle Ball Tour, the iHeartCountry Festival and the iHeartRadio Fiesta Latina, featuring some of the biggest names in the music industry.

*Deliver Content via Multiple Distribution Technologies.* We continue to expand the choices for our listeners. We deliver music, news, talk, sports, traffic and other content using an array of distribution technologies, including broadcast radio, digital, HD radio channels, satellite radio, digitally via iHeartRadio.com and our stations' websites, through our two new iHeartRadio on

demand subscription services - iHeartRadio Plus and iHeartRadio All Access and through our free iHeartRadio mobile application on smartphones and tablets, on gaming consoles, via in-home entertainment, in enhanced automotive platforms, as well as in-vehicle entertainment and navigation systems. Some examples of our recent initiatives are as follows:

•       *Streaming.* We provide streaming content via the Internet, mobile and other digital platforms. We rank among the top streaming networks in the U.S. with regards to Average Active Sessions ("AAS"), Session Starts ("SS") and Average Time Spent Listening ("ATSL"). AAS and SS measure the level of activity while ATSL measures the ability to keep the audience engaged.

•       *Websites and Mobile Applications.* We have developed mobile and Internet applications such as the iHeartRadio smart phone and tablet applications and website as well as websites for our stations and personalities. These mobile and Internet applications allow listeners to use their smart phones, tablets or other digital devices to interact directly with stations, find titles/artists, request songs and create custom and personalized stations while providing an additional method for advertisers to reach consumers. As of December 31, 2016, our iHeartRadio mobile application has been downloaded more than 1.3 billion times (including updates). iHeartRadio provides a unique digital music experience by offering access to more than 2,200 broadcast and digital-only radio stations, plus user-created custom stations with broad social media integration and our on demand content from our premium talk partnerships and user generated talk shows.

•       *On Demand.* In January 2017 we announced the official release of our two new on demand subscription services, iHeartRadio Plus and iHeartRadio All Access - the first fully-differentiated streaming music services that use on demand functionality to make radio truly interactive. Both services provide the best of live radio combined with easy-to-use on demand functionality. iHeartRadio Plus transforms live and custom radio listening with the addition of replay and unlimited skip functionality, the ability to save songs directly to user playlists and search for songs from a library of millions of tracks; iHeartRadio All Access combines the interactive functionality of iHeartRadio Plus with a complete music collection and library linked seamlessly to the radio listening experience, with functionality including the ability to listen offline; build subscribers' personal music libraries; no playback cap; and the ability to delete and sequence their playlist experience as well as manage unlimited playlists.

*Sources of Revenue*

Our iHM segment generated 54%, 53%, and 50% of our revenue for the years ended December 31, 2016, 2015 and 2014, respectively. The primary source of revenue in our iHM segment is the sale of advertising on our radio stations for local and national advertising. Our iHeartRadio mobile application and website, our station websites, national live events and Total Traffic & Weather Network also provide additional means for our advertisers to reach consumers. We also generate revenues from network compensation, our online services, our traffic business, events and other miscellaneous transactions. These other sources of revenue supplement our traditional advertising revenue without increasing on-air advertising time.

Our advertisers cover a wide range of categories, including consumer services, retailers, entertainment, health and beauty products, telecommunications, automotive, media and political. Our contracts with our advertisers range from less than one-year to multi-year terms.

Each radio station's local sales staff solicits advertising directly from local advertisers or indirectly through advertising agencies. Our ability to produce content that respond to the specific needs of our advertisers helps to build local direct advertising relationships. We utilize national sales teams to generate national advertising sales. National sales representatives obtain advertising principally from advertising agencies located outside the station's market and receive commissions based on advertising sold.

Advertising rates are principally based on the length of the spot and how many people in a targeted audience listen to our stations, as measured by independent ratings services. A station's format can be important in determining the size and characteristics of its listening audience, and advertising rates are influenced by the station's ability to attract and target audiences that advertisers aim to reach. The size of the market influences rates as well, with larger markets typically receiving higher rates than smaller markets. Rates are generally highest during morning and evening commuting periods.

3

*Radio Stations*

As of December 31, 2016, we owned 855 radio stations, including 240 AM and 615 FM radio stations. All of our radio stations are located in the United States. No one station is material to our overall operations. We believe that our properties are in good condition and suitable for our operations.

Radio broadcasting is subject to the jurisdiction of the FCC under the Communications Act of 1934, as amended (the "Communications Act"). As described in "Regulation of Our iHeartMedia Business" below, the FCC grants us licenses in order to operate our radio stations. The following table provides the number of owned radio stations in the top 25 Nielsen-ranked markets within our iHM segment.

| Nielsen Market Rank[1] | Market | Number of Stations |
|---|---|---|
| 1 | New York, NY | 6 |
| 2 | Los Angeles, CA | 8 |
| 3 | Chicago, IL | 6 |
| 4 | San Francisco, CA | 5 |
| 5 | Dallas-Ft. Worth, TX | 6 |
| 6 | Houston-Galveston, TX | 6 |
| 7 | Washington, DC | 5 |
| 8 | Atlanta, GA | 7 |
| 9 | Philadelphia, PA | 6 |
| 10 | Boston, MA | 4 |
| 11 | Miami-Ft. Lauderdale-Hollywood, FL | 7 |
| 12 | Detroit, MI | 6 |
| 13 | Seattle-Tacoma, WA | 6 |
| 14 | Phoenix, AZ | 8 |
| 16 | Minneapolis-St. Paul, MN | 6 |
| 17 | San Diego, CA | 7 |
| 18 | Denver-Boulder, CO | 8 |
| 19 | Tampa-St. Petersburg-Clearwater, FL | 8 |
| 20 | Nassau-Suffolk, NY | 1 |
| 21 | Baltimore, MD | 4 |
| 22 | St. Louis, MO | 6 |
| 23 | Portland, OR | 7 |
| 24 | Charlotte-Gastonia-Rock Hill, NC-SC | 4 |
| 25 | Riverside-San Bernardino, CA | 6 |
| **Total Top 25 Markets** | | **142[2]** |

(1)     Source: Fall 2016 NielsenAudio Radio Market Rankings.
(2)     Our station in the Nassau-Suffolk, NY market is also represented in the New York, NY Nielsen market. Thus, the actual number of stations in the top 25 markets is 142.

*Premiere Networks*

We operate Premiere, a national radio network that produces, distributes or represents 109 syndicated radio programs and services for more than 5,900 radio station affiliates. Our broad distribution capabilities enable us to attract and retain top programming talent. Some of our more popular syndicated programs feature top talent including Ryan Seacrest, Big Boy, Rush Limbaugh, Sean Hannity, Glenn Beck, Steve Harvey, Elvis Duran, Bobby Bones, Breakfast Club and Delilah. We believe recruiting and retaining top talent is an important component of the success of our radio networks.

4

*Total Traffic & Weather Network*

Total Traffic & Weather Network delivers real-time local traffic flow and incident information along with weather updates to more than 1,900 radio stations and approximately 75 television affiliates, as well as through Internet and mobile partnerships, reaching over 210 million consumers each month. Total Traffic & Weather Network services more than 200 markets in the United States, Canada and Mexico. It operates the largest broadcast traffic navigation network in North America and has expanded its offerings to include news and sports content.

### Competition

Our broadcast radio stations, as well as our mobile and digital applications and our traffic business, compete for listeners and advertising revenues directly with other radio stations within their respective markets, as well as with other advertising media, including broadcast and cable television, online, print media, outdoor advertising, satellite radio, direct mail and other forms of advertisement. In addition, the radio broadcasting industry is subject to competition from services that use media technologies such as Internet-based media, mobile applications and other digital radio services. Such services reach national and local audiences with multi-channel, multi-format, digital radio services.

Our broadcast radio stations compete for listeners primarily on the basis of program content that appeals to a particular demographic group. Our targeted listener base of specific demographic groups in each of our markets allows us to attract advertisers seeking to reach those listeners.

### Americas Outdoor Advertising

We are one of the largest outdoor advertising companies in North America (based on revenues), which includes the United States, Canada and Latin America. Approximately 90% of our revenue in our Americas outdoor advertising segment was derived from the United States in each of the years ended December 31, 2016, 2015 and 2014. As of December 31, 2016, we own or operate approximately 99,000 display structures in our Americas outdoor segment with operations in 43 of the 50 largest markets within the United States, including all of the 20 largest markets.

In the first quarter of 2016, Americas outdoor sold nine non-strategic outdoor markets including Cleveland and Columbus, Ohio, Des Moines, Iowa, Ft. Smith, Arkansas, Memphis, Tennessee, Portland, Oregon, Reno, Nevada, Seattle, Washington and Wichita, Kansas for approximately $592.3 million in cash and certain advertising assets in Florida. During the first quarter of 2016, Americas outdoor also entered into an agreement to sell its Indianapolis, Indiana market in exchange for certain assets in Atlanta, Georgia, plus approximately $41.2 million in cash. The transaction closed in January 2017.

Our Americas outdoor assets consist of printed and digital billboards, street furniture and transit displays, airport displays and wallscapes and other spectaculars, which we own or operate under lease management agreements. Our Americas outdoor advertising business is focused on metropolitan areas with dense populations.

### Strategy

We seek to capitalize on our Americas outdoor network and diversified product mix to maximize revenue. Our outdoor strategy focuses on pursuing the technology of digital displays, as well as leveraging our diversified product mix and long-standing presence in many of our existing markets, which provides us with the ability to launch new products and test new initiatives in a reliable and cost-effective manner.

*Promote Outdoor Media Spending.* Given the attractive industry fundamentals of outdoor media and our depth and breadth of relationships with both local and national advertisers, we believe we can drive outdoor advertising's share of total media spending by using our dedicated national sales team to highlight the value of outdoor advertising relative to other media. We have made and continue to make significant investments in research tools that enable our clients to better understand how our displays can successfully reach their target audiences and promote their advertising campaigns. Also, we are working closely with clients, advertising agencies and other diversified media companies to develop more sophisticated systems that will provide improved audience metrics for outdoor advertising, including our new programmatic effort to sell digital billboard advertisements using automated advertisement sales technology to introduce ease and efficiency to the out-of-home ad sales process and enable better targeting of digital billboard advertising.

*Continue to Deploy Digital Displays.* Our long-term strategy for our outdoor advertising businesses includes pursuing the technology of digital displays, including flat screens, LCDs and LEDs, as additions to traditional methods of displaying our clients' advertisements. Digital outdoor advertising provides significant advantages over traditional outdoor media. Our electronic displays are linked through centralized computer systems to instantaneously and simultaneously and rapidly change advertising copy on a large number of displays, allowing us to sell more advertising opportunities to advertisers. The ability to change copy by time of day and quickly change messaging based on advertisers' needs creates additional flexibility for our customers. Although

5

digital displays require more capital to construct compared to printed bulletins, the advantages of digital allow us to penetrate new accounts and categories of advertisers, as well as serve a broader set of needs for existing advertisers. Digital displays allow for high-frequency, 24-hour advertising changes in high-traffic locations and allow us to offer our clients optimal flexibility, distribution, circulation and visibility. We expect this trend to continue as we increase our quantity of digital inventory. As of December 31, 2016, we had deployed more than 1,100 digital billboards in 28 markets in the United States.

### Sources of Revenue

Americas outdoor generated 20%, 22% and 21% of our revenue in 2016, 2015 and 2014, respectively. Americas outdoor revenue is derived from the sale of advertising copy placed on our printed and digital displays. Our display inventory consists primarily of billboards, street furniture displays and transit displays. The margins on our billboard contracts, including those related to digital billboards, tend to be higher than those on contracts for other displays, due to their greater size, impact and location along major roadways that are highly trafficked. Billboards comprise approximately two-thirds of our display revenues. The following table shows the approximate percentage of revenue derived from each category for our Americas outdoor inventory:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Billboards: | | | |
| Bulletins | 59% | 58% | 58% |
| Posters | 10% | 12% | 12% |
| Street furniture displays | 7% | 6% | 7% |
| Transit displays | 16% | 15% | 16% |
| Spectaculars/wallscapes | 4% | 5% | 3% |
| Other | 4% | 4% | 4% |
| Total | 100% | 100% | 100% |

Our Americas outdoor segment generates revenues from local and national sales. Our advertising rates are based on a number of different factors including location, competition, size of display, illumination, market and gross ratings points. Gross ratings points are the total number of impressions delivered, expressed as a percentage of a market population, of a display or group of displays. The number of impressions delivered by a display is measured by the number of people passing the site during a defined period of time. For all of our billboards in the United States, we use independent, third-party auditing companies to verify the number of impressions delivered by a display.

While location, price and availability of displays are important competitive factors, we believe that providing quality customer service and establishing strong client relationships are also critical components of sales. In addition, we have long-standing relationships with a diversified group of advertising brands and agencies that allow us to diversify client accounts and establish continuing revenue streams.

### Billboards

Our billboard inventory primarily includes bulletins and posters.

- *Bulletins.* Bulletins vary in size, with the most common size being 14 feet high by 48 feet wide. Digital bulletins display static messages that resemble standard printed bulletins when viewed, but also allow advertisers to change messages throughout the course of a day, and may display advertisements for multiple customers. Our electronic displays are linked through centralized computer systems to instantaneously and simultaneously change advertising copy as needed. Because of their greater size, impact, high-frequency and 24-hour advertising changes, we typically receive our highest rates for digital bulletins. Almost all of the advertising copy displayed on printed bulletins is computer printed on vinyl and transported to the bulletin where it is secured to the display surface. Bulletins generally are located along major expressways, primary commuting routes and main intersections that are highly visible and heavily trafficked. Our clients may contract for individual bulletins or a network of bulletins, meaning the clients' advertisements are rotated among bulletins to increase the reach of the campaign. Our client contracts for bulletins, either printed or digital, generally have terms ranging from four weeks to one year.

- *Posters.* Printed posters are approximately 11 feet high by 23 feet wide, and the printed junior posters are approximately 5 feet high by 11 feet wide. Digital posters are available in addition to the traditional poster-size and junior poster-size. Similar to digital bulletins, digital posters display static messages that resemble standard printed posters when viewed, and are linked through centralized computer systems to instantaneously and simultaneously change messages throughout the course of a day. Advertising copy for printed posters is digitally printed on a single

piece of polyethylene material that is then transported and secured to the poster surfaces. Advertising copy for printed junior posters is printed using silk screen, lithographic or digital process to transfer the designs onto paper that is then transported and secured to the poster surfaces. Posters generally are located in commercial areas on primary and secondary routes near point-of-purchase locations, facilitating advertising campaigns with greater demographic targeting than those displayed on bulletins. Our poster rates typically are less than our bulletin rates, and our client contracts for posters generally have terms ranging from four weeks to one year. Premiere displays, which consist of premiere panels and squares, are innovative hybrids between bulletins and posters that we developed to provide our clients with an alternative for their targeted marketing campaigns. The premiere displays use one or more poster panels, but with vinyl advertising stretched over the panels similar to bulletins. Our intent is to combine the creative impact of bulletins with the additional reach and frequency of posters.

*Street Furniture Displays*

Our street furniture displays include advertising surfaces on bus shelters, information kiosks, freestanding units and other public structures, and are available in both printed and digital formats, primarily located in major metropolitan areas and along major commuting routes. Generally, we are responsible for the construction and maintenance of street furniture structures. Contracts for the right to place our street furniture displays in the public domain and sell advertising space on them are awarded by municipal and transit authorities in competitive bidding processes governed by local law. Generally, these contracts have terms ranging from 10 to 20 years. As compensation for the right to sell advertising space on our street furniture structures, we pay the municipality or transit authority a fee or revenue share that is either a fixed amount or a percentage of the revenue derived from the street furniture displays. Typically, these revenue sharing arrangements include payments by us of minimum guaranteed amounts. Client contracts for street furniture displays typically have terms ranging from four weeks to one year, and are typically for network packages of multiple street furniture displays.

*Transit Displays*

Our transit displays are advertising surfaces on various types of vehicles or within transit systems, including on the interior and exterior sides of buses, trains, trams, and within the common areas of rail stations and airports, and are available in both printed and digital formats. Similar to street furniture, contracts for the right to place our displays on such vehicles or within such transit systems and to sell advertising space on them generally are awarded by public transit authorities in competitive bidding processes or are negotiated with private transit operators. Generally, these contracts have terms ranging from five to ten years. Our client contracts for transit displays generally have terms ranging from four weeks to one year.

*Other Displays*

The balance of our display inventory consists of spectaculars and wallscapes. Spectaculars are customized display structures that often incorporate video, multidimensional lettering and figures, mechanical devices and moving parts and other embellishments to create special effects. The majority of our spectaculars are located in Los Angeles, San Francisco, Times Square in New York City and the Gardiner Expressway in Toronto. Client contracts for spectaculars typically have terms of one year or longer. A wallscape is a display that drapes over or is suspended from the sides of buildings or other structures. Generally, wallscapes are located in high-profile areas where other types of outdoor advertising displays are limited or unavailable. Clients typically contract for individual wallscapes for extended terms.

**Advertising Inventory and Markets**

As of December 31, 2016, we owned or operated approximately 99,000 display structures in our Americas outdoor advertising segment with operations in 43 of the 50 largest markets in the United States, including all of the 20 largest markets. Therefore, no one property is material to our overall operations. We believe that our properties are in good condition and suitable for our operations.

Our displays are located on owned land, leased land or land for which we have acquired permanent easements. The majority of the advertising structures on which our displays are mounted require permits. Permits are granted for the right to operate an advertising structure as long as the structure is used in compliance with the laws and regulations of the applicable jurisdiction.

**Production**

In a majority of our markets, our local production staff performs the full range of activities required to create and install advertising copy. Production work includes creating the advertising copy design and layout, coordinating its printing and installing the copy on displays. We provide creative services to smaller advertisers and to advertisers not represented by advertising agencies. National advertisers often use preprinted designs that require only installation. Our creative and production personnel typically

develop new designs or adopt copy from other media for use on our inventory. Our creative staff also can assist in the development of marketing presentations, demonstrations and strategies to attract new clients.

*Construction and Operation*

We typically own the physical structures on which our clients' advertising copy is displayed. We manage the construction of our structures centrally and erect them on sites we either lease or own or for which we have acquired permanent easements. The site lease terms generally range from one to 20 years. In addition to the site lease, we must obtain a permit to build the sign. Permits are typically issued in perpetuity by the state or local government and typically are transferable or renewable for a minimal, or no, fee. Printed bulletin and poster advertising copy is either printed with computer generated graphics on a single sheet of vinyl or placed on lithographed or silk-screened paper sheets supplied by the advertiser. These advertisements are then transported to the site and in the case of vinyl, wrapped around the face of the site, and in the case of paper, pasted and applied like wallpaper to the site. The operational process also includes conducting visual inspections of the inventory for display defects and taking the necessary corrective action within a reasonable period of time.

*Client Categories*

In 2016, the top five client categories in our Americas outdoor segment were business services, automotive, technology, beverage and travel.

*Competition*

The outdoor advertising industry in the Americas is fragmented, consisting of several large companies involved in outdoor advertising, such as OUTFRONT Media Inc. and Lamar Advertising Company, as well as numerous smaller and local companies operating a limited number of displays in a single market or a few local markets. We also compete with other advertising media in our respective markets, including broadcast and cable television, radio, print media, direct mail, mobile, social media, online and other forms of advertisement. Outdoor advertising companies compete primarily based on ability to reach consumers, which is driven by location of the display.

**International Outdoor Advertising**

Our International outdoor business segment includes our operations in Europe and Asia, with approximately 34%, 34% and 35% of our revenue in this segment derived from France and the United Kingdom for the years ended December 31, 2016, 2015 and 2014. As of December 31, 2016, we owned or operated more than 490,000 displays across 19 countries.

During the second quarter of 2016, International outdoor sold its business in Turkey for cash proceeds of $0.5 million.

During the fourth quarter of 2016, International outdoor sold its business in Australia for cash proceeds of $195.7 million, net of cash retained by the purchaser and closing costs.

Our International outdoor assets consist of street furniture and transit displays, billboards, mall displays, SmartBike programs and other spectaculars, which we own or operate under lease agreements. Our International business is focused on densely-populated metropolitan areas.

*Strategy*

Similar to our Americas outdoor advertising business, we believe our International outdoor advertising business has attractive industry fundamentals, including the ability to reach a broad audience and drive foot traffic to the point-of-sale, making outdoor a cost-effective medium for advertisers as measured by cost per thousand persons reached compared to other traditional media. Our International business focuses on the following strategies:

*Promote Overall Outdoor Media Spending.* Our strategy is to promote growth in outdoor advertising's share of total media spending by demonstrating the strength of our medium. As part of this effort, we are focusing on developing and implementing improved outdoor audience delivery measurement systems to provide advertisers with tools to plan their campaigns and determine how effectively their message is reaching the desired audience.

*Differentiate on Sales and Marketing.* For over five years, we have spent time and resources building commercial capabilities through a company wide sales force effectiveness program and an upgrade in our sales and marketing talent. These capabilities allow us to build and nurture relationships with our clients and their agencies as well as to offer packages and products that meet our clients' advertising needs. Going forward, particular areas of focus include pricing, packaging and programmatic selling. Our new proprietary programmatic platform enables marketers to buy digital out of home inventory in audience-based packages, giving them the unique ability to manage their campaigns on a self-service basis.

*Capitalize on Product and Geographic Opportunities.* We are also focused on growing our relevance to our advertising customers by continuously optimizing our display portfolio and targeting investments in promising market segments. We have continued to innovate and introduce new products in our markets based on local demand. Our street furniture business generates the largest portion of our revenue and that is where we plan to focus much of our investment. We plan to continue to evaluate municipal contracts that may come up for bid and will make prudent investments where we believe we can generate attractive returns.

*Continue to Deploy Digital Display Networks.* Our digital outdoor displays are a dynamic medium, which enables our customers to engage in real-time, tactical, topical and flexible advertising. We will continue our focused and dedicated digital strategy and remain committed to the development of digital out-of-home communication solutions. Through our digital brand, Clear Channel Play, we are able to offer networks of digital displays in multiple formats and multiple environments including bus shelters, billboards, airports, transit, malls and flagship locations. Part of our long-term strategy is to pursue the diversification of our product offering by introducing novel technologies, such as beacons, small cells, wayfinding stations and provision of wifi in our street furniture network, as additions to traditional methods of displaying our clients' advertisements. We are currently installing these technologies in a number of our markets. We seek to achieve greater consumer engagement and flexibility by delivering powerful, flexible and interactive campaigns that open up new possibilities for advertisers to engage with their target audiences. We had more than 9,600 digital displays in 15 countries across Europe and Asia as of December 31, 2016.

### Sources of Revenue

Our International outdoor segment generated 23%, 23% and 26% of our revenue in 2016, 2015 and 2014, respectively. Our International outdoor display inventory consists primarily of street furniture displays, billboards, transit displays and other out-of-home advertising displays. The following table shows the approximate percentage of revenue derived from each inventory category of our International outdoor segment:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Street furniture displays | 52% | 52% | 50% |
| Billboards | 17% | 19% | 20% |
| Transit displays | 10% | 9% | 10% |
| Other (1) | 21% | 20% | 20% |
| Total | 100% | 100% | 100% |

(1)     Includes advertising revenue from mall displays, other small displays, and non-advertising revenue from sales of street furniture equipment, cleaning and maintenance services, operation of SmartBike programs and production revenue.

Our International outdoor segment generates the majority of its revenue from the sale of advertising space on street furniture displays, billboards, retail displays and transit displays. Similar to our Americas outdoor business, advertising rates generally are based on the gross ratings points of a display or group of displays. In some of the countries where we have operations, the number of impressions delivered by a display is weighted to account for such factors as illumination, proximity to other displays and the speed and viewing angle of approaching traffic.

While location, price and availability of displays are important competitive factors, we believe that providing quality customer service and establishing strong client relationships are also critical components of sales. Our entrepreneurial culture allows local management to operate their markets as separate profit centers, encouraging customer cultivation and service.

*Street Furniture Displays*

Our International street furniture displays, available in printed and digital formats, are substantially similar to their Americas street furniture counterparts, and include bus shelters, freestanding units, various types of kiosks, benches and other public structures. Internationally, contracts with municipal and transit authorities for the right to place our street furniture in the public domain and sell advertising on such street furniture typically provide for terms ranging up to 15 years. The major difference between our International and Americas street furniture businesses is in the nature of the municipal contracts. In our International outdoor business, these contracts typically require us to provide the municipality with a broader range of metropolitan amenities such as bus shelters with or without advertising panels, information kiosks and public wastebaskets, as well as space for the municipality to display maps or other public information. In exchange for providing such metropolitan amenities and display space, we are authorized to sell advertising space on certain sections of the structures we erect in the public domain. Our International

9

street furniture is typically sold to clients as network packages of multiple street furniture displays, with contract terms ranging from one to two weeks. Client contracts are also available for longer terms.

*Billboards*

The sizes of our International billboards are not standardized. The billboards vary in both format and size across our networks, with the majority of our International billboards being similar in size to our posters used in our Americas outdoor business.

Our billboard inventory is primarily comprised of premium billboards and classic billboards and is available in printed and digital formats.

- *Premium.* Digital premium billboards typically display static messages that resemble standard printed billboards when viewed, but also allow advertisers to change messages throughout the course of a day, and may display advertisements for multiple customers. Our electronic displays are linked through centralized computer systems to instantaneously and simultaneously change advertising copy as needed. Because of their greater size, impact, high frequency and 24-hour advertising changes, digital premium billboards typically deliver our highest rates. Almost all of the advertising copy displayed on printed premium billboards is digitally-printed and transported to the billboard where it is secured to the display surface. Premium billboards generally are located along major expressways, primary commuting routes and main intersections that are highly visible and heavily trafficked. Our clients may contract for individual billboards or a network of billboards.

- *Classic.* Digital and printed classic billboards are available in a variety of formats across our markets. Similar to digital premium billboards, classic digital billboards typically display static messages that resemble standard printed posters when viewed, and are linked through centralized computer systems to instantaneously and simultaneously change messages throughout the course of a day. Advertising copy for printed classic billboards is digitally printed then transported and secured to the poster surfaces. Classic billboards generally are located in commercial areas on primary and secondary routes near point-of-purchase locations, facilitating advertising campaigns with greater demographic targeting than those displayed on premium billboards. Classic billboards typically deliver lower rates than our premium billboards. Our intent is to combine the creative impact of premium billboards with the additional reach and frequency of classic billboards.

Our billboards are primarily sold to clients as network packages with contract terms typically ranging from one to two weeks. Long-term client contracts are also available and typically have terms of up to one year. We lease the majority of our billboard sites from private landowners, usually for one to ten years.

*Retail Displays*

Our retail displays are mainly standalone advertising structures in or in close proximity to retail outlets such as malls and supermarkets. The right to place our displays in these locations and to sell advertising space on them generally is awarded by retail outlet operators such as large retailers or mall operators either through private tenders or bilateral negotiations. Upfront investment and ongoing maintenance costs vary across contracts. Contracts with mall operators and retailers have terms ranging from three to ten years. Our client contracts for retail displays, either printed or digital, generally have terms ranging from one week to two weeks.

*Transit Displays*

Our International transit display contracts are substantially similar to their Americas transit display counterparts. They are advertising surfaces on various types of vehicles or within transit systems, including on the interior and exterior sides of buses, trains, trams and within the common areas of rail stations and airports, and are available in both printed and digital formats. Similar to street furniture, contracts for the right to place our displays on such vehicles or within such transit systems and to sell advertising space on them generally are awarded by public transit authorities in competitive bidding processes or are negotiated with private transit operators. Our transit display contracts often require us to make only a minimal initial investment and few ongoing maintenance expenditures. Contracts with public transit authorities or private transit operators typically have terms ranging from two to five years. Our client contracts for transit displays, either printed or digital, generally have terms ranging from one week to one year, or longer.

*Other International Displays and Services*

The balance of our revenue from our International outdoor segment consists primarily of advertising revenue from other small displays and non-advertising revenue from sales of street furniture equipment, cleaning and maintenance services and

production and creative services revenue. Our International inventory includes other small displays that are counted as separate displays since they form a substantial part of our network and International outdoor advertising revenue. We also have a SmartBike bicycle rental program which provides bicycles for rent to the general public in several municipalities. In exchange for operating these bike rental programs, we generally derive revenue from advertising rights to the bikes, bike stations, additional street furniture displays, and/or a share of rental income from the local municipalities. In several of our International markets, we sell equipment or provide cleaning and maintenance services as part of street furniture contracts with municipalities.

*Advertising Inventory and Markets*

As of December 31, 2016, we owned or operated more than 490,000 displays in our International outdoor segment, with operations across 19 countries. Our International outdoor display count includes display faces, which may include multiple faces on a single structure, as well as small, individual displays. As a result, our International outdoor display count is not comparable to our Americas outdoor display count, which includes only unique displays. No one property is material to our overall operations. We believe that our properties are in good condition and suitable for our operations.

*Production*

The majority of our International clients are advertisers targeting national or regional audiences whose business generally is placed with us through media or advertising agencies. These agencies often provide to our International clients creative services to design and produce the advertising copy, which is delivered to us either in digital format or in the traditional format of physical printed advertisements. For digital advertising campaigns, the digital advertisement is received by our content management system and is then distributed to our digital displays. For traditional advertising campaigns, the printed advertisement - whether in paper or vinyl - is shipped to centralized warehouses operated by us. The copy is then sorted and delivered to sites where it is installed on our displays.

*Construction and Operation*

The International manufacturing process largely consists of two elements: the manufacture and installation of advertising structures and the weekly preparation of advertising posters for distribution throughout our networks. We outsource the manufacturing of advertising structures to third parties and regularly seek competitive bids. We use a wide range of suppliers located in many of our markets, although much of our inventory is manufactured in China and Turkey. The design of street furniture structures (such as bus shelters, bicycle racks and kiosks) is typically done in conjunction with a third party design or architectural firm and followed by a competitive bidding process to select a manufacturer. Our street furniture sites are posted by our own employees or subcontractors who also clean and maintain the sites. The decision to use our own employees or subcontractors is made on a market-by-market basis taking into consideration the mix of products in the market and local labor costs.

*Client Categories*

In 2016, the top five client categories in our International segment, based on International revenue derived from these categories, were retail, entertainment, telecommunications, food and food products, and automotive, accessories and equipment.

*Competition*

The international outdoor advertising industry is competitive, consisting of several large companies involved in outdoor advertising, such as JCDecaux SA and ExterionMedia (UK) Limited, as well as numerous smaller and local companies operating a limited number of displays in a single market or a few local markets. We also compete with other advertising media in our respective markets, including broadcast and cable television, radio, print media, direct mail, online, mobile and other forms of advertisement. Outdoor companies compete primarily based on ability to reach consumers, which is driven by location of the display.

Our business requires us to obtain and renew contracts with municipalities and other governmental entities, which frequently require us to participate in competitive bidding processes at each renewal. Many of these contracts typically have terms ranging up to 15 years and have revenue share, capital expenditure requirements and/or fixed payment components. Competitive bidding processes are complex and sometimes lengthy. Substantial costs may be incurred in connection with preparing bids for such processes. Our competitors, individually or through relationships with third parties, may be able to provide municipalities with different or greater capabilities or prices or benefits than we can provide. In the past we have not, and most likely in the future will not, be awarded all of the contracts on which we bid. There can be no assurance that we will win any particular bid, or that we will be able to replace any revenues lost upon expiration or completion of a contract. Our inability to renew existing contracts can also result in significant expenses from the removal of our displays. Furthermore, if and when we do obtain a contract, we are generally required to incur significant start-up expenses. The costs of bidding on contracts and the start-up costs associated with new contracts we may obtain may significantly reduce our cash flow and liquidity. The success of our business also depends generally on our ability to obtain and renew contracts with private landlords.

11

**Other**

Our Other category includes our media representation firm, Katz Media, as well as other general support services and initiatives that are ancillary to our other businesses.

Katz Media, a leading media representation firm in the U.S. for radio and television stations, sells national spot advertising time for clients in the radio and television industries. As of December 31, 2016, Katz Media represented more than 3,000 radio stations. Katz Media also represents more than 800 television and digital multicast stations throughout the United States.

Katz Media generates revenue primarily through contractual commissions realized from the sale of national spot and online advertising. National spot advertising is commercial airtime sold to advertisers on behalf of radio and television stations. Katz Media represents its media clients pursuant to media representation contracts, which typically have terms of up to ten years in length.

**Employees**

As of December 31, 2016, we had approximately 14,300 domestic employees and approximately 4,400 international employees, of which approximately 17,200 were in direct operations and 1,500 were in administrative or corporate related activities. Approximately 800 of our employees are subject to collective bargaining agreements in their respective countries. We are a party to numerous collective bargaining agreements, none of which represent a significant number of employees. We believe that our relationship with our union and non-union employees is good.

**Seasonality**

Required information is located within Item 7 of Part II of this Annual Report on Form 10-K.

**Regulation of our iHeartMedia Business**

*General*

The following is a brief summary of certain statutes, regulations, policies and proposals affecting our iHeartMedia business. For example, radio broadcasting is subject to the jurisdiction of the FCC under the Communications Act. The Communications Act permits the operation of a radio broadcast station only under a license issued by the FCC upon a finding that grant of the license would serve the public interest, convenience and necessity. Among other things, the Communications Act empowers the FCC to: issue, renew, revoke and modify broadcasting licenses; assign frequency bands for broadcasting; determine stations' frequencies, locations, power and other technical parameters; impose penalties for violation of its regulations, including monetary forfeitures and, in extreme cases, license revocation; impose annual regulatory and application processing fees; and adopt and implement regulations and policies affecting the ownership, program content, employment practices and many other aspects of the operation of broadcast stations.

This summary does not comprehensively cover all current and proposed statutes, regulations and policies affecting our iHeartMedia business. Reference should be made to the Communications Act and other relevant statutes, regulations, policies and proceedings for further information concerning the nature and extent of regulation of our iHeartMedia business. Finally, several of the following matters are now, or may become, the subject of court litigation, and we cannot predict the outcome of any such litigation or its impact on our iHeartMedia business.

*License Assignments*

The Communications Act prohibits the assignment of a license or the transfer of control of an FCC licensee without prior FCC approval. Applications for license assignments or transfers involving a substantial change in ownership are subject to a 30-day period for public comment, during which petitions to deny the application may be filed and considered by the FCC.

*License Renewal*

The FCC grants broadcast licenses for a term of up to eight years. The FCC will renew a license for an additional eight-year term if, after consideration of the renewal application and any objections thereto, it finds that the station has served the public interest, convenience and necessity and that, with respect to the station seeking renewal, there have been no serious violations of either the Communications Act or the FCC's rules and regulations by the licensee and no other such violations which, taken together, constitute a pattern of abuse. The FCC may grant the license renewal application with or without conditions, including renewal for a term less than eight years. The vast majority of radio licenses are renewed by the FCC for the full eight-year term. While we cannot guarantee the grant of any future renewal application, our stations' licenses historically have been renewed for the full eight-year term.

*Ownership Regulation*

FCC rules and policies define the interests of individuals and entities, known as "attributable" interests, which implicate FCC rules governing ownership of broadcast stations and other specified mass media entities. Under these rules, attributable interests generally include: (1) officers and directors of a licensee or of its direct or indirect parent; (2) general partners; (3) limited partners and limited liability company members, unless properly "insulated" from management activities; (4) a 5% or more direct or indirect voting stock interest in a corporate licensee or parent, except that, for a narrowly defined class of passive investors, the attribution threshold is a 20% or more voting stock interest; and (5) combined equity and debt interests in excess of 33% of a licensee's total asset value, if the interest holder provides over 15% of the licensee station's total weekly programming, or has an attributable broadcast or newspaper interest in the same market (the "EDP Rule"). An entity that owns one or more radio stations in a market and programs more than 15% of the broadcast time, or sells more than 15% per week of the advertising time, on a radio station in the same market is generally deemed to have an attributable interest in that station.

Debt instruments, non-voting corporate stock, minority voting stock interests in corporations having a single majority stockholder, and properly insulated limited partnership and limited liability company interests generally are not subject to attribution unless such interests implicate the EDP Rule. To the best of our knowledge at present, none of our officers, directors or 5% or greater stockholders holds an interest in another television station, radio station or daily newspaper that is inconsistent with the FCC's ownership rules.

The FCC is required to conduct periodic reviews of its media ownership rules. In 2003, the FCC, among other actions, modified the radio ownership rules and adopted new cross-media ownership limits. The U.S. Court of Appeals for the Third Circuit initially stayed implementation of the new rules. Later, it lifted the stay as to the radio ownership rules, allowing the modified rules to go into effect. It retained the stay on the cross-media ownership limits and remanded them to the FCC for further justification (leaving in effect separate pre-existing FCC rules governing newspaper-broadcast and radio-television cross-ownership). In 2007, the FCC adopted a decision that revised the newspaper-broadcast cross-ownership rule but made no changes to the radio ownership or radio-television cross-ownership rules. In 2011, the U.S. Court of Appeals for the Third Circuit vacated the FCC's revisions to the newspaper-broadcast cross-ownership rule and otherwise upheld the FCC's decision to retain the current radio ownership and radio-television cross-ownership rules. The U.S. Supreme Court denied review of the Third Circuit's decision. The FCC began a periodic review of its media ownership rules in 2010 and issued a notice of proposed rulemaking, but did not complete the proceeding. In August 2016, the FCC concluded its 2010 and 2014 quadrennial reviews with a decision retaining the local radio ownership rules, the radio-television cross-ownership rule and the prohibition on newspaper-broadcast ownership without significant change. That decision is subject to pending petitions for reconsideration and court appeals. We cannot predict the outcome of the FCC's media ownership proceedings or their effects on our business in the future.

Irrespective of the FCC's radio ownership rules, the Antitrust Division of the U.S. Department of Justice ("DOJ") and the U.S. Federal Trade Commission ("FTC") have the authority to determine that a particular transaction presents antitrust concerns. In particular, where the proposed purchaser already owns one or more radio stations in a particular market and seeks to acquire additional radio stations in that market, the DOJ has, in some cases, obtained consent decrees requiring radio station divestitures.

The current FCC ownership rules relevant to our business are summarized below.

- ***Local Radio Ownership Rule.*** The maximum allowable number of radio stations that may be commonly owned in a market is based on the size of the market. In markets with 45 or more stations, one entity may have an attributable interest in up to eight stations, of which no more than five are in the same service (AM or FM). In markets with 30-44 stations, one entity may have an attributable interest in up to seven stations, of which no more than four are in the same service. In markets with 15-29 stations, one entity may have an attributable interest in up to six stations, of which no more than four are in the same service. In markets with 14 or fewer stations, one entity may have an attributable interest in up to five stations, of which no more than three are in the same service, so long as the entity does not have an interest in more than 50% of all stations in the market. To apply these ownership tiers, the FCC relies on Nielsen Metro Survey Areas, where they exist, and a signal contour-overlap methodology where they do not exist. An FCC rulemaking is pending to determine how to define radio markets for stations located outside Nielsen Metro Survey Areas.

- ***Newspaper-Broadcast Cross-Ownership Rule.*** FCC rules generally prohibit an individual or entity from having an attributable interest in either a radio or television station and a daily newspaper located in the same market.

- ***Radio-Television Cross-Ownership Rule.*** FCC rules permit the common ownership of one television and up to seven same-market radio stations, or up to two television and six same-market radio stations, depending on the number of independent media voices in the market and on whether the television and radio components of the combination comply with the television and radio ownership limits, respectively.

13

*Alien Ownership Restrictions*

The Communications Act restricts foreign entities or individuals from owning or voting more than 20% of the equity of a broadcast licensee directly. It also restricts foreign entities or individuals from owning or voting more than 25% of a licensee's equity indirectly (i.e., through a parent company), unless the FCC has made a finding that greater indirect foreign ownership is in the public interest. Since we serve as a holding company for FCC licensee subsidiaries, we are effectively restricted from having more than one-fourth of our stock owned or voted directly or indirectly by foreign entities or individuals. In November 2013, the FCC clarified that it would entertain and authorize, on a case-by-case basis and upon a sufficient public interest showing, proposals to exceed the 25% foreign ownership limit in broadcasting holding companies. In September 2016, the FCC adopted rules to simplify and streamline the process for requesting authority to exceed the 25% indirect foreign ownership limit and reformed the methodology that publicly-traded broadcasters may use to assess their compliance with the foreign ownership restrictions.

*Indecency Regulation*

Federal law regulates the broadcast of obscene, indecent or profane material. Legislation enacted by Congress provides the FCC with authority to impose fines of up to $325,000 per utterance with a cap of $3.0 million for any violation arising from a single act. In June 2012, the U.S. Supreme Court ruled on the appeals of several FCC indecency enforcement actions. While setting aside the particular FCC actions under review on narrow due process grounds, the Supreme Court declined to rule on the constitutionality of the FCC's indecency policies, and the FCC has since solicited public comment on those policies. We have received, and may receive in the future, letters of inquiry and other notifications from the FCC concerning complaints that programming aired on our stations contains indecent or profane language. We cannot predict the outcome of our outstanding letters of inquiry and notifications from the FCC or the nature or extent of future FCC indecency enforcement actions.

*Equal Employment Opportunity*

The FCC's rules require broadcasters to engage in broad equal employment opportunity recruitment efforts, retain data concerning such efforts and report much of this data to the FCC and to the public via periodic reports filed with the FCC or placed in stations' public files and websites. Broadcasters could be sanctioned for noncompliance.

*Technical Rules*

Numerous FCC rules govern the technical operating parameters of radio stations, including permissible operating frequency, power and antenna height and interference protections between stations. Changes to these rules could negatively affect the operation of our stations. For example, in January 2011 a law was enacted that eliminates certain minimum distance separation requirements between full-power and low-power FM radio stations. In March 2011, the FCC adopted policies which, in certain circumstances, could make it more difficult for radio stations to relocate to increase their population coverage. In October 2015, the FCC proposed rules which could reduce the degree of interference protection afforded to certain of our AM radio stations that serve wide areas.

*Content, Licenses and Royalties*

We must pay royalties to copyright owners of musical compositions (typically, songwriters and publishers) whenever we broadcast or stream musical compositions. Copyright owners of musical compositions most often rely on intermediaries known as performing rights organizations ("PROs") to negotiate licenses with copyright users for the public performance of their compositions, collect royalties under such licenses and distribute them to copyright owners. We have obtained public performance licenses from, and pay license fees to, the three major PROs in the United States, which are the American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI") and SESAC, Inc. ("SESAC"). There is no guarantee that a given songwriter or publisher will remain associated with ASCAP, BMI or SESAC or that additional PROs will not emerge. In 2013, a new PRO was formed named Global Music Rights ("GMR"). Irving Azoff, one of our directors, is the Chairman and Chief Executive Officer of Azoff MSG Entertainment LLC, which owns 85% of GMR. GMR has secured the rights to certain high-value copyrights and is seeking to negotiate individual licensing agreements with radio stations for songs in its repertoire. GMR and the Radio Music License Committee, Inc. ("RMLC"), which negotiates music licensing fees with PROs on behalf of many U.S. radio stations, have instituted antitrust litigation against one another. Additionally, the U.S. Department of Justice ("DOJ") and a federal court have recently disagreed on the issue of whether the DOJ's consent decrees with major PROs require full-work licensing. The withdrawal of a significant number of musical composition copyright owners from the three established PROs, and/or the emergence of one or more additional PROs, the outcome of the GMR/RMLC litigation; and the outcome of the full-work licensing issue could impact, and in some circumstances increase, our royalty rates and negotiation costs.

To secure the rights to stream music content over the Internet, we also must obtain performance rights licenses and pay public performance royalties to copyright owners of sound recordings (typically, performing artists and record companies). Under Federal statutory licenses, we are permitted to stream any lawfully released sound recordings and to make ephemeral reproductions of these recordings on our computer servers without having to separately negotiate and obtain direct licenses with each individual

copyright owner as long as we operate in compliance with the rules of those statutory licenses and pay the applicable royalty rates to SoundExchange, the organization designated by the Copyright Royalty Board ("CRB") to collect and distribute royalties under these statutory licenses. Sound recordings fixed on or after February 15, 1972 are protected by federal copyright law. Sound recording copyright owners have asserted that state law provides copyright protection for the recordings fixed before that date ("pre-72 recordings"). Sound recording copyright owners have sued radio broadcasters and digital audio transmission services (including us) for unauthorized public performances and reproductions of pre-72 recordings under various state laws, and courts in two states have issued decisions favorable to the copyright owners. If one or more of these decisions is upheld on appeal and held to apply to radio broadcasting or Internet simulcasting, it could impede our ability to broadcast or stream pre-72 recordings and/or increase our licensing and negotiating costs of doing so.

The rates at which we pay royalties to copyright owners are privately negotiated or set pursuant to a regulatory process. In addition, we have business arrangements directly with some copyright owners to receive deliveries of and, in some cases, to directly license their sound recordings for use in our Internet operations. There is no guarantee that the licenses and associated royalty rates that currently are available to us will be available to us in the future. Congress may consider and adopt legislation that would require us to pay royalties to sound recording copyright owners for broadcasting those recordings on our terrestrial radio stations. In addition, the CRB recently issued a final determination establishing copyright royalty rates for the public performance and ephemeral reproduction of sound recordings by various noninteractive webcasters, including radio broadcasters that simulcast their terrestrial programming online, to apply to the period January 1, 2016-December 31, 2020 under the so-called webcasting statutory license. The rates set by the CRB represent a decrease from the 2015 CRB rates applicable to broadcasters and other webcasters, but the determination has been appealed. Increased royalty rates could significantly increase our expenses, which could adversely affect our business. Additionally, there are conditions applicable to the webcasting statutory license. Some, but not all, record companies have agreed to waive or provide limited relief from certain of these conditions under certain circumstances. Some of these conditions may be inconsistent with customary radio broadcasting practices.

*Privacy and Data Protection*

We collect certain types of information from users of our technology platforms, including, without limitation, our websites, web pages, interactive features, applications, social media pages, and mobile application ("Platforms"), in accordance with the privacy policies and terms of use posted on the applicable Platform. We collect personally identifiable information directly from Platform users in several ways, including when a user purchases our products or services, registers to use our services, fills out a listener profile, posts comments, uses our social networking features, participates in polls and contests and signs up to receive email newsletters. We also may obtain information about our listeners from other listeners and third parties. We use the information we collect about and from Platform users for a variety of business purposes.

As a company conducting business on the Internet, we are subject to a number of laws and regulations relating to consumer protection, information security, data protection and privacy, among other things. Many of these laws and regulations are still evolving and could be interpreted in ways that could harm our business. In the area of information security and data protection, the laws in several states require companies to implement specific information security controls to protect certain types of personally identifiable information. Likewise, all but a few states have laws in place requiring companies to notify users if there is a security breach that compromises certain categories of their personally identifiable information. Any failure on our part to comply with these laws may subject us to significant liabilities.

We have implemented commercially reasonable physical and electronic security measures that are designed to protect against the loss, misuse, and alteration of our listeners' personally identifiable information and to protect our proprietary business information. Despite our best efforts, no security measures are perfect or impenetrable. Any failure or perceived failure by us to protect our information or information about our listeners or to comply with our policies or applicable regulatory requirements could result in damage to our business and loss of confidence in us, damage to our brands, the loss of listeners, consumers, business partners and advertisers, as well as proceedings against us by governmental authorities or others, which could harm our business.

*Other*

Congress, the FCC and other government agencies and regulatory bodies may in the future adopt new laws, regulations and policies that could affect, directly or indirectly, the operation, profitability and ownership of our broadcast stations and Internet-based audio music services. In addition to the regulations and other arrangements noted above, such matters may include, for example: proposals to impose spectrum use or other fees on FCC licensees; changes to the political broadcasting rules, including the adoption of proposals to provide free air time to candidates; restrictions on the advertising of certain products, such as beer and wine; frequency allocation, spectrum reallocations and changes in technical rules; and the adoption of significant new programming and operational requirements designed to increase local community-responsive programming and enhance public interest reporting requirements.

**Regulation of our Americas and International Outdoor Advertising Businesses**

15

The outdoor advertising industry in the United States is subject to governmental regulation at the federal, state and local levels. These regulations may include, among others, restrictions on the construction, repair, maintenance, lighting, upgrading, height, size, spacing and location and permitting of and, in some instances, content of advertising copy being displayed on outdoor advertising structures. In addition, international regulations have a significant impact on the outdoor advertising industry. International regulation of the outdoor advertising industry can vary by municipality, region and country, but generally limits the size, placement, nature and density of out-of-home displays. Other regulations may limit the subject matter and language of out-of-home displays.

From time to time, legislation has been introduced in both the United States and foreign jurisdictions attempting to impose taxes on revenue from outdoor advertising or for the right to use outdoor advertising assets. Several jurisdictions have imposed such taxes as a percentage of our outdoor advertising revenue generated in that jurisdiction. In addition, some jurisdictions have taxed our personal property and leasehold interests in advertising locations using various valuation methodologies. We expect U.S. and foreign jurisdictions to continue to try to impose such taxes as a way of increasing revenue. In recent years, outdoor advertising also has become the subject of targeted taxes and fees. These laws may affect prevailing competitive conditions in our markets in a variety of ways. Such laws may reduce our expansion opportunities or may increase or reduce competitive pressure from other members of the outdoor advertising industry. No assurance can be given that existing or future laws or regulations, and the enforcement thereof, will not materially and adversely affect the outdoor advertising industry. However, we contest laws and regulations that we believe unlawfully restrict our constitutional or other legal rights and may adversely impact the growth of our outdoor advertising business.

In the United States, federal law, principally the Highway Beautification Act ("HBA"), regulates outdoor advertising on Federal-Aid Primary, Interstate and National Highway Systems roads within the United States ("controlled roads"). The HBA regulates the size and placement of billboards, requires the development of state standards, mandates a state's compliance program, promotes the expeditious removal of illegal signs and requires just compensation for takings.

To satisfy the HBA's requirements, all states have passed billboard control statutes and regulations that regulate, among other things, construction, repair, maintenance, lighting, height, size, spacing and the placement and permitting of outdoor advertising structures. We are not aware of any state that has passed control statutes and regulations less restrictive than the prevailing federal requirements on the federal highway system, including the requirement that an owner remove any non-grandfathered, non-compliant signs along the controlled roads, at the owner's expense and without compensation. Local governments generally also include billboard control as part of their zoning laws and building codes regulating those items described above and include similar provisions regarding the removal of non-grandfathered structures that do not comply with certain of the local requirements. Some local governments have initiated code enforcement and permit reviews of billboards within their jurisdiction. In some instances we have had to remove billboards as a result of such reviews.

As part of their billboard control laws, state and local governments regulate the construction of new signs. Some jurisdictions prohibit new construction, some jurisdictions allow new construction only to replace or relocate existing structures and some jurisdictions allow new construction subject to the various restrictions discussed above. In certain jurisdictions, restrictive regulations also limit our ability to relocate, rebuild, repair, maintain, upgrade, modify or replace existing legal non-conforming billboards.

U.S. federal law neither requires nor prohibits the removal of existing lawful billboards, but it does mandate the payment of compensation if a state or political subdivision compels the removal of a lawful billboard along the controlled roads. In the past, state governments have purchased and removed existing lawful billboards for beautification purposes using federal funding for transportation enhancement programs, and these jurisdictions may continue to do so in the future. From time to time, state and local government authorities use the power of eminent domain and amortization to remove billboards. Amortization is the required removal of legal non-conforming billboards (billboards which conformed with applicable laws and regulations when built, but which do not conform to current laws and regulations) or the commercial advertising placed on such billboards after a period of years. Pursuant to this concept, the governmental body asserts that just compensation is earned by continued operation of the billboard over that period of time. Although amortization is prohibited along all controlled roads, amortization has been upheld along non-controlled roads in limited instances where permitted by state and local law. Thus far, we have been able to obtain satisfactory compensation for, or relocation of, our billboards purchased or removed as a result of these types of governmental action, although there is no assurance that this will continue to be the case in the future.

We have introduced and intend to expand the deployment of digital billboards that display static digital advertising copy from various advertisers that change up to several times per minute. We have encountered some existing regulations in the U.S. and across some international jurisdictions that restrict or prohibit these types of digital displays. However, since digital technology for changing static copy has only recently been developed and introduced into the market on a large scale, and is in the process of being introduced more broadly in our international markets, existing regulations that currently do not apply to digital technology

16

by their terms could be revised to impose greater restrictions. These regulations, or actions by third parties, may impose greater restrictions on digital billboards due to alleged concerns over aesthetics or driver safety.

**Available Information**

You can find more information about us at our Internet website located at www.iheartmedia.com. Our Annual Report on Form 10-K, our Quarterly Reports on Form 10-Q, our Current Reports on Form 8-K and any amendments to those reports are available free of charge through our Internet website as soon as reasonably practicable after we electronically file such material with, or furnish such material to, the Securities and Exchange Commission ("SEC"). The contents of our website are not deemed to be part of this Annual Report on Form 10-K or any of our other filings with the SEC.

The SEC maintains an internet website that contains these reports at www.sec.gov. Any materials we file with the SEC may also be read or copied at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. Information concerning the operation of the Public Reference Room may be obtained by calling the SEC at (800) 732-0330.

# ITEM 1A. RISK FACTORS

**Risks Related to Our Business**

***To service our debt obligations and to fund our operations and our capital expenditures, we require a significant amount of cash to meet our needs, which depends on many factors beyond our control***

Our ability to service our debt obligations and to fund our operations and our capital expenditures requires a significant amount of cash. Our primary sources of liquidity are cash on hand, cash flow from operations and borrowing capacity under iHeartCommunications' receivables based credit facility, subject to certain limitations contained in iHeartCommunications' material financing agreements, to help meet our liquidity needs. As of December 31, 2016, we had $845.0 million of cash on our balance sheet. As of December 31, 2016, we had a borrowing base of $480.4 million under iHeartCommunications' receivables based credit facility, had $330.0 million of outstanding borrowings and $36.8 million of outstanding letters of credit, resulting in $113.6 million of excess availability. However, any incremental borrowings under iHeartCommunications' receivables based credit facility may be further limited by the terms contained in iHeartCommunications' material financing agreements. Due to the seasonal variations in our business, we made a repayment of $25.0 million on January 31, 2017, and we expect our borrowing base and excess availability to decrease in the first quarter of 2017. As a result, we may be required to repay a portion of our outstanding borrowings under this facility during the first quarter of 2017.

During the second quarter of 2014, the FASB issued ASU No. 2014-15, *Presentation of Financial Statements - Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern.* This update provides U.S. GAAP guidance on management's responsibility in evaluating whether there is substantial doubt about a company's ability to continue as a going concern and about related footnote disclosures. We adopted this standard for the year ended December 31, 2016. Under this standard, we are required to evaluate whether there is substantial doubt about its ability to continue as a going concern each reporting period, including interim periods. In evaluating our ability to continue as a going concern, management considered the conditions and events that could raise substantial doubt about our ability to continue as a going concern within 12 months after our financial statements were issued (February 23, 2017). Management considered our current financial condition and liquidity sources, including current funds available, forecasted future cash flows and our conditional and unconditional obligations due before February 23, 2018. Our forecasted future cash flows indicates that such cash flows would not be sufficient for us to meet our obligations, including payment of the outstanding balance on our receivables based credit facility, which has a maturity of December 24, 2017, as they become due in the ordinary course of business for 12 months following February 23, 2017. We plan to refinance or extend the receivables based credit facility to a date at least 12 months after February 23, 2017 with terms similar to the facility's current terms. We believe the refinancing or extension of the maturity of the receivables based credit facility is probable of being executed as we have successfully extended the maturity date of this receivables based credit facility in the past and the facility has a first-priority lien on the accounts receivable of iHeartCommunications and certain of its subsidiaries. Our plan to refinance or extend the due date of the receivables based credit facility, combined with current funds and expected future cash flows, are considered to be sufficient to enable the Company to meet its obligations as they become due in the ordinary course of business for a period of 12 months following the date these financial statements are issued. While we currently plan to refinance or extend the maturity of the receivables based credit facility and have begun discussing such refinancing or extension with our receivables based credit facility lenders, there is no assurance that the receivables based credit facility will be refinanced or extended in a timely manner, in amounts that are sufficient to meet the Company's obligations as they become due, or on terms acceptable to us, or at all. See "Management's Discussion and Analysis of Financial Condition and Results of Operations - Liquidity and Capital Resources - Anticipated Cash Requirements." Our ability to meet our obligations as they become due in the ordinary course of business for the next 12 months will depend on our ability to achieve forecasted results and our ability to refinance or extend the maturity of our receivables based credit facility. In 2016, we drew a net aggregate of $100.0 million under our receivables based credit facility to fund working capital needs, capital expenditures and interest payment obligations, and,

17

since the beginning of 2016, we completed several transactions as described under "Management's Discussion and Analysis of Financial Condition and Results of Operations-Liquidity and Capital Resources-Anticipated Cash Requirements." These transactions improved our liquidity position in the short term, but our annual cash interest payment obligations increased as a result. We anticipate paying cash interest of approximately $1.7 billion during 2017. If we are unable to continue to obtain sources of refinancing or generate sufficient cash through our operations and liquidity-generating transactions, or if we are unable to refinance or extend the maturity of our receivables based credit facility, we could face substantial liquidity problems, which could have a material adverse effect on our financial condition and on our ability to meet iHeartCommunications' obligations.

***Our results have been in the past, and could be in the future, adversely affected by economic uncertainty or deteriorations in economic conditions***

We derive revenues from the sale of advertising. Expenditures by advertisers tend to be cyclical, reflecting economic conditions and budgeting and buying patterns. Periods of a slowing economy or recession, or periods of economic uncertainty, may be accompanied by a decrease in advertising. For example, the global economic downturn that began in 2008 resulted in a decline in advertising and marketing by our customers, which resulted in a decline in advertising revenues across our businesses. This reduction in advertising revenues had an adverse effect on our revenue, profit margins, cash flow and liquidity. Global economic conditions have been slow to recover and remain uncertain. If economic conditions do not continue to improve, economic uncertainty increases or economic conditions deteriorate again, global economic conditions may once again adversely impact our revenue, profit margins, cash flow and liquidity. Furthermore, because a significant portion of our revenue is derived from local advertisers, our ability to generate revenues in specific markets is directly affected by local and regional conditions, and unfavorable regional economic conditions also may adversely impact our results. In addition, even in the absence of a downturn in general economic conditions, an individual business sector or market may experience a downturn, causing it to reduce its advertising expenditures, which also may adversely impact our results.

***We face intense competition in our iHeartMedia and our outdoor advertising businesses***

We operate in a highly competitive industry, and we may not be able to maintain or increase our current audience ratings and advertising revenues. Our iHeartMedia and our outdoor advertising businesses compete for audiences and advertising revenues with other radio and outdoor advertising businesses, as well as with other media, such as newspapers, magazines, television, direct mail, portable digital audio players, mobile devices, satellite radio, Internet-based services and live entertainment, within their respective markets. Audience ratings and market shares are subject to change for various reasons, including through consolidation of our competitors through processes such as mergers and acquisitions, which could have the effect of reducing our revenues in a specific market. Our competitors may develop technology, services or advertising media that are equal or superior to those we provide or that achieve greater market acceptance and brand recognition than we achieve. It also is possible that new competitors may emerge and rapidly acquire significant market share in any of our business segments. An increased level of competition for advertising dollars may lead to lower advertising rates as we attempt to retain customers or may cause us to lose customers to our competitors who offer lower rates that we are unable or unwilling to match.

***Alternative media platforms and technologies may continue to increase competition with our broadcasting operations***

Our terrestrial radio broadcasting operations face increasing competition from alternative media platforms and technologies, such as broadband wireless, satellite radio, audio broadcasting by cable television systems and Internet-based streaming music services, as well as consumer products, such as portable digital audio players and other mobile devices, smart phones and tablets, gaming consoles, in-home entertainment and enhanced automotive platforms. These technologies and alternative media platforms, including those used by us, compete with our broadcast radio stations for audience share and advertising revenues. We are unable to predict the effect that such technologies and related services and products will have on our broadcasting operations. The capital expenditures necessary to implement these or other technologies could be substantial and we cannot assure you that we will continue to have the resources to acquire new technologies or to introduce new services to compete with other new technologies or services, or that our investments in new technologies or services will provide the desired returns. Other companies employing new technologies or services could more successfully implement such new technologies or services or otherwise increase competition with our businesses.

***Our iHeartMedia business is dependent upon the performance of on-air talent and program hosts***

We employ or independently contract with many on-air personalities and hosts of syndicated radio programs with significant loyal audiences in their respective markets. Although we have entered into long-term agreements with some of our key on-air talent and program hosts to protect our interests in those relationships, we can give no assurance that all or any of these persons will remain with us or will retain their audiences. Competition for these individuals is intense and many of these individuals are under no legal obligation to remain with us. Our competitors may choose to extend offers to any of these individuals on terms which we may be unwilling to meet. Furthermore, the popularity and audience loyalty of our key on-air talent and program hosts is highly sensitive to rapidly changing public tastes. A loss of such popularity or audience loyalty is beyond our control and could

have a material adverse effect on our ability to attract local and/or national advertisers and on our revenue and/or ratings, and could result in increased expenses.

*Our business is dependent on our management team and other key individuals*

Our business is dependent upon the performance of our management team and other key individuals. Although we have entered into agreements with some members of our management team and certain other key individuals, we can give no assurance that all or any of our management team and other key individuals will remain with us, or that we won't continue to make changes to the composition of, and the roles and responsibilities of, our management team. Competition for these individuals is intense and many of our key employees are at-will employees who are under no legal obligation to remain with us, and may decide to leave for a variety of personal or other reasons beyond our control. If members of our management or key individuals decide to leave us in the future, if we decide to make further changes to the composition of, or the roles and responsibilities of, these individuals, or if we are not successful in attracting, motivating and retaining other key employees, our business could be adversely affected.

*Our financial performance may be adversely affected by many factors beyond our control*

Certain factors that could adversely affect our financial performance by, among other things, decreasing overall revenues, the numbers of advertising customers, advertising fees or profit margins include:

- unfavorable fluctuations in operating costs, which we may be unwilling or unable to pass through to our customers;
- our inability to successfully adopt or our being late in adopting technological changes and innovations that offer more attractive advertising or listening alternatives than what we offer, which could result in a loss of advertising customers or lower advertising rates, which could have a material adverse effect on our operating results and financial performance;
- the impact of potential new royalties charged for terrestrial radio broadcasting, which could materially increase our expenses;
- unfavorable shifts in population and other demographics, which may cause us to lose advertising customers as people migrate to markets where we have a smaller presence or which may cause advertisers to be willing to pay less in advertising fees if the general population shifts into a less desirable age or geographical demographic from an advertising perspective;
- adverse political effects and acts or threats of terrorism or military conflicts; and
- unfavorable changes in labor conditions, which may impair our ability to operate or require us to spend more to retain and attract key employees.

In addition, on June 23, 2016, the United Kingdom (the "U.K.") held a referendum in which voters approved an exit of the U.K. from the European Union (the "E.U."), commonly referred to as "Brexit". International outdoor is currently headquartered in the U.K. and transacts business in many key European markets. As a result of the referendum, it is expected that the British government will begin negotiating the terms of the U.K.'s withdrawal from the E.U. It is unclear how these negotiations will impact the economies of the U.K., the E.U. and other countries. This uncertainty may cause our customers to closely monitor their costs and reduce the amount they spend on advertising. In addition, the announcement of Brexit caused the British pound's currency rate to weaken against the U.S. dollar. Any of these or similar effects of Brexit could adversely impact our business, operating results, cash flows and financial condition.

*The success of our street furniture and transit products businesses is dependent on our obtaining key municipal concessions, which we may not be able to obtain on favorable terms*

Our street furniture and transit products businesses require us to obtain and renew contracts with municipalities and transit authorities. Many of these contracts, which require us to participate in competitive bidding processes at each renewal, typically have terms ranging up to 15 years and have revenue share, capital expenditure requirements and/or fixed payment components. Competitive bidding processes are complex and sometimes lengthy and substantial costs may be incurred in connection with preparing bids.

Our competitors, individually or through relationships with third parties, may be able to provide different or greater capabilities or prices or benefits than we can provide. In the past we have not been, and most likely in the future will not be, awarded all of the contracts on which we bid. The success of our business also depends generally on our ability to obtain and renew contracts with private landlords. There can be no assurance that we will win any particular bid, be able to renew existing contracts or be able to replace any revenue lost upon expiration or completion of a contract. Our inability to renew existing contracts may also result in significant expenses from the removal of our displays. Furthermore, if and when we do obtain a contract, we are generally required to incur significant start-up expenses. The costs of bidding on contracts and the start-up costs associated with new contracts we may obtain may significantly reduce our cash flow and liquidity.

19

This competitive bidding process presents a number of risks, including the following:

- we expend substantial cost and managerial time and effort to prepare bids and proposals for contracts that we may not win;
- we may be unable to estimate accurately the revenue derived from and the resources and cost structure that will be required to service any contract we win; and
- we may encounter expenses and delays if our competitors challenge awards of contracts to us in competitive bidding, and any such challenge could result in the resubmission of bids on modified specifications, or in the termination, reduction or modification of the awarded contract.

Our inability to successfully negotiate, renew or complete these contracts due to third-party or governmental demands and delay and the highly competitive bidding processes for these contracts could affect our ability to offer these products to our clients, or to offer them to our clients at rates that are competitive to other forms of advertising, without adversely affecting our financial results.

*Future dispositions, acquisitions and other strategic transactions could pose risks*

We frequently evaluate strategic opportunities both within and outside our existing lines of business. We expect from time to time to pursue strategic dispositions of certain businesses as well as acquisitions. These dispositions or acquisitions could be material. Our strategy involves numerous risks, including:

- our dispositions may negatively impact revenues from our national, regional and other sales networks;
- our dispositions may make it difficult to generate cash flows from operations sufficient to meet our anticipated cash requirements, including our and Clear Channel Outdoor Holdings, Inc.'s ("CCOH") debt service requirements;
- our acquisitions may prove unprofitable and fail to generate anticipated cash flows;
- to successfully manage our large portfolio of iHeartMedia, outdoor advertising and other businesses, we may need to:
  - recruit additional senior management as we cannot be assured that senior management of acquired businesses will continue to work for us and we cannot be certain that our recruiting efforts will succeed, and
  - expand corporate infrastructure to facilitate the integration of our operations with those of acquired businesses, because failure to do so may cause us to lose the benefits of any expansion that we decide to undertake by leading to disruptions in our ongoing businesses or by distracting our management;
- we may enter into markets and geographic areas where we have limited or no experience;
- we may encounter difficulties in the integration of operations and systems; and
- our management's attention may be diverted from other business concerns.

Dispositions and acquisitions of media and entertainment businesses and outdoor advertising businesses may require antitrust review by U.S. federal antitrust agencies and may require review by foreign antitrust agencies under the antitrust laws of foreign jurisdictions. We can give no assurances that the DOJ, the FTC or foreign antitrust agencies will not seek to bar us from disposing of or acquiring media and entertainment businesses or outdoor advertising businesses or impose stringent undertaking on our business as a condition to the completion of an acquisition in any market where we already have a significant position. Further, radio acquisitions are subject to FCC approval. Such transactions must comply with the Communications Act and FCC regulatory requirements and policies, including with respect to the number of broadcast facilities in which a person or entity may have an ownership or attributable interest in a given local market and the level of interest that may be held by a foreign individual or entity. The FCC's media ownership rules remain subject to ongoing agency and court proceedings. Future changes could restrict our ability to dispose of or acquire new radio assets or businesses.

*Extensive current government regulation, and future regulation, may limit our radio broadcasting and other iHeartMedia operations or adversely affect our business and financial results*

Congress and several federal agencies, including the FCC, extensively regulate the domestic radio industry. For example, the FCC could impact our profitability by imposing large fines on us if, in response to pending or future complaints, it finds that we broadcast indecent programming or committed other violations of FCC regulations. We could face significant fines, for instance, as a result of pending FCC investigations into the allegedly inappropriate broadcast of emergency alert signals by several of our stations. Additionally, we cannot be sure that the FCC will approve renewal of the licenses we must have in order to operate our stations. Nor can we be assured that our licenses will be renewed without conditions and for a full term. The non-renewal, or conditioned renewal, of a substantial number of our FCC licenses could have a materially adverse impact on our operations. Furthermore, possible changes in interference protections, spectrum allocations and other technical rules may negatively affect the operation of our stations. For example, in January 2011, a law was enacted that eliminates certain minimum distance separation requirements between full-power and low-power FM radio stations. In March 2011, the FCC adopted policies which, in certain circumstances, could make it more difficult for radio stations to relocate to increase their population coverage. In October 2015,

20

the FCC proposed rules, which could reduce the degree of interference protection afforded to certain of our AM radio stations that serve wide areas. In addition, Congress, the FCC and other regulatory agencies have considered, and may in the future consider and adopt, new laws, regulations and policies that could, directly or indirectly, have an adverse effect on our business operations and financial performance. For example, Congress may consider and adopt legislation that would impose an obligation upon all U.S. broadcasters to pay performing artists a royalty for the on-air broadcast of their sound recordings (this would be in addition to payments already made by broadcasters to owners of musical work rights, such as songwriters, composers and publishers). Moreover, it is possible that our license fees and negotiating costs associated with obtaining rights to use musical compositions and sound recordings in our programming content could sharply increase as a result of private negotiations, one or more regulatory rate-setting processes, or administrative and court decisions. The CRB recently issued a final determination establishing copyright royalty rates for the public performance and ephemeral reproduction of sound recordings by various noninteractive webcasters, including radio broadcasters that simulcast their terrestrial programming online, to apply to the period from January 1, 2016 to December 31, 2020 under the webcasting statutory license. The rates set by the CRB represent a decrease from the 2015 CRB rates applicable to broadcasters and other webcasters, but the determination has been appealed. Increased royalty rates could significantly increase our expenses, which could adversely affect our business. Additionally, there are conditions applicable to the webcasting statutory license. Some, but not all, record companies have agreed to waive or provide limited relief from certain of these conditions under certain circumstances. Some of these conditions may be inconsistent with customary radio broadcasting practices. Finally, various regulatory matters relating to our iHeartMedia business are now, or may become, the subject of court litigation, and we cannot predict the outcome of any such litigation or its impact on our business.

***Government regulation of outdoor advertising may restrict our outdoor advertising operations***

U.S. federal, state and local regulations have a significant impact on the outdoor advertising industry and our business. One of the seminal laws is the HBA, which regulates outdoor advertising on controlled roads in the United States. The HBA regulates the size and location of billboards, mandates a state compliance program, requires the development of state standards, promotes the expeditious removal of illegal signs and requires just compensation for takings. Construction, repair, maintenance, lighting, upgrading, height, size, spacing, the location and permitting of billboards and the use of new technologies for changing displays, such as digital displays, are regulated by federal, state and local governments. From time to time, states and municipalities have prohibited or significantly limited the construction of new outdoor advertising structures. Changes in laws and regulations affecting outdoor advertising, or changes in the interpretation of those laws and regulations, at any level of government, including the foreign jurisdictions in which we operate, could have a significant financial impact on us by requiring us to make significant expenditures or otherwise limiting or restricting some of our operations. Due to such regulations, it has become increasingly difficult to develop new outdoor advertising locations.

From time to time, certain state and local governments and third parties have attempted to force the removal of our displays under various state and local laws, including zoning ordinances, permit enforcement and condemnation. Similar risks also arise in certain of our international jurisdictions. Certain zoning ordinances provide for amortization, which is the required removal of legal non-conforming billboards (billboards which conformed with applicable laws and regulations when built, but which do not conform to current laws and regulations) or the commercial advertising placed on such billboards after a period of years. Pursuant to this concept, the governmental body asserts that just compensation is earned by continued operation of the billboard over that period of time. Although amortization is prohibited along all controlled roads, amortization has been upheld along non-controlled roads in limited instances where permitted by state and local law. Other regulations limit our ability to rebuild, replace, repair, maintain and upgrade non-conforming displays. In addition, from time to time third parties or local governments assert that we own or operate displays that either are not properly permitted or otherwise are not in strict compliance with applicable law. If we are increasingly unable to resolve such allegations or obtain acceptable arrangements in circumstances in which our displays are subject to removal, modification or amortization, or if there occurs an increase in such regulations or their enforcement, our operating results could suffer.

A number of state and local governments have implemented or initiated taxes, fees and registration requirements in an effort to decrease or restrict the number of outdoor signs and/or to raise revenue. From time to time, legislation also has been introduced in international jurisdictions attempting to impose taxes on revenue from outdoor advertising or for the right to use outdoor advertising assets. In addition, a number of jurisdictions have implemented legislation or interpreted existing legislation to restrict or prohibit the installation of digital billboards, and we expect these efforts to continue. The increased imposition of these measures, and our inability to overcome any such measures, could reduce our operating income if those outcomes require removal or restrictions on the use of preexisting displays or limit growth of digital displays. In addition, if we are unable to pass on the cost of these items to our clients, our operating income could be adversely affected.

International regulation of the outdoor advertising industry can vary by municipality, region and country, but generally limits the size, placement, nature and density of out-of-home displays. Other regulations limit the subject matter, animation and language of out-of-home displays. Our failure to comply with these or any future international regulations could have an adverse impact on the effectiveness of our displays or their attractiveness to clients as an advertising medium and may require us to make

21

significant expenditures to ensure compliance and avoid certain penalties or contractual breaches. As a result, we may experience a significant impact on our operations, revenue, international client base and overall financial condition.

***Regulations and consumer concerns regarding privacy and data protection, or any failure to comply with these regulations, could hinder our operations***

We collect and utilize demographic and other information, including personally identifiable information, from and about our listeners, consumers, business partners and advertisers as they interact with us. For example: (1) our broadcast radio station websites and our iHeartRadio digital platform collect personal information as users register for our services, fill out their listener profiles, post comments, use our social networking features, participate in polls and contests and sign-up to receive email newsletters; (2) we use tracking technologies, such as "cookies," to manage and track our listeners' interactions with us so that we can deliver relevant music content and advertising; and (3) we collect credit card or debit card information from consumers, business partners and advertisers who use our services.

We are subject to numerous federal, state and foreign laws and regulations relating to consumer protection, information security, data protection and privacy, among other things. Many of these laws are still evolving, new laws may be enacted and any of these laws could be amended or interpreted in ways that could harm our business. In addition, changes in consumer expectations and demands regarding privacy and data protection could restrict our ability to collect, use, disclose and derive economic value from demographic and other information related to our listeners, consumers, business partners and advertisers. Such restrictions could limit our ability to provide customized music content to our listeners, interact directly with our listeners and consumers and offer targeted advertising opportunities to our business partners and advertisers. Although we have implemented policies and procedures designed to comply with these laws and regulations, any failure or perceived failure by us to comply with our policies or applicable regulatory requirements related to consumer protection, information security, data protection and privacy could result in a loss of confidence in us, damage to our brands, the loss of listeners, consumers, business partners and advertisers, as well as proceedings against us by governmental authorities or others, which could hinder our operations and adversely affect our business.

***If our security measures are breached, we could lose valuable information, suffer disruptions to our business, and incur expenses and liabilities including damages to our relationships with listeners, consumers, business partners and advertisers***

Although we have implemented physical and electronic security measures that are designed to protect against the loss, misuse and alteration of our websites, digital assets and proprietary business information as well as listener, consumer, business partner and advertiser personally identifiable information, no security measures are perfect and impenetrable and we may be unable to anticipate or prevent unauthorized access. A security breach could occur due to the actions of outside parties, employee error, malfeasance or a combination of these or other actions. If an actual or perceived breach of our security occurs, we could lose competitively sensitive business information or suffer disruptions to our business operations, information processes or internal controls. In addition, the public perception of the effectiveness of our security measures or services could be harmed, we could lose listeners, consumers, business partners and advertisers. In the event of a security breach, we could suffer financial exposure in connection with penalties, remediation efforts, investigations and legal proceedings and changes in our security and system protection measures. Currently, not all of our systems are fully compliant with PCI-DSS standards and, as a result, we may face additional liability in the event of a security breach involving payment card information.

***Restrictions on outdoor advertising of certain products may restrict the categories of clients that can advertise using our products***

Out-of-court settlements between the major U.S. tobacco companies and all 50 states, the District of Columbia, the Commonwealth of Puerto Rico and other U.S. territories include a ban on the outdoor advertising of tobacco products. Other products and services may be targeted in the U.S. in the future, including alcohol products. Most European Union countries, among other nations, also have banned outdoor advertisements for tobacco products and regulate alcohol advertising. Regulations vary across the countries in which we conduct business. Any significant reduction in advertising of products due to content-related restrictions could cause a reduction in our direct revenues from such advertisements and an increase in the available space on the existing inventory of billboards in the outdoor advertising industry.

***Environmental, health, safety and land use laws and regulations may limit or restrict some of our operations***

As the owner or operator of various real properties and facilities, especially in our outdoor advertising operations, we must comply with various foreign, federal, state and local environmental, health, safety and land use laws and regulations. We and our properties are subject to such laws and regulations relating to the use, storage, disposal, emission and release of hazardous and non-hazardous substances and employee health and safety as well as zoning restrictions. Historically, we have not incurred significant expenditures to comply with these laws. However, additional laws which may be passed in the future, or a finding of a violation of or liability under existing laws, could require us to make significant expenditures and otherwise limit or restrict some of our operations.

***We are exposed to foreign currency exchange risks because a portion of our revenue is received in foreign currencies and translated to U.S. dollars for reporting purposes.***

We generate a portion of our revenues in currencies other than U.S. dollars. Changes in economic or political conditions, including Brexit, in any of the foreign countries in which we operate could result in exchange rate movement, new currency or exchange controls or other currency restrictions being imposed. Because we receive a portion of our revenues in currencies from the countries in which we operate, exchange rate fluctuations in any such currency could have an adverse effect on our profitability. A portion of our cash flows are generated in foreign currencies and translated to U.S. dollars for reporting purposes, and certain of the indebtedness held by our international subsidiaries is denominated in U.S. dollars, and, therefore, significant changes in the value of such foreign currencies relative to the U.S. dollar could have a material adverse effect on our financial condition and our ability to meet interest and principal payments on our indebtedness.

Given the volatility of exchange rates, we cannot assure you that we will be able to effectively manage our currency transaction and/or translation risks. It is possible that volatility in currency exchange rates will have a material adverse effect on our financial condition or results of operations. We expect to experience economic losses and gains and negative and positive impacts on our operating income as a result of foreign currency exchange rate fluctuations.

***Doing business in foreign countries exposes us to certain risks not expected to occur when doing business in the United States***

Doing business in foreign countries carries with it certain risks that are not found when doing business in the United States. These risks could result in losses against which we are not insured. Examples of these risks include:

- potential adverse changes in the diplomatic relations of foreign countries with the United States;
- hostility from local populations;
- the adverse effect of foreign exchange controls;
- government policies against businesses owned by foreigners;
- investment restrictions or requirements;
- expropriations of property without adequate compensation;
- the potential instability of foreign governments;
- the risk of insurrections;
- risks of renegotiation or modification of existing agreements with governmental authorities;
- difficulties collecting receivables and otherwise enforcing contracts with governmental agencies and others in some foreign legal systems;
- withholding and other taxes on remittances and other payments by subsidiaries;
- changes in tax structure and level; and
- changes in laws or regulations or the interpretation or application of laws or regulations.

Our International operations involve contracts with, and regulation by, foreign governments. We operate in many parts of the world that experience corruption to some degree. Although we have policies and procedures in place that are designed to promote legal and regulatory compliance (including with respect to the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act), our employees, subcontractors and agents could take actions that violate applicable anticorruption laws or regulations. Violations of these laws, or allegations of such violations, could have a material adverse effect on our business, financial position and results of operations.

***Significant equity investors control us and may have conflicts of interest with us in the future***

Private equity funds sponsored by or co-investors with Bain Capital and THL currently indirectly control us through their ownership of all of our outstanding shares of Class B common stock and Class C common stock, which collectively represent approximately 68% of the voting power of all of our outstanding capital stock. As a result, Bain Capital and THL have the power to elect all but two of our directors, appoint new management and approve any action requiring the approval of the holders of our capital stock, including adopting any amendments to our fourth amended and restated certificate of incorporation, and approving mergers or sales of substantially all of our capital stock or assets. The directors elected by Bain Capital and THL will have significant authority to make decisions affecting us, including the issuance of additional capital stock, change in control transactions, the incurrence of additional indebtedness, the implementation of stock repurchase programs and the decision of whether or not to declare dividends.

In addition, affiliates of Bain Capital and THL are lenders under  iHeartCommunications' term loan credit facilities and holders of iHeartCommunications' priority guarantee notes due 2019. It is possible that their interests in some circumstances may conflict with our interests and the interests of other stockholders.

Additionally, Bain Capital and THL are in the business of making investments in companies and may acquire and hold interests in businesses that compete directly or indirectly with us. One or more of the entities advised by or affiliated with Bain Capital and/or THL may also pursue acquisition opportunities that may be complementary to our business and, as a result, those acquisition opportunities may not be available to us. So long as entities advised by or affiliated with Bain Capital and THL directly or indirectly own a significant amount of the voting power of our outstanding equity interests, even if such amount is less than 50%, Bain Capital and THL will continue to be able to strongly influence or effectively control our decisions.

**Risks Related to Ownership of Our Class A Common Stock**

***The market price and trading volume of our Class A common stock may be volatile***

The market price of our Class A common stock could fluctuate significantly for many reasons, including, without limitation:

- as a result of the risk factors listed in this Annual Report on Form 10-K;
- actual or anticipated fluctuations in our operating results;
- reasons unrelated to operating performance, such as reports by industry analysts, investor perceptions, or negative announcements by our customers or competitors regarding their own performance;
- regulatory changes that could impact our business; and
- general economic and industry conditions.

Shares of our Class A common stock are quoted on the Over-the-Counter Pink Sheets. The lack of an active market may impair the ability of holders of our Class A common stock to sell their shares of Class A common stock at the time they wish to sell them or at a price that they consider reasonable. The lack of an active market may also reduce the fair market value of the shares of our Class A common stock.

***There is no assurance that holders of our Class A common stock will ever receive cash dividends***

We have never paid cash dividends on our Class A common stock, and there is no guarantee that we will ever pay cash dividends on our Class A common stock in the future. The terms of our financing arrangements and other debt restrict our ability to pay cash dividends on our Class A common stock. In addition to those restrictions, under Delaware law, we are permitted to pay cash dividends on our capital stock only out of our surplus, which in general terms means the excess of our net assets over the original aggregate par value of our stock. In the event we have no surplus, we are permitted to pay these cash dividends out of our net profits for the year in which the dividend is declared or in the immediately preceding year. Accordingly, there is no guarantee that, if we wish to pay cash dividends, we would be able to do so pursuant to Delaware law. Also, even if we are not prohibited from paying cash dividends by the terms of our financing agreements or by law, other factors such as the need to reinvest cash back into our operations may prompt our Board of Directors to elect not to pay cash dividends.

***We may terminate our Exchange Act reporting, if permitted by applicable law***

If at any time our Class A common stock is held by fewer than 300 holders of record, we will be permitted to cease to be a reporting company under the Exchange Act to the extent we are not otherwise required to continue to report pursuant to any contractual agreements, including with respect to any of our indebtedness. If we were to cease filing reports under the Exchange Act, the information now available to our stockholders in the annual, quarterly and other reports we currently file with the SEC would not be available to them as a matter of right.

**Risks Related to Our Indebtedness**

***The substantial amount of indebtedness of our subsidiary, iHeartCommunications, and its subsidiaries, may adversely affect our liquidity, our cash flows and our ability to operate our business and make us more vulnerable to changes in the economy or our industry***

We have a substantial amount of indebtedness. At December 31, 2016, we had $20.4 billion of total indebtedness outstanding, including: (1) $5.0 billion aggregate principal amount outstanding under iHeartCommunications' term loan D credit facility, which matures in January 2019 and $1.3 billion aggregate principal amount outstanding under iHeartCommunications' term loan E credit facility, which matures in July 2019; (2) $330.0 million aggregate principal amount outstanding under iHeartCommunications' receivables based credit facility, which matures in December 2017; (3) $2.0 billion aggregate principal amount outstanding of iHeartCommunications' 9.0% priority guarantee notes due 2019, which mature in December 2019; (4) $1.7 billion aggregate principal amount outstanding of iHeartCommunications' 9.0% priority guarantee notes due 2021, net of $25.3 million of unamortized discounts, which mature in March 2021; (5) $575.0 million aggregate principal amount outstanding of iHeartCommunications' 11.25% priority guarantee notes due 2021, which mature in March 2021; (6) $1.0 billion aggregate principal amount outstanding of iHeartCommunications' 9.0% priority guarantee notes due 2022, net of $2.0 million of unamortized premiums, which mature in September 2022; (7) $950.0 million aggregate principal amount outstanding of iHeartCommunications'

10.625% priority guarantee notes due 2023, which mature in March 2023; (8) $21.0 million aggregate principal amount of other secured debt; (9) $1.7 billion aggregate principal amount outstanding of iHeartCommunications' 14.0% senior notes due 2021, net of $12.0 million of unamortized discounts and net of $440.6 million held by a subsidiary of iHeartCommunications, which mature in February 2021; (10) $350.1 million aggregate principal amount outstanding of iHeartCommunications' Legacy Notes, which mature in June 2018 and October 2027, net of unamortized purchase accounting discounts of $124.9 million and net of $57.1 million of 5.5% senior notes due 2016, which matured in December 2016, but were not repaid and continue to be outstanding and are held by a subsidiary of iHeartCommunications and are eliminated in consolidation for accounting purposes; (11) $347.0 million aggregate principal amount outstanding of iHeartCommunications' 10.0% senior notes due 2018, net of $503.0 million held by certain subsidiaries of iHeartCommunications, which mature in January 2018; (12) $2.7 billion aggregate principal amount outstanding of subsidiary senior notes, net of unamortized discounts of $4.9 million, which mature in November 2022; (13) $2.2 billion aggregate principal amount outstanding of subsidiary senior subordinated notes, which mature in March 2020; (14) $223.2 million aggregate principal amount outstanding of international subsidiary senior notes, net of unamortized discounts of $1.8 million, which mature in December 2020; and (15) other obligations of $28.0 million. This large amount of indebtedness could have negative consequences for us, including, without limitation:

- requiring us to dedicate a substantial portion of our cash flow to the payment of principal and interest on indebtedness, thereby reducing cash available for other purposes, including to fund operations and capital expenditures, invest in new technology and pursue other business opportunities;
- limiting our liquidity and operational flexibility and limiting our ability to obtain additional financing for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes;
- limiting our ability to adjust to changing economic, business and competitive conditions;
- requiring us to defer planned capital expenditures, reduce discretionary spending, sell assets, restructure existing indebtedness or defer acquisitions or other strategic opportunities;
- limiting our ability to refinance any of the indebtedness or increasing the cost of any such financing;
- making us more vulnerable to an increase in interest rates, a downturn in our operating performance, a decline in general economic or industry conditions or a disruption in the credit markets; and
- making us more susceptible to negative changes in credit ratings, which could impact our ability to obtain financing in the future and increase the cost of such financing.

If compliance with the debt obligations materially hinders our ability to operate our business and adapt to changing industry conditions, we may lose market share, our revenue may decline and our operating results may suffer. The terms of iHeartCommunications' credit facilities and other indebtedness allow us, under certain conditions, to incur further indebtedness, including secured indebtedness, which heightens the foregoing risks.

***iHeartCommunications and its subsidiaries may not be able to generate sufficient cash to service all of their indebtedness, may not be able to refinance all of their indebtedness before it becomes due and may be forced to take other actions to satisfy their obligations under their indebtedness, which may not be successful***

iHeartCommunications' and its subsidiaries' ability to make scheduled payments on their respective debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond their or our control. In addition, because iHeartCommunications derives a substantial portion of its operating income from its subsidiaries, iHeartCommunications' ability to repay its debt depends upon the performance of its subsidiaries, their ability to dividend or distribute funds to iHeartCommunications and iHeartCommunications' receipt of funds under its cash management arrangement with its subsidiary, CCOH.

iHeartCommunications and its subsidiaries may not generate cash flow from operations or have cash on hand in an amount sufficient to fund our liquidity needs. We anticipate cash interest requirements of approximately $1.7 billion during 2017. At December 31, 2016, we had debt maturities totaling $343.5 million, $559.1 million (net of $503.0 million due to certain subsidiaries of iHeartCommunications) and $8.4 billion in 2017, 2018 and 2019, respectively. iHeartCommunications' and its subsidiaries' ability to pay their debt maturing over the next 12 months is dependent upon achieving forecasted cash from operations and our ability to refinance or extend the maturity of the receivables based credit facility. We are currently exploring, and expect to continue to explore, a variety of transactions to provide us with additional liquidity or to restructure our indebtedness, and we are seeking to refinance or extend the maturity of the receivables based credit facility. We cannot assure you that we will enter into or consummate any such liquidity-generating or restructuring transactions or that we will be successful in extending the maturity of the receivables based credit facility and we cannot currently predict the impact that any such transactions, if consummated, would have on us.

If iHeartCommunications' and  its subsidiaries' cash flows from operations, refinancing sources and other liquidity-generating or restructuring transactions are insufficient to fund or extend their respective debt service obligations or debt maturities, we may be forced to reduce or delay capital expenditures, sell material assets or operations, or seek additional capital from other

sources. We may not be able to take any of these actions, and these actions may not be successful or permit iHeartCommunications or its subsidiaries to meet the scheduled debt service obligations. Furthermore, these actions may not be permitted under the terms of existing or future debt agreements.

If we, iHeartCommunications or its subsidiaries cannot make scheduled payments on indebtedness, iHeartCommunications or its subsidiaries, as applicable, will be in default under one or more of the debt agreements and, as a result we could be forced into bankruptcy or liquidation.

***Our substantial debt service obligations have increased as a result of iHeartCommunications' financing transactions and may continue to do so, which could adversely affect our liquidity and prevent us from fulfilling our obligations***

During 2015 and 2016, our debt service obligations increased. Future financing transactions and any increase in interest rates may further increase our interest expense. The increase in our debt service obligations could adversely affect our liquidity and could have important consequences, including the following:

- it may make it more difficult for us to satisfy our obligations under our indebtedness and our contractual and commercial commitments; and
- it may otherwise further limit us in the ways summarized above under "The substantial amount of indebtedness of our subsidiary, iHeartCommunications, and its subsidiaries, may adversely affect our liquidity, our cash flows and our ability to operate our business and make us more vulnerable to changes in the economy or our industry," including by reducing our cash available for operations, debt service obligations, future business opportunities, acquisitions and capital expenditures.

Our ability to make payments with respect to iHeartCommunications' debt obligations will depend on our future operating performance, our ability to complete liquidity-generating transactions and iHeartCommunications' ability to continue to refinance its indebtedness and refinance or extend the maturity of its receivables based credit facility, which will be affected by prevailing economic and credit market conditions and financial, business and other factors, many of which are beyond our control.

***Because we and iHeartCommunications derive all of our operating income from our subsidiaries, iHeartCommunications' ability to repay its debt depends upon the performance of our subsidiaries and their ability to dividend or distribute funds to us***

We derive all of our operating income from our subsidiaries. As a result, our cash flow and the ability of iHeartCommunications to service its indebtedness depend on the performance of our subsidiaries and the ability of those entities to distribute funds to us. We cannot assure you that our subsidiaries will be able to, or be permitted to, pay to us the amounts necessary to service iHeartCommunications' debt.

***The documents governing iHeartCommunications' and its subsidiaries' indebtedness contain restrictions that limit our flexibility in operating our business***

iHeartCommunications' material financing agreements, including its credit agreements and indentures, contain various covenants restricting, among other things, our ability to:

- make acquisitions or investments;
- make loans or otherwise extend credit to others;
- incur indebtedness or issue shares or guarantees;
- create liens;
- enter into transactions with affiliates;
- sell, lease, transfer or dispose of assets;
- merge or consolidate with other companies; and
- make a substantial change to the general nature of our business.

In addition, under iHeartCommunications' senior secured credit facilities, iHeartCommunications is required to comply with certain affirmative covenants and certain specified financial covenants and ratios. For instance, iHeartCommunications' senior secured credit facilities require it to comply on a quarterly basis with a financial covenant limiting the ratio of its consolidated secured debt, net of cash and cash equivalents, to its consolidated EBITDA (as defined under the terms of the senior secured credit facilities) for the preceding four quarters. The maximum ratio permitted under this financial covenant for the four quarters ended December 31, 2016 was 8.75 to 1.

The restrictions contained in iHeartCommunications' credit agreements and indentures could affect our ability to operate our business and may limit our ability to react to market conditions or take advantage of potential business opportunities as they arise. For example, such restrictions could adversely affect our ability to finance our operations, make strategic acquisitions,

investments or alliances, restructure our organization or finance our capital needs. Additionally, the ability to comply with these covenants and restrictions may be affected by events beyond iHeartCommunications' or our control. These include prevailing economic, financial and industry conditions. If any of these covenants or restrictions is breached, iHeartCommunications could be in default under the agreements governing its indebtedness and, as a result, we would be forced into bankruptcy or liquidation.

***Downgrades in our credit ratings may adversely affect our borrowing costs, limit our financing options, reduce our flexibility under future financings and adversely affect our liquidity, and also may adversely impact our business operations***

The corporate credit ratings for iHeartCommunications and our indirect subsidiaries, Clear Channel Worldwide Holdings, Inc. ("CCWH") and Clear Channel International B.V. ("CCIBV"), are speculative-grade. Our corporate credit rating and our rating outlook are subject to review by rating agencies from time to time and, on various occasions, have been downgraded. In the future, our corporate credit ratings and our rating outlook could be further downgraded. These downgrades and any further downgrades in our credit ratings could increase our borrowing costs or increase the cost of doing business or otherwise negatively impact our business operations.

**Cautionary Statement Concerning Forward-Looking Statements**

The Private Securities Litigation Reform Act of 1995 provides a safe harbor for forward-looking statements made by us or on our behalf. Except for the historical information, this report contains various forward-looking statements which represent our expectations or beliefs concerning future events, including, without limitation, our future operating and financial performance, our ability to comply with the covenants in the agreements governing our indebtedness and the availability of capital and the terms thereof. Statements expressing expectations and projections with respect to future matters are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We caution that these forward-looking statements involve a number of risks and uncertainties and are subject to many variables which could impact our future performance. These statements are made on the basis of management's views and assumptions, as of the time the statements are made, regarding future events and performance. There can be no assurance, however, that management's expectations will necessarily come to pass. Actual future events and performance may differ materially from the expectations reflected in our forward-looking statements. We do not intend, nor do we undertake any duty, to update any forward-looking statements.

A wide range of factors could materially affect future developments and performance, including but not limited to:

- the impact of our substantial indebtedness, including the effect of our leverage on our financial position and earnings;
- our ability to generate sufficient cash from operations and liquidity-generating transactions and our need to allocate significant amounts of our cash to make payments on our indebtedness, which in turn could reduce our financial flexibility and ability to fund other activities;
- risks associated with weak or uncertain global economic conditions and their impact on the capital markets, including the effects of Brexit;
- other general economic and political conditions in the United States and in other countries in which we currently do business, including those resulting from recessions, political events and acts or threats of terrorism or military conflicts;
- industry conditions, including competition;
- the level of expenditures on advertising;
- legislative or regulatory requirements;
- fluctuations in operating costs;
- technological changes and innovations;
- changes in labor conditions, including programming, program hosts and management;
- capital expenditure requirements;
- risks of doing business in foreign countries;
- fluctuations in exchange rates and currency values;
- the outcome of pending and future litigation;
- taxes and tax disputes;
- changes in interest rates;
- shifts in population and other demographics;
- access to capital markets and borrowed indebtedness;
- our ability to implement our business strategies;
- the risk that we may not be able to integrate the operations of acquired businesses successfully;
- the risk that our strategic revenue and efficiency initiatives may not be entirely successful or that any cost savings achieved from such strategic revenue and efficiency initiatives may not persist; and
- certain other factors set forth in our other filings with the SEC.

27

This list of factors that may affect future performance and the accuracy of forward-looking statements is illustrative and is not intended to be exhaustive. Accordingly, all forward-looking statements should be evaluated with the understanding of their inherent uncertainty.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

**Corporate**

Our corporate headquarters are located in San Antonio, Texas, where we lease space in an executive office building and lease a data and administrative service center. In addition, certain of our executive and other operations are located in New York, New York and London, England.

**iHM**

The types of properties required to support each of our radio stations include offices, studios, transmitter sites and antenna sites. We either own or lease our transmitter and antenna sites. During 2015 and 2016, we sold approximately 382 of our owned broadcast communication tower sites and entered into operating leases for the use of the sites. These leases generally have expiration dates that range from five to 30 years. A radio station's studios are generally housed with its offices in downtown or business districts. A radio station's transmitter sites and antenna sites are generally positioned in a manner that provides maximum market coverage.

**Americas Outdoor and International Outdoor Advertising**

The types of properties required to support each of our outdoor advertising branches include offices, production facilities and structure sites. An outdoor branch and production facility is generally located in an industrial or warehouse district.

With respect to each of the Americas outdoor and International outdoor segments, we primarily lease our outdoor display sites and own or have acquired permanent easements for relatively few parcels of real property that serve as the sites for our outdoor displays. Our leases generally range from month-to-month to year-to-year and can be for terms of 10 years or longer, and many provide for renewal options.

There is no significant concentration of displays under any one lease or subject to negotiation with any one landlord. We believe that an important part of our management activity is to negotiate suitable lease renewals and extensions.

**Consolidated**

The studios and offices of our radio stations and outdoor advertising branches are located in leased or owned facilities. These leases generally have expiration dates that range from one to 40 years. We do not anticipate any difficulties in renewing those leases that expire within the next several years or in leasing other space, if required. We lease substantially all of our towers and antennas and own substantially all of the other equipment used in our iHM business. We own substantially all of the equipment used in our outdoor advertising businesses. For additional information regarding our iHM and outdoor properties, see "Item 1. Business."

## ITEM 3. LEGAL PROCEEDINGS

We currently are involved in certain legal proceedings arising in the ordinary course of business and, as required, have accrued an estimate of the probable costs for the resolution of those claims for which the occurrence of loss is probable and the amount can be reasonably estimated. These estimates have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in our assumptions or the effectiveness of our strategies related to these proceedings. Additionally, due to the inherent uncertainty of litigation, there can be no assurance that the resolution of any particular claim or proceeding would not have a material adverse effect on our financial condition or results of operations.

Although we are involved in a variety of legal proceedings in the ordinary course of business, a large portion of our litigation arises in the following contexts: commercial disputes; defamation matters; employment and benefits related claims; governmental fines; intellectual property claims; and tax disputes.

28

**International Investigations**

On April 21, 2015, inspections were conducted at our premises in Denmark and Sweden as part of an investigation by Danish competition authorities. On the same day, we received a communication from the U.K. competition authorities, also in connection with the investigation by Danish competition authorities. We are cooperating with the national competition authorities. At this time, the outcome of this investigation is uncertain.

**Stockholder Litigation**

On May 9, 2016, a stockholder of CCOH filed a derivative lawsuit in the Court of Chancery of the State of Delaware, captioned *GAMCO Asset Management Inc. v. iHeartMedia Inc. et al.,* C.A. No. 12312-VCS. The complaint names as defendants iHeartCommunications, Inc. ("iHeartCommunications"), CCOH's indirect parent company, iHeartMedia, Inc. ("iHeartMedia"), the parent company of iHeartCommunications, Bain Capital Partners, LLC and Thomas H. Lee Partners, L.P. (together, the "Sponsor Defendants"), iHeartMedia's private equity sponsors and majority owners, and the members of CCOH's board of directors. CCOH also is named as a nominal defendant. The complaint alleges that CCOH has been harmed by the intercompany agreements with iHeartCommunications, CCOH's lack of autonomy over its own cash and the actions of the defendants in serving the interests of iHeartMedia, iHeartCommunications and the Sponsor Defendants to the detriment of CCOH and its minority stockholders. Specifically, the complaint alleges that the defendants have breached their fiduciary duties by causing CCOH to: (i) continue to loan cash to iHeartCommunications under the intercompany note at below-market rates; (ii) abandon its growth and acquisition strategies in favor of transactions that would provide cash to iHeartCommunications; (iii) issue new debt in the CCIBV note offering (the "CCIBV Note Offering") to provide cash to iHeartMedia and iHeartCommunications through a dividend; and (iv) effect the sales of certain outdoor markets in the U.S. (the "Outdoor Asset Sales") to provide cash to iHeartMedia and iHeartCommunications through a dividend. The complaint also alleges that iHeartMedia, iHeartCommunications and the Sponsor Defendants aided and abetted the directors' breaches of their fiduciary duties. The complaint further alleges that iHeartMedia, iHeartCommunications and the Sponsor Defendants were unjustly enriched as a result of these transactions and that these transactions constituted a waste of corporate assets for which the defendants are liable to CCOH. The plaintiff is seeking, among other things, a ruling that the defendants breached their fiduciary duties to CCOH and that iHeartMedia, iHeartCommunications and the Sponsor Defendants aided and abetted the board of directors' breaches of fiduciary duty, rescission of payments to iHeartCommunications and its affiliates pursuant to dividends declared in connection with the CCIBV Note Offering and Outdoor Asset Sales, and an order requiring iHeartMedia, iHeartCommunications and the Sponsor Defendants to disgorge all profits they have received as a result of the alleged fiduciary misconduct.

On July 20, 2016, the defendants filed a motion to dismiss plaintiff's verified stockholder derivative complaint for failure to state a claim upon which relief can be granted. On November 23, 2016, the Court granted defendants' motion to dismiss all claims brought by the plaintiff. On December 19, 2016, the plaintiff filed a notice of appeal of the ruling.

## ITEM 4. MINE SAFETY DISCLOSURES

Not Applicable.

## EXECUTIVE OFFICERS OF THE REGISTRANT

The following information with respect to our executive officers is presented as of February 23, 2017:

| Name | Age | Position |
|---|---|---|
| Robert W. Pittman | 63 | Chairman and Chief Executive Officer |
| Richard J. Bressler | 59 | President, Chief Operating Officer, Chief Financial Officer and Director |
| Scott R. Wells | 48 | Chief Executive Officer - Clear Channel Outdoor Americas |
| C. William Eccleshare | 61 | Chairman and Chief Executive Officer- Clear Channel International |
| Steven J. Macri | 48 | Senior Vice President, Corporate Finance |
| Scott D. Hamilton | 47 | Senior Vice President, Chief Accounting Officer and Assistant Secretary |
| Robert H. Walls, Jr. | 56 | Executive Vice President, General Counsel and Secretary |

The officers named above serve until their respective successors are chosen and qualified, in each case unless the officer sooner dies, resigns, is removed or becomes disqualified.

*Robert W. Pittman* is the Chairman and Chief Executive Officer of the Company, iHeartCommunications and iHeartMedia Capital I, LLC and the Chairman and Chief Executive Officer of CCOH. Mr. Pittman was appointed as the Executive Chairman

29

and a director of the Company and iHeartCommunications on October 2, 2011. He was appointed as Chairman of the Company and iHeartCommunications on May 17, 2013. He also was appointed as Chairman and Chief Executive Officer and a member of the board of managers of iHeartMedia Capital I, LLC on April 26, 2013. Prior to October 2, 2011, Mr. Pittman served as the Chairman of Media and Entertainment Platforms for the Company and iHeartCommunications since November 2010. He has been a member of, and an investor in, Pilot Group, a private equity investment company, since April 2003. Mr. Pittman was formerly Chief Operating Officer of AOL Time Warner, Inc. from May 2002 to July 2002. He also served as Co-Chief Operating Officer of AOL Time Warner, Inc. from January 2001 to May 2002, and earlier, as President and Chief Operating Officer of America Online, Inc. from February 1998 to January 2001. Mr. Pittman serves on the boards of numerous charitable organizations, including the Alliance for Lupus Research, the Rock and Roll Hall of Fame Foundation and the Robin Hood Foundation, where he has served as past Chairman. Mr. Pittman was selected to serve as a member of our Board because of his service as our Chief Executive Officer, as well as his extensive media experience gained through the course of his career.

*Richard J. Bressler* is the President, Chief Operating Officer, Chief Financial Officer and Director of the Company, iHeartCommunications and iHeartMedia Capital I, LLC and the Chief Financial Officer of CCOH. Mr. Bressler was appointed as the Chief Financial Officer and President of the Company, iHeartCommunications, iHeartMedia Capital I, LLC and CCOH on July 29, 2013 and as Chief Operating Officer of the Company, iHeartCommunications and iHeartMedia Capital I, LLC on February 18, 2015. Prior thereto, Mr. Bressler was a Managing Director at THL. Prior to joining THL, Mr. Bressler was the Senior Executive Vice President and Chief Financial Officer of Viacom, Inc. from 2001 through 2005. He also served as Chairman and Chief Executive Officer of Time Warner Digital Media and, from 1995 to 1999, was Executive Vice President and Chief Financial Officer of Time Warner Inc. Prior to joining Time Inc. in 1988, Mr. Bressler was previously a partner with the accounting firm of Ernst & Young LLP. Mr. Bressler also currently is a director of the Company, iHeartCommunications and Gartner, Inc., a member of the board of managers of iHeartMedia Capital I, LLC and Mr. Bressler previously served as a member of the board of directors of American Media Operations, Inc., Nielsen Holdings B.V. and Warner Music Group Corp. and as a member of the J.P. Morgan Chase National Advisory Board. Mr. Bressler holds a B.B.A. in Accounting from Adelphi University.

*Scott R. Wells* is the Chief Executive Officer of Clear Channel Outdoor Americas at each of the Company, iHeartCommunications, iHeartMedia Capital I, LLC and CCOH and was appointed to this position on March 3, 2015. Previously, Mr. Wells served as an Operating Partner at Bain Capital since January 2011 and prior to that served as an Executive Vice President at Bain Capital since 2007. Mr. Wells also was one of the leaders of the firm's operationally focused Portfolio Group. Prior to joining Bain Capital, he held several executive roles at Dell, Inc. ("Dell") from 2004 to 2007, most recently as Vice President of Public Marketing and On-Line in the Americas. Prior to joining Dell, Mr. Wells was a Partner at Bain & Company, where he focused primarily on technology and consumer-oriented companies. Mr. Wells was a member of our Board from August 2008 until March 2015. He currently serves as a director of Ad Council, the Achievement Network (ANet) and the Outdoor Advertising Association of America (OAAA). He has an M.B.A., with distinction, from the Wharton School of the University of Pennsylvania and a B.S. from Virginia Tech.

*C. William Eccleshare* is the Chairman and Chief Executive Officer-Clear Channel International at each of the Company, iHeartCommunications, iHeartMedia Capital I, LLC and CCOH and was appointed to this position on March 2, 2015. Prior to such time, he served as Chief Executive Officer - Outdoor of the Company, iHeartCommunications and CCOH since January 24, 2012 and as Chief Executive Officer-Outdoor of iHeartMedia Capital I, LLC on April 26, 2013. Prior to January 24, 2012, he served as Chief Executive Officer-Clear Channel Outdoor-International of the Company and iHeartCommunications since February 17, 2011 and as Chief Executive Officer-International of CCOH since September 1, 2009. Previously, he was Chairman and CEO of BBDO EMEA from 2005 to 2009. Prior thereto, he was Chairman and CEO of Young & Rubicam EMEA since 2002.

*Steven J. Macri* is the Senior Vice President-Corporate Finance of the Company, iHeartMedia Capital I, LLC, iHeartCommunications and CCOH and the Chief Financial Officer of the Company's iHM segment. Mr. Macri was appointed Senior Vice President-Corporate Finance of the Company, iHeartCommunications, iHeartMedia Capital I, LLC and CCOH on September 9, 2014 and as the Chief Financial Officer of the Company's iHM segment on October 7, 2013. Prior to joining the company, Mr. Macri served as Chief Financial Officer for LogicSource Inc., from March 2012 to September 2013. Prior to joining LogicSource, Mr. Macri was Executive Vice President and Chief Financial Officer at Warner Music Group Corp. from September 2008 to December 2011 and prior thereto served as Controller and Senior Vice President-Finance from February 2005 to August 2008. He has an MBA from New York University Stern School of Business and a B.S. in Accounting from Syracuse University.

*Scott D. Hamilton* is the Senior Vice President, Chief Accounting Officer and Assistant Secretary of the Company, iHeartCommunications, iHeartMedia Capital I, LLC and CCOH. Mr. Hamilton was appointed Senior Vice President, Chief Accounting Officer and Assistant Secretary of the Company, iHeartCommunications and CCOH on April 26, 2010 and was appointed as Senior Vice President, Chief Accounting Officer and Assistant Secretary of iHeartMedia Capital I, LLC on April 26, 2013. Prior to April 26, 2010, Mr. Hamilton served as Controller and Chief Accounting Officer of Avaya Inc. ("Avaya"), a multinational telecommunications company, from October 2008 to April 2010. Prior thereto, Mr. Hamilton served in various

30

accounting and finance positions at Avaya, beginning in October 2004. Prior thereto, Mr. Hamilton was employed by PricewaterhouseCoopers from September 1992 until September 2004 in various roles including audit, transaction services and technical accounting consulting.

   *Robert H. Walls, Jr.* is the Executive Vice President, General Counsel and Secretary of the Company, iHeartCommunications, iHeartMedia Capital I, LLC and CCOH.  Mr. Walls was appointed the Executive Vice President, General Counsel and Secretary of  the Company, iHeartCommunications and CCOH on January 1, 2010 and was appointed as Executive Vice President, General Counsel and Secretary of iHeartMedia Capital I, LLC on April 26, 2013.  On March 31, 2011, Mr. Walls was appointed to serve in the newly-created Office of the Chief Executive Officer for iHeartMedia Capital I, LLC, iHeartCommunications and CCOH, in addition to his existing offices. Mr. Walls served in the Office of the Chief Executive Officer for iHeartMedia Capital I, LLC and iHeartCommunications until October 2, 2011, and served in the Office of the Chief Executive Officer for CCOH until January 24, 2012.  Mr. Walls was a founding partner of Post Oak Energy Capital, LP and served as Managing Director through December 31, 2009 and as an advisor to Post Oak Energy Capital, LP through December 31, 2013.

# PART II

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Shares of our Class A common stock are quoted for trading on the Over-The-Counter Pink Sheets ("OTC Pink") Bulletin Board under the symbol "IHRT." There were 286 stockholders of record as of February 20, 2017. This figure does not include an estimate of the indeterminate number of beneficial holders whose shares may be held of record by brokerage firms and clearing agencies. The following quotations obtained from the OTC Pink reflect the high and low bid prices for our Class A common stock based on inter-dealer prices, without retail mark-up, mark-down or commission and may not represent actual transactions.

| | Class A Common Stock Market Price | | | | Class A Common Stock Market Price | | |
|---|---|---|---|---|---|---|---|
| | High | | Low | | High | | Low |
| **2016** | | | | **2015** | | | |
| First Quarter................ | $ | 1.25 | $ | 0.80 | First Quarter................. | $ | 7.65 | $ | 4.20 |
| Second Quarter........... | | 1.30 | | 0.77 | Second Quarter............. | | 7.50 | | 5.15 |
| Third Quarter............. | | 1.47 | | 1.08 | Third Quarter............... | | 7.05 | | 4.05 |
| Fourth Quarter............ | | 1.53 | | 1.11 | Fourth Quarter.............. | | 4.50 | | 0.85 |

There is no established public trading market for our Class B and Class C common stock. There were 555,556 shares of our Class B common stock and 58,967,502 shares of our Class C common stock outstanding on February 20, 2017. All outstanding shares of our Class B common stock are held by Clear Channel Capital IV, LLC and all outstanding shares of our Class C common stock are held by Clear Channel Capital V,L.P.

**Dividend Policy**

We currently do not intend to pay regular quarterly dividends on the shares of our common stock. We have not declared any dividend on our common stock since our incorporation. We are a holding company with no independent operations and no significant assets other than the stock of our subsidiaries. We, therefore, are dependent on the receipt of dividends or other distributions from our subsidiaries to pay dividends. In addition, iHeartCommunications' debt financing arrangements include restrictions on its ability to pay dividends, which in turn affects our ability to pay dividends. See "Management's Discussion and Analysis of Financial Condition and Results of Operations-Liquidity and Capital Resources-Sources of Capital" and Note 5 to the Consolidated Financial Statements.

**Sales of Unregistered Securities**

We did not sell any equity securities during 2016 that were not registered under the Securities Act of 1933.

**Purchases of Equity Securities**

The following table sets forth the purchases made during the quarter ended December 31, 2016 by or on behalf of us or an affiliated purchaser of shares of our Class A common stock registered pursuant to Section 12 of the Exchange Act:

| Period | Total Number of Shares Purchased(1) | | Average Price Paid per Share(1) | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares that May Yet Be Purchased Under the Plans or Programs | |
|---|---|---|---|---|---|---|
| October 1 through October 31 | 17,987 | $ | 1.47 | - | $ | - |
| November 1 through November 30 | - | | - | - | | - |
| December 1 through December 31 | 6,416 | | 1.34 | - | | - |
| Total | 24,403 | $ | 1.45 | - | | - |

32

(1) The shares indicated consist of shares of our Class A common stock tendered by employees to us during the three months ended December 31, 2016 to satisfy the employees' tax withholding obligation in connection with the vesting and release of restricted shares, which are repurchased by us based on their fair market value on the date the relevant transaction occurs.

**ITEM 6. SELECTED FINANCIAL DATA**

The following tables set forth our selected historical consolidated financial and other data as of the dates and for the periods indicated. The selected historical financial data are derived from our audited consolidated financial statements. Certain prior period amounts have been reclassified to conform to the 2016 presentation. Historical results are not necessarily indicative of the results to be expected for future periods. Acquisitions and dispositions impact the comparability of the historical consolidated financial data reflected in this schedule of Selected Financial Data.

The selected historical consolidated financial and other data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto located within Item 8 of Part II of this Annual Report on Form 10-K.

| *(In thousands)* | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Results of Operations Data:** | | | | | |
| Revenue | $ 6,273,573 | $ 6,241,516 | $ 6,318,533 | $ 6,243,044 | $ 6,246,884 |
| Operating expenses: | | | | | |
| Direct operating expenses (excludes depreciation and amortization) | 2,412,287 | 2,471,113 | 2,540,035 | 2,560,028 | 2,501,313 |
| Selling, general and administrative expenses (excludes depreciation and amortization) | 1,725,899 | 1,704,352 | 1,680,938 | 1,641,462 | 1,661,604 |
| Corporate expenses (excludes depreciation and amortization) | 341,025 | 314,999 | 320,931 | 315,972 | 295,108 |
| Depreciation and amortization | 635,227 | 673,991 | 710,898 | 730,828 | 729,285 |
| Impairment charges [1] | 8,000 | 21,631 | 24,176 | 16,970 | 37,651 |
| Other operating income, net | 353,556 | 94,001 | 40,031 | 22,998 | 48,127 |
| Operating income | 1,504,691 | 1,149,431 | 1,081,586 | 1,000,782 | 1,070,050 |
| Interest expense | 1,849,982 | 1,805,496 | 1,741,596 | 1,649,451 | 1,549,023 |
| Gain (loss) on investments | (12,907) | (4,421) | - | 130,879 | (4,580) |
| Equity in earnings (loss) of nonconsolidated affiliates | (16,733) | (902) | (9,416) | (77,696) | 18,557 |
| Gain (loss) on extinguishment of debt | 157,556 | (2,201) | (43,347) | (87,868) | (254,723) |
| Other income (expense), net | (73,102) | 13,056 | 9,104 | (21,980) | 250 |
| Loss before income taxes | (290,477) | (650,533) | (703,669) | (705,334) | (719,469) |
| Income tax benefit (expense) | 50,474 | (86,957) | (58,489) | 121,817 | 308,279 |
| Consolidated net loss | (240,003) | (737,490) | (762,158) | (583,517) | (411,190) |
| Less amount attributable to noncontrolling interest | 56,315 | 17,131 | 31,603 | 23,366 | 13,289 |
| Net loss attributable to the Company | $ (296,318) | $ (754,621) | $ (793,761) | $ (606,883) | $ (424,479) |

| | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| Net loss per common share: | | | | | |
| Basic | | | | | |
| Net loss attributable to the Company | $ (3.50) | $ (8.95) | $ (9.46) | $ (7.31) | $ (5.23) |
| Diluted: | | | | | |
| Net loss attributable to the Company | $ (3.50) | $ (8.95) | $ (9.46) | $ (7.31) | $ (5.23) |

(1)  We recorded non-cash impairment charges of $8.0 million, $21.6 million, $24.2 million, $17.0 million and $37.7 million during 2016, 2015, 2014, 2013 and 2012, respectively. Our impairment charges are discussed more fully in Item 8 of Part II of this Annual Report on Form 10-K.

*(In thousands)*

| | | As of December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2016 | &sbsp; | | 2015 | | 2014 | | 2013 | | 2012 |
| **Balance Sheet Data:** | | | | | | | | | | |
| Current assets | $ | 2,504,687 | | $ | 2,778,115 | $ | 2,109,748 | $ | 2,431,162 | $ | 2,943,307 |
| Property, plant and equipment, net | | 1,948,162 | | | 2,212,556 | | 2,699,064 | | 2,897,630 | | 3,036,854 |
| Total assets | | 12,862,247 | | | 13,673,115 | | 13,839,579 | | 14,871,407 | | 16,084,487 |
| Current liabilities | | 1,696,570 | | | 1,659,228 | | 1,364,285 | | 1,763,618 | | 1,782,142 |
| Long-term debt, net of current maturities | | 20,022,080 | | | 20,539,099 | | 20,159,545 | | 19,856,551 | | 20,163,197 |
| Stockholders' deficit | | (10,885,475) | | | (10,606,681) | | (9,665,208) | | (8,696,635) | | (7,995,191) |

35

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**OVERVIEW**

**Format of Presentation**

Management's discussion and analysis of our financial condition and results of operations ("MD&A") should be read in conjunction with the consolidated financial statements and related footnotes contained in Item 8 of this Annual Report on Form 10-K. Our discussion is presented on both a consolidated and segment basis. Our reportable segments are iHeartMedia ("iHM"), Americas outdoor advertising ("Americas outdoor" or "Americas outdoor advertising"), and International outdoor advertising ("International outdoor" or "International outdoor advertising"). Our iHM segment provides media and entertainment services via live broadcast and digital delivery, and also includes our national syndication business. Our Americas outdoor and International outdoor segments provide outdoor advertising services in their respective geographic regions using various digital and printed display types. Included in the "Other" category are our media representation business, Katz Media Group, as well as other general support services and initiatives, which are ancillary to our other businesses.

We manage our operating segments primarily focusing on their operating income, while Corporate expenses, Depreciation and amortization, Impairment charges, Other operating income (expense), net, Interest expense, Gain (loss) on investments, net, Equity in earnings (loss) of nonconsolidated affiliates, Gain (loss) on extinguishment of debt, Other income (expense), net and Income tax benefit (expense) are managed on a total company basis and are, therefore, included only in our discussion of consolidated results.

Certain prior period amounts have been reclassified to conform to the 2016 presentation.

**iHM**

Our iHM strategy centers on delivering entertaining and informative content across multiple platforms, including broadcast, mobile and digital, as well as events. Our primary source of revenue is derived from selling local and national advertising time on our radio stations, with contracts typically less than one year in duration. The programming formats of our radio stations are designed to reach audiences with targeted demographic characteristics. We are working closely with our advertising and marketing partners to develop tools and leverage data to enable advertisers to effectively reach their desired audiences. We continue to expand the choices for listeners and we deliver our content and sell advertising across multiple distribution channels, including digitally via our iHeartRadio mobile application and other digital platforms which reach national, regional and local audiences. We also generate revenues from network syndication, our nationally recognized live events, our station websites and other miscellaneous transactions.

iHM management monitors average advertising rates and cost per minute ("CPM"), which are principally based on the length of the spot and how many people in a targeted audience listen to our stations, as measured by an independent ratings service. In addition, our advertising rates are influenced by the time of day the advertisement airs, with morning and evening drive-time hours typically priced the highest. Our price and yield information systems enable our station managers and sales teams to adjust commercial inventory and pricing based on local market demand, as well as to manage and monitor different commercial durations in order to provide more effective advertising for our customers at what we believe are optimal prices given market conditions. Yield is measured by management in a variety of ways, including revenue earned divided by minutes of advertising sold.

Management looks at our iHM operations' overall revenue as well as the revenue from each type of advertising, including local advertising, which is sold predominately in a station's local market, and national advertising, which is sold across multiple markets. Local advertising is sold by each radio station's sales staff while national advertising is sold by our national sales team. Local advertising, which is our largest source of advertising revenue, and national advertising revenues are tracked separately because these revenue streams have different sales teams and respond differently to changes in the economic environment. We periodically review and refine our selling structures in all regions and markets in an effort to maximize the value of our offering to advertisers and, therefore, our revenue.

Management also looks at iHM revenue by region and market size. Typically, larger markets can reach larger audiences with wider demographics than smaller markets. Additionally, management reviews our share of iHM advertising revenues in markets where such information is available, as well as our share of target demographics listening in an average quarter hour. This metric gauges how well our formats are attracting and retaining listeners.

A portion of our iHM segment's expenses vary in connection with changes in revenue. These variable expenses primarily relate to costs in our sales department, such as commissions, and bad debt. Our content costs, including music royalty and license fees for music delivered via broadcast or digital streaming, vary with the volume and mix of songs played on our stations and the listening hours on our digital platforms. Our programming and general and administrative departments incur most of our fixed

36

costs, such as utilities and office salaries. We incur discretionary costs in our advertising, marketing and promotions, which we primarily use in an effort to maintain and/or increase our audience share. Lastly, we have incentive systems in each of our departments which provide for bonus payments based on specific performance metrics, including ratings, revenue and overall profitability.

## Outdoor Advertising

Our outdoor advertising revenue is derived from selling advertising space on the displays we own or operate in key markets worldwide, consisting primarily of billboards, street furniture and transit displays. Part of our long-term strategy for our outdoor advertising businesses is to pursue the technology of digital displays, including flat screens, LCDs and LEDs, as additions to traditional methods of displaying our clients' advertisements. We are currently installing these technologies in certain markets, both domestically and internationally. Management typically monitors our outdoor advertising business by reviewing the average rates, average revenue per display, occupancy and inventory levels of each of our display types by market.

We own the majority of our advertising displays, which typically are located on sites that we either lease or own or for which we have acquired permanent easements. Our advertising contracts with clients typically outline the number of displays reserved, the duration of the advertising campaign and the unit price per display.

The significant expenses associated with our operations include direct production, maintenance and installation expenses as well as site lease expenses for land under our displays including revenue-sharing or minimum guaranteed amounts payable under our billboard, street furniture and transit display contracts. Our direct production, maintenance and installation expenses include costs for printing, transporting and changing the advertising copy on our displays, the related labor costs, the vinyl and paper costs, electricity costs and the costs for cleaning and maintaining our displays. Vinyl and paper costs vary according to the complexity of the advertising copy and the quantity of displays. Our site lease expenses include lease payments for use of the land under our displays, as well as any revenue-sharing arrangements or minimum guaranteed amounts payable that we may have with the landlords. The terms of our site leases and revenue-sharing or minimum guaranteed contracts generally range from one to 20 years.

### Americas Outdoor Advertising

Our advertising rates are based on a number of different factors including location, competition, type and size of display, illumination, market and gross ratings points. Gross ratings points are the total number of impressions delivered by a display or group of displays, expressed as a percentage of a market population. The number of impressions delivered by a display is measured by the number of people passing the site during a defined period of time. For all of our billboards in the United States, we use independent, third-party auditing companies to verify the number of impressions delivered by a display.

Client contract terms typically range from four weeks to one year for the majority of our display inventory in the United States. Generally, we own the street furniture structures and are responsible for their construction and maintenance. Contracts for the right to place our street furniture and transit displays and sell advertising space on them are awarded by municipal and transit authorities in competitive bidding processes governed by local law or are negotiated with private transit operators. Generally, these contracts have terms ranging from 10 to 20 years.

### International Outdoor Advertising

Similar to our Americas outdoor business, advertising rates generally are based on the gross ratings points of a display or group of displays. The number of impressions delivered by a display, in some countries, is weighted to account for such factors as illumination, proximity to other displays and the speed and viewing angle of approaching traffic. In addition, because our International outdoor advertising operations are conducted in foreign markets, including Europe and Asia, management reviews the operating results from our foreign operations on a constant dollar basis. A constant dollar basis allows for comparison of operations independent of foreign exchange movements.

Our International display inventory is typically sold to clients through network packages, with client contract terms typically ranging from one to two weeks with terms of up to one year available as well. Internationally, contracts with municipal and transit authorities for the right to place our street furniture and transit displays typically provide for terms ranging up to 15 years. The major difference between our International and Americas street furniture businesses is in the nature of the municipal contracts. In our International outdoor business, these contracts typically require us to provide the municipality with a broader range of metropolitan amenities in exchange for which we are authorized to sell advertising space on certain sections of the structures we erect in the public domain. A different regulatory environment for billboards and competitive bidding for street furniture and transit display contracts, which constitute a larger portion of our business internationally, may result in higher site lease costs in our International business.

**Macroeconomic Indicators**

Our advertising revenue for all of our segments is highly correlated to changes in gross domestic product ("GDP") as advertising spending has historically trended in line with GDP, both domestically and internationally. According to the U.S. Department of Commerce, estimated U.S. GDP growth for 2016 was 1.6%. Internationally, our results are impacted by fluctuations in foreign currency exchange rates as well as the economic conditions in the foreign markets in which we have operations.

**Executive Summary**

The key developments in our business for the year ended December 31, 2016 are summarized below:

- Consolidated revenue increased $32.1 million during 2016 compared to 2015. Excluding the $47.6 million impact from movements in foreign exchange rates, consolidated revenue increased $79.7 million during 2016 compared to 2015.
- We sold nine non-strategic U.S. outdoor markets in the first quarter of 2016. We sold our outdoor businesses in Turkey and Australia in the second and fourth quarters of 2016, respectively. These businesses had total revenues of $123.5 million in 2016 and $248.9 million in 2015, and we realized a net gain of $349.3 million on the sales.
- We spent $30.9 million on strategic revenue and efficiency initiatives during 2016 to realign and improve our on-going business operations–a decrease of $11.9 million compared to 2015.
- On July 15, 2016, Broader Media, LLC, our indirect wholly-owned subsidiary, repurchased approximately $383.0 million aggregate principal amount of iHeartCommunications' 10.0% Senior Notes due 2018 for an aggregate purchase price of $222.2 million, resulting in a gain on extinguishment of debt of $157.6 million. The repurchase effectively reduces our consolidated annual cash interest obligations by $38.3 million.

Revenues and expenses "excluding the impact of foreign exchange movements" in this Management's Discussion & Analysis of Financial Condition and Results of Operations is presented because management believes that viewing certain financial results without the impact of fluctuations in foreign currency rates facilitates period to period comparisons of business performance and provides useful information to investors. Revenues and expenses "excluding the impact of foreign exchange movements" are calculated by converting the current period's revenues and expenses in local currency to U.S. dollars using average foreign exchange rates for the prior period.

**Consolidated Results of Operations**

The comparison of our historical results of operations for the year ended December 31, 2016 to the year ended December 31, 2015 is as follows:

| (In thousands) | Years Ended December 31, | | % Change |
| --- | --- | --- | --- |
| | 2016 | 2015 | |
| Revenue | $ 6,273,573 | $ 6,241,516 | 0.5% |
| Operating expenses: | | | |
| Direct operating expenses (excludes depreciation and amortization) | 2,412,287 | 2,471,113 | (2.4)% |
| Selling, general and administrative expenses (excludes depreciation and amortization) | 1,725,899 | 1,704,352 | 1.3% |
| Corporate expenses (excludes depreciation and amortization) | 341,025 | 314,999 | 8.3% |
| Depreciation and amortization | 635,227 | 673,991 | (5.8)% |
| Impairment charges | 8,000 | 21,631 | (63.0)% |
| Other operating income, net | 353,556 | 94,001 | 276.1% |
| Operating income | 1,504,691 | 1,149,431 | 30.9% |
| Interest expense | 1,849,982 | 1,805,496 | |
| Loss on investments, net | (12,907) | (4,421) | |
| Equity in loss of nonconsolidated affiliates | (16,733) | (902) | |
| Gain (loss) on extinguishment of debt | 157,556 | (2,201) | |
| Other income (expense), net | (73,102) | 13,056 | |
| Loss before income taxes | (290,477) | (650,533) | |
| Income tax (expense) benefit | 50,474 | (86,957) | |
| Consolidated net loss | (240,003) | (737,490) | |
| Less amount attributable to noncontrolling interest | 56,315 | 17,131 | |
| Net loss attributable to the Company | $ (296,318) | $ (754,621) | |

*Consolidated Revenue*

Consolidated revenue increased $32.1 million during the year ended December 31, 2016 compared to 2015. Excluding the $47.6 million impact from movements in foreign exchange rates, consolidated revenue increased $79.7 million during the year ended December 31, 2016 compared to 2015. Revenue growth from our iHM business was partially offset by lower revenue generated by our Americas and International outdoor businesses as a result of the sales of certain U.S. outdoor markets and international businesses which generated $248.9 million in revenue in the year ended December 31, 2015 compared to $123.5 million in the year ended December 31, 2016.

*Consolidated Direct Operating Expenses*

Consolidated direct operating expenses decreased $58.8 million during the year ended December 31, 2016 compared to 2015. Excluding the $29.0 million impact from movements in foreign exchange rates, consolidated direct operating expenses decreased $29.8 million during the year ended December 31, 2016 compared to 2015. Lower direct operating expenses in our iHM business were primarily driven by the impact of contract renegotiations, partially offset by increases primarily related to higher revenue. Lower direct operating expenses in our Americas outdoor business were primarily due to the sale of nine non-strategic U.S. outdoor markets in the first quarter of 2016. Lower direct operating expenses in our International outdoor business related primarily to the loss of the London bus contract and the sale of our businesses in Australia and Turkey, partially offset by increases in expenses related to higher revenues in other countries.

*Consolidated Selling, General and Administrative ("SG&A") Expenses*

Consolidated SG&A expenses increased $21.5 million during the year ended December 31, 2016 compared to 2015. Excluding the $9.9 million impact from movements in foreign exchange rates, consolidated SG&A expenses increased $31.4 million during the year ended December 31, 2016 compared to 2015. Higher SG&A expenses driven primarily by investments in sales capabilities in our iHM business were partially offset by a decrease in SG&A expenses resulting from the sale of non-strategic U.S. outdoor markets in the first quarter of 2016.

*Corporate Expenses*

Corporate expenses increased $26.0 million during the year ended December 31, 2016 compared to 2015 primarily resulting from higher professional fees and higher expenses related to variable compensation plans, as well as higher employee health benefit costs. Excluding the $4.1 million impact from movements in foreign exchange rates, corporate expenses increased $30.1 million during the year ended December 31, 2016 compared to 2015.

*Revenue and Efficiency Initiatives*

Included in the amounts for direct operating expenses, SG&A and corporate expenses discussed above are expenses incurred in connection with our strategic revenue and efficiency initiatives. These costs consist primarily of severance related to workforce initiatives, consolidation of locations and positions, contract cancellation costs, consulting expenses, and other costs incurred in connection with improving our businesses. These costs are expected to provide benefits in future periods as the initiative results are realized.

Strategic revenue and efficiency costs were $30.9 million during the year ended December 31, 2016. Of these expenses, $15.5 million was incurred by our iHM segment, $3.1 million was incurred by our Americas outdoor segment, $7.4 million was incurred by our International outdoor segment, $1.3 million was incurred by our Other category and $3.6 million was incurred by Corporate. $10.9 million of these costs are reported within direct operating expenses, $16.4 million are reported within SG&A and $3.6 million are reported within corporate expenses.

Strategic revenue and efficiency costs were $42.8 million during the year ended December 31, 2015. Of these expenses, $11.8 million was incurred by our iHM segment, $2.4 million was incurred by our Americas outdoor segment, $11.1 million was incurred by our International outdoor segment, $3.7 million was incurred by our Other segment and $13.8 million was incurred by Corporate. $14.0 million of these costs are reported within direct operating expenses, $15.0 million are reported within SG&A and $13.8 million are reported within corporate expenses.

*Depreciation and Amortization*

Depreciation and amortization decreased $38.8 million during 2016 compared to 2015, primarily due to assets becoming fully depreciated or fully amortized, the sale of certain outdoor markets, as well as the impact of movements in foreign exchange rates.

*Impairment Charges*

We perform our annual impairment test on our goodwill, FCC licenses, billboard permits, and other intangible assets as of July 1 of each year. In addition, we test for impairment of property, plant and equipment whenever events and circumstances indicate that depreciable assets might be impaired. As a result of these impairment tests, during 2016 we recorded impairment charges of $8.0 million related primarily to goodwill in one of our International outdoor businesses. During 2015 we recorded impairment charges of $21.6 million related to billboard permits in one Americas outdoor market. Please see Note 2 to the Consolidated Financial Statements located in Item 8 of this Annual Report on Form 10-K for a further description of the impairment charges.

*Other Operating Income, Net*

Other operating income was $353.6 million in 2016, which primarily related to the net gain of $278.3 million on sale of nine non-strategic outdoor markets in the first quarter of 2016 and the net gain of $127.6 million on sale on our outdoor Australia business in the fourth quarter of 2016, partially offset by the $56.6 million loss, which includes $32.2 million in cumulative translation adjustments, on the sale of our Turkey business in the second quarter of 2016. In the first quarter of 2016, Americas outdoor sold nine non-strategic outdoor markets including Cleveland and Columbus, Ohio, Des Moines, Iowa, Ft. Smith, Arkansas, Memphis, Tennessee, Portland, Oregon, Reno, Nevada, Seattle, Washington and Wichita, Kansas for net proceeds of $592.3 million in cash and certain advertising assets in Florida.

Other operating income of $94.0 million in 2015 primarily related to the gain on the sale of radio towers which were subsequently leased back (see Note 2 to our Consolidated Financial Statements located in Item 8 of this Annual Report on Form 10-K).

*Interest Expense*

Interest expense increased $44.5 million during 2016 compared to 2015 due to higher interest rates on floating rate loans and new debt issuances. Please refer to "Sources of Capital" for additional discussion of debt issuances and exchanges. Our weighted average cost of debt during 2016 and 2015 was 8.5% and 8.5%, respectively.

40

*Loss on Investments, Net*

During the years ended December 31, 2016 and 2015, we recognized losses of $12.9 million and $4.4 million, respectively, related to cost-method investments. The loss in the year ended December 31, 2016 related primarily to a $14.5 million non-cash impairment recorded in connection with an other-than-temporary decline in the value of one of our cost investments.

*Equity in Loss of Nonconsolidated Affiliates*

During the years ended December 31, 2016 and 2015, we recognized losses of $16.7 million and $0.9 million respectively, related to equity-method investments. The loss in the year ended December 31, 2016 related primarily to a $15.0 million non-cash impairment recorded in connection with an other-than-temporary decline in the value of one of our equity investments.

*Gain (loss) on Extinguishment of Debt*

During the third quarter of 2016, Broader Media, LLC, an indirect wholly-owned subsidiary of the Company, repurchased approximately $383.0 million aggregate principal amount of iHeartCommunications' 10.0% Senior Notes due 2018 for an aggregate purchase price of approximately $222.2 million. In connection with this repurchase, we recognized a gain of $157.6 million.

In connection with the first quarter 2015 prepayment of iHeartCommunications' Term Loan B facility and Term Loan C-asset sale facility, we recognized a loss of $2.2 million.

*Other Income (Expense), Net*

Other expense was $73.1 million for 2016. Other income was $13.1 million for 2015. These amounts relate primarily to net foreign exchange gains and losses recognized in connection with intercompany notes denominated in foreign currencies. The decline in value during 2016 of the British pound against the Euro impacted Euro-denominated notes payable by one of our UK subsidiaries, which was the primary driver of the foreign exchange loss in 2016.

*Income Tax Expense*

The effective tax rate for the year ended December 31, 2016 was 17.4% as compared to (13.4)% for the year ended December 31, 2015. The effective tax benefit rate for 2016 was impacted by the $43.3 million deferred tax benefit recorded in connection with the release of valuation allowance in France, which was offset by $54.7 million of tax expense attributable to the sale of our outdoor business in Australia. Additionally, the 2016 effective tax benefit rate was impacted by the $31.8 million valuation allowance recorded against a portion of current period federal and state deferred tax assets due to the uncertainty of the ability to realize those assets in future periods.

The effective tax rate for 2015 was impacted by the $305.3 million valuation allowance recorded against our current period federal and state net operating losses due to the uncertainty of the ability to utilize those losses in future periods. The valuation allowance was recorded against the Company's current period federal and state net operating losses due to the uncertainty of the ability to utilize these losses in future periods.

**iHM Results of Operations**

Our iHM operating results were as follows:

| (In thousands) | Years Ended December 31, | | % |
| --- | --- | --- | --- |
| | 2016 | 2015 | Change |
| Revenue | $ 3,403,040 | $ 3,284,320 | 3.6% |
| Direct operating expenses | 975,463 | 972,937 | 0.3% |
| SG&A expenses | 1,102,998 | 1,065,066 | 3.6% |
| Depreciation and amortization | 243,964 | 240,207 | 1.6% |
| Operating income | $ 1,080,615 | $ 1,006,110 | 7.4% |

iHM revenue increased $118.7 million during 2016 compared to 2015. Growth in broadcast radio and digital advertising was driven primarily by political advertising revenues resulting from 2016 being a presidential election year. In addition, we had growth in our traffic and weather business, sponsorship and other revenues surrounding our events and trade and barter. Trade and barter includes the impact of marketing partnerships with our advertisers on events, as well as revenue recognized in connection with advertising provided during the period in connection with investments made in certain non-public companies.

iHM direct operating expenses increased $2.5 million during 2016 compared to 2015 primarily driven by higher content and programming costs, as well as higher theater and event production costs. In addition, we incurred higher spending on strategic revenue and efficiency initiatives and lease expense was higher as a result of the sale and subsequent leaseback of broadcast communications tower sites in the second quarter of 2015. These costs were nearly offset by the $33.8 million benefit resulting from contract renegotiations completed in the third quarter. iHM SG&A expenses increased $37.9 million during 2016 compared to 2015 primarily due to investments in national and digital sales capabilities, higher promotion expense and higher variable compensation related to higher revenue.

**Americas Outdoor Results of Operations**

Our Americas outdoor operating results were as follows:

| (In thousands) | Years Ended December 31, | | % |
| --- | --- | --- | --- |
| | 2016 | 2015 | Change |
| Revenue | $ 1,278,413 | $ 1,349,021 | (5.2)% |
| Direct operating expenses | 570,310 | 597,382 | (4.5)% |
| SG&A expenses | 225,415 | 233,254 | (3.4)% |
| Depreciation and amortization | 185,654 | 204,514 | (9.2)% |
| Operating income | $ 297,034 | $ 313,871 | (5.4)% |

Americas outdoor revenue decreased $70.6 million during 2016 compared to 2015. Excluding the $7.7 million impact from movements in foreign exchange rates, Americas outdoor revenue decreased $62.9 million during 2016 compared to 2015. The decrease in revenue is due to the $102.7 million impact of the sale of nine non-strategic U.S. markets in the first quarter of 2016. The decrease in revenue resulting from these sales was partially offset by increased revenues from digital billboards from new deployments and higher occupancy on existing digital billboards, as well as new airport contracts, and higher revenues in Latin America.

Americas outdoor direct operating expenses decreased $27.1 million during 2016 compared to 2015. Excluding the $3.6 million impact from movements in foreign exchange rates, Americas outdoor direct operating expenses decreased $23.5 million during 2016 compared to 2015. The decrease in direct operating expenses was driven by a $35.4 million decrease in direct operating expenses resulting from the sale of the nine non-strategic markets in the first quarter of 2016, partially offset by higher site lease expenses related to new airport contracts. Americas outdoor SG&A expenses decreased $7.9 million during 2016 compared to 2015. Excluding the $2.1 million impact from movements in foreign exchange rates, Americas outdoor SG&A expenses decreased $5.8 million during 2016 compared to 2015. This decrease was due to a $20.4 million decrease in SG&A expenses resulting from the sale of the nine non-strategic U.S. markets in the first quarter of 2016, partially offset by higher variable compensation expense related to higher revenues.

Depreciation and amortization decreased $18.9 million. Excluding the $0.8 million impact from movements in foreign exchange rates, depreciation and amortization decreased $18.1 million primarily due to the sale of the nine non-strategic U.S. markets in the first quarter of 2016 and assets becoming fully depreciated or fully amortized.

**International Outdoor Results of Operations**

Our International outdoor operating results were as follows:

| (In thousands) | Years Ended December 31, | | % |
| --- | --- | --- | --- |
| | 2016 | 2015 | Change |
| Revenue | $ 1,423,982 | $ 1,457,183 | (2.3)% |
| Direct operating expenses | 865,259 | 897,520 | (3.6)% |
| SG&A expenses | 289,787 | 298,250 | (2.8)% |
| Depreciation and amortization | 152,758 | 166,060 | (8.0)% |
| Operating income | $ 116,178 | $ 95,353 | 21.8% |

International outdoor revenue decreased $33.2 million during 2016 compared to 2015. Excluding the $39.9 million impact from movements in foreign exchange rates, International outdoor revenue increased $6.7 million during 2016 compared to 2015. The increase in revenue is due to growth across most of our markets including China, Italy, Spain, Sweden, France and Belgium,

primarily from new digital assets and new contracts. This growth was partially offset by a $22.7 million decrease in revenue resulting from the sale of our businesses in Turkey and Australia in the second and fourth quarters of 2016, respectively, as well as lower revenue in the United Kingdom as a result of the London bus shelter contract not being renewed.

International outdoor direct operating expenses decreased $32.2 million during 2016 compared to 2015. Excluding the $25.4 million impact from movements in foreign exchange rates, International outdoor direct operating expenses decreased $6.8 million during 2016 compared to 2015. The decrease was driven by a $14.6 million decrease in direct operating expenses resulting from the sale of our businesses in Turkey and Australia and lower rent expense due to lower revenue in the United Kingdom as a result of the London bus shelter contract not being renewed. These decreases were partially offset by higher site lease and production expenses in countries experiencing revenue growth. International outdoor SG&A expenses decreased $8.5 million during 2016 compared to 2015. Excluding the $7.8 million impact from movements in foreign exchange rates, International outdoor SG&A expenses decreased $0.7 million during 2016 compared to 2015. The decrease in SG&A expenses was primarily due to a $3.0 million decrease resulting from the sale of our businesses in Turkey and Australia, partially offset by higher variable compensation expenses.

Included in 2015 International Outdoor direct operating expenses and SG&A expenses are $8.2 million and $3.2 million, respectively, recorded in the fourth quarter of 2015 to correct for accounting errors included in the results of our Netherlands subsidiary reported in prior years. Such corrections are not considered to be material to the prior year financial results.

Depreciation and amortization decreased $13.3 million. Excluding the $5.5 million impact from movements in foreign exchange rates, depreciation and amortization decreased $7.8 million primarily due to assets becoming fully depreciated or fully amortized.

**Consolidated Results of Operations**

The comparison of our historical results of operations for the year ended December 31, 2015 to the year ended December 31, 2014 is as follows:

| *(In thousands)* | | Years Ended December 31, | | | % |
|---|---|---|---|---|---|
| | | 2015 | | 2014 | Change |
| Revenue | $ | 6,241,516 | $ | 6,318,533 | (1.2)% |
| Operating expenses: | | | | | |
| Direct operating expenses (excludes depreciation and amortization) | | 2,471,113 | | 2,540,035 | (2.7)% |
| Selling, general and administrative expenses (excludes depreciation and amortization) | | 1,704,352 | | 1,680,938 | 1.4% |
| Corporate expenses (excludes depreciation and amortization) | | 314,999 | | 320,931 | (1.8)% |
| Depreciation and amortization | | 673,991 | | 710,898 | (5.2)% |
| Impairment charges | | 21,631 | | 24,176 | (10.5)% |
| Other operating income, net | | 94,001 | | 40,031 | 134.8% |
| Operating income | | 1,149,431 | | 1,081,586 | 6.3% |
| Interest expense | | 1,805,496 | | 1,741,596 | |
| Loss on investments, net | | (4,421) | | - | |
| Equity in earnings (loss) of nonconsolidated affiliates | | (902) | | (9,416) | |
| Loss on extinguishment of debt | | (2,201) | | (43,347) | |
| Other income, net | | 13,056 | | 9,104 | |
| Loss before income taxes | | (650,533) | | (703,669) | |
| Income tax expense | | (86,957) | | (58,489) | |
| Consolidated net loss | | (737,490) | | (762,158) | |
| Less amount attributable to noncontrolling interest | | 17,131 | | 31,603 | |
| Net loss attributable to the Company | $ | (754,621) | $ | (793,761) | |

*Consolidated Revenue*

Consolidated revenue decreased $77.0 million during 2015 compared to 2014. Excluding the $229.0 million impact from movements in foreign exchange rates, consolidated revenue increased $152.0 million during 2015 compared to 2014. iHM revenue increased $122.8 million during 2015 compared to 2014 driven primarily by our core radio business, both broadcast and digital,

43

including the impact of marketing partnerships with our advertisers for live events and barter and trade revenue, partially offset by a decrease in political advertising revenues. Americas outdoor revenue decreased $1.6 million during 2015 compared to 2014. Excluding the $23.4 million impact from movements in foreign exchange rates, Americas outdoor revenue increased $21.8 million during 2015 compared to 2014 primarily driven by higher revenues from digital billboards and our Spectacolor business. International outdoor revenue decreased $153.4 million during 2015 compared to 2014. Excluding the $205.6 million impact from movements in foreign exchange rates, International outdoor revenue increased $52.2 million during 2015 compared to 2014 primarily driven by new contracts and the impact of sales initiatives. Other revenues decreased $48.8 million during 2015 compared to 2014 primarily as a result of lower political advertising revenues and lower contract termination fees earned by our media representation business.

*Consolidated Direct Operating Expenses*

Consolidated direct operating expenses decreased $68.9 million during 2015 compared to 2014. Excluding the $146.6 million impact from movements in foreign exchange rates, consolidated direct operating expenses increased $77.7 million during 2015 compared to 2014. iHM direct operating expenses increased $40.8 million during 2015 compared to 2014, primarily due to higher music license and performance royalties, higher lease expense as a result of the sale and subsequent leaseback of broadcast communication tower sites and higher compensation related to radio programming. Americas outdoor direct operating expenses decreased $8.4 million during 2015 compared to 2014. Excluding the $13.1 million impact from movements in foreign exchange rates, Americas outdoor direct operating expenses increased $4.7 million during 2015 compared to 2014 primarily due to higher variable site lease expenses related to the increase in revenues. International outdoor direct operating expenses decreased $93.6 million during 2015 compared to 2014. Excluding the $133.5 million impact from movements in foreign exchange rates, International outdoor direct operating expenses increased $39.9 million during 2015 compared to 2014 primarily as a result of higher variable costs associated with higher revenue, as well as higher spending on strategic efficiency initiatives.

*Consolidated SG&A Expenses*

Consolidated SG&A expenses increased $23.4 million during 2015 compared to 2014. Excluding the $51.1 million impact from movements in foreign exchange rates, consolidated SG&A expenses increased $74.5 million during 2015 compared to 2014. iHM SG&A expenses increased $51.7 million during 2015 compared to 2014 primarily due to higher barter and trade expenses, higher sales expense, including commissions related to higher revenue and higher bad debt expense. Americas outdoor SG&A expenses decreased $0.4 million during 2015 compared to 2014. Excluding the $6.0 million impact from movements in foreign exchange rates, Americas outdoor SG&A expenses increased $5.6 million during 2015 compared to 2014 primarily in Latin America. International outdoor SG&A expenses decreased $16.6 million during 2015 compared to 2014. Excluding the $45.0 million impact from movements in foreign exchange rates, International outdoor SG&A expenses increased $28.4 million during 2015 compared to 2014 primarily due to higher compensation expense, including commissions in connection with higher revenues.

*Corporate Expenses*

Corporate expenses decreased $5.9 million during 2015 compared to 2014. Excluding the $3.5 million impact from movements in foreign exchange rates, corporate expenses decreased $2.4 million during 2015 compared to 2014 primarily due to a $20.2 million decrease in spending related to our strategic revenue and efficiency initiatives. This was partially offset by the impact of an $8.5 million insurance recovery related to stockholder litigation recognized in 2014, higher variable compensation expense related to sales growth and higher legal fees related to the negotiation of digital royalty rates before the Copyright Royalty Board.

*Revenue and Efficiency Initiatives*

Included in the amounts for direct operating expenses, SG&A and corporate expenses discussed above are expenses of $42.8 million incurred in 2015 in connection with our strategic revenue and efficiency initiatives. The costs were incurred to improve revenue growth, enhance yield, reduce costs and organize each business to maximize performance and profitability. These costs consist primarily of consolidation of locations and positions, severance related to workforce initiatives, consulting expenses and other costs incurred in connection with streamlining our businesses. These costs are expected to provide benefits in future periods as the initiative results are realized.

Of the strategic revenue and efficiency costs for 2015, $14.0 million are reported within direct operating expenses, $15.0 million are reported within SG&A and $13.8 million are reported within corporate expense. In 2014, such costs totaled $13.0 million, $23.7 million, and $34.0 million, respectively.

*Depreciation and Amortization*

Depreciation and amortization decreased $36.9 million during 2015 compared to 2014, primarily due to assets becoming fully depreciated or fully amortized as well as the impact of movements in foreign exchange rates.

*Impairment Charges*

We performed our annual impairment test on our goodwill, FCC licenses, billboard permits, and other intangible assets as of July 1 of each year. In addition, we test for impairment of property, plant and equipment whenever events and circumstances indicate that depreciable assets might be impaired. As a result of these impairment tests, during 2015 we recorded impairment charges of $21.6 million related to billboard permits in one Americas outdoor market. During 2014, we recognized impairment charges of $24.2 million primarily related to the impairment of FCC licenses in eight markets due to changes in the discount rates and weighted-average cost of capital for those markets. Please see Note 2 to the Consolidated Financial Statements located in Item 8 of this Annual Report on Form 10-K for a further description of the impairment charges.

*Other Operating Income, Net*

Other operating income of $94.0 million in 2015 primarily related to the gain on the sale of radio towers which were subsequently leased back.

Other operating income of $40.0 million in 2014 primarily related to a non-cash gain of $43.5 million recognized on the sale of non-core radio stations in exchange for a portfolio of 29 stations in five markets.

*Interest Expense*

Interest expense increased $63.9 million during 2015 compared to 2014 primarily due to the weighted average cost of debt increasing due to debt refinancing transactions that resulted in higher interest rates. Please refer to "Sources of Capital" for additional discussion of debt issuances and exchanges. Our weighted average cost of debt during 2015 and 2014 was 8.5% and 8.1%, respectively.

*Loss on Investments, Net*

In 2015, we recognized a loss of $5.0 million related to cost method investments.

*Equity in Loss of Nonconsolidated Affiliates*

Equity in loss of nonconsolidated affiliates was $0.9 million for 2015.

Equity in loss of nonconsolidated affiliates of $9.4 million during 2014 primarily related to the $4.5 million gain on the sale of our 50% interest in Buspak, offset by the sale of our 50% interest in ARN, which included a loss on the sale of $2.4 million and $11.5 million of foreign exchange losses that were reclassified from accumulated other comprehensive income at the date of the sale.

*Loss on Extinguishment of Debt*

In connection with the first quarter 2015 prepayment of iHeartCommunications' Term Loan B facility and Term Loan C-asset sale facility, we recognized a loss of $2.2 million.

During the fourth quarter of 2014, CC Finco, LLC ("CC Finco"), an indirect wholly-owned subsidiary of ours, repurchased $57.1 million aggregate principal amount of iHeartCommunications' 5.5% Senior Notes due 2016 and $120.0 million aggregate principal amount of iHeartCommunications' 10.0% Senior Notes due 2018 for a total of $159.3 million, including accrued interest, through open market purchases. In connection with these transactions, we recognized a net gain of $12.9 million.

In September 2014, iHeartCommunications prepaid $974.9 million of the loans outstanding under its Term Loan B facility and $16.1 million of the loans outstanding under its Term Loan C-asset sale facility. In connection with these transactions, we recognized a loss of $4.8 million.

During June 2014, iHeartCommunications redeemed $567.1 million aggregate principal amount of its outstanding 5.5% Senior Notes due 2014 and $241.0 million aggregate principal amount of its outstanding 4.9% Senior Notes due 2015. In connection with these transactions, we recognized a loss of $47.5 million.

During the first quarter of 2014, CC Finco repurchased $52.9 million aggregate principal amount of iHeartCommunications' outstanding 5.5% Senior Notes due 2014 and $9.0 million aggregate principal amount of iHeartCommunications' outstanding 4.9% Senior Notes due 2015 for a total of $63.1 million, including accrued interest, through open market purchases. In connection with these transactions, we recognized a loss of $3.9 million.

*Other Income (Expense), Net*

45

Other income of $13.1 million and $9.1 million for 2015 and 2014, respectively, primarily related to gains on foreign exchange transactions.

*Income Tax Expense*

The effective tax rate for the year ended December 31, 2015 was (13.4%) as compared to (8.3%) for the year ended December 31, 2014. The effective tax rate for 2015 was impacted by the $305.3 million valuation allowance recorded against our current period federal and state net operating losses due to the uncertainty of the ability to utilize those losses in future periods. The valuation allowance was recorded against the Company's current period federal and state net operating losses due to the uncertainty of the ability to utilize these losses in future periods.

The effective tax rate for the year ended December 31, 2014 was primarily impacted by the $339.8 million valuation allowance recorded during the period as additional deferred tax expense. The valuation allowance was recorded against a portion of the U.S. Federal and State net operating losses due to the uncertainty of the ability to utilize those losses in future periods. This expense was partially offset by $28.9 million in net tax benefits associated with a decrease in unrecognized tax benefits resulting from the expiration of statutes of limitations to assess taxes in the United Kingdom and several state jurisdictions.

**iHM Results of Operations**

Our iHM operating results were as follows:

| *(In thousands)* | Years Ended December 31, | | | % |
|---|---|---|---|---|
| | 2015 | | 2014 | Change |
| Revenue | $ 3,284,320 | $ | 3,161,503 | 3.9% |
| Direct operating expenses | 972,937 | | 932,172 | 4.4% |
| SG&A expenses | 1,065,066 | | 1,013,407 | 5.1% |
| Depreciation and amortization | 240,207 | | 240,846 | (0.3)% |
| Operating income | $ 1,006,110 | $ | 975,078 | 3.2% |

iHM revenue increased $122.8 million during 2015 compared to 2014 driven primarily by increases in our core radio business, both broadcast and digital, including the impact of marketing partnerships with our advertisers for live events, such as the iHeartRadio Music Festival, the iHeartRadio Music Awards, the iHeart Country Festival and iHeartRadio Jingle Balls concert tour, and barter and trade revenue. Revenue also increased for our traffic and weather business, as well as growth in our syndication business driven by growth in our news/talk format. Partially offsetting these increases were decreases in political advertising revenues as a result of 2015 not being a congressional election year.

iHM direct operating expenses increased $40.8 million during 2015 compared to 2014, primarily due to higher music license and performance royalties, higher lease expense as a result of the sale and subsequent leaseback of radio tower sites and higher radio programming costs. iHM SG&A expenses increased $51.7 million during 2015 compared to 2014 primarily due to higher barter and trade expenses, higher bad debt expense and investments in national and digital sales capabilities, partially offset by lower advertising and promotion expense and lower legal expense. Strategic revenue and efficiency spending included in SG&A expenses decreased $3.9 million compared to the same period last year.

**Americas Outdoor Results of Operations**

Our Americas outdoor operating results were as follows:

| *(In thousands)* | Years Ended December 31, | | | % |
|---|---|---|---|---|
| | 2015 | | 2014 | Change |
| Revenue | $ 1,349,021 | $ | 1,350,623 | (0.1)% |
| Direct operating expenses | 597,382 | | 605,771 | (1.4)% |
| SG&A expenses | 233,254 | | 233,641 | (0.2)% |
| Depreciation and amortization | 204,514 | | 203,928 | 0.3% |
| Operating income | $ 313,871 | $ | 307,283 | 2.1% |

Americas outdoor revenue decreased $1.6 million during 2015 compared to 2014. Excluding the $23.4 million impact from movements in foreign exchange rates, Americas outdoor revenue increased $21.8 million during 2015 compared to 2014

46

driven primarily by an increase in revenues from digital billboards as a result of new deployments, as well as from our Spectacolor business, partially offset by lower advertising revenues from our static bulletins and posters, and our airports business.

Americas outdoor direct operating expenses decreased $8.4 million during 2015 compared to 2014. Excluding the $13.1 million impact from movements in foreign exchange rates, Americas outdoor direct operating expenses increased $4.7 million during 2015 compared to 2014 primarily due to higher variable site lease expenses related to the increase in revenues. Americas outdoor SG&A expenses decreased $0.4 million during 2015 compared to 2014. Excluding the $6.0 million impact from movements in foreign exchange rates, Americas outdoor SG&A expenses increased $5.6 million during 2015 compared to 2014 primarily due to higher expenses in Latin America.

**International Outdoor Results of Operations**

Our International outdoor operating results were as follows:

| (In thousands) | Years Ended December 31, | | | | % |
| --- | --- | --- | --- | --- | --- |
| | | 2015 | | 2014 | Change |
| Revenue | $ | 1,457,183 | $ | 1,610,636 | (9.5)% |
| Direct operating expenses | | 897,520 | | 991,117 | (9.4)% |
| SG&A expenses | | 298,250 | | 314,878 | (5.3)% |
| Depreciation and amortization | | 166,060 | | 198,143 | (16.2)% |
| Operating income | $ | 95,353 | $ | 106,498 | (10.5)% |

International outdoor revenue decreased $153.4 million during 2015 compared to 2014. Excluding the $205.6 million impact from movements in foreign exchange rates, International outdoor revenue increased $52.2 million during 2015 compared to 2014 primarily driven by new contracts along with higher occupancy and higher rates for our transit and street furniture products, particularly digital, in certain European countries, including Sweden, Norway, Italy and the UK, as well as from new contracts in Australia and China.

International outdoor direct operating expenses decreased $93.6 million during 2015 compared to 2014. Excluding the $133.5 million impact from movements in foreign exchange rates, International outdoor direct operating expenses increased $39.9 million during 2015 compared to 2014 primarily as a result of higher variable costs associated with higher revenue, as well as site lease termination fees on lower-margin boards incurred in connection with strategic revenue and efficiency initiatives. International outdoor SG&A expenses decreased $16.6 million during 2015 compared to 2014. Excluding the $45.0 million impact from movements in foreign exchange rates, International outdoor SG&A expenses increased $28.4 million during 2015 compared to 2014 primarily due to higher compensation expense, including commissions in connection with higher revenues.

Depreciation and amortization decreased $32.1 million. Excluding the $19.5 million impact from movements in foreign exchange rates, depreciation and amortization decreased $12.6 million primarily due to assets becoming fully depreciated or fully amortized.

Also included in International Outdoor direct operating expenses and SG&A expenses are $8.2 million and $3.2 million, respectively, recorded in the fourth quarter of 2015 to correct for accounting errors included in the results for our Netherlands subsidiary reported in prior years. Such corrections are not considered to be material to the current year or prior year financial results.

47

**Reconciliation of Segment Operating Income to Consolidated Operating Income**

| (In thousands) | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| iHM | $ | 1,080,615 | $ | 1,006,110 | $ | 975,078 |
| Americas outdoor advertising | | 297,034 | | 313,871 | | 307,283 |
| International outdoor advertising | | 116,178 | | 95,353 | | 106,498 |
| Other | | 43,411 | | 19,314 | | 36,359 |
| Impairment charges | | (8,000) | | (21,631) | | (24,176) |
| Corporate expense [1] | | (378,103) | | (357,587) | | (359,487) |
| Other operating income, net | | 353,556 | | 94,001 | | 40,031 |
| Consolidated operating income | $ | 1,504,691 | $ | 1,149,431 | $ | 1,081,586 |

(1) Corporate expenses include expenses related to iHM, Americas outdoor, International outdoor and our Other category, as well as overall executive, administrative and support functions.

**Share-Based Compensation Expense**

Share-based compensation expenses are recorded in corporate expenses and were $13.1 million, $10.9 million and $10.7 million for the years ended December 31, 2016, 2015 and 2014, respectively.

As of December 31, 2016, there was $21.0 million of unrecognized compensation cost, net of estimated forfeitures, related to unvested share-based compensation arrangements that will vest based on service conditions. This cost is expected to be recognized over a weighted average period of approximately three years. In addition, as of December 31, 2016, there was $26.4 million of unrecognized compensation cost, net of estimated forfeitures, related to unvested share-based compensation arrangements that will vest based on market, performance and service conditions. This cost will be recognized when it becomes probable that the performance condition will be satisfied.

## LIQUIDITY AND CAPITAL RESOURCES

**Cash Flows**

The following discussion highlights cash flow activities during the years ended December 31, 2016, 2015 and 2014:

| (In thousands) | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| Cash provided by (used for): | | | | | | |
| Operating activities | $ | (13,982) | $ | (77,304) | $ | 245,116 |
| Investing activities | $ | 510,915 | $ | 30,234 | $ | (88,682) |
| Financing activities | $ | (418,231) | $ | 377,410 | $ | (398,001) |

*Operating Activities*

*2016*

Cash used for operating activities was $14.0 million in 2016 compared to $77.3 million of cash used for operating activities in 2015. Our consolidated net loss in 2016 and 2015 included non-cash items of $195.0 million and $700.7 million, respectively. Non-cash items affecting our net loss include impairment charges, depreciation and amortization, deferred taxes, provision for doubtful accounts, amortization of deferred financing charges and note discounts, net, share-based compensation, gain on disposal of operating and fixed assets, loss on investments, equity in loss of nonconsolidated affiliates, (gain) loss on extinguishment of debt, and other reconciling items, net as presented on the face of the consolidated statement of cash flows. The decrease in cash used for operating activities is primarily attributed to changes in working capital balances, particularly accounts receivable, which were driven primarily by improved collections. Cash paid for interest was $77.8 million higher in 2016 compared to the prior year due to the timing of accrued interest payments and higher interest rates as a result of financing transactions.

48

*2015*

Cash used for operating activities was $77.3 million in 2015 compared to $245.1 million of cash provided from operating activities in 2014. Our consolidated net loss in 2015 and 2014 included non-cash items of $700.7 million and $877.5 million, respectively. Non-cash items affecting our net loss include impairment charges, depreciation and amortization, deferred taxes, provision for doubtful accounts, amortization of deferred financing charges and note discounts, net, share-based compensation, gain on disposal of operating and fixed assets, gain on marketable securities, equity in (earnings) loss of nonconsolidated affiliates, loss on extinguishment of debt, and other reconciling items, net as presented on the face of the consolidated statement of cash flows.  The increase in cash used for operating activities is primarily attributed to an increase of $146.1 million of cash interest payments in 2015 compared to 2014, as well as changes in working capital balances, particularly accounts receivable, which were driven primarily by an increase in revenues and slower collections, as well as prepaid and other current assets. Cash paid for interest was higher in 2015 compared to the prior year due to the timing of accrued interest payments and higher interest rates as a result of refinancing transactions.

*2014*

Cash provided by operating activities in 2014 was $245.1 million compared to $212.9 million of cash provided in 2013. Our consolidated net loss included $877.5 million of non-cash items in 2014. Our consolidated net loss in 2013 included $782.5 million of non-cash items. Non-cash items affecting our net loss include impairment charges, depreciation and amortization, deferred taxes, provision for doubtful accounts, amortization of deferred financing charges and note discounts, net, share-based compensation, gain on disposal of operating and fixed assets, gain on marketable securities, equity in (earnings) loss of nonconsolidated affiliates, loss on extinguishment of debt, and other reconciling items, net as presented on the face of the consolidated statement of cash flows. Cash paid for interest was $2.6 million lower in 2014 compared to the prior year due to the timing of accrued interest payments from refinancing transactions.

***Investing Activities***

*2016*

Cash provided by investing activities of $510.9 million in 2016 primarily reflected net cash proceeds from the sale of nine non-strategic outdoor markets including Cleveland and Columbus, Ohio, Des Moines, Iowa, Ft. Smith, Arkansas, Memphis, Tennessee, Portland, Oregon, Reno, Nevada, Seattle, Washington and Wichita, Kansas of $592.3 million in cash and certain advertising assets in Florida, and the sale of our outdoor business in Australia for $195.7 million, net of cash retained by the purchaser and closing costs. Those sale proceeds were partially offset by $314.7 million used for capital expenditures.  We spent  $73.2 million for capital expenditures in our iHM segment primarily related to leasehold improvements and IT infrastructure, $81.4 million in our Americas outdoor segment primarily related to the construction of new advertising structures such as digital displays, $143.8 million in our International outdoor segment primarily related to street furniture advertising structures, $2.5 million in our Other category and $13.8 million by Corporate primarily related to equipment and software.

*2015*

Cash provided by investing activities of $30.2 million in 2015 primarily reflected proceeds of $369.9 million from the sale of broadcasting towers and related property and equipment, as well as proceeds of $34.3 million from the sale of our San Antonio office buildings, partially offset by closing costs incurred in relation to the sale of broadcasting towers of $10.0 million. We are leasing back a portion of the radio towers and related property and equipment, as well as the San Antonio office buildings, under long-term operating leases. Those sale proceeds were partially offset by $296.4 million used for capital expenditures and $85.8 million used to purchase businesses, investments and other operating assets. We spent $63.8 million for capital expenditures in our iHM segment primarily related to leasehold improvements and IT infrastructure, $82.2 million in our Americas outdoor segment primarily related to the construction of new advertising structures such as digital displays, $132.6 million in our International outdoor segment primarily related to street furniture advertising and digital billboard structures, $2.0 million in our Other category and $15.8 million by Corporate primarily related to equipment and software.

*2014*

Cash used for investing activities of $88.7 million in 2014 primarily reflected capital expenditures of $318.2 million, partially offset by proceeds of $236.6 million primarily from the sale of our 50% interest in ARN and the sale of our 50% interest in Buspak. We spent $53.9 million for capital expenditures in our iHM segment primarily related to leasehold improvements and IT infrastructure, $109.7 million in our Americas outdoor segment primarily related to the construction of new advertising structures such as digital displays, $117.5 million in our International outdoor segment primarily related to billboard and street furniture advertising structures, $2.2 million in our Other category, and $34.9 million by Corporate primarily related to equipment and software.

*Financing Activities*

*2016*

Cash used for financing activities of $418.2 million in 2016 primarily resulted from the purchase of iHeartCommunications' 10.0% Senior Notes due 2018 for an aggregate purchase price of $222.2 million, the payment at maturity of $192.9 million of 5.5% Senior Notes in December 2016, other payments on long-term debt and dividends paid to non-controlling interests, partially offset by net draws under iHeartCommunications' receivables based credit facility of $100.0 million.

*2015*

Cash provided by financing activities of $377.4 million in 2015 primarily resulted from net draws under iHeartCommunications' receivables based credit facility of $230.0 million, the net effect of the proceeds from the issuance of $950.0 million of 10.625% Priority Guarantee Notes due 2023 and proceeds from the issuance by CCIBV of $225.0 million of 8.75% Senior Notes due 2020, offset by the prepayment at par of $916.1 million of the loans outstanding under our term loan B facility, $15.2 million of the loans outstanding under our term loan C-asset sale facility and cash paid of $42.6 million to purchase CCOH's Class A common stock.

*2014*

Cash used for financing activities of $398.0 million in 2014 primarily reflected payments on long-term debt and the payment by CCOH of a dividend to CCOH stockholders, partially offset by proceeds from the issuance of long-term debt. iHeartCommunications received cash proceeds from the issuance by CCU Escrow Corporation of 10% Senior Notes due 2018 ($850.0 million in aggregate principal amount), the sale by a subsidiary of iHeartCommunications of 14% Senior Notes due 2021 to private purchasers ($227.0 million in aggregate principal amount) and the issuance to private purchasers of 9% Priority Guarantee Notes due 2022 ($1,000.0 million in aggregate principal amount). This was partially offset by the redemption of $567.1 million principal amount outstanding of iHeartCommunications' 5.5% Senior Notes due 2014 (including $158.5 million principal amount of the notes held by a subsidiary of the Company) and $241.0 million principal amount outstanding of iHeartCommunications' 4.9% Senior Notes due 2015, the repayment of the full $247.0 million principal amount outstanding under iHeartCommunications' receivables-based credit facility, and the prepayment of $974.9 million aggregate principal amount of the Term B facility due 2016 and $16.1 million aggregate principal amount of the Term loan C facility due 2016. In addition, during 2014, CC Finco repurchased $239.0 million aggregate principal amount of notes, for a total purchase price of $222.4 million, including accrued interest.

**Anticipated Cash Requirements**

Our primary sources of liquidity are cash on hand, cash flow from operations, borrowing capacity under iHeartCommunications' domestic receivables based credit facility, subject to certain limitations contained in iHeartCommunications' material financing agreements and cash from liquidity-generating transactions. As of December 31, 2016, we had $845.0 million of cash on our balance sheet, including $542.0 million of cash held by our subsidiary, CCOH. Included in the cash held by CCOH is $180.1 million of cash held outside the U.S. It is our policy to permanently reinvest the earnings of our non-U.S. subsidiaries as these earnings are generally redeployed in those jurisdictions for operating needs and continued functioning of their businesses. We have the ability and intent to indefinitely reinvest the undistributed earnings of consolidated subsidiaries based outside of the United States. If any excess cash held by our foreign subsidiaries were needed to fund operations in the United States, we could presently repatriate available funds without a requirement to accrue or pay U.S. taxes. This is a result of significant deficits, as calculated for tax law purposes, in our foreign earnings and profits, which gives us flexibility to make future cash distributions as non-taxable returns of capital. As of December 31, 2016, we had a borrowing base of $480.4 million under iHeartCommunications' receivables based credit facility, had $330.0 million of outstanding borrowings and had $36.8 million of outstanding letters of credit, resulting in $113.6 million of excess availability. However, any incremental borrowings under iHeartCommunications' receivables based credit facility may be further limited by the terms contained in iHeartCommunications' material financing agreements.

Since the beginning of 2016, we successfully completed several transactions that had a positive impact on our liquidity. In the first quarter of 2016, we received $196.3 million as a dividend from CCOH funded with the proceeds of the December 2015 issuance of 8.75% Senior Notes due 2020 by Clear Channel International B.V. ("CCIBV"), an indirect subsidiary of the Company and of CCOH, and $486.5 million as a dividend from CCOH ($186.5 million net of iHeartCommunications' concurrent repayment of the Revolving Promissory Note) funded with the proceeds of a $300.0 million repayment under the Revolving Promissory note and the sale of CCOH's outdoor business in non-strategic Americas outdoor markets. During the fourth quarter of 2016, CCOH sold its outdoor business in Australia for cash proceeds of $195.7 million, net of cash retained by the purchaser and closing costs and we incurred $100.0 million of additional borrowings under our receivables based credit facility. On February 9, 2017, CCOH declared a special dividend of $282.5 million using a portion of the proceeds from the sales of certain non-strategic U.S. outdoor markets and of our Australia outdoor business. We received on February 23, 2017 89.9% of the dividend or approximately $254.0

million, with the remaining 10.1% or approximately $28.5 million paid to public stockholders of CCOH. These transactions improved our liquidity position in the short term. We are currently exploring, and expect to continue to explore, a variety of other transactions to provide us with additional liquidity. We cannot assure you that we will enter into or consummate any such liquidity-generating transactions, or that such transactions will provide sufficient cash to satisfy our liquidity needs, and any such transactions, if consummated, could adversely affect us in other ways. Future liquidity-generating transactions could have the effect of further increasing our annual cash interest payment obligations, reducing our cash flow from operations or reducing cash available for capital expenditures and other business initiatives.

Our primary uses of liquidity are to fund our working capital, debt service, capital expenditures and other obligations. At December 31, 2016, we had debt maturities totaling $343.5 million, $559.1 million and $8,369.0 million in 2017, 2018 and 2019, respectively. On February 7, 2017, we exchanged $234.9 million of our 10.0% Senior Notes due 2018, net of $241.4 million of such notes held by our subsidiaries, for $234.9 million principal amount of newly-issued 11.25% Priority Guarantee Notes due 2021. A substantial amount of our cash requirements are for debt service obligations. During the year ended December 31, 2016, we spent $2,081.3 million of cash on payments of principal and interest on our debt, net of facility draws and proceeds received, compared to $1,219.5 million in the year ended December 31, 2015. We anticipate having approximately $1.7 billion of cash interest payment obligations in 2017, compared to $1.8 billion of cash interest payments in 2016. Our significant interest payment obligations reduce our financial flexibility, make us more vulnerable to changes in operating performance and economic downturns, reduce our liquidity over time and could negatively affect iHeartCommunications' ability to obtain additional financing in the future.

While we have been successful in accessing the capital markets on terms and in amounts adequate to refinance our indebtedness and meet our liquidity needs in the past, there can be no assurance that refinancing alternatives will be available in sufficient amounts or on terms acceptable to us in the future due to market conditions, our financial condition, our liquidity constraints or other factors, many of which are beyond our control. Even if refinancing alternatives are available to us, we may not find them suitable or at comparable interest rates to the indebtedness being refinanced, and our annual cash interest payment obligations could increase further. In addition, the terms of our existing or future debt agreements may restrict us from securing refinancing on terms that are available to us at that time. If we are unable to continue to obtain sources of refinancing or generate sufficient cash through our operations and liquidity-generating transactions, we could face substantial liquidity problems, which could have a material adverse effect on our financial condition and on our ability to meet iHeartCommunications' obligations.

On July 15, 2016, Broader Media, LLC, our indirect wholly-owned subsidiary, repurchased approximately $383.0 million aggregate principal amount of iHeartCommunications' 10.0% Senior Notes due 2018 for an aggregate purchase price of approximately $222.2 million. The repurchase effectively reduces the principal amount of our debt maturing in 2018 by $383.0 million and our consolidated annual cash interest obligations by $38.3 million, because principal and interest payments made to our wholly-owned subsidiary are eliminated in consolidation. On February 7, 2017, we completed an exchange offer of $476.4 million principal amount of our 10.0% Senior Notes due 2018 for $476.4 million principal amount of newly-issued 11.25% Priority Guarantee Notes due 2021. Of the $476.4 million principal amount of 11.25% Priority Guarantee Notes due 2021 issued in the exchange offer, $241.4 million principal amount was issued to subsidiaries of iHeartCommunications that exchanged 10.0% Senior Notes due 2018 in the exchange offer. We may make additional repurchases of indebtedness of iHeartCommunications in the future. In addition, we frequently evaluate strategic opportunities both within and outside our existing lines of business. We expect from time to time to pursue dispositions or acquisitions, which could be material. iHeartCommunications' and iHeartCommunications' subsidiaries' significant amount of indebtedness may limit our ability to pursue dispositions or acquisitions. The terms of our existing or future debt agreements may also restrict our ability to engage in these transactions.

On November 17, 2016, we incurred $100.0 million of additional borrowings under our receivables based credit facility, and as of December 31, 2016, we had total outstanding borrowings of $330.0 million under this facility. Due to the seasonal variations in our business, we made a repayment of $25.0 million on January 31, 2017, and we expect our borrowing base and excess availability to decrease in the first quarter of 2017. As a result, we may be required to repay an additional portion of our outstanding borrowings under this facility during the first quarter of 2017. The receivables based credit facility has a maturity date of December 24, 2017.

During the second quarter of 2014, the FASB issued ASU No. 2014-15, *Presentation of Financial Statements - Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*. This update provides U.S. GAAP guidance on management's responsibility in evaluating whether there is substantial doubt about a company's ability to continue as a going concern and about related footnote disclosures. We adopted this standard for the year ended December 31, 2016. Under this standard, we are required to evaluate whether there is substantial doubt about our ability to continue as a going concern each reporting period, including interim periods.

In evaluating our ability to continue as a going concern, management considered the conditions and events that could raise substantial doubt about our ability to continue as a going concern within 12 months after our financial statements were issued

51

(February 23, 2017). Management considered our current financial condition and liquidity sources, including current funds available, forecasted future cash flows and our conditional and unconditional obligations due before February 23, 2018. Our forecast of future cash flows indicates that such cash flows would not be sufficient for us to meet our obligations, including payment of the outstanding receivables based credit facility balance at maturity, as they become due in the ordinary course of business for a period of 12 months following February 23, 2017. We plan to refinance or extend the receivables based credit facility to a date at least 12 months after February 23, 2017 with terms similar to the facility's current terms.

Management believes the refinancing or extension of the maturity of the receivables based credit facility is probable of being executed as we have successfully extended the maturity date of this receivables based credit facility in the past, and the facility has a first-priority lien on the accounts receivable of iHeartCommunications and certain of its subsidiaries. Management's plan to refinance or extend the due date of the receivables based credit facility, combined with current funds and expected future cash flows, are considered to be sufficient to enable us to meet our obligations as they become due in the ordinary course of business for a period of 12 months following the date these financial statements are issued. This belief assumes, among other things, that we will continue to be successful in implementing our business strategy and that there will be no material adverse developments in our business, liquidity or capital requirements, which include promoting spending in our industries and capitalizing on our diverse geographic and product opportunities, including the continued investment in our media and entertainment initiatives and continued deployment of digital displays. There is no assurance we will be able to achieve our forecasted operating cash flows or that the receivables based credit facility will be extended in a timely manner or on terms acceptable to us, or at all. If one or more of these factors do not occur as expected, it could cause a default under one or more of the agreements governing our indebtedness. In addition to the transactions described above, we have from time to time been engaged in discussions with some of the holders of our indebtedness regarding proposed modifications to the terms of that indebtedness and other changes to our capital structure, but those discussions have not resulted in any agreements to date. We have considered and will continue to evaluate potential transactions to improve our capital structure and address our liquidity constraints and we have retained advisers to assist with the assessment of a potential debt restructuring transaction. See "-Potential Restructuring of Our Indebtedness." If our future cash flows from operations, refinancing sources and liquidity-generating transactions are insufficient to service our debt or to fund our other liquidity needs, and if we are unable to refinancing or extend the maturity of the receivables based credit facility or complete a debt restructuring transaction, we may be forced to reduce or delay our business activities and capital expenditures, sell material assets, seek additional capital or be required to file for bankruptcy court protection. We cannot assure you that we would be able to accomplish any of these alternatives on a timely basis or on satisfactory terms, if at all.

Except as set forth below under "-Non-Payment of $57.1 million of iHeartCommunications Legacy Notes Held by an Affiliate," we were in compliance with the covenants contained in iHeartCommunications' material financing agreements as of December 31, 2016, including the maximum consolidated senior secured net debt to consolidated EBITDA limitation contained in iHeartCommunications' senior secured credit facilities. However, our future results are subject to significant uncertainty and there can be no assurance that we will be able to maintain compliance with these covenants. These covenants include a requirement in our senior secured credit facilities that we receive an opinion from our auditors in connection with our year-end audit that is not subject to a "going concern" or like qualification or exception. Our ability to comply with these covenants in the future may be affected by events beyond our control, including the uncertainties described above and prevailing economic, financial and industry conditions. The breach of any covenants set forth in iHeartCommunications' financing agreements would result in a default thereunder. An event of default would permit the lenders under a defaulted financing agreement to declare all indebtedness thereunder to be immediately due and payable. Moreover, the lenders under the receivables based credit facility under iHeartCommunications' senior secured credit facilities would have the option to terminate their commitments to make further extensions of credit thereunder. If we are unable to repay iHeartCommunications' obligations under any secured credit facility, the lenders could proceed against any assets that were pledged to secure such facility. In addition, a default or acceleration under any of iHeartCommunications' material financing agreements could cause a default under other of our obligations that are subject to cross-default and cross-acceleration provisions. The threshold amount for a cross-default under the senior secured credit facilities and the indentures governing our outstanding bonds is $100.0 million. The default resulting from non-payment of the $57.1 million of 5.50% Senior Notes described below is below the $100.0 million cross-default threshold in iHeartCommunications' debt documents.

**Non-Payment of $57.1 Million of iHeartCommunications Legacy Notes Held by an Affiliate**

Our wholly-owned subsidiary, Clear Channel Holdings, Inc. ("CCH"), owns $57.1 million aggregate principal amount of our 5.50% Senior Notes due 2016 (the "5.50% Senior Notes"). On December 9, 2016, a special committee of our independent directors decided to not repay the $57.1 million principal amount of the 5.50% Senior Notes held by CCH when the notes matured on December 15, 2016. On December 12, 2016, we informed CCH that we did not intend to repay the $57.1 million principal amount of the 5.50% Senior Notes held by CCH when the notes matured on December 15, 2016. CCH informed us that, while it retains its right to exercise remedies under the indenture governing the 5.50% Senior Notes (the "legacy notes indenture") in the future, it does not currently intend to, and it does not currently intend to request that the trustee, seek to collect principal amounts due or exercise or request enforcement of any remedy with respect to the nonpayment of such principal amount under the legacy

notes indenture. As a result, $57.1 million of the 5.50% Senior Notes remain outstanding. We repaid the other $192.9 million of 5.50% Senior Notes held by other holders, and we intend to continue to pay interest on the 5.50% Senior Notes held by CCH for so long as such notes continue to remain outstanding.

For as long as we have at least $500 million of legacy notes outstanding, including the $57.1 million of 5.50% Senior Notes currently held by CCH, we will not have an obligation to grant certain additional security interests in favor of certain of our lenders and holders of our existing priority guarantee notes or the holders of our legacy notes under the "springing lien" described in the agreements governing that indebtedness, and the limitations existing with respect to the existing security interests will remain in place until up to 60 days following the date on which not more than $500 million aggregate principal amount of the legacy notes remain outstanding.

**Potential Restructuring of Our Indebtedness**

We have been reviewing a number of potential alternatives regarding our outstanding indebtedness. These alternatives include refinancings, exchange offers, consent solicitations, the issuance of new indebtedness, amendments to the terms of our existing indebtedness and/or other transactions. We may enter into discussions with holders of our indebtedness with respect to these alternatives. Among these alternatives is a global restructuring that would, on a consensual basis, seek to modify the terms of substantially all of our outstanding indebtedness. We may offer to exchange the indebtedness under our senior secured credit facilities, all of our priority guarantee notes, our legacy notes and/or our senior notes due 2021 for new debt and/or equity securities of our parent and/or subsidiary companies. In conjunction with any such transactions, we may seek consents to amend the documents governing our indebtedness to amend or eliminate certain covenants or collateral provisions.

Because the terms of any such transactions will be subject to negotiations with the holders of our indebtedness, they may differ materially from those described above and are, to a large extent, outside of our control. There can be no assurance that we will be able to complete any such transactions, and, as no decision with respect to the terms of any such transactions has been made, we may decide not to pursue any such transactions. If we are unable to complete any such transactions, we may be required to file for bankruptcy court protection.

Although we will continue to have a substantial amount of indebtedness outstanding even if we are able to consummate a restructuring of our indebtedness, we believe that such a restructuring would benefit our stakeholders by significantly improving our capital structure and preventing us from having to file for bankruptcy. A bankruptcy filing could be more costly than a restructuring of our indebtedness and could significantly damage our key assets including our relationships with advertisers, consumers, business partners, suppliers, customers and creditors, and significantly harm our brand.

**Sources of Capital**

As of December 31, 2016 and 2015, we had the following debt outstanding, net of cash and cash equivalents:

| (In millions) | December 31, | | | |
|---|---|---|---|---|
| | 2016 | | 2015 | |
| Senior Secured Credit Facilities: | | | | |
| Term Loan D Facility Due 2019 | $ | 5,000.0 | $ | 5,000.0 |
| Term Loan E Facility Due 2019 | | 1,300.0 | | 1,300.0 |
| Receivables Based Credit Facility Due 2017[1] | | 330.0 | | 230.0 |
| 9.0% Priority Guarantee Notes Due 2019 | | 1,999.8 | | 1,999.8 |
| 9.0% Priority Guarantee Notes Due 2021 | | 1,750.0 | | 1,750.0 |
| 11.25% Priority Guarantee Notes Due 2021[2] | | 575.0 | | 575.0 |
| 9.0% Priority Guarantee Notes Due 2022 | | 1,000.0 | | 1,000.0 |
| 10.625% Priority Guarantee Notes Due 2023 | | 950.0 | | 950.0 |
| Subsidiary Revolving Credit Facility due 2018[3] | | - | | - |
| Other Secured Subsidiary Debt | | 21.0 | | 25.2 |
| Total Secured Debt | $ | 12,925.8 | $ | 12,830.0 |
| | | | | |
| 14.0% Senior Notes Due 2021 | | 1,729.2 | | 1,695.1 |
| iHeartCommunications Legacy Notes: | | | | |
| 5.5% Senior Notes Due 2016[4] | | - | | 192.9 |
| 6.875% Senior Notes Due 2018 | | 175.0 | | 175.0 |
| 7.25% Senior Notes Due 2027 | | 300.0 | | 300.0 |
| 10.0% Senior Notes Due 2018[2] | | 347.0 | | 730.0 |
| Subsidiary Senior Notes: | | | | |
| 6.5% Series A Senior Notes Due 2022 | | 735.8 | | 735.8 |
| 6.5% Series B Senior Notes Due 2022 | | 1,989.2 | | 1,989.2 |
| Subsidiary Senior Subordinated Notes: | | | | |
| 7.625% Series A Senior Notes Due 2020 | | 275.0 | | 275.0 |
| 7.625% Series B Senior Notes Due 2020 | | 1,925.0 | | 1,925.0 |
| Subsidiary 8.75% Senior Notes due 2020 | | 225.0 | | 225.0 |
| Other Subsidiary Debt | | 28.0 | | 0.2 |
| Purchase accounting adjustments and original issue discount | | (167.0) | | (204.6) |
| Long-term debt fees | | (123.0) | | (148.0) |
| Total Debt | $ | 20,365.0 | $ | 20,720.6 |
| Less: Cash and cash equivalents | | 845.0 | | 772.7 |
| | $ | 19,520.0 | $ | 19,947.9 |

(1)    The receivables based credit facility provides for borrowings of up to the lesser of $535.0 million (the revolving credit commitment) or the borrowing base amount, as defined under the receivables based credit facility, subject to certain limitations contained in iHeartCommunications' material financing agreements. As of December 31, 2016, we had $113.6 million of availability under the receivables based credit facility.

(2)    On July 15, 2016, Broader Media, LLC, our indirect wholly-owned subsidiary, repurchased approximately $383.0 million aggregate principal amount of iHeartCommunications' 10.0% Senior Notes due 2018 for an aggregate purchase price of approximately $222.2 million. On February 7, 2017, we completed an exchange offer of $476.4 million principal amount of our 10.0% Senior Notes due 2018 for $476.4 million principal amount of newly-issued 11.25% Priority Guarantee Notes due 2021, which were issued as "additional notes" under the indenture governing the 11.25% Priority Guarantee Notes due 2021. Of the $476.4 million principal amount of 11.25% Priority Guarantee Notes due 2021 issued in the exchange offer, $241.4 million principal amount was issued to subsidiaries of iHeartCommunications that exchanged 10.0% Senior Notes due 2018 in the exchange offer.

(3)     The subsidiary revolving credit facility provides for borrowings of up to $75.0 million (the revolving credit commitment).

(4)     In December 2016, iHeartCommunications repaid at maturity $192.9 million of 5.5% Senior Notes due 2016 and did not pay $57.1 million of the notes held by a subsidiary of the Company. The $57.1 million of aggregate principal amount remains outstanding and is eliminated for purposes of consolidation of the Company's financial statements.

Our subsidiaries have from time to time repurchased certain debt obligations of iHeartCommunications and our equity securities and equity securities outstanding of CCOH, and may in the future, as part of various financing and investment strategies, purchase additional outstanding indebtedness of iHeartCommunications or its subsidiaries or our outstanding equity securities or outstanding equity securities of CCOH, in tender offers, open market purchases, privately negotiated transactions or otherwise. We or our subsidiaries may also sell certain assets, securities, or properties. These purchases or sales, if any, could have a material positive or negative impact on our liquidity available to repay outstanding debt obligations or on our consolidated results of operations. These transactions could also require or result in amendments to the agreements governing outstanding debt obligations or changes in our leverage or other financial ratios, which could have a material positive or negative impact on our ability to comply with the covenants contained in iHeartCommunications' debt agreements. These transactions, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors. The amounts involved may be material.

On October 4, 2016, iHeartCommunications announced the successful completion of the solicitation of consents (the "Consent Solicitation") from holders of its outstanding Senior Notes due 2021 (the "2021 Notes") to an amendment to the indenture governing the 2021 Notes (the "2021 Notes Indenture") to increase the aggregate principal amount of indebtedness under Credit Facilities (as defined in the 2021 Notes Indenture) permitted to be incurred under Section 4.09(b)(1) of the 2021 Notes Indenture by $500.0 million to $17.3 billion. iHeartCommunications paid an aggregate consent fee of $8.6 million to holders of the 2021 Notes that consented to the amendment in accordance with the terms of the Consent Solicitation.

On December 12, 2016, iHeartCommunications announced the results and expiration of the six separate consent solicitations (the "Consent Solicitations") with respect to its 2021 Notes and its five series of priority guarantee notes. Holders of 2021 Notes representing approximately 81.5% of the outstanding principal amount of the 2021 Notes (excluding any 2021 Notes held by the Company or its affiliates), consented to the proposed amendment (the "Proposed Amendment") to Section 9.07 of the indenture governing the 2021 Notes Indenture. The Proposed Amendment allows the Company to exclude, in any offer to consent, waive or amend any of the terms or provisions of the 2021 Notes Indenture or the Senior Notes in connection with an exchange offer, any holders of Notes who are not institutional "accredited investors," who are not non-"U.S. persons", or those in foreign jurisdictions whose inclusion would require the Company to comply with the registration requirements or other similar requirements under any securities laws of such foreign jurisdiction or would be unlawful. iHeartCommunications paid an aggregate consent fee of $1.7 million to holders of the 2021 Notes that consented to the amendment in accordance with the terms of the Consent Solicitation and will pay a contingent fee of $2.6 million to such holders upon the completion of an exchange offer in which the Company relies on the changes effected by the Proposed Amendment.

iHeartCommunications also announced the expiration of its consent solicitations with respect to its five series of priority guarantee notes. Because iHeartCommunications did not receive consents from holders representing a majority of the aggregate principal amount of each of its five series of priority guarantee notes outstanding, the Proposed Amendment was not effected with respect to the priority guarantee notes and no fixed fee or contingent fee will be paid to holders of such notes.

### Senior Secured Credit Facilities

As of December 31, 2016, iHeartCommunications had a total of $6,300.0 million outstanding under its senior secured credit facilities, consisting of:

- a $5.0 billion term loan D, which matures on January 30, 2019; and
- a $1.3 billion term loan E, which matures on July 30, 2019.

iHeartCommunications may raise incremental term loans of up to (a) $1.5 billion, plus (b) the excess, if any, of (x) 0.65 times pro forma consolidated EBITDA (as calculated in the manner provided in the senior secured credit facilities documentation), over (y) $1.5 billion, plus (c) the aggregate amount of certain principal prepayments made in respect of the term loans under the senior secured credit facilities. Availability of such incremental term loans is subject, among other things, to the absence of any default, pro forma compliance with the financial covenant and the receipt of commitments by existing or additional lenders.

iHeartCommunications is the primary borrower under the senior secured credit facilities, and certain of its domestic restricted subsidiaries are co-borrowers under a portion of the term loan facilities.

*Interest Rate and Fees*

Borrowings under iHeartCommunications' senior secured credit facilities bear interest at a rate equal to an applicable margin plus, at iHeartCommunications' option, either (i) a base rate determined by reference to the higher of (A) the prime lending rate publicly announced by the administrative agent or (B) the Federal funds effective rate from time to time plus 0.50%, or (ii) a Eurocurrency rate determined by reference to the costs of funds for deposits for the interest period relevant to such borrowing adjusted for certain additional costs.

The margin percentages applicable to the term loan facilities are the following percentages per annum:

- with respect to loans under the term loan D, (i) 5.75% in the case of base rate loans and (ii) 6.75% in the case of Eurocurrency rate loans; and
- with respect to loans under the term loan E, (i) 6.50% in the case of base rate loans and (ii) 7.50% in the case of Eurocurrency rate loans.

The margin percentages are subject to adjustment based upon iHeartCommunications' leverage ratio.

*Prepayments*

The senior secured credit facilities require iHeartCommunications to prepay outstanding term loans, subject to certain exceptions, with:

- 50% (which percentage may be reduced to 25% and to 0% based upon iHeartCommunications' leverage ratio) of iHeartCommunications' annual excess cash flow (as calculated in accordance with the senior secured credit facilities), less any voluntary prepayments of term loans and subject to customary credits;
- 100% of the net cash proceeds of sales or other dispositions of specified assets being marketed for sale (including casualty and condemnation events), subject to certain exceptions;
- 100% (which percentage may be reduced to 75% and 50% based upon iHeartCommunications' leverage ratio) of the net cash proceeds of sales or other dispositions by iHeartCommunications or its wholly-owned restricted subsidiaries of assets other than specified assets being marketed for sale, subject to reinvestment rights and certain other exceptions;
- 100% of the net cash proceeds of (i) any incurrence of certain debt, other than debt permitted under iHeartCommunications' senior secured credit facilities, (ii) certain securitization financing, (iii) certain issuances of Permitted Additional Notes (as defined in the senior secured credit facilities) and (iv) certain issuances of Permitted Unsecured Notes and Permitted Senior Secured Notes (as defined in the senior secured credit facilities); and
- Net cash proceeds received by iHeartCommunications as dividends or distributions from indebtedness incurred at CCOH provided that the Consolidated Leverage Ratio of CCOH is no greater than 7.00 to 1.00.

The foregoing prepayments will be applied at iHeartCommunications' option to the term loans (on a pro rata basis) in one of the following cases: (i) first to outstanding term loan D and second to outstanding term loan E, (ii) first to outstanding term loan E and second to outstanding term loan D or (iii) ratably to outstanding term loan D and term loan E.

iHeartCommunications may voluntarily repay outstanding loans under the senior secured credit facilities at any time without premium or penalty, other than customary "breakage" costs with respect to Eurocurrency rate loans.

*Collateral and Guarantees*

The senior secured credit facilities are guaranteed by iHeartCommunications and each of iHeartCommunications' existing and future material wholly-owned domestic restricted subsidiaries, subject to certain exceptions.

All obligations under the senior secured credit facilities, and the guarantees of those obligations, are secured, subject to permitted liens, including prior liens permitted by the indenture governing iHeartCommunications' legacy notes, and other exceptions, by:

- a lien on the capital stock of iHeartCommunications;
- 100% of the capital stock of any future material wholly-owned domestic license subsidiary that is not a "Restricted Subsidiary" under the indenture governing iHeartCommunications' legacy notes;
- certain assets that do not constitute "principal property" (as defined in the indenture governing iHeartCommunications' legacy notes);
- certain specified assets of iHeartCommunications and the guarantors that constitute "principal property" (as defined in the indenture governing iHeartCommunications' legacy notes) securing obligations under the senior secured credit facilities up to the maximum amount permitted to be secured by such assets without requiring equal and ratable security under the indenture governing iHeartCommunications' legacy notes; and

56

- a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility that is junior to the lien securing iHeartCommunications' obligations under such credit facility.

*Certain Covenants and Events of Default*

The senior secured credit facilities require iHeartCommunications to comply on a quarterly basis with a financial covenant limiting the ratio of consolidated secured debt, net of cash and cash equivalents, to consolidated EBITDA (as defined by iHeartCommunications' senior secured credit facilities) for the preceding four quarters. iHeartCommunications' secured debt consists of the senior secured credit facilities, the receivables based credit facility, the priority guarantee notes and certain other secured subsidiary debt. As required by the definition of consolidated EBITDA in iHeartCommunications' senior secured credit facilities, iHeartCommunications' consolidated EBITDA for the preceding four quarters of $1.8 billion is calculated as operating income (loss) before depreciation, amortization, impairment charges and other operating income (expense), net plus share-based compensation and is further adjusted for the following items: (i) costs incurred in connection with the closure and/or consolidation of facilities, retention charges, consulting fees and other permitted activities; (ii) extraordinary, non-recurring or unusual gains or losses or expenses and severance; (iii) non-cash charges; (iv) cash received from nonconsolidated affiliates; and (v) various other items.

The following table reflects a reconciliation of consolidated EBITDA (as defined by iHeartCommunications' senior secured credit facilities) to operating income and net cash provided by operating activities for the four quarters ended December 31, 2016:

| (In Millions) | Four Quarters Ended December 31, 2016 |
|---|---|
| Consolidated EBITDA (as defined by iHeartCommunications' senior secured credit facilities) | $1,844.9 |
| Less adjustments to consolidated EBITDA (as defined by iHeartCommunications' senior secured credit facilities): | |
| Costs incurred in connection with the closure and/or consolidation of facilities, retention charges, consulting fees and other permitted activities | (34.6) |
| Extraordinary, non-recurring or unusual gains or losses or expenses and severance (as referenced in the definition of consolidated EBITDA in iHeartCommunications' senior secured credit facilities) | (42.9) |
| Non-cash charges | (8.2) |
| Other items | 45.5 |
| Less: Depreciation and amortization, Impairment charges, Other operating income (expense), net, and Share-based compensation expense | (300.0) |
| **Operating income** | 1,504.7 |
| Plus: Depreciation and amortization, Impairment charges, Gain (loss) on disposal of operating and fixed assets, and Share-based compensation expense | 290.6 |
| Less: Interest expense | (1,850.0) |
| Less: Current income tax expense | (47.7) |
| Plus: Other income (expense), net | (73.1) |
| Adjustments to reconcile consolidated net loss to net cash provided by operating activities (including Provision for doubtful accounts, Amortization of deferred financing charges and note discounts, net and Other reconciling items, net) | 130.5 |
| Change in assets and liabilities, net of assets acquired and liabilities assumed | 31.0 |
| **Net cash used for operating activities** | $ (14.0) |

The maximum ratio permitted under this financial covenant for the four quarters ended December 31, 2016 was 8.75:1. At December 31, 2016, the ratio was 6.6:1.

In addition, the senior secured credit facilities include negative covenants that, subject to significant exceptions, limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things:

- incur additional indebtedness;
- create liens on assets;
- engage in mergers, consolidations, liquidations and dissolutions;
- sell assets;
- pay dividends and distributions or repurchase iHeartCommunications' capital stock;

- make investments, loans, or advances;
- prepay certain junior indebtedness;
- engage in certain transactions with affiliates;
- amend material agreements governing certain junior indebtedness; and
- change lines of business.

The senior secured credit facilities include certain customary representations and warranties, affirmative covenants and events of default, including payment defaults, breach of representations and warranties, covenant defaults, cross-defaults to certain indebtedness, certain events of bankruptcy, certain events under ERISA, material judgments, the invalidity of material provisions of the senior secured credit facilities documentation, the failure of collateral under the security documents for the senior secured credit facilities, the failure of the senior secured credit facilities to be senior debt under the subordination provisions of certain of iHeartCommunications' subordinated debt and a change of control. If an event of default occurs, the lenders under the senior secured credit facilities will be entitled to take various actions, including the acceleration of all amounts due under the senior secured credit facilities and all actions permitted to be taken by a secured creditor.

***Receivables Based Credit Facility***

On November 17, 2016, we incurred $100.0 million of additional borrowings under our receivables based credit facility. As of December 31, 2016, there was $330.0 million aggregate principal amount outstanding under iHeartCommunications' receivables based credit facility. On January 31, 2017, iHeartCommunications prepaid $25.0 million of the amount borrowed under its receivables based credit facility, bringing its total outstanding borrowings under this facility to $305.0 million.

The receivables based credit facility provides revolving credit commitments of $535.0 million, subject to a borrowing base. The borrowing base at any time equals 90% of the eligible accounts receivable of iHeartCommunications and certain of its subsidiaries. The receivables based credit facility includes a letter of credit sub-facility and a swingline loan sub-facility.

iHeartCommunications and certain subsidiary borrowers are the borrowers under the receivables based credit facility. iHeartCommunications has the ability to designate one or more of its restricted subsidiaries as borrowers under the receivables based credit facility. The receivables based credit facility loans are available in U.S. dollars and letters of credit are available in a variety of currencies including U.S. dollars, Euros, Pounds Sterling, and Canadian dollars.

*Interest Rate and Fees*

Borrowings under the receivables based credit facility bear interest at a rate per annum equal to an applicable margin plus, at iHeartCommunications' option, either (i) a base rate determined by reference to the highest of (a) the prime rate of Citibank, N.A. and (b) the Federal Funds rate plus 0.50% or (ii) a Eurocurrency rate determined by reference to the rate (adjusted for statutory reserve requirements for Eurocurrency liabilities) for Eurodollar deposits for the interest period relevant to such borrowing. The applicable margin for borrowings under the receivables based credit facility ranges from 1.50% to 2.00% for Eurocurrency borrowings and from 0.50% to 1.00% for base-rate borrowings, depending on average daily excess availability under the receivables based credit facility during the prior fiscal quarter.

In addition to paying interest on outstanding principal under the receivables based credit facility, iHeartCommunications is required to pay a commitment fee to the lenders under the receivables based credit facility in respect of the unutilized commitments thereunder. The commitment fee rate ranges from 0.25% to 0.375% per annum dependent upon average unused commitments during the prior quarter. iHeartCommunications must also pay customary letter of credit fees.

*Maturity*

Borrowings under the receivables based credit facility will mature, and lending commitments thereunder will terminate, on the fifth anniversary of the effectiveness of the receivables based credit facility, which is December 24, 2017.

*Prepayments*

If at any time the sum of the outstanding amounts under the receivables based credit facility exceeds the lesser of (i) the borrowing base and (ii) the aggregate commitments under the facility, iHeartCommunications will be required to repay outstanding loans and cash collateralize letters of credit in an aggregate amount equal to such excess. iHeartCommunications may voluntarily repay outstanding loans under the receivables based credit facility at any time without premium or penalty, other than customary "breakage" costs with respect to Eurocurrency rate loans. Any voluntary prepayments iHeartCommunications makes will not reduce its commitments under the receivables based credit facility.

*Guarantees and Security*

The facility is guaranteed by, subject to certain exceptions, the guarantors of iHeartCommunications' senior secured credit facilities. All obligations under the receivables based credit facility, and the guarantees of those obligations, are secured by a perfected security interest in all of iHeartCommunications' and all of the guarantors' accounts receivable and related assets and proceeds thereof that is senior to the security interest of iHeartCommunications' senior secured credit facilities in such accounts receivable and related assets and proceeds thereof, subject to permitted liens, including prior liens permitted by the indenture governing certain of iHeartCommunications' legacy notes, and certain exceptions.

*Certain Covenants and Events of Default*

If borrowing availability is less than the greater of (a) $50.0 million and (b) 10% of the aggregate commitments under the receivables based credit facility, in each case, for five consecutive business days (a "Liquidity Event"), iHeartCommunications will be required to comply with a minimum fixed charge coverage ratio of at least 1.00 to 1.00 for fiscal quarters ending on or after the occurrence of the Liquidity Event, and will be continued to comply with this minimum fixed charge coverage ratio until borrowing availability exceeds the greater of (x) $50.0 million and (y) 10% of the aggregate commitments under the receivables based credit facility, in each case, for 30 consecutive calendar days, at which time the Liquidity Event shall no longer be deemed to be occurring. In addition, the receivables based credit facility includes negative covenants that, subject to significant exceptions, limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things:

- incur additional indebtedness;
- create liens on assets;
- engage in mergers, consolidations, liquidations and dissolutions;
- sell assets;
- pay dividends and distributions or repurchase capital stock;
- make investments, loans, or advances;
- prepay certain junior indebtedness;
- engage in certain transactions with affiliates;
- amend material agreements governing certain junior indebtedness; and
- change lines of business.

The receivables based credit facility includes certain customary representations and warranties, affirmative covenants and events of default, including payment defaults, breach of representations and warranties, covenant defaults, cross-defaults to certain indebtedness, certain events of bankruptcy, certain events under ERISA, material judgments and a change of control. If an event of default occurs, the lenders under the receivables based credit facility will be entitled to take various actions, including the acceleration of all amounts due under iHeartCommunications' receivables based credit facility and all actions permitted to be taken by a secured creditor.

### 9.0% Priority Guarantee Notes due 2019

As of December 31, 2016, iHeartCommunications had outstanding $2.0 billion aggregate principal amount of 9.0% priority guarantee notes due 2019 (the "9.0% Priority Guarantee Notes due 2019").

The 9.0% Priority Guarantee Notes due 2019 mature on December 15, 2019 and bear interest at a rate of 9.0% per annum, payable semi-annually in arrears on June 15 and December 15 of each year. The 9.0% Priority Guarantee Notes due 2019 are iHeartCommunications' senior obligations and are fully and unconditionally guaranteed, jointly and severally, on a senior basis by the guarantors named in the indenture. The 9.0% Priority Guarantee Notes due 2019 and the guarantors' obligations under the guarantees are secured by (i) a lien on (a) the capital stock of iHeartCommunications and (b) certain property and related assets that do not constitute "principal property" (as defined in the indenture governing certain Legacy Notes of iHeartCommunications), in each case equal in priority to the liens securing the obligations under iHeartCommunications' senior secured credit facilities, the 9.0% Priority Guarantee Notes due 2021, the 11.25% Priority Guarantee Notes due 2021, 9.0% Priority Guarantee Notes due 2022 and the 10.625% Priority Guarantee Notes due 2023, subject to certain exceptions, and (ii) a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility junior in priority to the lien securing iHeartCommunications' obligations thereunder, subject to certain exceptions. In addition to the collateral granted to secure the 9.0% Priority Guarantee Notes due 2019, the collateral agent and the trustee for the 9.0% Priority Guarantee Notes due 2019 entered into an agreement with the administrative agent for the lenders under the senior secured credit facilities to turn over to the trustee under the 9.0% Priority Guarantee Notes due 2019, for the benefit of the holders of the 9.0% Priority Guarantee Notes due 2019, a pro rata share of any recovery received on account of the principal properties, subject to certain terms and conditions.

iHeartCommunications may redeem the 9.0% Priority Guarantee Notes due 2019, in whole or in part, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date.

59

The indenture governing the 9.0% Priority Guarantee Notes due 2019 contains covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) pay dividends, redeem stock or make other distributions or investments; (ii) incur additional debt or issue certain preferred stock; (iii) modify any of iHeartCommunications' existing senior notes; (iv) transfer or sell assets; (v) engage in certain transactions with affiliates; (vi) create restrictions on dividends or other payments by the restricted subsidiaries; and (vii) merge, consolidate or sell substantially all of iHeartCommunications' assets. The indenture contains covenants that limit iHeartMedia Capital I, LLC's ability, iHeartCommunications' ability and the ability of their restricted subsidiaries to, among other things: (i) create liens on assets and (ii) materially impair the value of the security interests taken with respect to the collateral for the benefit of the notes collateral agent and the holders of the 9.0% Priority Guarantee Notes due 2019. The indenture also provides for customary events of default.

### 9.0% Priority Guarantee Notes due 2021

As of December 31, 2016, iHeartCommunications had outstanding $1.75 billion aggregate principal amount of 9.0% priority guarantee notes due 2021 (the "9.0% Priority Guarantee Notes due 2021").

The 9.0% Priority Guarantee Notes due 2021 mature on March 1, 2021 and bear interest at a rate of 9.0% per annum, payable semi-annually in arrears on March 1 and September 1 of each year. The 9.0% Priority Guarantee Notes due 2021 are iHeartCommunications' senior obligations and are fully and unconditionally guaranteed, jointly and severally, on a senior basis by the guarantors named in the indenture. The 9.0% Priority Guarantee Notes due 2021 and the guarantors' obligations under the guarantees are secured by (i) a lien on (a)  the capital stock of iHeartCommunications and (b) certain property and related assets that do not constitute "principal property" (as defined in the indenture governing certain Legacy Notes of iHeartCommunications), in each case equal in priority to the liens securing the obligations under iHeartCommunications' senior secured credit facilities, the 9.0% Priority Guarantee Notes due 2019, the 11.25% Priority Guarantee Notes due 2021, the 9.0% Priority Guarantee Notes due 2022 and the 10.625% Priority Guarantee Notes due 2023, subject to certain exceptions and (ii) a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility junior in priority to the lien securing iHeartCommunications' obligations thereunder, subject to certain exceptions.

iHeartCommunications may redeem the 9.0% Priority Guarantee Notes due 2021, in whole or part, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date.

The indenture governing the 9.0% Priority Guarantee Notes due 2021 contains covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) pay dividends, redeem stock or make other distributions or investments; (ii) incur additional debt or issue certain preferred stock; (iii) modify any of iHeartCommunications' existing senior notes; (iv) transfer or sell assets; (v) engage in certain transactions with affiliates; (vi) create restrictions on dividends or other payments by the restricted subsidiaries; and (vii) merge, consolidate or sell substantially all of iHeartCommunications' assets. The indenture contains covenants that limit iHeartMedia Capital I, LLC's ability, iHeartCommunications' ability and the ability of their restricted subsidiaries to, among other things: (i) create liens on assets and (ii) materially impair the value of the security interests taken with respect to the collateral for the benefit of the notes collateral agent and the holders of the 9.0% Priority Guarantee Notes due 2021. The indenture also provides for customary events of default.

### 11.25% Priority Guarantee Notes due 2021

As of December 31, 2016, iHeartCommunications had outstanding $575.0 million aggregate principal amount of 11.25% Priority Guarantee Notes due 2021 (the "11.25% Priority Guarantee Notes due 2021"). On February 7, 2017, we completed an exchange offer of $476.4 million principal amount of our 10.0% Senior Notes due 2018 for $476.4 million principal amount of newly-issued 11.25% Priority Guarantee Notes due 2021, which were issued as "additional notes" under the indenture governing the 11.25% Priority Guarantee Notes due 2021. Of the $476.4 million principal amount of 11.25% Priority Guarantee Notes due 2021 issued in the exchange offer, $241.4 million principal amount was issued to subsidiaries of iHeartCommunications that exchanged 10.0% Senior Notes due 2018 in the exchange offer.

The 11.25% Priority Guarantee Notes due 2021 mature on March 1, 2021 and bear interest at a rate of 11.25% per annum, payable semi-annually in arrears on March 1 and September 1 of each year. The 11.25% Priority Guarantee Notes due 2021 are iHeartCommunications' senior obligations and are fully and unconditionally guaranteed, jointly and severally, on a senior basis by the guarantors named in the indenture governing such notes. The 11.25% Priority Guarantee Notes due 2021 and the guarantors' obligations under the guarantees are secured by (i) a lien on (a) the capital stock of iHeartCommunications and (b) certain property and related assets that do not constitute "principal property" (as defined in the indenture governing certain Legacy Notes of iHeartCommunications), in each case equal in priority to the liens securing the obligations under iHeartCommunications' senior secured credit facilities, the 9.0% Priority Guarantee Notes due 2019, the 9.0% Priority Guarantee Notes due 2021, the 9.0% Priority Guarantee Notes due 2022 and the 10.625% Priority Guarantee Notes due 2023, subject to certain exceptions, and (ii) a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility junior in priority to the lien securing iHeartCommunications' obligations thereunder, subject to certain exceptions.

iHeartCommunications may redeem the 11.25% Priority Guarantee Notes due 2021, in whole or in part, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date.

The indenture governing the 11.25% Priority Guarantee Notes due 2021 contains covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) pay dividends, redeem stock or make other distributions or investments; (ii) incur additional debt or issue certain preferred stock; (iii) modify any of iHeartCommunications' existing senior notes; (iv) transfer or sell assets; (v) engage in certain transactions with affiliates; (vi) create restrictions on dividends or other payments by the restricted subsidiaries; and (vii) merge, consolidate or sell substantially all of iHeartCommunications' assets. The indenture contains covenants that limit iHeartMedia Capital I, LLC's ability, iHeartCommunications' ability and the ability of their restricted subsidiaries to, among other things: (i) create liens on assets and (ii) materially impair the value of the security interests taken with respect to the collateral for the benefit of the notes collateral agent and the holders of the 11.25% Priority Guarantee Notes due 2021. The indenture also provides for customary events of default.

### 9.0% Priority Guarantee Notes due 2022

As of December 31, 2016, iHeartCommunications had outstanding $1.0 billion aggregate principal amount of 9.0% priority guarantee notes due 2022 (the "9.0% Priority Guarantee Notes due 2022").

The 9.0% Priority Guarantee Notes due 2022 mature on September 15, 2022 and bear interest at a rate of 9.0% per annum, payable semi-annually in arrears on March 15 and September 15 of each year. The 9.0% Priority Guarantee Notes due 2022 are iHeartCommunications senior obligations and are fully and unconditionally guaranteed, jointly and severally, on a senior basis by the guarantors named in the indenture. The 9.0% Priority Guarantee Notes due 2022 and the guarantors' obligations under the guarantees are secured by (i) a lien on (a) the capital stock of iHeartCommunications and (b) certain property and related assets that do not constitute "principal property" (as defined in the indenture governing certain Legacy Notes of iHeartCommunications), in each case equal in priority to the liens securing the obligations under iHeartCommunications' senior secured credit facilities, the 9.0% Priority Guarantee Notes due 2019, the 9.0% Priority Guarantee Notes due 2021, the 11.25% Priority Guarantee Notes due 2021 and the 10.625% Priority Guarantee Notes due 2023, subject to certain exceptions, and (ii) a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility junior in priority to the lien securing iHeartCommunications' obligations thereunder, subject to certain exceptions.

iHeartCommunications may redeem the 9.0% Priority Guarantee Notes due 2022 at its option, in whole or part, at any time prior to September 15, 2017, at a price equal to 100% of the principal amount of the 9.0% Priority Guarantee Notes due 2022 redeemed, plus accrued and unpaid interest to the redemption date and plus an applicable premium. iHeartCommunications may redeem the 9.0% Priority Guarantee Notes due 2022, in whole or in part, on or after September 15, 2017, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date. At any time on or before September 15, 2017, iHeartCommunications may elect to redeem up to 40% of the aggregate principal amount of the 9.0% Priority Guarantee Notes due 2022 at a redemption price equal to 109.0% of the principal amount thereof, plus accrued and unpaid interest to the redemption date, with the net proceeds of one or more equity offerings.

The indenture governing the 9.0% Priority Guarantee Notes due 2022 contains covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) pay dividends, redeem stock or make other distributions or investments; (ii) incur additional debt or issue certain preferred stock; (iii) modify any of iHeartCommunications' existing senior notes; (iv) transfer or sell assets; (v) engage in certain transactions with affiliates; (vi) create restrictions on dividends or other payments by the restricted subsidiaries; and (vii) merge, consolidate or sell substantially all of iHeartCommunications' assets. The indenture contains covenants that limit iHeartMedia Capital I, LLC's ability, iHeartCommunications' ability and the ability of their restricted subsidiaries to, among other things: (i) create liens on assets and (ii) materially impair the value of the security interests taken with respect to the collateral for the benefit of the notes collateral agent and the holders of the 9.0% Priority Guarantee Notes due 2022. The indenture also provides for customary events of default.

### 10.625% Priority Guarantee Notes due 2023

As of December 31, 2016, iHeartCommunications had outstanding $950.0 million aggregate principal amount of 10.625% priority guarantee notes due 2023 (the "10.625% Priority Guarantee Notes due 2023").

The 10.625% Priority Guarantee Notes due 2023 mature on March 15, 2023 and bear interest at a rate of 10.625% per annum, payable semi-annually in arrears on March 15 and September 15 of each year. The 10.625% Priority Guarantee Notes due 2023 are iHeartCommunications' senior obligations and are fully and unconditionally guaranteed, jointly and severally, on a senior basis by the guarantors named in the indenture. The 10.625% Priority Guarantee Notes due 2023 and the guarantors' obligations under the guarantees are secured by (i) a lien on (a) the capital stock of iHeartCommunications and (b) certain property and related

61

assets that do not constitute "principal property" (as defined in the indenture governing certain Legacy Notes of iHeartCommunications), in each case equal in priority to the liens securing the obligations under iHeartCommunications' senior secured credit facilities, the 9.0% Priority Guarantee Notes due 2019, the 9.0% Priority Guarantee Notes due 2021, the 11.25% Priority Guarantee Notes due 2021 and the 9.0% Priority Guarantee Notes due 2022, subject to certain exceptions, and (ii) a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility junior in priority to the lien securing iHeartCommunications' obligations thereunder, subject to certain exceptions.

iHeartCommunications may redeem the 10.625% Priority Guarantee Notes due 2023 at its option, in whole or part, at any time prior to March 15, 2018, at a price equal to 100% of the principal amount of the 10.625% Priority Guarantee Notes due 2023 redeemed, plus accrued and unpaid interest to the redemption date and plus an applicable premium. iHeartCommunications may redeem the 10.625% Priority Guarantee Notes due 2023, in whole or in part, on or after March 15, 2018, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date. At any time on or before March 15, 2018, iHeartCommunications may elect to redeem up to 40% of the aggregate principal amount of the 10.625% Priority Guarantee Notes due 2023 at a redemption price equal to 110.625% of the principal amount thereof, plus accrued and unpaid interest to the redemption date, with the net proceeds of one or more equity offerings.

The indenture governing the 10.625% Priority Guarantee Notes due 2023 contains covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) pay dividends, redeem stock or make other distributions or investments; (ii) incur additional debt or issue certain preferred stock; (iii) modify any of iHeartCommunications' existing senior notes; (iv) transfer or sell assets; (v) engage in certain transactions with affiliates; (vi) create restrictions on dividends or other payments by the restricted subsidiaries; and (vii) merge, consolidate or sell substantially all of iHeartCommunications' assets. The indenture contains covenants that limit iHeartMedia Capital I, LLC's ability, iHeartCommunications' ability and the ability of their restricted subsidiaries to, among other things: (i) create liens on assets and (ii) materially impair the value of the security interests taken with respect to the collateral for the benefit of the notes collateral agent and the holders of the 10.625% Priority Guarantee Notes due 2023. The indenture also provides for customary events of default.

*Subsidiary Senior Revolving Credit Facility due 2018*

During the third quarter of 2013, CCOH entered into a five-year senior secured revolving credit facility with an aggregate principal amount of $75.0 million. The revolving credit facility may be used for working capital needs, to issue letters of credit and for other general corporate purposes. At December 31, 2016, there were no amounts outstanding under the revolving credit facility, and $65.4 million of letters of credit under the revolving credit facility, which reduce availability under the facility.

The revolving credit facility contains a springing covenant that requires CCOH to maintain a secured leverage ratio (as defined in the revolving credit facility) of not more than 1.5:1 that is tested at the end of a quarter if availability under the facility is less than 75% of the aggregate commitments under the facility as of the end of the quarter. CCOH was in compliance with the secured leverage ratio covenant as of December 31, 2016.

*14.0% Senior Notes due 2021*

As of December 31, 2016, iHeartCommunications had outstanding approximately $1.7 billion of aggregate principal amount of 14.0% Senior Notes due 2021 (net of $440.6 million principal amount held by a subsidiary of iHeartCommunications).

On October 4, 2016, iHeartCommunications announced the successful completion of the solicitation of consents (the "Consent Solicitation") from holders of its outstanding Senior Notes due 2021 (the "2021 Notes") to an amendment to the indenture governing the 2021 Notes (the "2021 Notes Indenture") to increase the aggregate principal amount of indebtedness under Credit Facilities (as defined in the 2021 Notes Indenture) permitted to be incurred under Section 4.09(b)(1) of the 2021 Notes Indenture by $500.0 million to $17.3 billion. iHeartCommunications paid an aggregate consent fee of $8.6 million to holders of the 2021 Notes that consented to the amendment in accordance with the terms of the Consent Solicitation.

On December 12, 2016, iHeartCommunications announced the results and expiration of the six separate consent solicitations (the "Consent Solicitations") with respect to its 2021 Notes and its five series of priority guarantee notes. Holders of 2021 Notes representing approximately 81.5% of the outstanding principal amount of the 2021 Notes (excluding any 2021 Notes held by the Company or its affiliates), consented to the proposed amendment (the "Proposed Amendment") to Section 9.07 of the indenture governing the 2021 Notes Indenture. The Proposed Amendment allows the Company to exclude, in any offer to consent, waive or amend any of the terms or provisions of the 2021 Notes Indenture or the Senior Notes in connection with an exchange offer, any holders of Notes who are not institutional "accredited investors," who are not non-"U.S. persons", or those in foreign jurisdictions whose inclusion would require the Company to comply with the registration requirements or other similar requirements under any securities laws of such foreign jurisdiction or would be unlawful. iHeartCommunications paid an aggregate consent fee of $1.7 million to holders of the 2021 Notes that consented to the amendment in accordance with the terms of the Consent Solicitation

62

and will pay a contingent fee of $2.6 million to such holders upon the completion of an exchange offer in which the Company relies on the changes effected by the Proposed Amendment.

The 14% Senior Notes due 2021 mature on February 1, 2021. Interest on the 14% Senior Notes due 2021 is payable semi-annually on February 1 and August 1 of each year. Interest on the 14% Senior Notes due 2021 will be paid at the rate of (i) 12.0% per annum in cash and (ii) 2.0% per annum through the issuance of payment-in-kind notes (the "PIK Notes"). Any PIK Notes issued in certificated form will be dated as of the applicable interest payment date and will bear interest from and after such date. All PIK Notes issued will mature on February 1, 2021 and have the same rights and benefits as the 14% Senior Notes due 2021. Beginning with the interest payment due August 1, 2018 and continuing on each interest payment date thereafter, redemptions of a portion of the principal amount then outstanding will become due for purposes of applicable high yield discount obligation ("AHYDO") catch-up payments.

The 14% Senior Notes due 2021 are fully and unconditionally guaranteed on a senior basis by the guarantors named in the indenture governing such notes. The guarantee is structurally subordinated to all existing and future indebtedness and other liabilities of any subsidiary of the applicable subsidiary guarantor that is not also a guarantor of the Senior Notes due 2021. The guarantees are subordinated to the guarantees of iHeartCommunications' senior secured credit facility and certain other permitted debt, but rank equal to all other senior indebtedness of the guarantors.

iHeartCommunications may redeem the 14% Senior Notes due 2021, in whole or in part at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date.

The indenture governing the 14% Senior Notes due 2021 contains covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) incur additional indebtedness or issue certain preferred stock; (ii) pay dividends on, or make distributions in respect of, iHeartCommunications' capital stock or repurchase iHeartCommunications' capital stock; (iii) make certain investments or other restricted payments; (iv) sell certain assets; (v) create liens or use assets as security in other transactions; (vi) merge, consolidate or transfer or dispose of substantially all of iHeartCommunications' assets; (vii) engage in transactions with affiliates; and (viii) designate iHeartCommunications' subsidiaries as unrestricted subsidiaries.

*iHeartCommunications Legacy Notes*

As of December 31, 2016, iHeartCommunications had approximately $475.0 million aggregate principal amount of senior notes outstanding (net of $57.1 million aggregate principal amount held by a subsidiary of iHeartCommunications). In December 2016, iHeartCommunications repaid at maturity $192.9 million of 5.5% Senior Notes due 2016 and did not pay $57.1 million of the notes held by a subsidiary of iHeartCommunications. Although the non-payment of the $57.1 million of 5.50% Senior Notes due 2016 is a default under the indenture governing the 5.50% Senior Notes due 2016 (the "legacy notes indenture"), the subsidiary that holds the notes informed us that, while it retains its right to exercise remedies under the legacy notes indenture in the future, it does not currently intend to, and it does not currently intend to request that the trustee, seek to collect principal amounts due or exercise or request enforcement of any remedy with respect to the nonpayment of such principal amount under the legacy notes indenture. The default resulting from non-payment of the $57.1 million of 5.50% Senior Notes is below the $100.0 million cross-default threshold in iHeartCommunications' debt documents. See "-Non-Payment of $57.1 Million of iHeartCommunications Legacy Notes Held by an Affiliate." The $57.1 million of aggregate principal amount remains outstanding and is eliminated for purposes of consolidation of in our financial statements.

The senior notes were the obligations of iHeartCommunications prior to the merger in 2008. The senior notes are senior, unsecured obligations that are effectively subordinated to iHeartCommunications' secured indebtedness to the extent of the value of iHeartCommunications' assets securing such indebtedness and are not guaranteed by any of iHeartCommunications' subsidiaries and, as a result, are structurally subordinated to all indebtedness and other liabilities of iHeartCommunications' subsidiaries. The senior notes rank equally in right of payment with all of iHeartCommunications' existing and future senior indebtedness and senior in right of payment to all existing and future subordinated indebtedness.

*10.0% Senior Notes due 2018*

As of December 31, 2016, iHeartCommunications had outstanding $347.0 million aggregate principal amount of 10.0% Senior Notes due 2018 (net of $503.0 million aggregate principal amount held by certain subsidiaries of iHeartCommunications). On February 7, 2017, we completed an exchange offer of $476.4 million principal amount of our 10.0% Senior Notes due 2018 for $476.4 million principal amount of newly-issued 11.25% Priority Guarantee Notes due 2021, which were issued as "additional notes" under the indenture governing the 11.25% Priority Guarantee Notes due 2021. Of the $476.4 million principal amount of 10.0% Senior Notes due 2018 tendered and accepted for exchange, $241.4 million principal amount was tendered by subsidiaries of iHeartCommunications. After giving effect to the exchange offer, iHeartCommunications had outstanding $112.1 million

63

aggregate principal amount of 10.0% Senior Notes due 2018 (net of $261.5 million aggregate principal amount held by certain subsidiaries of iHeartCommunications). The 10.0% Senior Notes due 2018 mature on January 15, 2018 and bear interest at a rate of 10.0% per annum, payable semi-annually on January 15 and July 15 of each year.

The 10.0% Senior Notes due 2018 are senior, unsecured obligations that are effectively subordinated to iHeartCommunications' secured indebtedness to the extent of the value of iHeartCommunications' assets securing such indebtedness and are not guaranteed by any of iHeartCommunications' subsidiaries and, as a result, are structurally subordinated to all indebtedness and other liabilities of iHeartCommunications' subsidiaries. The 10.0% Senior Notes due 2018 rank equally in right of payment with all of iHeartCommunications' existing and future senior indebtedness and senior in right of payment to all existing and future subordinated indebtedness.

*CCWH Senior Notes*

As of December 31, 2016, CCWH senior notes represented $2.7 billion aggregate principal amount of indebtedness outstanding, which consisted of $735.75 million aggregate principal amount of Series A Senior Notes due 2022 (the "Series A CCWH Senior Notes") and $1,989.25 million aggregate principal amount of Series B CCWH Senior Notes due 2022 (the "Series B CCWH Senior Notes"). The CCWH Senior Notes are guaranteed by CCOH, Clear Channel Outdoor, Inc. ("CCOI") and certain of CCOH's direct and indirect subsidiaries.

The CCWH Senior Notes are senior obligations that rank pari passu in right of payment to all unsubordinated indebtedness of CCWH and the guarantees of the CCWH Senior Notes rank pari passu in right of payment to all unsubordinated indebtedness of the guarantors. Interest on the CCWH Senior Notes is payable to the trustee weekly in arrears and to the noteholders on May 15 and November 15 of each year.

At any time prior to November 15, 2017, CCWH may redeem the CCWH Senior Notes, in whole or in part, at a price equal to 100% of the principal amount of the CCWH Senior Notes plus a "make-whole" premium, together with accrued and unpaid interest, if any, to the redemption date. CCWH may redeem the CCWH Senior Notes, in whole or in part, on or after November 15, 2017, at the redemption prices set forth in the applicable indenture governing the CCWH Senior Notes plus accrued and unpaid interest to the redemption date. Notwithstanding the foregoing, neither CCOH nor any of its subsidiaries is permitted to make any purchase of, or otherwise effectively cancel or retire any Series A CCWH Senior Notes or Series B CCWH Senior Notes if, after giving effect thereto and, if applicable, any concurrent purchase of or other addition with respect to any Series B CCWH Senior Notes or Series A CCWH Senior Notes, as applicable, the ratio of (a) the outstanding aggregate principal amount of the Series A CCWH Senior Notes to (b) the outstanding aggregate principal amount of the Series B CCWH Senior Notes shall be greater than 0.25, subject to certain exceptions.

The indenture governing the Series A CCWH Senior Notes contains covenants that limit CCOH and its restricted subsidiaries ability to, among other things:

- incur or guarantee additional debt to persons other than iHeartCommunications and its subsidiaries (other than CCOH) or issue certain preferred stock;
- create liens on its restricted subsidiaries' assets to secure such debt;
- create restrictions on the payment of dividends or other amounts to CCOH from its restricted subsidiaries that are not guarantors of the CCWH Senior Notes;
- enter into certain transactions with affiliates; and
- merge or consolidate with another person, or sell or otherwise dispose of all or substantially all of its assets.

In addition, the indenture governing the Series A CCWH Senior Notes provides that if CCWH (i) makes an optional redemption of the Series B CCWH Senior Notes or purchases or makes an offer to purchase the Series B CCWH Senior Notes at or above 100% of the principal amount thereof, then CCWH shall apply a pro rata amount to make an optional redemption or purchase a pro rata amount of the Series A CCWH Senior Notes or (ii) makes an asset sale offer under the indenture governing the Series B CCWH Senior Notes, then CCWH shall apply a pro rata amount to make an offer to purchase a pro rata amount of Series A CCWH Senior Notes.

The indenture governing the Series A CCWH Senior Notes does not include limitations on dividends, distributions, investments or asset sales.

The indenture governing the Series B CCWH Senior Notes contains covenants that limit CCOH and its restricted subsidiaries ability to, among other things:

- incur or guarantee additional debt or issue certain preferred stock;
- redeem, repurchase or retire CCOH's subordinated debt;

64

- make certain investments;
- create liens on its or its restricted subsidiaries' assets to secure debt;
- create restrictions on the payment of dividends or other amounts to it from its restricted subsidiaries that are not guarantors of the CCWH Senior Notes;
- enter into certain transactions with affiliates;
- merge or consolidate with another person, or sell or otherwise dispose of all or substantially all of its assets;
- sell certain assets, including capital stock of its subsidiaries;
- designate its subsidiaries as unrestricted subsidiaries; and
- pay dividends, redeem or repurchase capital stock or make other restricted payments.

The Series A CCWH Senior Notes indenture and Series B CCWH Senior Notes indenture restrict CCOH's ability to incur additional indebtedness but permit CCOH to incur additional indebtedness based on an incurrence test. In order to incur (i) additional indebtedness under this test, CCOH's debt to adjusted EBITDA ratios (as defined by the indentures) must be lower than 7.0:1 and 5.0:1 for total debt and senior debt, respectively, and (ii) additional indebtedness that is subordinated to the CCWH Senior Notes under this test, CCOH's debt to adjusted EBITDA ratios (as defined by the indentures) must be lower than 7.0:1 for total debt. The indentures contain certain other exceptions that allow CCOH to incur additional indebtedness. The Series B CCWH Senior Notes indenture also permits CCOH to pay dividends from the proceeds of indebtedness or the proceeds from asset sales if its debt to adjusted EBITDA ratios (as defined by the indentures) are lower than 7.0:1 and 5.0:1 for total debt and senior debt, respectively. The Series A CCWH Senior Notes indenture does not limit CCOH's ability to pay dividends. Because our consolidated leverage ratio exceeded the limit in the incurrence tests described above, we are not currently permitted to incur additional indebtedness using the incurrence test in the Series A CCWH Senior Notes indenture and the Series B CCWH Senior Notes indenture, and we are not currently permitted to pay dividends from the proceeds of indebtedness or the excess proceeds from asset sales under the Series B CCWH Senior Notes indenture. There are other exceptions in these indentures that allow us to incur additional indebtedness and pay dividends. The exceptions in the Series B CCWH Senior Notes indenture that allow us to pay dividends include (i) $525.0 million of dividends made pursuant to general restricted payment baskets and (ii) dividends made using proceeds received upon a demand by us of amounts outstanding under the revolving promissory note issued by iHeartCommunications to CCOH.

### CCWH Senior Subordinated Notes

As of December 31, 2016, CCWH Subordinated Notes represented $2.2 billion of aggregate principal amount of indebtedness outstanding, which consist of $275.0 million aggregate principal amount of 7.625% Series A Senior Subordinated Notes due 2020 (the "Series A CCWH Subordinated Notes") and $1,925.0 million aggregate principal amount of 7.625% Series B Senior Subordinated Notes due 2020 (the "Series B CCWH Subordinated Notes"). Interest on the CCWH Subordinated Notes is payable to the trustee weekly in arrears and to the noteholders on March 15 and September 15 of each year.

The CCWH Subordinated Notes are CCWH's senior subordinated obligations and are fully and unconditionally guaranteed, jointly and severally, on a senior subordinated basis by CCOH, CCOI and certain of CCOH's other domestic subsidiaries. The CCWH Subordinated Notes are unsecured senior subordinated obligations that rank junior to all of CCWH's existing and future senior debt, including the CCWH Senior Notes, equally with any of CCWH's existing and future senior subordinated debt and ahead of all of CCWH's existing and future debt that expressly provides that it is subordinated to the CCWH Subordinated Notes. The guarantees of the CCWH Subordinated Notes rank junior to each guarantor's existing and future senior debt, including the CCWH Senior Notes, equally with each guarantor's existing and future senior subordinated debt and ahead of each guarantor's existing and future debt that expressly provides that it is subordinated to the guarantees of the CCWH Subordinated Notes.

CCWH may redeem the CCWH Subordinated Notes, in whole or in part, at the redemption prices set forth in the applicable indenture governing the CCWH Subordinated Notes plus accrued and unpaid interest to the redemption date. Neither CCOH nor any of its subsidiaries is permitted to make any purchase of, or otherwise effectively cancel or retire any Series A CCWH Subordinated Notes or Series B CCWH Subordinated Notes if, after giving effect thereto and, if applicable, any concurrent purchase of or other addition with respect to any Series B CCWH Subordinated Notes or Series A CCWH Subordinated Notes, as applicable, the ratio of (a) the outstanding aggregate principal amount of the Series A CCWH Subordinated Notes to (b) the outstanding aggregate principal amount of the Series B CCWH Subordinated Notes shall be greater than 0.25, subject to certain exceptions.

The indenture governing the Series A CCWH Subordinated Notes contains covenants that limit CCOH and its restricted subsidiaries ability to, among other things:

- incur or guarantee additional debt to persons other than iHeartCommunications and its subsidiaries (other than CCOH) or issue certain preferred stock;

65

- create restrictions on the payment of dividends or other amounts to CCOH from its restricted subsidiaries that are not guarantors of the notes;
- enter into certain transactions with affiliates; and
- merge or consolidate with another person, or sell or otherwise dispose of all or substantially all of CCOH's assets.

In addition, the indenture governing the Series A CCWH Subordinated Notes provides that if CCWH (i) makes an optional redemption of the Series B CCWH Subordinated Notes or purchases or makes an offer to purchase the Series B CCWH Subordinated Notes at or above 100% of the principal amount thereof, then CCWH shall apply a pro rata amount to make an optional redemption or purchase a pro rata amount of the Series A CCWH Subordinated Notes or (ii) makes an asset sale offer under the indenture governing the Series B CCWH Subordinated Notes, then CCWH shall apply a pro rata amount to make an offer to purchase a pro rata amount of Series A CCWH Subordinated Notes.

The indenture governing the Series A CCWH Subordinated Notes does not include limitations on dividends, distributions, investments or asset sales.

The indenture governing the Series B CCWH Subordinated Notes contains covenants that limit CCOH and its restricted subsidiaries ability to, among other things:

- incur or guarantee additional debt or issue certain preferred stock;
- make certain investments;
- create restrictions on the payment of dividends or other amounts to CCOH from its restricted subsidiaries that are not guarantors of the notes;
- enter into certain transactions with affiliates;
- merge or consolidate with another person, or sell or otherwise dispose of all or substantially all of CCOH's assets;
- sell certain assets, including capital stock of CCOH's subsidiaries;
- designate CCOH's subsidiaries as unrestricted subsidiaries; and
- pay dividends, redeem or repurchase capital stock or make other restricted payments.

The Series A CCWH Subordinated Notes indenture and Series B CCWH Subordinated Notes indenture restrict CCOH's ability to incur additional indebtedness but permit CCOH to incur additional indebtedness based on an incurrence test. In order to incur additional indebtedness under this test, CCOH's debt to adjusted EBITDA ratio (as defined by the indentures) must be lower than 7.0:1. The indentures contain certain other exceptions that allow CCOH to incur additional indebtedness. The Series B CCWH Subordinated Notes indenture also permits CCOH to pay dividends from the proceeds of indebtedness or the proceeds from asset sales if its debt to adjusted EBITDA ratio (as defined by the indentures) is lower than 7.0:1. The Series A CCWH Senior Subordinated Notes indenture does not limit CCOH's ability to pay dividends. Because our consolidated leverage ratio exceeded the limit in the incurrence tests described above, we are not currently permitted to incur additional indebtedness using the incurrence test in the Series A CCWH Subordinated Notes indenture and the Series B CCWH Subordinated Notes indenture, and we are not currently permitted to pay dividends from the proceeds of indebtedness or the excess proceeds from asset sales under the Series B CCWH Subordinated Notes indenture. There are other exceptions in these indentures that allow us to incur additional indebtedness and pay dividends. The exceptions in the Series B CCWH Subordinated Notes indenture that allow us to pay dividends include (i) $525.0 million of dividends made pursuant to general restricted payment baskets and (ii) dividends made using proceeds received upon a demand by us of amounts outstanding under the revolving promissory note issued by iHeartCommunications to CCOH.

***Clear Channel International B.V. Senior Notes***

As of December 31, 2016, Clear Channel International B.V., an international subsidiary of ours, had $225.0 million aggregate principal amount outstanding of its 8.75% Senior Notes due 2020 ("CCIBV Senior Notes").

The CCIBV Senior Notes mature on December 15, 2020 and bear interest at a rate of 8.75% per annum, payable semi-annually in arrears on June 15 and December 15 of each year. The CCIBV Senior Notes are guaranteed by certain of our International outdoor business's existing and future subsidiaries. The Company does not guarantee or otherwise assume any liability for the CCIBV Senior Notes. The notes are senior unsecured obligations that rank pari passu in right of payment to all unsubordinated indebtedness of CCIBV, and the guarantees of the notes are senior unsecured obligations that rank pari passu in right of payment to all unsubordinated indebtedness of the guarantors of the notes.

Clear Channel International B.V. may redeem the notes at its option, in whole or part, at any time prior to December 15, 2017, at a price equal to 100% of the principal amount of the notes redeemed, plus a make-whole premium, plus accrued and unpaid interest to the redemption date. Clear Channel International B.V. may redeem the notes, in whole or in part, on or after December 15, 2017, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date.

66

At any time on or before December 15, 2017, Clear Channel International B.V. may elect to redeem up to 40% of the aggregate principal amount of the notes at a redemption price equal to 108.75% of the principal amount thereof, plus accrued and unpaid interest to the redemption date, with the net proceeds of one or more equity offerings.

The indenture governing the CCIBV Senior Notes contains covenants that limit Clear Channel International B.V.'s ability and the ability of its restricted subsidiaries to, among other things: (i) pay dividends, redeem stock or make other distributions or investments; (ii) incur additional debt or issue certain preferred stock; (iii) transfer or sell assets; (iv) create liens on assets; (v) engage in certain transactions with affiliates; (vi) create restrictions on dividends or other payments by the restricted subsidiaries; and (vii) merge, consolidate or sell substantially all of Clear Channel International B.V.'s assets.

### Refinancing and Financing Transactions

#### 2016 Refinancing and Financing Transactions

On July 15, 2016, Broader Media, LLC, our indirect wholly-owned subsidiary, repurchased approximately $383.0 million aggregate principal amount of iHeartCommunications' 10.0% Senior Notes due 2018 for an aggregate purchase price of approximately $222.2 million. Principal and interest payments made to our wholly-owned subsidiary are eliminated in consolidation.

On November 17, 2016, iHeartCommunications incurred $100.0 million of additional borrowings under its receivables based credit facility, bringing its total outstanding borrowings under this facility to $330.0 million. On January 31, 2017, iHeartCommunications prepaid $25.0 million of the amount borrowed under its receivables based credit facility, bringing its total outstanding borrowings under this facility to $305.0 million.

On December 20, 2016, iHeartCommunications commenced an offer to noteholders to exchange its 10.0% Senior Notes due 2018 for newly-issued 11.25% Priority Guarantee Notes which were issued as "additional notes" under the indenture governing iHeartCommunications' existing 11.25% Priority Guarantee Notes due 2021. On February 7, 2017, we completed the exchange offer and issued $476.4 million aggregate principal amount of 11.25% Priority Guarantee Notes due 2021 (including $241.4 million aggregate principal amount to certain subsidiaries of iHeartCommunications) to tendering holders in exchange for their $476.4 million principal amount of our 10.0% Senior Notes due 2018.

#### 2015 Refinancing and Financing Transactions

On February 26, 2015, iHeartCommunications issued at par $950.0 million aggregate principal amount of 10.625% Priority Guarantee Notes due 2023 and used the net proceeds from the offering primarily to prepay its term loan facilities due 2016.

On December 16, 2015, Clear Channel International B.V. ("CCIBV"), an indirect subsidiary of the Company, issued $225.0 million in aggregate principal amount of 8.75% Senior Notes due 2020.

CCIBV used the net proceeds of the notes, together with cash on hand, to make a loan to its direct parent company, which used the proceeds to repay a loan and make a distribution to its parent company, which, in turn, made indirect distributions to CCOH. CCOH used the proceeds of the distribution to fund a special cash dividend paid on January 7, 2016 in an aggregate amount equal to approximately $217.8 million to its stockholders. We received $196.3 million of the dividend through three of our wholly-owned subsidiaries.

#### 2014 Refinancing Transactions

On February 14, 2014, CC Finco, an indirect wholly-owned subsidiary of ours, sold $227.0 million in aggregate principal amount of 14.0% Senior Notes due 2021 issued by iHeartCommunications to private purchasers in a transaction exempt from registration under the Securities Act of 1933, as amended. This $227.0 million in aggregate principal amount of 14.0% Senior Notes due 2021, which was previously eliminated in consolidation because the notes were held by a subsidiary, is now reflected on our consolidated balance sheet. CC Finco contributed the net proceeds from the sale of the 14.0% Senior Notes due 2021 to iHeartCommunications.

On May 1, 2014, CCU Escrow Corporation issued $850.0 million in aggregate principal amount of 10.0% Senior Notes due 2018 in a private offer. On June 6, 2014, CCU Escrow Corporation merged into iHeartCommunications, and iHeartCommunications assumed CCU Escrow Corporation's obligations under the 10.0% Senior Notes due 2018. Using the proceeds from the issuance of the 10.0% Senior Notes due 2018, iHeartCommunications redeemed $567.1 million aggregate principal amount of iHeartCommunications' 5.5% Senior Notes due 2014 (including $158.5 million principal amount of the notes held by a subsidiary of iHeartCommunications) and $241.0 million aggregate principal amount of iHeartCommunications' 4.9% Senior Notes due 2015.

On August 22, 2014, iHeartCommunications issued and sold $222.2 million in aggregate principal amount of new 14.0% Senior Notes due 2021 to CC Finco in a transaction exempt from registration under the Securities Act of 1933, as amended. The new 14.0% Senior Notes due 2021 were issued as additional notes under the indenture governing iHeartCommunications' existing 14.0% Senior Notes due 2021. On August 22, 2014, iHeartCommunications redeemed all of the outstanding $94.3 million aggregate principal amount of 10.75% Senior Cash Pay Notes due 2016 and $127.9 million aggregate principal amount of 11.00%/11.75% Senior Toggle Notes due 2016 using proceeds of the issuance of the new 14.0% Senior Notes due 2021.

On September 10, 2014, iHeartCommunications issued and sold $750.0 million in aggregate principal amount of 9% Priority Guarantee Notes due 2022 and used the net proceeds of such issuance to prepay at par $729.0 million of the loans outstanding under its term loan B facility and $12.1 million of the loans outstanding under its term loan C-asset sale facility, and to pay accrued and unpaid interest with regard to such loans to, but not including, the date of prepayment.

On September 29, 2014, iHeartCommunications issued an additional $250.0 million in aggregate principal amount of 9% Priority Guarantee Notes due 2022 and used the proceeds of such issuance to prepay at par $245.9 million of loans outstanding under its term loan B facility and $4.1 million of loans outstanding under its term loan C-asset sale facility, and to pay accrued and unpaid interest with regard to such loans to, but not including, the date of repayment.

***Dispositions and Other***

*2016*

In the first quarter of 2016, Americas outdoor sold non-strategic outdoor markets including Cleveland and Columbus, Ohio, Des Moines, Iowa, Ft. Smith, Arkansas, Memphis, Tennessee, Portland, Oregon, Reno, Nevada, Seattle, Washington and Wichita, Kansas for net proceeds of $592.3 million in cash and certain advertising assets in Florida. We recognized a net gain of $278.3 million related to the sale, which is included within Other operating income (expense), net.

In the second quarter of 2016, International outdoor sold its business in Turkey. As a result, we recognized a net loss of $56.6 million, which includes $32.2 million in cumulative translation adjustments that were recognized upon sale of the subsidiaries in Turkey.

In the fourth quarter of 2016, International outdoor sold its business in Australia, for cash proceeds of $195.7 million, net of cash retained by the purchaser and closing costs. As a result, we recognized a net gain of $127.6 million, which is net of $14.6 million in cumulative translation adjustments that were recognized upon the sale of our outdoor business in Australia.

*2015*

During the first quarter of 2015, the Company sold two office buildings located in San Antonio, Texas for $34.3 million. Concurrently with the sale of these properties, the Company entered into lease agreements for the continued use of the buildings, pursuant to which the Company will have annual lease payments of $2.6 million. The Company recognized a gain of $8.1 million on the sale of one of the buildings, which is being recognized over the term of the lease.

During 2015, we entered into a sale-leaseback arrangement, in which we sold 376 of our broadcast communication tower sites and related assets for $369.9 million. Simultaneous with the sales, we entered into lease agreements for the continued use of space on 367 of the towers sold. Upon completion of the transactions, we realized a net gain of $210.6 million, of which $109.0 million was deferred and will be recognized over the lease term. The Company incurred $13.3 million in operating lease expense in relation to these agreements in the year ended December 31, 2015. On January 15, 2016, we and certain of our subsidiaries completed the final closing for the sale of six of the Company's broadcast communication tower sites and related assets for approximately $5.5 million. Simultaneous with the sales, we entered into lease agreements for the continued use of tower space. The leases entered into as a part of these transactions are for a term of fifteen years and include three optional five-year renewal periods.

*2014*

During 2014, the Company sold its 50% interest in Australian Radio Network ("ARN"), an Australian company that owns and operates radio stations in Australia and New Zealand. An impairment charge of $95.4 million was recorded during the fourth quarter of 2013 to write down the investment to its estimated fair value. Upon sale of ARN, the Company recognized a loss of $2.4 million and $11.5 million of foreign exchange losses, which were reclassified from accumulated other comprehensive income.

During 2014, our International outdoor segment sold its 50% interest in Buspak, a bus advertising company in Hong Kong and recognized a gain on sale of $4.5 million.

68

**Uses of Capital**

*Debt Repurchases, Maturities and Other*

*2016*

On July 15, 2016, Broader Media, LLC, our indirect wholly-owned subsidiary, repurchased approximately $383.0 million aggregate principal amount of iHeartCommunications' 10.0% Senior Notes due 2018 for an aggregate purchase price of approximately $222.2 million. Principal and interest payments made to our wholly-owned subsidiary are eliminated in consolidation.

On October 4, 2016, iHeartCommunications announced the successful completion of the solicitation of consents (the "Consent Solicitation") from holders of its outstanding Senior Notes due 2021 (the "2021 Notes") to an amendment to the indenture governing the 2021 Notes (the "2021 Notes Indenture") to increase the aggregate principal amount of indebtedness under Credit Facilities (as defined in the 2021 Notes Indenture) permitted to be incurred under Section 4.09(b)(1) of the indenture by $500.0 million to $17.3 billion. iHeartCommunications paid an aggregate consent fee of $8.6 million to holders of the 2021 Notes that consented to the amendment in accordance with the terms of the Consent Solicitation.

On December 12, 2016, iHeartCommunications announced the results and expiration of the six separate consent solicitations (the "Consent Solicitations") with respect to its 2021 Notes and its five series of priority guarantee notes. Holders of 2021 Notes representing approximately 81.5% of the outstanding principal amount of the 2021 Notes (excluding any 2021 Notes held by the Company or its affiliates), consented to the proposed amendment (the "Proposed Amendment") to Section 9.07 of the indenture governing the 2021 Notes Indenture. The Proposed Amendment allows the Company to exclude, in any offer to consent, waive or amend any of the terms or provisions of the 2021 Notes Indenture or the Senior Notes in connection with an exchange offer, any holders of Notes who are not institutional "accredited investors," who are not non-"U.S. persons", or those in foreign jurisdictions whose inclusion would require the Company to comply with the registration requirements or other similar requirements under any securities laws of such foreign jurisdiction or would be unlawful. iHeartCommunications paid an aggregate consent fee of $1.7 million to holders of the 2021 Notes that consented to the amendment in accordance with the terms of the Consent Solicitation and will pay a contingent fee of $2.6 million to such holders upon the completion of an exchange offer in which the Company relies on the changes effected by the Proposed Amendment.

iHeartCommunications also announced the expiration of its consent solicitations with respect to its five series of priority guarantee notes. Because iHeartCommunications did not receive consents from holders representing a majority of the aggregate principal amount of each of its five series of priority guarantee notes outstanding, the Proposed Amendment was not effected with respect to the priority guarantee notes and no fixed fee or contingent fee will be paid to holders of such notes.

In December 2016, iHeartCommunications repaid at maturity $192.9 million of 5.5% Senior Notes due 2016 and did not pay $57.1 million of the notes held by a subsidiary of the Company. See "- Non-Payment of $57.1 Million of iHeartCommunications Legacy Notes Held by an Affiliate." The $57.1 million of aggregate principal amount remains outstanding and is eliminated for purposes of consolidation of the Company's financial statements.

*2015*

On February 26, 2015, iHeartCommunications prepaid at par $916.1 million of loans outstanding under its term loan B facility and $15.2 million of loans outstanding under its term loan C-asset sale facility, using a portion of the net proceeds of the 10.625% Priority Guarantee Notes due 2023 issued on such date.

*2014*

During the period of October 1, 2014 through December 31, 2014, CC Finco repurchased via open market transactions a total of $177.1 million aggregate principal amount of notes, comprised of $57.1 million of iHeartCommunications' outstanding 5.5% Senior Notes due 2016 and $120.0 million of iHeartCommunications' outstanding 10.0% Senior Notes due 2018, for a total purchase price of $159.3 million, including accrued interest. The notes repurchased by CC Finco were not cancelled and remain outstanding.

On September 29, 2014, iHeartCommunications prepaid at par $245.9 million of the loans outstanding under its 9% term loan B facility and $4.1million of the loans outstanding under its term loan C-asset sale facility, using the net proceeds of the Priority Guarantee Notes due 2022 issued on such date.

On September 10, 2014, iHeartCommunications prepaid at par $729.0 million of the loans outstanding under its 9% term loan B facility and $12.1 million of the loans outstanding under its term loan C-asset sale facility, using the net proceeds of the Priority Guarantee Notes due 2022 issued on such date.

On August 22, 2014, iHeartCommunications redeemed all of the outstanding $94.3 million aggregate principal amount of 10.75% Senior Cash Pay Notes due 2016 and $127.9 million aggregate principal amount of 11.00%/11.75% Senior Toggle Notes due 2016 using proceeds of the issuance to CC Finco of new 14.0% Senior Notes due 2021.

On June 6, 2014, using the proceeds from the issuance of the 10.0% Senior Notes due 2018, iHeartCommunications redeemed $567.1 million aggregate principal amount of iHeartCommunications' 5.5% Senior Notes due 2014 (including $158.5 million principal amount of the notes held by a subsidiary of iHeartCommunications) and $241.0 million aggregate principal amount of iHeartCommunications' 4.9% Senior Notes due 2015.

During March 2014, CC Finco repurchased, through open market purchases, a total of $61.9 million aggregate principal amount of notes, comprised of $52.9 million of iHeartCommunications' outstanding 5.5% Senior Notes due 2014 and $9.0 million of iHeartCommunications' outstanding 4.9% Senior Notes due 2015, for a total purchase price of $63.1 million, including accrued interest. CC Finco contributed the notes to a subsidiary of ours and iHeartCommunications canceled these notes subsequent to the purchase.

**Capital Expenditures**

Capital expenditures for the years ended December 31, 2016, 2015 and 2014 were as follows:

| (In millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| iHM | 73.2 | 63.8 | 53.9 |
| Americas outdoor advertising | 81.4 | 82.2 | 109.7 |
| International outdoor advertising | 143.8 | 132.6 | 117.5 |
| Corporate and Other | 16.3 | 17.8 | 37.1 |
| Total capital expenditures | 314.7 | 296.4 | 318.2 |

See the Contractual Obligations table under "Commitments, Contingencies and Guarantees" and Note 6 to our Consolidated Financial Statements located in Item 8 of Part II of this Annual Report on Form 10-K for the Company's future capital expenditure commitments.

**Stock Registration**

On June 24, 2015, we registered 4,000,000 shares of our Class A common stock, par value $0.001 per share, for offer or sale under our 2015 Executive Long-Term Incentive Plan.

On July 27, 2015, the board of directors approved the issuance of 1,253,831 restricted shares pursuant to our 2015 Executive Long-term Incentive Plan.

Our capital expenditures are not of significant size individually and primarily relate to the ongoing deployment of digital displays and improvements to traditional displays in our Americas outdoor segment as well as new billboard and street furniture contracts and renewals of existing contracts in our International outdoor segment, studio and broadcast equipment at iHM and software at Corporate.

***Dividends***

We have never paid cash dividends on our Class A common stock. iHeartCommunications' debt financing arrangements include restrictions on its ability to pay dividends as described in this MD&A, which in turn affects our ability to pay dividends.

*Acquisitions*

The Company is the beneficiary of Aloha Station Trust, LLC (the "Aloha Trust"), which owns and operates radio stations which the Aloha Trust is required to divest in order to comply with Federal Communication Commission ("FCC") media ownership rules, and which are being marketed for sale. During 2014, the Aloha Trust completed a transaction in which it exchanged two radio stations for a portfolio of 29 radio stations. In this transaction the Company received 28 radio stations. One radio station was placed into the Brunswick Station Trust, LLC in order to comply with FCC media ownership rules where it is being marketed for sale, and the Company is the beneficiary of this trust. The exchange was accounted for at fair value in accordance with ASC 805, Business Combinations. The disposal of these radio stations resulted in a gain on sale of $43.5 million, which is included in other operating income. This acquisition resulted in an aggregate increase in net assets of $49.2 million, which includes $13.8 million in indefinite-lived intangible assets, $10.2 million in definite-lived intangibles, $8.1 million in property, plant and equipment and $0.8 million of assumed liabilities. In addition, the Company recognized $17.9 million of goodwill.

*Stock Purchases*

On August 9, 2010, iHeartCommunications announced that its board of directors approved a stock purchase program under which iHeartCommunications or its subsidiaries could purchase up to an aggregate of $100.0 million of our Class A common stock and/or the Class A common stock of CCOH. The stock purchase program did not have a fixed expiration date and could be modified, suspended or terminated at any time at iHeartCommunications' discretion. As of December 31, 2014, an aggregate $34.2 million was available under this program. In January 2015, CC Finco, LLC ("CC Finco"), an indirect wholly-owned subsidiary of the Company, purchased 2,000,000 shares of CCOH's Class A common stock for $20.4 million. On April 2, 2015, CC Finco purchased an additional 2,172,946 shares of CCOH's Class A common stock for $22.2 million. As a result of this purchase, the stock purchase program concluded. The purchase of shares in excess of the amount available under the stock purchase program was separately approved by the board of directors. As of December 31, 2016, iHeartCommunications' and its subsidiaries held 10,726,917 shares of CCOH's Class A Common Stock and all of CCOH's Class B common stock, which collectively represent 89.9% of the outstanding shares of CCOH's common stock on a fully-diluted basis, assuming the conversion of all of CCOH's Class B common stock into Class A common stock.

On December 3, 2015, Clear Channel Holdings, Inc. contributed 100,000,000 shares of CCOH's Class B Common Stock to Broader Media, LLC, an indirect wholly-owned subsidiary of the Company, as a capital contribution, to provide greater flexibility in support of future financing transactions, share dispositions and other similar transactions.

**Certain Relationships with the Sponsors**

iHeartCommunications is party to a management agreement with certain affiliates of Bain Capital Partners, LLC and Thomas H. Lee Partners, L.P. (together, the "Sponsors") and certain other parties pursuant to which such affiliates of the Sponsors will provide management and financial advisory services until 2018. These arrangements require management fees to be paid to such affiliates of the Sponsors for such services at a rate not greater than $15.0 million per year, plus reimbursable expenses. During the years ended December 31, 2016, 2015 and 2014, we recognized management fees and reimbursable expenses of $15.3 million, $15.4 million and $15.2 million, respectively.

**CCOH Dividends**

In connection with the cash management arrangements for CCOH, iHeartCommunications maintains an intercompany revolving promissory note payable by iHeartCommunications to CCOH (the "Note"), which consists of the net activities resulting from day-to-day cash management services provided by iHeartCommunications to CCOH. As of December 31, 2016, the balance of the Note was $885.7 million all of which is payable on demand. The Note is eliminated in consolidation in our consolidated financial statements.

The Note previously was the subject of litigation. Pursuant to the terms of the settlement of that litigation, CCOH's board of directors established a committee for the specific purpose of monitoring the Note. That committee has the non-exclusive authority, pursuant to the terms of its charter, to demand payments under the Note under certain specified circumstances tied to the Company's liquidity or the amount outstanding under the Note as long as CCOH makes a simultaneous dividend equal to the amount so demanded.

On August 11, 2014, in accordance with the terms of its charter, (i) that committee demanded repayment of $175 million outstanding under the Note on such date and (ii) CCOH paid a special cash dividend in aggregate amount equal to $175 million to CCOH's stockholders of record as of August 4, 2014. As the indirect parent of CCOH, we were entitled to approximately 88% of the proceeds from such dividend through our wholly-owned subsidiaries. The remaining approximately 12% of the proceeds from the dividend, or approximately $21 million, was paid to the public stockholders of CCOH and is included in Dividends and other payments to noncontrolling interests in our consolidated statement of cash flows. We funded the net payment of this $21

71

million with cash on hand, which reduced the amount of cash available to fund our working capital needs, debt service obligations and other obligations. Following satisfaction of the demand, the balance outstanding under the Note was reduced by $175 million.

On December 16, 2015, CCIBV, an indirect subsidiary of the Company and of CCOH, issued $225.0 million in aggregate principal amount of 8.75% Senior Notes due 2020, the proceeds of which were used to fund a dividend by CCOH, which was paid on January 7, 2016. We received approximately $196.3 million of the dividend through three of our wholly-owned subsidiaries, and approximately $21.5 million was paid to the public stockholders of CCOH.

In the first quarter of 2016, CCOH sold non-strategic Americas outdoor markets for an aggregate purchase price of approximately $592.3 million in cash and certain advertising assets in Florida (the "Transactions"). Following the completion of the Transactions, the board of directors of CCOH made a demand for the repayment of $300.0 million outstanding on the Note and declared special cash dividends in an aggregate amount of $540.0 million, which were paid on February 4, 2016. A portion of the proceeds of the Transactions, together with the proceeds from the concurrent $300.0 million repayment of the Note, were used to fund the dividends. We received approximately $486.5 million of the dividend proceeds ($186.5 million net of iHeartCommunications' repayment of the Note) through three of our wholly-owned subsidiaries, and approximately $53.5 million was paid to the public stockholders of CCOH.

During the fourth quarter of 2016, CCOH sold its outdoor business in Australia for cash proceeds of $195.7 million, net of cash retained by the purchaser and closing costs. On February 9, 2017, CCOH declared a special dividend of $282.5 million using a portion of the cash proceeds from the sales of certain non-strategic U.S. outdoor markets and of our Australia outdoor business. On February 23, 2017, we received 89.9% of the dividend or approximately $254.0 million, with the remaining 10.1% or approximately $28.5 million paid to public stockholders of CCOH.

**Commitments, Contingencies and Guarantees**

We are currently involved in certain legal proceedings arising in the ordinary course of business and, as required, have accrued our estimate of the probable costs for resolution of those claims for which the occurrence of loss is probable and the amount can be reasonably estimated. These estimates have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in our assumptions or the effectiveness of our strategies related to these proceedings. Please refer to Item 3. "Legal Proceedings" within Part I of this Annual Report on Form 10-K.

Certain agreements relating to acquisitions provide for purchase price adjustments and other future contingent payments based on the financial performance of the acquired companies generally over a one to five-year period. The aggregate of these contingent payments, if performance targets are met, would not significantly impact our financial position or results of operations.

In addition to our scheduled maturities on our debt, we have future cash obligations under various types of contracts. We lease office space, certain broadcast facilities, equipment and the majority of the land occupied by our outdoor advertising structures under long-term operating leases. Some of our lease agreements contain renewal options and annual rental escalation clauses (generally tied to the consumer price index), as well as provisions for our payment of utilities and maintenance.

We have minimum franchise payments associated with non-cancelable contracts that enable us to display advertising on such media as buses, trains, bus shelters and terminals. The majority of these contracts contain rent provisions that are calculated as the greater of a percentage of the relevant advertising revenue or a specified guaranteed minimum annual payment. Also, we have non-cancelable contracts in our radio broadcasting operations related to program rights and music license fees.

In the normal course of business, our broadcasting operations have minimum future payments associated with employee and talent contracts. These contracts typically contain cancellation provisions that allow us to cancel the contract with good cause.

The scheduled maturities of iHeartCommunications' senior secured credit facilities, receivables based credit facility, priority guarantee notes, other long-term debt outstanding, and our future minimum rental commitments under non-cancelable lease agreements, minimum payments under other non-cancelable contracts, payments under employment/talent contracts, capital expenditure commitments and other long-term obligations as of December 31, 2016 are as follows:

72

*(In thousands)*

| Contractual Obligations | Total | | 2017 | | 2018-2019 | | 2020-2021 | | Thereafter | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Long-term Debt:** | | | | | | | | | | |
| Secured Debt [1] | $ | 12,925,802 | $ | 337,080 | $ | 8,304,999 | $ | 2,325,943 | $ | 1,957,780 |
| Senior Notes due 2021 [2] | | 1,886,585 | | - | | 89,541 | | 1,797,044 | | - |
| iHeartCommunications Legacy Notes: | | 475,000 | | - | | 175,000 | | - | | 300,000 |
| Senior Notes due 2018 [1] | | 347,028 | | - | | 347,028 | | - | | - |
| CCWH Senior Notes | | 2,725,000 | | - | | - | | - | | 2,725,000 |
| CCWH Senior Subordinated Notes | | 2,200,000 | | - | | - | | 2,200,000 | | - |
| CCIBV Senior Notes | | 225,000 | | - | | - | | 225,000 | | - |
| Other Long-term Debt | | 27,954 | | 6,370 | | 11,557 | | 10,027 | | - |
| Interest payments on long-term debt [3] | | 6,809,024 | | 1,727,652 | | 3,040,297 | | 1,571,531 | | 469,544 |
| Non-cancelable operating leases | | 4,086,598 | | 464,877 | | 799,047 | | 674,732 | | 2,147,942 |
| Non-cancelable contracts | | 1,884,913 | | 435,186 | | 618,085 | | 420,301 | | 411,341 |
| Employment/talent contracts | | 216,199 | | 64,222 | | 100,227 | | 51,750 | | - |
| Capital expenditures | | 77,716 | | 49,618 | | 11,797 | | 4,059 | | 12,242 |
| Unrecognized tax benefits [4] | | 115,078 | | - | | - | | - | | 115,078 |
| Other long-term obligations [5] | | 334,646 | | (1,346) | | 43,479 | | 31,200 | | 261,313 |
| Total | $ | 34,336,543 | $ | 3,083,659 | $ | 13,541,057 | $ | 9,311,587 | $ | 8,400,240 |

(1) As of December 31, 2016, iHeartCommunications had outstanding $347.0 million aggregate principal amount of 10.0% Senior Notes due 2018. On February 7, 2017, we completed an exchange offer of $476.4 million principal amount of our 10.0% Senior Notes due 2018 for $476.4 million principal amount of newly-issued 11.25% Priority Guarantee Notes due 2021, which were issued as "additional notes" under the indenture governing the 11.25% Priority Guarantee Notes due 2021. Of the $476.4 million principal amount of 10.0% Senior Notes due 2018 tendered and accepted for exchange, $241.4 million principal amount was tendered by subsidiaries of iHeartCommunications. After giving effect to the exchange offer, iHeartCommunications had outstanding $112.1 million aggregate principal amount of 10.0% Senior Notes due 2018.

(2) Beginning on August 1, 2018 and continuing with each interest payment thereafter, we are required to make certain applicable high yield discount obligation ("AHYDO") catch-up payments on the principal amount outstanding of Senior Notes due 2021. Contractual obligations due in the years 2018-2019 and 2020-2021 include $89.5 million and $68.4 million, respectively, related to the AHYDO payments. The table includes the current principal amount of Senior Notes due 2021 and reflects the assumption of additional PIK notes to be issued at each successive interest payment date in the future until maturity.

(3) Interest payments on the senior secured credit facilities assume the interest rate is held constant over the remaining term.

(4) The non-current portion of the unrecognized tax benefits is included in the "Thereafter" column as we cannot reasonably estimate the timing or amounts of additional cash payments, if any, at this time. For additional information, see Note 7 included in Item 8 of Part II of this Annual Report on Form 10-K.

(5) Other long-term obligations includes $42.1 million related to asset retirement obligations recorded pursuant to ASC 410-20, which assumes the underlying assets will be removed at some period over the next 55 years. Also included are $0.1 million of contract payments in our syndicated radio and media representation businesses and $292.4 million of various other long-term obligations.

**SEASONALITY**

Typically, the iHM, Americas outdoor and International outdoor segments experience their lowest financial performance in the first quarter of the calendar year, with International outdoor historically experiencing a loss from operations in that period. Our International outdoor segment typically experiences its strongest performance in the second and fourth quarters of the calendar year. We expect this trend to continue in the future. In addition, the majority of interest payments made in relation to long-term debt are paid in the first and third quarters of each calendar year.

## MARKET RISK

We are exposed to market risks arising from changes in market rates and prices, including movements in interest rates, foreign currency exchange rates and inflation.

### Interest Rate Risk

A significant amount of our long-term debt bears interest at variable rates. Accordingly, our earnings will be affected by changes in interest rates. As of December 31, 2016, approximately 32% of our aggregate principal amount of long-term debt bears interest at floating rates. Assuming the current level of borrowings and assuming a 100% change in LIBOR, it is estimated that our interest expense for the year ended December 31, 2016 would have changed by $35.4 million.

In the event of an adverse change in interest rates, management may take actions to mitigate our exposure. However, due to the uncertainty of the actions that would be taken and their possible effects, the preceding interest rate sensitivity analysis assumes no such actions. Further, the analysis does not consider the effects of the change in the level of overall economic activity that could exist in such an environment.

### Foreign Currency Exchange Rate Risk

We have operations in countries throughout the world. Foreign operations are measured in their local currencies. As a result, our financial results could be affected by factors such as changes in foreign currency exchange rates or weak economic conditions in the foreign markets in which we have operations. We believe we mitigate a small portion of our exposure to foreign currency fluctuations with a natural hedge through borrowings in currencies other than the U.S. dollar. Our foreign operations reported net income of $122.6 million for year ended December 31, 2016. We estimate a 10% increase in the value of the U.S. dollar relative to foreign currencies would have decreased our net income for the year ended December 31, 2016 by $12.3 million. A 10% decrease in the value of the U.S. dollar relative to foreign currencies during the year ended December 31, 2016 would have increased our net income by a corresponding amount.

This analysis does not consider the implications that such currency fluctuations could have on the overall economic activity that could exist in such an environment in the U.S. or the foreign countries or on the results of operations of these foreign entities.

### Inflation

Inflation is a factor in the economies in which we do business and we continue to seek ways to mitigate its effect. Inflation has affected our performance in terms of higher costs for wages, salaries and equipment. Although the exact impact of inflation is indeterminable, we believe we have offset these higher costs by increasing the effective advertising rates of most of our broadcasting stations and outdoor display faces in our iHM, Americas outdoor and International outdoor operations.

## NEW ACCOUNTING PRONOUNCEMENTS

During the third quarter of 2015, the FASB issued ASU 2015-14, *Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date*. This update provides a one-year deferral of the effective date for ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU No. 2014-09 provides guidance for the recognition, measurement and disclosure of revenue resulting from contracts with customers and will supersede virtually all of the current revenue recognition guidance under U.S. GAAP. The standard is effective for the first interim period within annual reporting periods beginning after December 15, 2017. The two permitted transition methods under the new standard are the full retrospective method, in which case the standard would be applied to each prior reporting period presented and the cumulative effect of applying the standard would be recognized at the earliest period shown, or the modified retrospective method, in which case the cumulative effect of applying the standard would be recognized at the date of initial application. The Company expects to utilize the full retrospective method. The Company has substantially completed its evaluation of the potential changes from adopting the new standard on its future financial reporting and disclosures which included reviews of contractual terms for all of the Company's significant revenue streams and the development of an implementation plan. The Company continues to execute on its implementation plan, including detailed policy drafting and training of segment personnel. Based on its evaluation, the Company does not expect material changes to its 2016 or 2017 consolidated revenues, operating income or balance sheets as a result of the implementation of this standard.

During the first quarter of 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. The new leasing standard presents significant changes to the balance sheets of lessees. Lessor accounting is updated to align with certain changes in the lessee model and the new revenue recognition standard which was issued in the third quarter of 2015. The standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2018. The Company is currently evaluating the impact of the provisions of this new standard on its consolidated financial statements.

74

During the second quarter of 2016, the FASB issued ASU No. 2016-09, *Compensation - Stock Compensation (Topic 718)*. This update changes the accounting for certain aspects of share-based payments to employees. Income tax effects of share-based payment awards will be recognized in the income statement with the vesting or settlement of the awards and the record keeping for additional paid-in capital pools will no longer be necessary. Additionally, companies can make a policy election to either estimate forfeitures or recognize them as they occur. The standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2016. The Company does not expect the provisions of this new standard to have a material impact on its consolidated financial statements.

During the second quarter of 2016, the FASB issued ASU No. 2016-13, *Financial Instruments - Credit Losses (Topic 326)*. The new standard changes the impairment model for most financial assets and certain other instruments. Entities will be required to use a model that will result in the earlier recognition of allowances for losses for trade and other receivables, held-to-maturity debt securities, loans and other instruments. For available-for-sale debt securities with unrealized losses, the losses will be recognized as allowances rather than as reductions in the amortized cost of the securities. For an SEC filer, the standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2019. The Company is currently evaluating the impact of the provisions of this new standard on its consolidated financial statements.

During the third quarter of 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230)*. The new standard addresses the classification of cash flows related to certain cash receipts and cash payments. Additionally, the standard clarifies how the predominance principle should be used when cash receipts and cash payments have aspects of more than one class of cash flows. First, an entity will apply the guidance in Topic 230 and other applicable topics. If there is no guidance for those cash receipts and cash payments, an entity will determine each separately identifiable source or use and classify the receipt or payment based on the nature of the cash flow. If a receipt or payment has aspects of more than one class of cash flows and cannot be separated, the classification will depend on the predominant source or use. The standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2017. The Company is currently evaluating the impact of the provisions of this new standard on its consolidated financial statements.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of our financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of expenses during the reporting period. On an ongoing basis, we evaluate our estimates that are based on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. The result of these evaluations forms the basis for making judgments about the carrying values of assets and liabilities and the reported amount of expenses that are not readily apparent from other sources. Because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such difference could be material. Our significant accounting policies are discussed in the notes to our consolidated financial statements included in Item 8 of Part II of this Annual Report on Form 10-K. Management believes that the following accounting estimates are the most critical to aid in fully understanding and evaluating our reported financial results, and they require management's most difficult, subjective or complex judgments, resulting from the need to make estimates about the effect of matters that are inherently uncertain. The following narrative describes these critical accounting estimates, the judgments and assumptions and the effect if actual results differ from these assumptions.

### Allowance for Doubtful Accounts

We evaluate the collectability of our accounts receivable based on a combination of factors. In circumstances where we are aware of a specific customer's inability to meet its financial obligations, we record a specific reserve to reduce the amounts recorded to what we believe will be collected. For all other customers, we recognize reserves for bad debt based on historical experience for each business unit, adjusted for relative improvements or deteriorations in the agings and changes in current economic conditions.

If our agings were to improve or deteriorate resulting in a 10% change in our allowance, we estimated that our bad debt expense for the year ended December 31, 2016 would have changed by approximately $3.4 million.

### Leases

The most significant estimates used by management in accounting for leases and the impact of these estimates are as follows:

*Expected lease term* Our expected lease term includes both contractual lease periods and cancelable option periods where failure to exercise such options would result in an economic penalty. The expected lease term is used in determining whether the lease is accounted for as an operating lease or a capital lease. A lease is considered a capital lease if the lease term exceeds 75%

75

of the leased asset's useful life. The expected lease term is also used in determining the depreciable life of the asset. An increase in the expected lease term will increase the probability that a lease may be considered a capital lease and will generally result in higher interest and depreciation expense for a leased property recorded on our balance sheet.

*Incremental borrowing rate* The incremental borrowing rate is primarily used in determining whether the lease is accounted for as an operating lease or a capital lease. A lease is considered a capital lease if the net present value of the minimum lease payments is greater than 90% of the fair market value of the property. An increase in the incremental borrowing rate decreases the net present value of the minimum lease payments and reduces the probability that a lease will be considered a capital lease.

*Fair market value of leased asset* The fair market value of leased property is generally estimated based on comparable market data as provided by third-party sources. Fair market value is used in determining whether the lease is accounted for as an operating lease or a capital lease. A lease is considered a capital lease if the net present value of the minimum lease payments equals or exceeds 90% of the fair market value of the leased property. A higher fair market value reduces the likelihood that a lease will be considered a capital lease.

## Long-lived Assets

Long-lived assets, including structures and other property, plant and equipment and definite-lived intangibles, are reported at historical cost less accumulated depreciation and amortization. We estimate the useful lives for various types of advertising structures and other long-lived assets based on our historical experience and our plans regarding how we intend to use those assets. Advertising structures have different lives depending on their nature, with large format bulletins generally having longer depreciable lives and posters and other displays having shorter depreciable lives. Street furniture and transit displays are depreciated over their estimated useful lives or appropriate contractual periods, whichever is shorter. Our experience indicates that the estimated useful lives applied to our portfolio of assets have been reasonable, and we do not expect significant changes to the estimated useful lives of our long-lived assets in the future. When we determine that structures or other long-lived assets will be disposed of prior to the end of their useful lives, we estimate the revised useful lives and depreciate the assets over the revised period. We also review long-lived assets for impairment when events and circumstances indicate that depreciable and amortizable long-lived assets might be impaired and the undiscounted cash flows estimated to be generated by those assets are less than the carrying amounts of those assets. When specific assets are determined to be unrecoverable, the cost basis of the asset is reduced to reflect the current fair market value.

We use various assumptions in determining the remaining useful lives of assets to be disposed of prior to the end of their useful lives and in determining the current fair market value of long-lived assets that are determined to be unrecoverable. Estimated useful lives and fair values are sensitive to factors including contractual commitments, regulatory requirements, future expected cash flows, industry growth rates and discount rates, as well as future salvage values. Our impairment loss calculations require management to apply judgment in estimating future cash flows, including forecasting useful lives of the assets and selecting the discount rate that reflects the risk inherent in future cash flows.

If actual results are not consistent with our assumptions and judgments used in estimating future cash flows and asset fair values, we may be exposed to future impairment losses that could be material to our results of operations.

## Indefinite-lived Intangible Assets

In connection with the Merger Agreement pursuant to which we acquired iHeartCommunications in 2008, we allocated the purchase price to all of our assets and liabilities at estimated fair values, including our FCC licenses and our billboard permits. Indefinite-lived intangible assets, such as our FCC licenses and our billboard permits, are reviewed annually for possible impairment using the direct valuation method as prescribed in ASC 805-20-S99. Under the direct valuation method, the estimated fair value of the indefinite-lived intangible assets was calculated at the market level as prescribed by ASC 350-30-35.Under the direct valuation method, it is assumed that rather than acquiring indefinite-lived intangible assets as a part of a going concern business, the buyer hypothetically obtains indefinite-lived intangible assets and builds a new operation with similar attributes from scratch. Thus, the buyer incurs start-up costs during the build-up phase which are normally associated with going concern value. Initial capital costs are deducted from the discounted cash flows model which results in value that is directly attributable to the indefinite-lived intangible assets.

Our key assumptions using the direct valuation method are market revenue growth rates, market share, profit margin, duration and profile of the build-up period, estimated start-up capital costs and losses incurred during the build-up period, the risk-adjusted discount rate and terminal values. This data is populated using industry normalized information representing an average asset within a market.

76

On July 1, 2016, we performed our annual impairment test in accordance with ASC 350-30-35 and recognized an impairment of $0.7 million related to FCC Licenses in one market and did not recognize any aggregate impairment charges related to billboard permits.

In determining the fair value of our FCC licenses, the following key assumptions were used:
- Revenue growth sales forecasts and published by BIA Financial Network, Inc. ("BIA"), varying by market, were used for the initial four-year period;
- 2.0% revenue growth was assumed beyond the initial four-year period;
- Revenue was grown proportionally over a build-up period, reaching market revenue forecast by year 3;
- Operating margins of 12.5% in the first year gradually climb to the industry average margin in year 3 of up to 26.5%, depending on market size; and
- Assumed discount rates of 8.5% for the 13 largest markets and 9.0% for all other markets.

In determining the fair value of our billboard permits, the following key assumptions were used:
- Industry revenue growth forecast at 3.0% was used for the initial four-year period;
- 3.0% revenue growth was assumed beyond the initial four-year period;
- Revenue was grown over a build-up period, reaching maturity by year 2;
- Operating margins gradually climb to the industry average margin of up to 56.1%, depending on market size, by year 3; and
- Assumed discount rate of 7.5%.

While we believe we have made reasonable estimates and utilized appropriate assumptions to calculate the fair value of our indefinite-lived intangible assets, it is possible a material change could occur. If future results are not consistent with our assumptions and estimates, we may be exposed to impairment charges in the future. The following table shows the change in the fair value of our indefinite-lived intangible assets that would result from a 100 basis point decline in our discrete and terminal period revenue growth rate and profit margin assumptions and a 100 basis point increase in our discount rate assumption:

| (In thousands) Description | Revenue Growth Rate | | Profit Margin | | Discount Rates | |
|---|---|---|---|---|---|---|
| FCC license | $ | 465,102 | $ | 158,468 | $ | 495,326 |
| Billboard permits | $ | 1,138,600 | $ | 162,800 | $ | 1,162,700 |

The estimated fair value of our FCC licenses and billboard permits at July 1, 2016 was $7.1 billion ($3.1 billion for FCC licenses and $4.0 billion for billboard permits), while the carrying value was $3.4 billion. The estimated fair value of our FCC licenses and billboard permits at July 1, 2015 was $6.1 billion ($3.0 billion for FCC licenses and $3.1 billion for billboard permits), while the carrying value was $3.5 billion.

**Goodwill**

Goodwill represents the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations. We test goodwill at interim dates if events or changes in circumstances indicate that goodwill might be impaired. The fair value of our reporting units is used to apply value to the net assets of each reporting unit. To the extent that the carrying amount of net assets would exceed the fair value, an impairment charge may be required to be recorded.

The discounted cash flow approach we use for valuing goodwill as part of the two-step impairment testing approach involves estimating future cash flows expected to be generated from the related assets, discounted to their present value using a risk-adjusted discount rate. Terminal values are also estimated and discounted to their present value.

On July 1, 2016, we performed our annual impairment test in accordance with ASC 350-30-35, resulting in a goodwill impairment charge of $7.3 million relating to one outdoor market. In determining the fair value of our reporting units, we used the following assumptions:

- Expected cash flows underlying our business plans for the periods 2016 through 2020. Our cash flow assumptions are based on detailed, multi-year forecasts performed by each of our operating segments, and reflect the advertising outlook across our businesses.
- Cash flows beyond 2020 are projected to grow at a perpetual growth rate, which we estimated at 2.0% for our iHM segment, 3.0% for our Americas outdoor and International outdoor segments, and 2.0% for our Other segment.
- In order to risk adjust the cash flow projections in determining fair value, we utilized a discount rate of approximately 8.0% to 11.5% for each of our reporting units.

Based on our annual assessment using the assumptions described above, a hypothetical 10.0% reduction in the estimated fair value in each of our reporting units would not result in a material impairment condition.

While we believe we have made reasonable estimates and utilized appropriate assumptions to calculate the estimated fair value of our reporting units, it is possible a material change could occur. If future results are not consistent with our assumptions and estimates, we may be exposed to impairment charges in the future. The following table shows the decline in the fair value of each of our reportable segments that would result from a 100 basis point decline in our discrete and terminal period revenue growth rate and profit margin assumptions and a 100 basis point increase in our discount rate assumption:

| *(In thousands)*<br>Description | | Revenue<br>Growth Rate | | Profit<br>Margin | | Discount<br>Rates |
|---|---|---|---|---|---|---|
| iHM | $ | 1,080,000 | $ | 280,000 | $ | 1,050,000 |
| Americas Outdoor | $ | 860,000 | $ | 180,000 | $ | 820,000 |
| International Outdoor | $ | 330,000 | $ | 210,000 | $ | 260,000 |

**Tax Provisions**

Our estimates of income taxes and the significant items giving rise to the deferred tax assets and liabilities are shown in the notes to our consolidated financial statements and reflect our assessment of actual future taxes to be paid on items reflected in the financial statements, giving consideration to both timing and probability of these estimates. Actual income taxes could vary from these estimates due to future changes in income tax law or results from the final review of our tax returns by federal, state or foreign tax authorities.

We use our judgment to determine whether it is more likely than not that our deferred tax assets will be realized. Deferred tax assets are reduced by valuation allowances if the Company believes it is more than likely than not that some portion or the entire asset will not be realized.

We use our judgment to determine whether it is more likely than not that we will sustain positions that we have taken on tax returns and, if so, the amount of benefit to initially recognize within our financial statements. We regularly review our uncertain tax positions and adjust our unrecognized tax benefits (UTBs) in light of changes in facts and circumstances, such as changes in tax law, interactions with taxing authorities and developments in case law. These adjustments to our UTBs may affect our income tax expense. Settlement of uncertain tax positions may require use of our cash.

**Litigation Accruals**

We are currently involved in certain legal proceedings. Based on current assumptions, we have accrued an estimate of the probable costs for the resolution of those claims for which the occurrence of loss is probable and the amount can be reasonably estimated. Future results of operations could be materially affected by changes in these assumptions or the effectiveness of our strategies related to these proceedings.

Management's estimates have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies.

**Insurance Accruals**

We are currently self-insured beyond certain retention amounts for various insurance coverages, including general liability and property and casualty. Accruals are recorded based on estimates of actual claims filed, historical payouts, existing insurance coverage and projected future development of costs related to existing claims. Our self-insured liabilities contain uncertainties because management must make assumptions and apply judgment to estimate the ultimate cost to settle reported claims and claims incurred but not reported as of December 31, 2016.

If actual results are not consistent with our assumptions and judgments, we may be exposed to gains or losses that could be material. A 10% change in our self-insurance liabilities at December 31, 2016 would have affected our net loss by approximately $1.8 million for the year ended December 31, 2016.

**Asset Retirement Obligations**

ASC 410-20 requires us to estimate our obligation upon the termination or nonrenewal of a lease, to dismantle and remove our billboard structures from the leased land and to reclaim the site to its original condition.

78

Due to the high rate of lease renewals over a long period of time, our calculation assumes all related assets will be removed at some period over the next 55 years. An estimate of third-party cost information is used with respect to the dismantling of the structures and the reclamation of the site. The interest rate used to calculate the present value of such costs over the retirement period is based on an estimated risk-adjusted credit rate for the same period. If our assumption of the risk-adjusted credit rate used to discount current year additions to the asset retirement obligation decreased approximately 1%, our liability as of December 31, 2016 would not be materially impacted. Similarly, if our assumption of the risk-adjusted credit rate increased approximately 1%, our liability would not be materially impacted.

**Share-Based Compensation**

Under the fair value recognition provisions of ASC 718-10, share-based compensation cost is measured at the grant date based on the fair value of the award. Determining the fair value of share-based awards at the grant date requires assumptions and judgments about expected volatility and forfeiture rates, among other factors. If actual results differ significantly from these estimates, our results of operations could be materially impacted.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Required information is located within Item 7 of Part II of this Annual Report on Form 10-K.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
iHeartMedia, Inc.

We have audited the accompanying consolidated balance sheets of iHeartMedia, Inc. and subsidiaries (the Company) as of December 31, 2016 and 2015, and the related consolidated statements of comprehensive loss, changes in stockholders' deficit and cash flows for each of the three years in the period ended December 31, 2016. Our audits also included the financial statement schedule listed in the Index at Item 15(a)2. These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of iHeartMedia, Inc. and subsidiaries at December 31, 2016 and 2015, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2016, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 23, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
San Antonio, Texas
February 23, 2017

80

## CONSOLIDATED BALANCE SHEETS OF
## IHEARTMEDIA, INC. AND SUBSIDIARIES

| (In thousands) | | December 31, 2016 | | December 31, 2015 |
|---|---|---:|---|---:|
| CURRENT ASSETS | | | | |
| Cash and cash equivalents | $ | 845,030 | $ | 772,678 |
| Accounts receivable, net of allowance of $33,882 in 2016 and $34,889 in 2015 | | 1,364,404 | | 1,442,038 |
| Prepaid expenses | | 184,586 | | 189,055 |
| Assets held for sale | | 55,602 | | 295,075 |
| Other current assets | | 55,065 | | 79,269 |
| **Total Current Assets** | | 2,504,687 | | 2,778,115 |
| PROPERTY, PLANT AND EQUIPMENT | | | | |
| Structures, net | | 1,196,676 | | 1,391,880 |
| Other property, plant and equipment, net | | 751,486 | | 820,676 |
| INTANGIBLE ASSETS AND GOODWILL | | | | |
| Indefinite-lived intangibles - licenses | | 2,413,899 | | 2,413,483 |
| Indefinite-lived intangibles - permits | | 960,966 | | 971,327 |
| Other intangibles, net | | 740,508 | | 953,660 |
| Goodwill | | 4,066,575 | | 4,128,887 |
| OTHER ASSETS | | | | |
| Other assets | | 227,450 | | 215,087 |
| **Total Assets** | $ | 12,862,247 | $ | 13,673,115 |
| CURRENT LIABILITIES | | | | |
| Accounts payable | $ | 146,772 | $ | 153,276 |
| Accrued expenses | | 742,617 | | 834,416 |
| Accrued interest | | 264,170 | | 279,100 |
| Deferred income | | 200,103 | | 210,924 |
| Current portion of long-term debt | | 342,908 | | 181,512 |
| **Total Current Liabilities** | | 1,696,570 | | 1,659,228 |
| Long-term debt | | 20,022,080 | | 20,539,099 |
| Deferred income taxes | | 1,457,095 | | 1,554,898 |
| Other long-term liabilities | | 571,977 | | 526,571 |
| Commitments and contingent liabilities (Note 6) | | | | |
| STOCKHOLDERS' DEFICIT | | | | |
| Noncontrolling interest | | 135,183 | | 177,615 |
| Class A Common Stock, par value $.001 per share, authorized 400,000,000 shares, issued 31,502,448 and 30,295,457 shares in 2016 and 2015, respectively | | 31 | | 30 |
| Class B Common Stock, par value $.001 per share, authorized 150,000,000 shares, issued 555,556 shares in 2016 and 2015 | | 1 | | 1 |
| Class C Common Stock, par value $.001 per share, authorized 100,000,000 shares, issued 58,967,502 shares in 2016 and 2015 | | 59 | | 59 |
| Additional paid-in capital | | 2,070,575 | | 2,068,949 |
| Accumulated deficit | | (12,733,329) | | (12,437,011) |
| Accumulated other comprehensive loss | | (355,876) | | (414,407) |
| Cost of shares (389,920 in 2016 and 229,824 in 2015) held in treasury | | (2,119) | | (1,917) |
| **Total Stockholders' Deficit** | | (10,885,475) | | (10,606,681) |
| **Total Liabilities and Stockholders' Deficit** | $ | 12,862,247 | $ | 13,673,115 |

See Notes to Consolidated Financial Statements

81

## CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS OF IHEARTMEDIA, INC. AND SUBSIDIARIES

*(In thousands)*

| | | Years Ended December 31, | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Revenue | $ 6,273,573 | $ 6,241,516 | $ 6,318,533 |
| Operating expenses: | | | |
| Direct operating expenses (excludes depreciation and amortization) | 2,412,287 | 2,471,113 | 2,540,035 |
| Selling, general and administrative expenses (excludes depreciation and amortization) | 1,725,899 | 1,704,352 | 1,680,938 |
| Corporate expenses (excludes depreciation and amortization) | 341,025 | 314,999 | 320,931 |
| Depreciation and amortization | 635,227 | 673,991 | 710,898 |
| Impairment charges | 8,000 | 21,631 | 24,176 |
| Other operating income, net | 353,556 | 94,001 | 40,031 |
| Operating income | 1,504,691 | 1,149,431 | 1,081,586 |
| Interest expense | 1,849,982 | 1,805,496 | 1,741,596 |
| Loss on investments, net | (12,907) | (4,421) | - |
| Equity in loss of nonconsolidated affiliates | (16,733) | (902) | (9,416) |
| Gain (loss) on extinguishment of debt | 157,556 | (2,201) | (43,347) |
| Other income (expense), net | (73,102) | 13,056 | 9,104 |
| Loss before income taxes | (290,477) | (650,533) | (703,669) |
| Income tax benefit (expense) | 50,474 | (86,957) | (58,489) |
| Consolidated net loss | (240,003) | (737,490) | (762,158) |
| Less amount attributable to noncontrolling interest | 56,315 | 17,131 | 31,603 |
| Net loss attributable to the Company | $ (296,318) | $ (754,621) | $ (793,761) |
| Other comprehensive income (loss), net of tax: | | | |
| Foreign currency translation adjustments | 21,983 | (114,906) | (121,878) |
| Unrealized gain on securities and derivatives: | | | |
| Unrealized holding gain (loss) on marketable securities | (576) | 553 | 327 |
| Other adjustments to comprehensive income (loss) | (11,814) | (10,266) | (11,438) |
| Reclassification adjustments | 46,730 | 808 | 3,317 |
| Other comprehensive income (loss) | 56,323 | (123,811) | (129,672) |
| Comprehensive loss | (239,995) | (878,432) | (923,433) |
| Less amount attributable to noncontrolling interest | (2,208) | (22,410) | (21,080) |
| Comprehensive loss attributable to the Company | $ (237,787) | $ (856,022) | $ (902,353) |
| | | | |
| Net loss attributable to the Company per common share: | | | |
| Basic | $ (3.50) | $ (8.95) | $ (9.46) |
| Weighted average common shares outstanding - Basic | 84,569 | 84,278 | 83,941 |
| Diluted | $ (3.50) | $ (8.95) | $ (9.46) |
| Weighted average common shares outstanding - Diluted | 84,569 | 84,278 | 83,941 |

See Notes to Consolidated Financial Statements

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' DEFICIT OF IHEARTMEDIA, INC. AND SUBSIDIARIES

*(In thousands, except share data)*

| | Common Shares | | | Non-controlling Interest | Controlling Interest | | | | | |
| | Class C Shares | Class B Shares | Class A Shares | | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balances at December 31, 2013** | 58,967,502 | 555,556 | 29,504,379 | $245,531 | $ 89 | $2,148,303 | $(10,888,629) | $ (196,073) | $ (5,856) | $ (8,696,635) |
| Net income (loss) | | | | 31,603 | - | - | (793,761) | - | - | (762,158) |
| Issuance (forfeiture) of restricted stock | | | (196,796) | 2,237 | - | - | - | - | (993) | 1,244 |
| Amortization of share-based compensation | | | | 7,743 | - | 2,970 | - | - | - | 10,713 |
| Purchases of additional noncontrolling interest | | | | (1,944) | - | (42,881) | - | (3,925) | - | (48,750) |
| Dividend declared and paid to noncontrolling interests | | | | (40,027) | - | - | - | - | - | (40,027) |
| Other | | | | 77 | - | (5,603) | - | - | 5,603 | 77 |
| Other comprehensive loss | | | | (21,080) | - | - | - | (108,592) | - | (129,672) |
| **Balances at December 31, 2014** | 58,967,502 | 555,556 | 29,307,583 | $224,140 | $ 89 | $2,102,789 | $(11,682,390) | $ (308,590) | $ (1,246) | $ (9,665,208) |
| Net income (loss) | | | | 17,131 | - | - | (754,621) | - | - | (737,490) |
| Issuance (forfeiture) of restricted stock | | | 987,874 | 2,886 | 1 | (1) | - | - | (671) | 2,215 |
| Amortization of share-based compensation | | | | 8,359 | - | 2,564 | - | - | - | 10,923 |
| Purchases of additional noncontrolling interest | | | | (1,978) | - | (36,403) | - | (4,416) | - | (42,797) |
| Dividend declared and paid to noncontrolling interests | | | | (52,384) | - | - | - | - | - | (52,384) |
| Other | | | | 1,871 | - | - | - | - | - | 1,871 |
| Other comprehensive loss | | | | (22,410) | - | - | - | (101,401) | - | (123,811) |
| **Balances at December 31, 2015** | 58,967,502 | 555,556 | 30,295,457 | $177,615 | $ 90 | $2,068,949 | $(12,437,011) | $ (414,407) | $ (1,917) | $(10,606,681) |
| Net income (loss) | | | | 56,315 | - | - | (296,318) | - | - | (240,003) |
| Issuance (forfeiture) of restricted stock | | | 1,206,991 | (1,366) | 1 | (1) | - | - | (199) | (1,565) |
| Amortization of share-based compensation | | | | 10,238 | - | 2,848 | - | - | - | 13,086 |
| Purchases of additional noncontrolling interest | | | | 1,224 | - | (1,224) | - | - | - | - |
| Disposal of noncontrolling interest | | | | (36,846) | - | - | - | - | - | (36,846) |
| Dividend declared and paid to noncontrolling interests | | | | (70,412) | - | - | - | - | - | (70,412) |
| Other | | | | 623 | - | 3 | - | - | (3) | 623 |
| Other comprehensive income | | | | (2,208) | - | - | - | 58,531 | - | 56,323 |
| **Balances at December 31, 2016** | 58,967,502 | 555,556 | 31,502,448 | $135,183 | $ 91 | $2,070,575 | $(12,733,329) | $ (355,876) | $ (2,119) | $(10,885,475) |

See Notes to Consolidated Financial Statements

**CONSOLIDATED STATEMENTS OF CASH FLOWS OF
IHEARTMEDIA, INC. AND SUBSIDIARIES**

*(In thousands)*

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Cash flows from operating activities:** | | | |
| Consolidated net loss | $ (240,003) | $ (737,490) | $ (762,158) |
| **Reconciling items:** | | | |
| Impairment charges | 8,000 | 21,631 | 24,176 |
| Depreciation and amortization | 635,227 | 673,991 | 710,898 |
| Deferred taxes | (98,127) | 27,848 | 33,923 |
| Provision for doubtful accounts | 27,390 | 30,579 | 14,167 |
| Amortization of deferred financing charges and note discounts, net | 69,951 | 63,838 | 89,701 |
| Share-based compensation | 13,086 | 10,923 | 10,713 |
| Gain on disposal of operating and other assets | (365,710) | (107,186) | (44,512) |
| Loss on investments | 12,907 | 4,421 | - |
| Equity in loss of nonconsolidated affiliates | 16,733 | 902 | 9,416 |
| (Gain) loss on extinguishment of debt | (157,556) | 2,201 | 43,347 |
| Other reconciling items, net | 33,120 | (28,490) | (14,325) |
| Changes in operating assets and liabilities, net of effects of acquisitions and dispositions: | | | |
| Increase in accounts receivable | (14,469) | (121,574) | (13,898) |
| (Increase) decrease in prepaid expenses and other current assets | (2,753) | (20,631) | 15,216 |
| Increase (decrease) in accrued expenses | (2,862) | (15,841) | 31,049 |
| Increase in accounts payable | 3,065 | 27,385 | 6,404 |
| Increase in accrued interest | 20,809 | 59,608 | 88,560 |
| Increase in deferred income | 23,661 | 23,516 | 11,288 |
| Changes in other operating assets and liabilities | 3,549 | 7,065 | (8,849) |
| Net cash provided by (used for) operating activities | (13,982) | (77,304) | 245,116 |
| **Cash flows from investing activities:** | | | |
| Proceeds from sale of other investments | 5,367 | 579 | 236,618 |
| Purchases of businesses | (500) | (27,588) | 841 |
| Purchases of property, plant and equipment | (314,717) | (296,380) | (318,164) |
| Proceeds from disposal of assets | 856,981 | 414,278 | 10,273 |
| Purchases of other operating assets | (4,414) | (29,159) | (4,541) |
| Purchases of investments | (29,031) | (29,006) | (8,520) |
| Change in other, net | (2,771) | (2,490) | (5,189) |
| Net cash provided by (used for) investing activities | 510,915 | 30,234 | (88,682) |
| **Cash flows from financing activities:** | | | |
| Draws on credit facilities | 100,000 | 350,000 | 68,010 |
| Payments on credit facilities | (2,100) | (123,849) | (315,682) |
| Proceeds from long-term debt | 6,856 | 1,172,777 | 2,062,475 |
| Payments on long-term debt | (421,263) | (931,420) | (2,099,101) |
| Payments to repurchase noncontrolling interests | - | (42,797) | (48,750) |
| Dividends and other payments to noncontrolling interests | (89,631) | (30,871) | (40,027) |
| Deferred financing charges | (10,529) | (18,644) | (26,169) |
| Change in other, net | (1,564) | 2,214 | 1,243 |
| Net cash provided by (used for) financing activities | (418,231) | 377,410 | (398,001) |
| Effect of exchange rate changes on cash | (6,350) | (14,686) | (9,560) |
| Net increase (decrease) in cash and cash equivalents | 72,352 | 315,654 | (251,127) |
| Cash and cash equivalents at beginning of period | 772,678 | 457,024 | 708,151 |
| Cash and cash equivalents at end of period | $ 845,030 | $ 772,678 | $ 457,024 |
| **SUPPLEMENTAL DISCLOSURES:** | | | |
| Cash paid during the year for interest | $ 1,764,776 | $ 1,686,988 | $ 1,540,860 |
| Cash paid during the year for taxes | 44,844 | 52,169 | 53,074 |

See Notes to Consolidated Financial Statements

84

IHEARTMEDIA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Nature of Business**

iHeartMedia, Inc. (the "Company") was formed in May 2007 by private equity funds sponsored by Bain Capital Partners, LLC and Thomas H. Lee Partners, L.P. (together, the "Sponsors") for the purpose of acquiring the business of iHeartCommunications, Inc., a Texas company ("iHeartCommunications"). The acquisition was completed on July 30, 2008 pursuant to the Agreement and Plan of Merger, dated November 16, 2006, as amended on April 18, 2007, May 17, 2007 and May 13, 2008 (the "Merger Agreement").

The Company's reportable segments are iHeartMedia ("iHM"), Americas outdoor advertising ("Americas outdoor"), and International outdoor advertising ("International outdoor"). The iHM segment provides media and entertainment services via broadcast and digital delivery. The Americas outdoor and International outdoor segments provide outdoor advertising services in their respective geographic regions using various digital and traditional display types. Included in the "Other" category are the Company's media representation business, Katz Media Group, as well as other general support services and initiatives, which are ancillary to its other businesses.

**Use of Estimates**

The preparation of the consolidated financial statements in conformity with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates, judgments, and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes including, but not limited to, legal, tax and insurance accruals. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. Actual results could differ from those estimates.

**Principles of Consolidation**

The consolidated financial statements include the accounts of the Company and its subsidiaries. Also included in the consolidated financial statements are entities for which the Company has a controlling financial interest or is the primary beneficiary. Investments in companies in which the Company owns 20% to 50% of the voting common stock or otherwise exercises significant influence over operating and financial policies of the Company are accounted for using the equity method of accounting. All significant intercompany accounts have been eliminated in consolidation.

Certain prior period amounts have been reclassified to conform to the 2016 presentation. Included in International Outdoor Direct operating expenses and Selling, general and administrative expenses are $8.2 million and $3.2 million, respectively, recorded in the fourth quarter of 2015 to correct for accounting errors included in the results for our Netherlands subsidiary reported in prior years. Such corrections are not considered to be material to current year or prior year financial results.

The Company is the beneficiary of two trusts created to comply with Federal Communications Commission ("FCC") ownership rules. The radio stations owned by the trusts are managed by independent trustees. The trustees are marketing these stations for sale, and the stations will have to be sold unless any stations may be owned by the Company under then-current FCC rules, in which case the trusts will be terminated with respect to such stations. The trust agreements stipulate that the Company must fund any operating shortfalls of the trust activities, and any excess cash flow generated by the trusts is distributed to the Company. The Company is also the beneficiary of proceeds from the sale of stations held in the trusts. The Company consolidates the trusts in accordance with ASC 810-10, which requires an enterprise involved with variable interest entities to perform an analysis to determine whether the enterprise's variable interest or interests give it a controlling financial interest in the variable interest entity, as the trusts were determined to be a variable interest entity and the Company is the primary beneficiary under the trusts.

**Going Concern Considerations**

During the second quarter of 2014, the FASB issued ASU No. 2014-15, *Presentation of Financial Statements - Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*. This update provides U.S. GAAP guidance on management's responsibility in evaluating whether there is substantial doubt about a company's ability to continue as a going concern and about related footnote disclosures. The Company adopted this standard for the year ended December 31, 2016. Under this standard, the Company is required to evaluate whether there is substantial doubt about its ability to continue as a going concern each reporting period, including interim periods.

In evaluating the Company's ability to continue as a going concern, management considered the conditions and events that could raise substantial doubt about the Company's ability to continue as a going concern within 12 months after the Company's financial

85

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

statements were issued (February 23, 2017). Management considered the Company's current financial condition and liquidity sources, including current funds available, forecasted future cash flows and the Company's conditional and unconditional obligations due before February 23, 2018.

As of December 31, 2016, the Company had $845.0 million of cash on its balance sheet, including $542.0 million of cash held by the Company's subsidiary, Clear Channel Outdoor Holdings, Inc. ("CCOH"). As of December 31, 2016, the Company had $113.6 million of excess availability under its receivables based credit facility. A substantial amount of the Company's cash requirements are for debt service obligations. The Company incurred net losses for the years ended December 31, 2016, 2015 and 2014 and had negative cash flows from operating activities for the years ended December 31, 2016 and 2015. The Company's current operating plan indicates it will continue to incur net losses and generate negative cash flows from operating activities given the Company's indebtedness and related interest expense. During the year ended December 31, 2016, the Company spent $2,081.3 million of cash on payments of principal and interest on its debt, net of facility draws and proceeds received, and anticipates having approximately $1.7 billion of cash interest payment obligations in 2017. At December 31, 2016, the Company had debt maturities totaling $343.5 million, $559.1 million (net of $503.0 million due to certain subsidiaries of iHeartCommunications) and $8,369.0 million in 2017, 2018 and 2019, respectively. The Company's debt maturities at December 31, 2016 include $330.0 million outstanding under a receivables based credit facility, which matures on December 24, 2017. These factors coupled with the Company's forecast of future cash flows indicates that such cash flows would not be sufficient for the Company to meet its obligations, including payment of the outstanding receivables based credit facility balance at maturity, as they become due in the ordinary course of business for a period of 12 months following February 23, 2017.

The Company plans to refinance or extend the receivables based credit facility to a date at least 12 months after February 23, 2017 with terms similar to the facility's current terms.

Management believes the refinancing or extension of the maturity of the receivables based credit facility is probable of being executed as the Company has successfully extended the maturity date of this receivables based credit facility in the past, and the facility has a first-priority lien on the accounts receivable of iHeartCommunications and certain of its subsidiaries (see Footnote 5). Management's plan to refinance or extend the due date of the receivables based credit facility, combined with current funds and expected future cash flows, are considered to be sufficient to enable the Company to meet its obligations as they become due in the ordinary course of business for a period of 12 months following the date these financial statements are issued.

While management plans to refinance or extend the maturity of the receivables based credit facility and has begun discussing such extension with its receivables based credit facility lenders, there is no assurance that the receivables based credit facility will be refinanced or extended in a timely manner, in amounts that are sufficient to meet the Company's obligations as they become due, or on terms acceptable to the Company, or at all. The Company's ability to meet its obligations as they become due in the ordinary course of business for the next 12 months will depend on its ability to achieve forecasted results and its ability to refinance or extend the maturity of its receivables based credit facility. Management's belief that the receivables based credit facility will be refinanced or extended and that such refinancing or extension, together with forecasted operating cash flow, will be sufficient to enable the Company to meet its obligations as they become due in the ordinary course of business for 12 months following the date these financial statements are issued assumes, among other things, that the Company will continue to be successful in implementing its business strategy and that there will be no material adverse developments in its business, liquidity or capital requirements. If one or more of these factors do not occur as expected, it could cause a default under one or more of the agreements governing the Company's indebtedness.

The Company has been reviewing a number or potential alternatives regarding its outstanding indebtedness. These alternatives include refinancings, exchange offers, consent solicitations, the issuance of new indebtedness, amendments to the terms of the Company's existing indebtedness and/or other transactions. The Company has considered and will continue to evaluate potential transactions to improve its capital structure and address its liquidity constraints.

**Cash and Cash Equivalents**

Cash and cash equivalents include all highly liquid investments with an original maturity of three months or less.

**Accounts Receivable**

Accounts receivable are recorded at the invoiced amount, net of reserves for sales returns and allowances, and allowances for doubtful accounts. The Company evaluates the collectability of its accounts receivable based on a combination of factors. In circumstances where it is aware of a specific customer's inability to meet its financial obligations, it records a specific reserve to

86

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

reduce the amounts recorded to what it believes will be collected. For all other customers, it recognizes reserves for bad debt based on historical experience of bad debts as a percent of revenue for each business unit, adjusted for relative improvements or deteriorations in the agings and changes in current economic conditions. The Company believes its concentration of credit risk is limited due to the large number and the geographic diversification of its customers.

**Business Combinations**

The Company accounts for its business combinations under the acquisition method of accounting. The total cost of an acquisition is allocated to the underlying identifiable net assets, based on their respective estimated fair values. The excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash inflows and outflows, discount rates, asset lives and market multiples, among other items. Various acquisition agreements may include contingent purchase consideration based on performance requirements of the investee. The Company accounts for these payments in conformity with the provisions of ASC 805-20-30, which establish the requirements related to recognition of certain assets and liabilities arising from contingencies.

**Property, Plant and Equipment**

Property, plant and equipment are stated at cost. Depreciation is computed using the straight-line method at rates that, in the opinion of management, are adequate to allocate the cost of such assets over their estimated useful lives, which are as follows:

> Buildings and improvements - 10 to 39 years
> Structures - 3 to 20 years
> Towers, transmitters and studio equipment - 5 to 20 years
> Furniture and other equipment - 2 to 20 years
> Leasehold improvements - shorter of economic life or lease term assuming renewal periods, if appropriate

For assets associated with a lease or contract, the assets are depreciated at the shorter of the economic life or the lease or contract term, assuming renewal periods, if appropriate. Expenditures for maintenance and repairs are charged to operations as incurred, whereas expenditures for renewal and betterments are capitalized.

The Company tests for possible impairment of property, plant, and equipment whenever events and circumstances indicate that depreciable assets might be impaired and the undiscounted cash flows estimated to be generated by those assets are less than the carrying amounts of those assets. When specific assets are determined to be unrecoverable, the cost basis of the asset is reduced to reflect the current fair market value.

Assets and businesses are classified as held for sale if their carrying amount will be recovered or settled principally through a sale transaction rather than through continuing use. The asset or business must be available for immediate sale and the sale must be highly probable within one year.

**Leases**

Most of the Company's outdoor advertising structures are located on leased land. Americas outdoor land leases are typically paid in advance for periods ranging from one to 12 months. International outdoor land leases are paid both in advance and in arrears, for periods ranging up to 12 months. Most international street furniture display faces are operated through contracts with municipalities for up to 15 years. The leased land and street furniture contracts often include a percent of revenue to be paid along with a base rent payment. Prepaid land leases are recorded as an asset and expensed ratably over the related rental term and rent payments in arrears are recorded as an accrued liability.

The Company has entered into leases for tower sites for most of its broadcasting locations. Tower site leases are typically paid monthly in advance, and have 30-year lease terms including annual rent escalations. Most tower site leases are operating leases, and operating lease expense is recognized straight-line based on the minimum lease payments for each lease.

**Intangible Assets**

The Company's indefinite-lived intangible assets include FCC broadcast licenses in its iHM segment and billboard permits in its Americas outdoor advertising segment. The Company's indefinite-lived intangible assets are not subject to amortization, but are tested for impairment at least annually. The Company tests for possible impairment of indefinite-lived intangible assets whenever

87

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

events or changes in circumstances, such as a significant reduction in operating cash flow or a dramatic change in the manner for which the asset is intended to be used indicate that the carrying amount of the asset may not be recoverable.

The Company performs its annual impairment test for its FCC licenses and permits using a direct valuation technique as prescribed in ASC 805-20-S99. The Company engages a third party valuation firm, to assist the Company in the development of these assumptions and the Company's determination of the fair value of its FCC licenses and permits.

Other intangible assets include definite-lived intangible assets and permanent easements. The Company's definite-lived intangible assets include primarily transit and street furniture contracts, talent and representation contracts, customer and advertiser relationships, and site-leases, all of which are amortized over the respective lives of the agreements, or over the period of time the assets are expected to contribute directly or indirectly to the Company's future cash flows. The Company periodically reviews the appropriateness of the amortization periods related to its definite-lived intangible assets. These assets are recorded at cost. Permanent easements are indefinite-lived intangible assets which include certain rights to use real property not owned by the Company.

The Company tests for possible impairment of other intangible assets whenever events and circumstances indicate that they might be impaired and the undiscounted cash flows estimated to be generated by those assets are less than the carrying amounts of those assets. When specific assets are determined to be unrecoverable, the cost basis of the asset is reduced to reflect the current fair market value.

**Goodwill**

At least annually, the Company performs its impairment test for each reporting unit's goodwill. The Company uses a discounted cash flow model to determine if the carrying value of the reporting unit, including goodwill, is less than the fair value of the reporting unit. The Company identified its reporting units in accordance with ASC 350-20-55. The U.S. radio markets are aggregated into a single reporting unit and the Company's U.S. outdoor advertising markets are aggregated into a single reporting unit for purposes of the goodwill impairment test. The Company also determined that within its Americas outdoor segment, Canada constitutes a separate reporting unit and each country in its International outdoor segment constitutes a separate reporting unit. The Company recognized goodwill impairment of $7.3 million in 2016 related to one of our International outdoor markets and had no impairment of goodwill in 2015 and 2014.

**Nonconsolidated Affiliates**

In general, investments in which the Company owns 20% to 50% of the common stock or otherwise exercises significant influence over the investee are accounted for under the equity method. The Company does not recognize gains or losses upon the issuance of securities by any of its equity method investees. The Company reviews the value of equity method investments and records impairment charges in the statement of operations as a component of "Equity in earnings (loss) of nonconsolidated affiliates" for any decline in value that is determined to be other-than-temporary. The Company recognized other-than-temporary impairment of $15.0 million on an equity investment for the year ended December 31, 2016, which was recorded in "Equity in loss of nonconsolidated affiliates."

**Other Investments**

Other investments are composed primarily of equity securities. Securities for which fair value is determinable are classified as available-for-sale or trading and are carried at fair value based on quoted market prices. Securities are carried at historical cost when quoted market prices are unavailable. The net unrealized gains or losses on the available-for-sale securities, net of tax, are reported in accumulated other comprehensive loss as a component of stockholders' deficit.

The Company periodically assesses the value of available-for-sale and non-marketable securities and records impairment charges in the statement of comprehensive loss for any decline in value that is determined to be other-than-temporary. The average cost method is used to compute the realized gains and losses on sales of equity securities. Based on these assessments, the Company concluded that other-than-temporary impairments existed at December 31, 2016 and December 31, 2015 and recorded noncash impairment charges of $14.8 million and $5.0 million during 2016 and 2015, respectively. Such charge is recorded on the statement of comprehensive loss in "Loss on investments, net". There were no impairment charges during the year ended December 31, 2014.

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Financial Instruments**

Due to their short maturity, the carrying amounts of accounts and notes receivable, accounts payable, accrued liabilities, and short-term borrowings approximated their fair values at December 31, 2016 and 2015.

**Income Taxes**

The Company accounts for income taxes using the liability method. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. Deferred tax assets are reduced by valuation allowances if the Company believes it is more likely than not that some portion or the entire asset will not be realized. Generally all earnings from the Company's foreign operations are permanently reinvested and not distributed. The Company has not provided U.S. federal income taxes for temporary differences with respect to investments in foreign subsidiaries, which at December 31, 2016 currently result in tax basis amounts greater than the financial reporting basis. It is not apparent that these unrecognized deferred tax assets will reverse in the foreseeable future. If any excess cash held by our foreign subsidiaries were needed to fund operations in the United States, we could presently repatriate available funds without a requirement to accrue or pay U.S. taxes. This is a result of significant deficits, as calculated for tax law purposes, in our foreign earnings and profits, which gives us flexibility to make future cash distributions as non-taxable returns of capital. We regularly review our tax liabilities on amounts that may be distributed in future periods and provide for foreign withholding and other current and deferred taxes on any such amounts. The determination of the amount of federal income taxes, if any, that might become due in the event that our foreign earnings are distributed is not practicable.

**Revenue Recognition**

iHM revenue is recognized as advertisements or programs are broadcast and is generally billed monthly. Outdoor advertising contracts typically cover periods of a few weeks up to one year and are generally billed monthly. Revenue for outdoor advertising space rental is recognized ratably over the term of the contract. Advertising revenue is reported net of agency commissions. Agency commissions are calculated based on a stated percentage applied to gross billing revenue for the Company's media and entertainment and outdoor operations. Payments received in advance of being earned are recorded as deferred income. Revenue arrangements may contain multiple products and services and revenues are allocated based on the relative fair value of each delivered item and recognized in accordance with the applicable revenue recognition criteria for the specific unit of accounting.

Barter transactions represent the exchange of advertising spots or display space for merchandise, services or other assets. These transactions are recorded at the estimated fair market value of the advertising spots or display space or the fair value of the merchandise or services or other assets received, whichever is most readily determinable. Revenue is recognized on barter and trade transactions when the advertisements are broadcasted or displayed. Expenses are recorded ratably over a period that estimates when the merchandise, service or other assets received is utilized, or when the event occurs. Barter and trade revenues and expenses from continuing operations are included in consolidated revenue and selling, general and administrative expenses, respectively. Barter and trade revenues and expenses from continuing operations were as follows:

| *(In millions)* | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2016 | | 2015 | | 2014 |
| Barter and trade revenues | $ | 165.8 | $ | 133.5 | $ | 78.3 |
| Barter and trade expenses | | 112.2 | | 112.1 | | 75.1 |

**Advertising Expense**

The Company records advertising expense as it is incurred. Advertising expenses were $132.7 million, $129.1 million and $103.0 million for the years ended December 31, 2016, 2015 and 2014, respectively.

**Share-Based Compensation**

Under the fair value recognition provisions of ASC 718-10, share-based compensation cost is measured at the grant date based on the fair value of the award. For awards that vest based on service conditions, this cost is recognized as expense on a straight-line basis over the vesting period. For awards that will vest based on market or performance conditions, this cost will be recognized when it becomes probable that the performance conditions will be satisfied. Determining the fair value of share-based awards at the grant date requires assumptions and judgments about expected volatility and forfeiture rates, among other factors.

IHEARTMEDIA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Foreign Currency**

Results of operations for foreign subsidiaries and foreign equity investees are translated into U.S. dollars using the average exchange rates during the year. The assets and liabilities of those subsidiaries and investees are translated into U.S. dollars using the exchange rates at the balance sheet date. The related translation adjustments are recorded in a separate component of stockholders' deficit, "Accumulated other comprehensive loss". Foreign currency transaction gains and losses are included in operations.

**New Accounting Pronouncements**

During the third quarter of 2015, the FASB issued ASU 2015-14, *Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date*. This update provides a one-year deferral of the effective date for ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU No. 2014-09 provides guidance for the recognition, measurement and disclosure of revenue resulting from contracts with customers and will supersede virtually all of the current revenue recognition guidance under U.S. GAAP.  The standard is effective for the first interim period within annual reporting periods beginning after December 15, 2017. The two permitted transition methods under the new standard are the full retrospective method, in which case the standard would be applied to each prior reporting period presented and the cumulative effect of applying the standard would be recognized at the earliest period shown, or the modified retrospective method, in which case the cumulative effect of applying the standard would be recognized at the date of initial application. The Company expects to utilize the full retrospective method. The Company has substantially completed its evaluation of the potential changes from adopting the new standard on its future financial reporting and disclosures which included reviews of contractual terms for all of the Company's significant revenue streams and the development of an implementation plan. The Company continues to execute on its implementation plan, including detailed policy drafting and training of segment personnel. Based on its evaluation, the Company does not expect material changes to its 2016 or 2017 consolidated revenues, operating income or balance sheets as a result of the implementation of this standard.

During the second quarter of 2015, the FASB issued ASU No. 2015-03,  *Interest-Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*. This update simplifies the presentation of debt issuance costs as a deduction from the carrying value of the outstanding debt balance rather than showing the debt issuance costs as an asset. The standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2015. The retrospective adoption of this guidance resulted in the reclassification of debt issuance costs of $148.0 million as of December 31, 2015, which are now reflected as "Long-term debt fees" in Note 5.

During the first quarter of 2016, the FASB issued ASU No. 2016-02, Leases *(Topic 842)*. The new leasing standard presents significant changes to the balance sheets of lessees. Lessor accounting is updated to align with certain changes in the lessee model and the new revenue recognition standard which was issued in the third quarter of 2015. The standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2018.  The Company is currently evaluating the impact of the provisions of this new standard on its consolidated financial statements.

During the second quarter of 2016, the FASB issued ASU No. 2016-09, *Compensation - Stock Compensation (Topic 718)*. This update changes the accounting for certain aspects of share-based payments to employees. Income tax effects of share-based payment awards will be recognized in the income statement with the vesting or settlement of the awards and the record keeping for additional paid-in capital pools will no longer be necessary.  Additionally, companies can make a policy election to either estimate forfeitures or recognize them as they occur. The standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2016. The Company does not expect the provisions of this new standard to have a material impact on its consolidated financial statements.

During the second quarter of 2016, the FASB issued ASU No. 2016-13, *Financial Instruments - Credit Losse*s *(Topic 326)*. The new standard changes the impairment model for most financial assets and certain other instruments. Entities will be required to use a model that will result in the earlier recognition of allowances for losses for trade and other receivables, held-to-maturity debt securities, loans and other instruments. For available-for-sale debt securities with unrealized losses, the losses will be recognized as allowances rather than as reductions in the amortized cost of the securities. For an SEC filer, the standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2019. The Company is currently evaluating the impact of the provisions of this new standard on its consolidated financial statements.

During the third quarter of 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230)*. The new standard addresses the classification of cash flows related to certain cash receipts and cash payments. Additionally, the standard clarifies how the predominance principle should be used when cash receipts and cash payments have aspects of more than one class of cash flows. First, an entity will apply the guidance in Topic 230 and other applicable topics. If there is no guidance for those cash

90

IHEARTMEDIA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

receipts and cash payments, an entity will determine each separately identifiable source or use and classify the receipt or payment based on the nature of the cash flow. If a receipt or payment has aspects of more than one class of cash flows and cannot be separated, the classification will depend on the predominant source or use. The standard is effective for annual periods, and for interim periods within those annual periods, beginning after December 15, 2017. The Company is currently evaluating the impact of the provisions of this new standard on its consolidated financial statements.

## NOTE 2 - PROPERTY, PLANT AND EQUIPMENT, INTANGIBLE ASSETS AND GOODWILL

**Dispositions**

During the first quarter of 2016, the Company and certain of its subsidiaries completed the final closing for the sale of six of the Company's broadcast communication tower sites and related assets for approximately $5.5 million. Simultaneous with the sale, the Company entered into lease agreements for the continued use of space on all six of the towers sold. The Company realized a net gain of $2.7 million, of which $1.9 million was deferred and will be recognized over the lease term.

During the first quarter of 2016, Americas outdoor sold nine non-strategic outdoor markets including Cleveland and Columbus, Ohio, Des Moines, Iowa, Ft. Smith, Arkansas, Memphis, Tennessee, Portland, Oregon, Reno, Nevada, Seattle, Washington and Wichita, Kansas for net proceeds, which included cash and certain advertising assets in Florida, totaling $592.3 million. The Company recognized a net gain of $278.3 million related to the sale, which is included within Other operating income (expense), net.

During the first quarter of 2016, Americas outdoor also entered into an agreement to sell its Indianapolis, Indiana market in exchange for certain assets in Atlanta, Georgia, plus approximately $41.2 million in cash. The transaction closed in January 2017. The related net assets are separately presented and classified as held-for-sale on the face of the Consolidated Balance Sheet as of December 31, 2016.

During the second quarter of 2016, International outdoor sold its business in Turkey. As a result, the Company recognized a net loss of $56.6 million, which includes $32.2 million in cumulative translation adjustments that were recognized upon the sale of the Company's subsidiaries in Turkey.

During the fourth quarter of 2016, International outdoor sold its outdoor business in Australia for cash proceeds of $195.7 million, net of cash retained by the purchaser and closing costs. As a result, the Company recognized a net gain of $127.6 million, which is net of $14.6 million in cumulative translation adjustments that were recognized upon the sale of the Company's outdoor business in Australia.

**Property, Plant and Equipment**

The Company's property, plant and equipment consisted of the following classes of assets as of December 31, 2016 and 2015, respectively:

| *(In thousands)* | | December 31, 2016 | | December 31, 2015 |
|---|---|---|---|---|
| Land, buildings and improvements | $ | 570,566 | $ | 603,234 |
| Structures | | 2,684,673 | | 2,824,794 |
| Towers, transmitters and studio equipment | | 350,760 | | 347,877 |
| Furniture and other equipment | | 622,848 | | 591,149 |
| Construction in progress | | 91,655 | | 69,042 |
| | | 4,320,502 | | 4,436,096 |
| Less: accumulated depreciation | | 2,372,340 | | 2,223,540 |
| Property, plant and equipment, net | $ | 1,948,162 | $ | 2,212,556 |

**Indefinite-lived Intangible Assets**

The Company's indefinite-lived intangible assets consist of FCC broadcast licenses and billboard permits. FCC broadcast licenses are granted to radio stations for up to eight years under the Telecommunications Act of 1996 (the "Act"). The Act requires the FCC to renew a broadcast license if the FCC finds that the station has served the public interest, convenience and necessity, there

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

have been no serious violations of either the Communications Act of 1934 or the FCC's rules and regulations by the licensee, and there have been no other serious violations which taken together constitute a pattern of abuse. The licenses may be renewed indefinitely at little or no cost. The Company does not believe that the technology of wireless broadcasting will be replaced in the foreseeable future.

The Company's billboard permits are granted for the right to operate an advertising structure at the specified location as long as the structure is in compliance with the laws and regulations of each jurisdiction. The Company's permits are located on owned land, leased land or land for which we have acquired permanent easements. In cases where the Company's permits are located on leased land, the leases typically have initial terms of between 10 and 20 years and renew indefinitely, with rental payments generally escalating at an inflation-based index. If the Company loses its lease, the Company will typically obtain permission to relocate the permit or bank it with the municipality for future use. Due to significant differences in both business practices and regulations, billboards in the International outdoor segment are subject to long-term, finite contracts unlike the Company's permits in the United States and Canada. Accordingly, there are no indefinite-lived intangible assets in the International outdoor segment.

*Annual Impairment Test to Indefinite-lived Intangible Assets*

The Company performs its annual impairment test on indefinite-lived intangible assets as of July 1 of each year.

The impairment tests for indefinite-lived intangible assets consist of a comparison between the fair value of the indefinite-lived intangible asset at the market level with its carrying amount. If the carrying amount of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized equal to that excess. After an impairment loss is recognized, the adjusted carrying amount of the indefinite-lived asset is its new accounting basis. The fair value of the indefinite-lived asset is determined using the direct valuation method as prescribed in ASC 805-20-S99. Under the direct valuation method, the fair value of the indefinite-lived assets is calculated at the market level as prescribed by ASC 350-30-35. The Company engaged a third-party valuation firm, to assist it in the development of the assumptions and the Company's determination of the fair value of its indefinite-lived intangible assets.

The application of the direct valuation method attempts to isolate the income that is properly attributable to the indefinite-lived intangible asset alone (that is, apart from tangible and identified intangible assets and goodwill). It is based upon modeling a hypothetical "greenfield" build-up to a "normalized" enterprise that, by design, lacks inherent goodwill and whose only other assets have essentially been paid for (or added) as part of the build-up process. The Company forecasts revenue, expenses, and cash flows over a ten-year period for each of its markets in its application of the direct valuation method. The Company also calculates a "normalized" residual year which represents the perpetual cash flows of each market. The residual year cash flow was capitalized to arrive at the terminal value of the licenses in each market.

Under the direct valuation method, it is assumed that rather than acquiring indefinite-lived intangible assets as part of a going concern business, the buyer hypothetically develops indefinite-lived intangible assets and builds a new operation with similar attributes from scratch. Thus, the buyer incurs start-up costs during the build-up phase which are normally associated with going concern value. Initial capital costs are deducted from the discounted cash flow model which results in value that is directly attributable to the indefinite-lived intangible asset.

The key assumptions using the direct valuation method are market revenue growth rates, market share, profit margin, duration and profile of the build-up period, estimated start-up capital costs and losses incurred during the build-up period, the risk-adjusted discount rate and terminal values. This data is populated using industry normalized information representing an average FCC license or billboard permit within a market.

During 2016, the Company recognized an impairment charge of $0.7 million related to FCC licenses in one market. During 2015, the Company recognized an impairment charge of $21.6 million related to billboard permits in one market. During 2014, the Company recognized a $15.7 million impairment charge related to FCC licenses in eleven markets due to changes in the revenue growth forecasts and margins for those markets.

**Other Intangible Assets**

Other intangible assets include definite-lived intangible assets and permanent easements. The Company's definite-lived intangible assets primarily include transit and street furniture contracts, talent and representation contracts, customer and advertiser relationships, and site-leases and other contractual rights, all of which are amortized over the shorter of either the respective lives of the agreements or over the period of time the assets are expected to contribute directly or indirectly to the Company's future

92

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

cash flows. Permanent easements are indefinite-lived intangible assets which include certain rights to use real property not owned by the Company. The Company periodically reviews the appropriateness of the amortization periods related to its definite-lived intangible assets. These assets are recorded at cost.

The following table presents the gross carrying amount and accumulated amortization for each major class of other intangible assets as of December 31, 2016 and 2015, respectively:

| *(In thousands)* | December 31, 2016 | | December 31, 2015 | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Transit, street furniture and other outdoor contractual rights | $ 563,863 | $ (426,752) | $ 635,772 | $ (457,060) |
| Customer / advertiser relationships | 1,222,519 | (1,012,380) | 1,222,518 | (891,488) |
| Talent contracts | 319,384 | (281,060) | 319,384 | (252,526) |
| Representation contracts | 253,511 | (229,413) | 239,142 | (217,770) |
| Permanent easements | 159,782 | - | 156,349 | - |
| Other | 390,171 | (219,117) | 394,983 | (195,644) |
| Total | $ 2,909,230 | $ (2,168,722) | $ 2,968,148 | $ (2,014,488) |

Total amortization expense related to definite-lived intangible assets for the years ended December 31, 2016, 2015 and 2014 was $222.6 million, $237.5 million, and $263.4 million, respectively.

As acquisitions and dispositions occur in the future, amortization expense may vary. The following table presents the Company's estimate of amortization expense for each of the five succeeding fiscal years for definite-lived intangible assets:

| *(In thousands)* | | |
|---|---|---|
| 2017 | $ | 195,966 |
| 2018 | | 128,279 |
| 2019 | | 44,820 |
| 2020 | | 38,199 |
| 2021 | | 35,471 |

***Annual Impairment Test to Goodwill***

The Company performs its annual impairment test on goodwill as of July 1 of each year.

Each of the U.S. radio markets and outdoor advertising markets are components of the Company. The U.S. radio markets are aggregated into a single reporting unit and the U.S. outdoor advertising markets are aggregated into a single reporting unit for purposes of the goodwill impairment test using the guidance in ASC 350-20-55. The Company also determined that each country within its Americas outdoor segment and International outdoor segment constitutes a separate reporting unit.

The goodwill impairment test is a two-step process. The first step, used to screen for potential impairment, compares the fair value of the reporting unit with its carrying amount, including goodwill. If applicable, the second step, used to measure the amount of the impairment loss, compares the implied fair value of the reporting unit goodwill with the carrying amount of that goodwill.

Each of the Company's reporting units is valued using a discounted cash flow model which requires estimating future cash flows expected to be generated from the reporting unit and discounting such cash flows to their present value using a risk-adjusted discount rate. Terminal values were also estimated and discounted to their present value. Assessing the recoverability of goodwill requires the Company to make estimates and assumptions about sales, operating margins, growth rates and discount rates based on its budgets, business plans, economic projections, anticipated future cash flows and marketplace data. There are inherent uncertainties related to these factors and management's judgment in applying these factors.

93

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company recognized goodwill impairment of $7.3 million during the year ended December 31, 2016 related to one market in the Company's International outdoor segment and concluded no goodwill impairment charge was required for the year ended December 31, 2015.

The following table presents the changes in the carrying amount of goodwill in each of the Company's reportable segments:

| *(In thousands)* | iHM | | Americas Outdoor Advertising | | International Outdoor Advertising | | Other | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2014 | $ | 3,288,481 | $ | 584,574 | $ | 232,538 | $ | 81,831 | $ | 4,187,424 |
| Acquisitions | | - | | - | | 10,998 | | - | | 10,998 |
| Foreign currency | | - | | (709) | | (19,644) | | - | | (20,353) |
| Assets held for sale | | - | | (49,182) | | - | | - | | (49,182) |
| Balance as of December 31, 2015 | $ | 3,288,481 | $ | 534,683 | $ | 223,892 | $ | 81,831 | $ | 4,128,887 |
| Impairment | | - | | - | | (7,274) | | - | | (7,274) |
| Dispositions | | - | | (6,934) | | (30,718) | | - | | (37,652) |
| Foreign currency | | - | | (1,998) | | (5,051) | | - | | (7,049) |
| Assets held for sale | | - | | (10,337) | | - | | - | | (10,337) |
| Balance as of December 31, 2016 | $ | 3,288,481 | $ | 515,414 | $ | 180,849 | $ | 81,831 | $ | 4,066,575 |

The balance at December 31, 2014 is net of cumulative impairments of $3.5 billion, $2.6 billion, $326.6 million and $212.0 million in the Company's iHM, Americas outdoor, International outdoor and Other segments, respectively.

94

IHEARTMEDIA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 3 - INVESTMENTS

The following table summarizes the Company's investments in nonconsolidated affiliates and available-for-sale securities:

| (In thousands) | Equity Method Investments | | Cost Method Investments | | Marketable Equity Securities | | Total Investments | |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2014 | $ | 9,493 | $ | 16,269 | $ | 1,978 | $ | 27,740 |
| Cash advances | | 2,578 | | - | | - | | 2,578 |
| Acquisitions of investments, net | | 17,980 | | 47,546 | | - | | 65,526 |
| Equity in earnings (loss) | | (902) | | - | | - | | (902) |
| Foreign currency translation adjustment | | (89) | | (13) | | (205) | | (307) |
| Distributions received | | (1,350) | | - | | - | | (1,350) |
| Loss on investments | | - | | (5,000) | | - | | (5,000) |
| Other | | - | | - | | 553 | | 553 |
| Balance at December 31, 2015 | $ | 27,710 | $ | 58,802 | $ | 2,326 | $ | 88,838 |
| Cash advances | | 2,993 | | - | | - | | 2,993 |
| Acquisitions of investments, net | | 6,737 | | 26,086 | | - | | 32,823 |
| Equity in loss | | (16,733) | | - | | - | | (16,733) |
| Disposals of investments, net | | (2,476) | | (1,000) | | - | | (3,476) |
| Foreign currency transaction adjustment | | (45) | | (196) | | (35) | | (276) |
| Distributions received | | (3,709) | | - | | - | | (3,709) |
| Loss on investments | | - | | (14,798) | | - | | (14,798) |
| Other | | | | 2,772 | | (576) | | 2,196 |
| Balance at December 31, 2016 | $ | 14,477 | $ | 71,666 | $ | 1,715 | $ | 87,858 |

Equity method investments in the table above are not consolidated, but are accounted for under the equity method of accounting, whereby the Company records its investments in these entities in the balance sheet as "Other assets." The Company's interests in their operations are recorded in the statement of comprehensive loss as "Equity in earnings (loss) of nonconsolidated affiliates." Other cost investments include various investments in companies for which there is no readily determinable market value.

During 2016, the Company recorded $26.1 million in its iHM segment for investments made in four private companies in exchange for advertising services and cash. Two of these investments are being accounted for under the equity method of accounting, and two of these investments are being accounted for under the cost method. During the fourth quarter of 2015, the Company recorded $36.5 million in its iHM segment for investments made in three private companies in exchange for advertising services. One of these investments is being accounted for under the equity method of accounting, and two of these investments are being accounted for under the cost method. The Company recognized barter revenue of $15.6 million in the year ended December 31, 2015 and $36.6 million in the year ended December 31, 2016 as services were provided. The Company recognized a non-cash impairment of $14.5 million on one of these cost investments for the year ended December 31, 2016, which was recorded in "Loss on investments, net." In addition, the Company recognized a non-cash impairment of $15.0 million on one of these equity investments for the year ended December 31, 2016, which was recorded in "Equity in loss of nonconsolidated affiliates."

The Company recognized a non-cash impairment of $5.0 million on a cost investment for the year ended December 31, 2015, which was recorded in "Loss on investments, net."

**Marketable Equity Securities**

ASC 820-10-35 establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

95

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company's marketable equity securities are measured at fair value on each reporting date.

The marketable equity securities are measured at fair value using quoted prices in active markets. Due to the fact that the inputs used to measure the marketable equity securities at fair value are observable, the Company has categorized the fair value measurements of the securities as Level 1. As of December 31, 2016 and 2015, the Company held $1.7 million and $2.3 million in marketable equity securities, which are included within Other Assets.

## NOTE 4 - ASSET RETIREMENT OBLIGATION

The Company's asset retirement obligation is reported in "Other long-term liabilities" with the current portion recorded in "Accrued liabilities" and relates to its obligation to dismantle and remove outdoor advertising displays from leased land and to reclaim the site to its original condition upon the termination or non-renewal of a lease or contract. When the liability is recorded, the cost is capitalized as part of the related long-lived assets' carrying value. Due to the high rate of lease renewals over a long period of time, the calculation assumes that all related assets will be removed at some period over the next 55 years. An estimate of third-party cost information is used with respect to the dismantling of the structures and the reclamation of the site. The interest rate used to calculate the present value of such costs over the retirement period is based on an estimated risk adjusted credit rate for the same period.

The following table presents the activity related to the Company's asset retirement obligation:

| *(In thousands)* | Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Beginning balance | $ 48,056 | $ 54,211 |
| Adjustment due to changes in estimates | (5,343) | 2,082 |
| Accretion of liability | 5,090 | 754 |
| Liabilities settled | (4,310) | (6,105) |
| Foreign Currency | (1,002) | (2,886) |
| Ending balance | 42,491 | 48,056 |
| Less: current portion | 424 | 482 |
| Long-term portion of asset retirement obligation | $ 42,067 | $ 47,574 |

96

IHEARTMEDIA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 5 - LONG-TERM DEBT

Long-term debt at December 31, 2016 and 2015 consisted of the following:

| (In thousands) | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Senior Secured Credit Facilities | $ 6,300,000 | $ 6,300,000 |
| Receivables Based Credit Facility Due 2017 | 330,000 | 230,000 |
| Priority Guarantee Notes | 6,274,815 | 6,274,815 |
| Subsidiary Revolving Credit Facility Due 2018 | - | - |
| Other Secured Subsidiary Debt | 20,987 | 25,228 |
| Total Consolidated Secured Debt | 12,925,802 | 12,830,043 |
| | | |
| 14.0% Senior Notes Due 2021 | 1,729,168 | 1,695,097 |
| Legacy Notes[1] | 475,000 | 667,900 |
| 10.0% Senior Notes Due 2018 | 347,028 | 730,000 |
| Subsidiary Senior Notes | 5,150,000 | 5,150,000 |
| Other Subsidiary Debt | 27,954 | 165 |
| Purchase accounting adjustments and original issue discount | (166,961) | (204,611) |
| Long-term debt fees | (123,003) | (147,983) |
| | 20,364,988 | 20,720,611 |
| Less: current portion | 342,908 | 181,512 |
| Total long-term debt | $ 20,022,080 | $ 20,539,099 |

(1)   The Legacy Notes amount does not include $57.1 million aggregate principal amount of 5.5% Senior Notes due 2016, which matured on December 15, 2016 and continue to remain outstanding. These notes are held by a subsidiary of the Company and are eliminated for purposes of consolidation of the Company's financial statements.

The Company's weighted average interest rate at December 31, 2016 and 2015 was 8.5%. The aggregate market value of the Company's debt based on market prices for which quotes were available was approximately $16.7 billion and $15.2 billion at December 31, 2016 and 2015, respectively. Under the fair value hierarchy established by ASC 820-10-35, the fair market value of the Company's debt is classified as either Level 1 or Level 2.

### Senior Secured Credit Facilities

As of December 31, 2016 and 2015, iHeartCommunications had senior secured credit facilities consisting of:

| (In thousands) | Maturity Date | December 31, 2016 | December 31, 2015 |
|---|---|---|---|
| Term Loan D | 1/30/2019 | $ 5,000,000 | $ 5,000,000 |
| Term Loan E | 7/30/2019 | 1,300,000 | 1,300,000 |
| Total Senior Secured Credit Facilities | | $ 6,300,000 | $ 6,300,000 |

iHeartCommunications is the primary borrower under the senior secured credit facilities, and certain of its domestic restricted subsidiaries are co-borrowers under a portion of the term loan facilities.

### Interest Rate and Fees

Borrowings under iHeartCommunications' senior secured credit facilities bear interest at a rate equal to an applicable margin plus, at iHeartCommunications' option, either (i) a base rate determined by reference to the higher of (A) the prime lending rate publicly announced by the administrative agent or (B) the Federal funds effective rate from time to time plus 0.50%, or (ii) a Eurocurrency

97

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

rate determined by reference to the costs of funds for deposits for the interest period relevant to such borrowing adjusted for certain additional costs.

The margin percentages applicable to the term loan facilities are the following percentages per annum:

- with respect to loans under the term loan D, (i) 5.75% in the case of base rate loans and (ii) 6.75% in the case of Eurocurrency rate loans; and
- with respect to loans under the term loan E, (i) 6.50% in the case of base rate loans and (ii) 7.50% in the case of Eurocurrency rate loans.

The margin percentages are subject to adjustment based upon iHeartCommunications' leverage ratio.

*Collateral and Guarantees*

The senior secured credit facilities are guaranteed by iHeartCommunications and each of iHeartCommunications' existing and future material wholly-owned domestic restricted subsidiaries, subject to certain exceptions.

All obligations under the senior secured credit facilities, and the guarantees of those obligations, are secured, subject to permitted liens, including prior liens permitted by the indenture governing iHeartCommunications' legacy notes, and other exceptions, by:

- a lien on the capital stock of iHeartCommunications;
- 100% of the capital stock of any future material wholly-owned domestic license subsidiary that is not a "Restricted Subsidiary" under the indenture governing iHeartCommunications' legacy notes;
- certain assets that do not constitute "principal property" (as defined in the indenture governing iHeartCommunications' legacy notes);
- certain specified assets of iHeartCommunications and the guarantors that constitute "principal property" (as defined in the indenture governing iHeartCommunications' legacy notes) securing obligations under the senior secured credit facilities up to the maximum amount permitted to be secured by such assets without requiring equal and ratable security under the indenture governing iHeartCommunications' legacy notes; and
- a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility that is junior to the lien securing iHeartCommunications' obligations under such credit facility.

*Certain Covenants*

The senior secured credit facilities include negative covenants that, subject to significant exceptions, limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things:

- incur additional indebtedness;
- create liens on assets;
- engage in mergers, consolidations, liquidations and dissolutions;
- sell assets;
- pay dividends and distributions or repurchase iHeartCommunications' capital stock;
- make investments, loans, or advances;
- prepay certain junior indebtedness;
- engage in certain transactions with affiliates;
- amend material agreements governing certain junior indebtedness; and
- change lines of business.

**Receivables Based Credit Facility**

On November 17, 2016, iHeartCommunications' incurred $100.0 million of additional borrowings under its receivables based credit facility. As of December 31, 2016, there were borrowings of $330.0 million outstanding under iHeartCommunications' receivables based credit facility. On January 31, 2017, iHeartCommunications prepaid $25.0 million of the amount borrowed under its receivables based credit facility, bringing its total outstanding borrowings under this facility to $305.0 million.

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The receivables based credit facility provides revolving credit commitments of $535.0 million, subject to a borrowing base. The borrowing base at any time equals 90% of the eligible accounts receivable of iHeartCommunications and certain of its subsidiaries. The receivables based credit facility includes a letter of credit sub-facility and a swingline loan sub-facility.

iHeartCommunications and certain subsidiary borrowers are the borrowers under the receivables based credit facility. iHeartCommunications has the ability to designate one or more of its restricted subsidiaries as borrowers under the receivables based credit facility. The receivables based credit facility loans are available in U.S. dollars and letters of credit are available in a variety of currencies including U.S. dollars, Euros, Pounds Sterling, and Canadian dollars.

*Interest Rate and Fees*

Borrowings under the receivables based credit facility bear interest at a rate per annum equal to an applicable margin plus, at iHeartCommunications' option, either (i) a base rate determined by reference to the highest of (a) the prime rate of Citibank, N.A. and (b) the Federal Funds rate plus 0.50% or (ii) a Eurocurrency rate determined by reference to the rate (adjusted for statutory reserve requirements for Eurocurrency liabilities) for Eurodollar deposits for the interest period relevant to such borrowing. The applicable margin for borrowings under the receivables based credit facility ranges from 1.50% to 2.00% for Eurocurrency borrowings and from 0.50% to 1.00% for base-rate borrowings, depending on average daily excess availability under the receivables based credit facility during the prior fiscal quarter.

In addition to paying interest on outstanding principal under the receivables based credit facility, iHeartCommunications is required to pay a commitment fee to the lenders under the receivables based credit facility in respect of the unutilized commitments thereunder. The commitment fee rate ranges from 0.25% to 0.375% per annum dependent upon average unused commitments during the prior quarter. iHeartCommunications must also pay customary letter of credit fees.

*Maturity*

Borrowings under the receivables based credit facility will mature, and lending commitments thereunder will terminate, on the fifth anniversary of the effectiveness of the receivables based credit facility, which is December 24, 2017.

*Guarantees and Security*

The facility is guaranteed by, subject to certain exceptions, the guarantors of iHeartCommunications' senior secured credit facilities. All obligations under the receivables based credit facility, and the guarantees of those obligations, are secured by a perfected security interest in all of iHeartCommunications' and all of the guarantors' accounts receivable and related assets and proceeds thereof that is senior to the security interest of iHeartCommunications' senior secured credit facilities in such accounts receivable and related assets and proceeds thereof, subject to permitted liens, including prior liens permitted by the indenture governing certain of iHeartCommunications' legacy notes, and certain exceptions.

*Certain Covenants*

The receivables based credit facility includes negative covenants that, subject to significant exceptions, limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things:

- incur additional indebtedness;
- create liens on assets;
- engage in mergers, consolidations, liquidations and dissolutions;
- sell assets;
- pay dividends and distributions or repurchase capital stock;
- make investments, loans, or advances;
- prepay certain junior indebtedness;
- engage in certain transactions with affiliates;
- amend material agreements governing certain junior indebtedness; and
- change lines of business.

99

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Priority Guarantee Notes**

As of December 31, 2016 and 2015, iHeartCommunications had outstanding Priority Guarantee Notes consisting of:

| (In thousands) | Maturity Date | Interest Rate | Interest Payment Terms | December 31, 2016 | December 31, 2015 |
|---|---|---|---|---|---|
| 9.0% Priority Guarantee Notes due 2019 | 12/15/2019 | 9.0% | Payable semi-annually in arrears on June 15 and December 15 of each year | $  1,999,815 | $  1,999,815 |
| 9.0% Priority Guarantee Notes due 2021 | 3/1/2021 | 9.0% | Payable semi-annually in arrears on March 1 and September 1 of each year | 1,750,000 | 1,750,000 |
| 11.25% Priority Guarantee Notes due 2021 | 3/1/2021 | 11.25% | Payable semi-annually in arrears on March 1 and September 1 of each year | 575,000 | 575,000 |
| 9.0% Priority Guarantee Notes due 2022 | 9/15/2022 | 9.0% | Payable semi-annually in arrears on March 15 and September 15 of each year | 1,000,000 | 1,000,000 |
| 10.625% Priority Guarantee Notes due 2023 | 3/15/2023 | 10.625% | Payable semi-annually in arrears on March 15 and September 15 of each year | 950,000 | 950,000 |
| Total Priority Guarantee Notes | | | | $  6,274,815 | $  6,274,815 |

*Guarantees and Security*

The Priority Guarantee Notes are iHeartCommunications' senior obligations and are fully and unconditionally guaranteed, jointly and severally, on a senior basis by the guarantors named in the indentures. The Priority Guarantee Notes and the guarantors' obligations under the guarantees are secured by (i) a lien on (a) the capital stock of iHeartCommunications and (b) certain property and related assets that do not constitute "principal property" (as defined in the indenture governing certain of iHeartCommunications' legacy notes), in each case equal in priority to the liens securing the obligations under iHeartCommunications' senior secured credit facilities, subject to certain exceptions, and (ii) a lien on the accounts receivable and related assets securing iHeartCommunications' receivables based credit facility junior in priority to the lien securing iHeartCommunications' obligations thereunder, subject to certain exceptions. In addition to the collateral granted to secure the Priority Guarantee Notes, the collateral agent and the trustee for the 9% Priority Guarantee Notes due 2019 entered into an agreement with the administrative agent for the lenders under the senior secured credit facilities to turn over to the trustee under the 9% Priority Guarantee Notes due 2019, for the benefit of the holders of the 9% Priority Guarantee Notes due 2019, a pro rata share of any recovery received on account of the principal properties, subject to certain terms and conditions.

*Redemptions*

iHeartCommunications may redeem the Priority Guarantee Notes at its option, in whole or in part, at redemption prices set forth in the indentures, plus accrued and unpaid interest to the redemption dates.

*Certain Covenants*

The indentures governing the Priority Guarantee Notes contain covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) pay dividends, redeem stock or make other distributions or investments; (ii) incur additional debt or issue certain preferred stock; (iii) modify any of iHeartCommunications' existing senior notes; (iv) transfer or sell assets; (v) engage in certain transactions with affiliates; (vi) create restrictions on dividends or other payments by the restricted subsidiaries; and (vii) merge, consolidate or sell substantially all of iHeartCommunications' assets. The indentures contain covenants that limit the Company's and iHeartCommunications' ability and the ability of their restricted subsidiaries to, among other things: (i) create liens on assets and (ii) materially impair the value of the security interests taken with respect to the collateral for the benefit of the notes collateral agent and the holders of the Priority Guarantee Notes. The indentures also provide for customary events of default.

100

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Subsidiary Revolving Credit Facility Due 2018**

During the third quarter of 2013, CCOH entered into a five-year senior secured revolving credit facility with an aggregate principal amount of $75.0 million. The revolving credit facility may be used for working capital needs, to issue letters of credit and for other general corporate purposes. At December 31, 2016, there were no amounts outstanding under the revolving credit facility, and $65.4 million of letters of credit under the revolving credit facility, which reduce availability under the facility.

**14.0% Senior Notes due 2021**

As of December 31, 2016, iHeartCommunications had outstanding approximately $1.7 billion of aggregate principal amount of 14.0% Senior Notes due 2021 (net of $440.6 million principal amount held by a subsidiary of iHeartCommunications).

The 14.0% Senior Notes due 2021 mature on February 1, 2021. Interest on the 14.0% Senior Notes due 2021 is payable semi-annually on February 1 and August 1 of each year. Interest on the 14.0% Senior Notes due 2021 will be paid at the rate of (i) 12.0% per annum in cash and (ii) 2.0% per annum through the issuance of payment-in-kind notes (the "PIK Notes"). Any PIK Notes issued in certificated form will be dated as of the applicable interest payment date and will bear interest from and after such date. All PIK Notes issued will mature on February 1, 2021 and have the same rights and benefits as the 14.0% Senior Notes due 2021. Beginning with the interest payment due August 1, 2018 and continuing on each interest payment date thereafter, redemptions of a portion of the principal amount then outstanding will become due for purposes of applicable high yield discount obligation ("AHYDO") catch-up payments.

The 14.0% Senior Notes due 2021 are fully and unconditionally guaranteed on a senior basis by the guarantors named in the indenture governing such notes. The guarantee is structurally subordinated to all existing and future indebtedness and other liabilities of any subsidiary of the applicable subsidiary guarantor that is not also a guarantor of the 14.0% Senior Notes due 2021. The guarantees are subordinated to the guarantees of iHeartCommunications' senior secured credit facilities and certain other permitted debt, but rank equal to all other senior indebtedness of the guarantors.

iHeartCommunications may redeem the 14.0% Senior Notes due 2021, in whole or in part, within certain dates, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date.

The indenture governing the 14.0% Senior Notes due 2021 contains covenants that limit iHeartCommunications' ability and the ability of its restricted subsidiaries to, among other things: (i) incur additional indebtedness or issue certain preferred stock; (ii) pay dividends on, or make distributions in respect of, iHeartCommunications' capital stock or repurchase iHeartCommunications' capital stock; (iii) make certain investments or other restricted payments; (iv) sell certain assets; (v) create liens or use assets as security in other transactions; (vi) merge, consolidate or transfer or dispose of substantially all of iHeartCommunications' assets; (vii) engage in transactions with affiliates; and (viii) designate iHeartCommunications' subsidiaries as unrestricted subsidiaries.

**Legacy Notes**

As of December 31, 2016 and 2015, iHeartCommunications had outstanding senior notes (net of $57.1 million aggregate principal amount held by a subsidiary of iHeartCommunications) consisting of:

| (In thousands) | December 31, 2016 | | December 31, 2015 |
|---|---|---|---|
| 5.5% Senior Notes Due 2016[1] | $ - | $ | 192,900 |
| 6.875% Senior Notes Due 2018 | 175,000 | | 175,000 |
| 7.25% Senior Notes Due 2027 | 300,000 | | 300,000 |
| Total Legacy Notes | $ 475,000 | $ | 667,900 |

(1)     In December 2016, iHeartCommunications repaid at maturity $192.9 million of 5.5% Senior Notes due 2016 and did not pay $57.1 million of the notes held by a subsidiary of the Company. The $57.1 million of aggregate principal amount remains outstanding and is eliminated for purposes of consolidation of the Company's financial statements.

These senior notes were the obligations of iHeartCommunications prior to the merger in 2008. The senior notes are senior, unsecured obligations that are effectively subordinated to iHeartCommunications' secured indebtedness to the extent of the value of iHeartCommunications' assets securing such indebtedness and are not guaranteed by any of iHeartCommunications' subsidiaries

101

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

and, as a result, are structurally subordinated to all indebtedness and other liabilities of iHeartCommunications' subsidiaries. The senior notes rank equally in right of payment with all of iHeartCommunications' existing and future senior indebtedness and senior in right of payment to all existing and future subordinated indebtedness.

***10.0% Senior Notes due 2018***

As of December 31, 2016, iHeartCommunications had outstanding $347.0 million aggregate principal amount of 10.0% Senior Notes due 2018 (net of $503.0 million aggregate principal amount held by certain subsidiaries of iHeartCommunications). The 10.0% Senior Notes due 2018 mature on January 15, 2018 and bear interest at a rate of 10.0% per annum, payable semi-annually on January 15 and July 15 of each year. On December 20, 2016, iHeartCommunications commenced an offer to noteholders to exchange its 10.0% Senior Notes due 2018 for newly-issued 11.25% Priority Guarantee Notes which will be issued as "additional notes" under the indenture governing iHeartCommunications' existing 11.25% Priority Guarantee Notes due 2021. On February 7, 2017, iHeartCommunications completed the exchange offer by issuing $476.4 million in aggregate principal amount of 11.25% Priority Guarantee Notes due 2021 in exchange for $476.4 million of aggregate principal amount outstanding of its 10.0% Senior Notes due 2018, of which $241.4 million is held by subsidiaries of iHeartCommunications.

The 10% Senior Notes due 2018 are senior, unsecured obligations that are effectively subordinated to iHeartCommunications' secured indebtedness to the extent of the value of iHeartCommunications' assets securing such indebtedness and are not guaranteed by any of iHeartCommunications' subsidiaries and, as a result, are structurally subordinated to all indebtedness and other liabilities of iHeartCommunications' subsidiaries. The 10.0% Senior Notes due 2018 rank equally in right of payment with all of iHeartCommunications' existing and future senior indebtedness and senior in right of payment to all existing and future subordinated indebtedness.

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Subsidiary Senior Notes**

As of December 31, 2016 and 2015, the Company's subsidiaries, Clear Channel Worldwide Holdings, Inc. ("CCWH") and Clear Channel International B.V. had outstanding notes consisting of:

| (In thousands) | Maturity Date | Interest Rate | Interest Payment Terms | December 31, 2016 | December 31, 2015 |
|---|---|---|---|---|---|
| **CCWH Senior Notes:** | | | | | |
| 6.5% Series A Senior Notes Due 2022 | 11/15/2022 | 6.5% | Payable to the trustee weekly in arrears and to noteholders on May 15 and November 15 of each year | $ 735,750 | $ 735,750 |
| 6.5% Series B Senior Notes Due 2022 | 11/15/2022 | 6.5% | Payable to the trustee weekly in arrears and to noteholders on May 15 and November 15 of each year | 1,989,250 | 1,989,250 |
| **CCWH Senior Subordinated Notes:** | | | | | |
| 7.625% Series A Senior Notes Due 2020 | 3/15/2020 | 7.625% | Payable to the trustee weekly in arrears and to noteholders on March 15 and September 15 of each year | 275,000 | 275,000 |
| 7.625% Series B Senior Notes Due 2020 | 3/15/2020 | 7.625% | Payable to the trustee weekly in arrears and to noteholders on March 15 and September 15 of each year | 1,925,000 | 1,925,000 |
| Total CCWH Notes | | | | $ 4,925,000 | $ 4,925,000 |
| **Clear Channel International B.V. Senior Notes:** | | | | | |
| 8.75% Senior Notes Due 2020 | 12/15/2020 | 8.75% | Payable semi-annually in arrears on June 15 and December 15 of each year | $ 225,000 | $ 225,000 |
| Total Subsidiary Senior Notes | | | | $ 5,150,000 | $ 5,150,000 |

*CCWH Senior and Senior Subordinated Notes*

The CCWH Senior Notes are guaranteed by CCOH, Clear Channel Outdoor, Inc. ("CCOI") and certain of CCOH's direct and indirect subsidiaries. The CCWH Senior Subordinated Notes are fully and unconditionally guaranteed, jointly and severally, on a senior subordinated basis by CCOH, CCOI and certain of CCOH's other domestic subsidiaries and rank junior to each guarantor's existing and future senior debt, including the CCWH Senior Notes, equally with each guarantor's existing and future senior subordinated debt and ahead of each guarantor's existing and future debt that expressly provides that it is subordinated to the guarantees of the CCWH Senior Subordinated Notes.

The CCWH Senior Notes are senior obligations that rank pari passu in right of payment to all unsubordinated indebtedness of CCWH and the guarantees of the CCWH Senior Notes rank pari passu in right of payment to all unsubordinated indebtedness of the guarantors. The CCWH Senior Subordinated Notes are unsecured senior subordinated obligations that rank junior to all of CCWH's existing and future senior debt, including the CCWH Senior Notes, equally with any of CCWH's existing and future senior subordinated debt and ahead of all of CCWH's existing and future debt that expressly provides that it is subordinated to the CCWH Senior Subordinated Notes.

103

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Redemptions*

CCWH may redeem the CCWH Senior Notes and the CCWH Senior Subordinated Notes at its option, in whole or in part, at redemption prices set forth in the indentures plus accrued and unpaid interest to the redemption dates and plus an applicable premium.

*Certain Covenants*

The indentures governing the CCWH Senior Notes and the CCWH Senior Subordinated Notes contain covenants that limit CCOH and its restricted subsidiaries ability to, among other things:

- incur or guarantee additional debt or issue certain preferred stock;

- make certain investments;

- in case of the Senior Notes, create liens on its restricted subsidiaries' assets to secure such debt;

- create restrictions on the payment of dividends or other amounts to it from its restricted subsidiaries that are not guarantors of the notes;

- enter into certain transactions with affiliates;

- merge or consolidate with another person, or sell or otherwise dispose of all or substantially all of its assets;

- sell certain assets, including capital stock of its subsidiaries; and

- in the case of the Series B CCWH Senior Notes and the Series B CCWH Senior Subordinated Notes, pay dividends, redeem or repurchase capital stock or make other restricted payments.

*Clear Channel International B.V. Senior Notes*

The Clear Channel International B.V. Senior Notes ("CCIBV Senior Notes") are guaranteed by certain of the International outdoor business's existing and future subsidiaries. The Company does not guarantee or otherwise assume any liability for the CCIBV Senior Notes. The notes are senior unsecured obligations that rank pari passu in right of payment to all unsubordinated indebtedness of Clear Channel International B.V., and the guarantees of the notes are senior unsecured obligations that rank pari passu in right of payment to all unsubordinated indebtedness of the guarantors of the notes.

*Redemptions*

Clear Channel International B.V. may redeem the notes at its option, in whole or part, at the redemption prices set forth in the indenture plus accrued and unpaid interest to the redemption date.

*Certain Covenants*

The indenture governing the CCIBV Senior Notes contains covenants that limit Clear Channel International B.V.'s ability and the ability of its restricted subsidiaries to, among other things:

- pay dividends, redeem stock or make other distributions or investments;

- incur additional debt or issue certain preferred stock;

- transfer or sell assets;

- create liens on assets;

- engage in certain transactions with affiliates;

- create restrictions on dividends or other payments by the restricted subsidiaries; and

- merge, consolidate or sell substantially all of Clear Channel International B.V.'s assets.

104

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Future Maturities of Long-term Debt**

Future maturities of long-term debt at December 31, 2016 are as follows:

| (in thousands) | | |
|---|---|---:|
| 2017 | $ | 343,450 |
| 2018 | | 534,287 |
| 2019 | | 8,304,297 |
| 2020 | | 2,430,131 |
| 2021 | | 4,060,007 |
| Thereafter | | 4,982,780 |
| Total [1] [2] | $ | 20,654,952 |

(1)   Excludes purchase accounting adjustments and original issue discount of $167.0 million and long-term debt fees of $123.0 million, which are amortized through interest expense over the life of the underlying debt obligations.

(2)   Excludes certain estimated applicable high yield discount obligation ("AHYDO") catch-up payments on the principal amount outstanding of Senior Notes due 2021 of $24.8 million, $64.7 million, and $68.4 million in 2018, 2019 and 2020, respectively.

**Surety Bonds, Letters of Credit and Guarantees**

As of December 31, 2016, iHeartCommunications had outstanding surety bonds, commercial standby letters of credit and bank guarantees of $60.0 million, $103.4 million and $35.7 million, respectively. Bank guarantees of $18.8 million were cash secured. These surety bonds, letters of credit and bank guarantees relate to various operational matters including insurance, bid, concession and performance bonds as well as other items.

## NOTE 6 - COMMITMENTS AND CONTINGENCIES

**Commitments and Contingencies**

The Company accounts for its rentals that include renewal options, annual rent escalation clauses, minimum franchise payments and maintenance related to displays under the guidance in ASC 840.

The Company considers its non-cancelable contracts that enable it to display advertising on buses, bus shelters, trains, etc. to be leases in accordance with the guidance in ASC 840-10. These contracts may contain minimum annual franchise payments which generally escalate each year. The Company accounts for these minimum franchise payments on a straight-line basis. If the rental increases are not scheduled in the lease, such as an increase based on subsequent changes in the index or rate, those rents are considered contingent rentals and are recorded as expense when accruable. Other contracts may contain a variable rent component based on revenue. The Company accounts for these variable components as contingent rentals and records these payments as expense when accruable. No single contract or lease is material to the Company's operations.

The Company accounts for annual rent escalation clauses included in the lease term on a straight-line basis under the guidance in ASC 840-20-25. The Company considers renewal periods in determining its lease terms if at inception of the lease there is reasonable assurance the lease will be renewed. Expenditures for maintenance are charged to operations as incurred, whereas expenditures for renewal and betterments are capitalized.

The Company leases office space, certain broadcasting facilities, equipment and the majority of the land occupied by its outdoor advertising structures under long-term operating leases. The Company accounts for these leases in accordance with the policies described above.

The Company's contracts with municipal bodies or private companies relating to street furniture, billboards, transit and malls generally require the Company to build bus stops, kiosks and other public amenities or advertising structures during the term of the contract. The Company owns these structures and is generally allowed to advertise on them for the remaining term of the contract. Once the Company has built the structure, the cost is capitalized and expensed over the shorter of the economic life of the asset or the remaining life of the contract.

105

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In addition, the Company has commitments relating to required purchases of property, plant and equipment under certain street furniture contracts. Certain of the Company's contracts contain penalties for not fulfilling its commitments related to its obligations to build bus stops, kiosks and other public amenities or advertising structures. Historically, any such penalties have not materially impacted the Company's financial position or results of operations.

As of December 31, 2016, the Company's future minimum rental commitments under non-cancelable operating lease agreements with terms in excess of one year, minimum payments under non-cancelable contracts in excess of one year, capital expenditure commitments and employment/talent contracts consist of the following:

| (In thousands) | Non-Cancelable Operating Leases | | Non-Cancelable Contracts | | Capital Expenditure Commitments | | Employment/Talent Contracts | |
|---|---|---|---|---|---|---|---|---|
| 2017 | $ | 464,877 | $ | 435,186 | $ | 49,618 | $ | 64,222 |
| 2018 | | 414,790 | | 331,815 | | 7,348 | | 52,134 |
| 2019 | | 384,257 | | 286,270 | | 4,449 | | 48,093 |
| 2020 | | 353,934 | | 229,104 | | 1,962 | | 45,500 |
| 2021 | | 320,798 | | 191,197 | | 2,097 | | 6,250 |
| Thereafter | | 2,147,942 | | 411,341 | | 12,242 | | - |
| Total | $ | 4,086,598 | $ | 1,884,913 | $ | 77,716 | $ | 216,199 |

Rent expense charged to operations for the years ended December 31, 2016, 2015 and 2014 was $1.12 billion, $1.14 billion and $1.17 billion, respectively.

In various areas in which the Company operates, outdoor advertising is the object of restrictive and, in some cases, prohibitive zoning and other regulatory provisions, either enacted or proposed. The impact to the Company of loss of displays due to governmental action has been somewhat mitigated by Federal and state laws mandating compensation for such loss and constitutional restraints.

The Company and its subsidiaries are involved in certain legal proceedings arising in the ordinary course of business and, as required, have accrued an estimate of the probable costs for the resolution of those claims for which the occurrence of loss is probable and the amount can be reasonably estimated. These estimates have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in the Company's assumptions or the effectiveness of its strategies related to these proceedings. Additionally, due to the inherent uncertainty of litigation, there can be no assurance that the resolution of any particular claim or proceeding would not have a material adverse effect on the Company's financial condition or results of operations.

Although the Company is involved in a variety of legal proceedings in the ordinary course of business, a large portion of its litigation arises in the following contexts: commercial disputes; defamation matters; employment and benefits related claims; governmental fines; intellectual property claims; and tax disputes.

**International Outdoor Investigation**

On April 21, 2015, inspections were conducted at the premises of Clear Channel in Denmark and Sweden as part of an investigation by Danish competition authorities. Additionally, on the same day, Clear Channel UK received a communication from the UK competition authorities, also in connection with the investigation by Danish competition authorities. Clear Channel and its affiliates are cooperating with the national competition authorities.

**Stockholder Litigation**

On May 9, 2016, a stockholder of CCOH filed a derivative lawsuit in the Court of Chancery of the State of Delaware, captioned GAMCO Asset Management Inc. v. iHeartMedia Inc. et al., C.A. No. 12312-VCS. The complaint names as defendants the Company, iHeartCommunications, Inc. ("iHeartCommunications"), an indirect subsidiary of the Company, Bain Capital Partners, LLC and Thomas H. Lee Partners, L.P. (together, the "Sponsor Defendants"), the Company's private equity sponsors and majority owners,

106

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

and the members of CCOH's board of directors. CCOH also is named as a nominal defendant. The complaint alleges that the defendants have breached their fiduciary duties by causing CCOH to: (i) continue to loan cash to iHeartCommunications under the intercompany note at below-market rates; (ii) abandon its growth and acquisition strategies in favor of transactions that would provide cash to the Company and iHeartCommunications through a dividend; (iii) issue new debt in the CCIBV note offering (the "CCIBV Note Offering") to provide cash to the Company and iHeartCommunications through a dividend; and (iv) effect the sales of certain outdoor markets in the U.S. (the "Outdoor Asset Sales") allegedly to provide cash to the Company and iHeartCommunications through a dividend. The complaint also alleges that the Company, iHeartCommunications and the Sponsor Defendants were unjustly enriched as a result of these transactions and that these transactions constituted a waste of corporate assets for which the defendants are liable to CCOH. The plaintiff is seeking, among other things, a ruling that the defendants breached their fiduciary duties to CCOH and that the Company, iHeartCommunications and the Sponsor Defendants aided and abetted the CCOH board of directors' breaches of fiduciary duty, rescission of payments made by CCOH to iHeartCommunications and its affiliates pursuant to dividends declared in connection with the CCIBV Note Offering and Outdoor Asset Sales, and an order requiring the Company, iHeartCommunications and the Sponsor Defendants to disgorge all profits they have received as a result of the alleged fiduciary misconduct.

On July 20, 2016, the defendants filed a motion to dismiss plaintiff's verified stockholder derivative complaint for failure to state a claim upon which relief can be granted. On November 23, 2016, the Court granted defendants' motion to dismiss all claims brought by the plaintiff. On December 19, 2016, the plaintiff filed a notice of appeal of the ruling.

## NOTE 7 - INCOME TAXES

Significant components of the provision for income tax benefit (expense) are as follows:

| (In thousands) | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2016 | | 2015 | | 2014 |
| Current - Federal | $ | (190) | $ | (31) | $ | (503) |
| Current - foreign | | (44,555) | | (46,188) | | (27,256) |
| Current - state | | (2,908) | | (12,890) | | 3,193 |
| Total current expense | | (47,653) | | (59,109) | | (24,566) |
| | | | | | | |
| Deferred - Federal | | 38,715 | | (30,719) | | (29,284) |
| Deferred - foreign | | 56,747 | | 5,269 | | 4,308 |
| Deferred - state | | 2,665 | | (2,398) | | (8,947) |
| Total deferred benefit (expense) | | 98,127 | | (27,848) | | (33,923) |
| Income tax benefit (expense) | $ | 50,474 | $ | (86,957) | $ | (58,489) |

Current tax expense of $47.7 million was recorded for 2016 as compared to a current tax expense of $59.1 million for 2015. The current tax expense recorded in 2016 was primarily related to foreign income taxes on operating profits generated in certain foreign jurisdictions during the period. The decrease in current tax expense when compared to 2015 was primarily attributable to a decrease in state tax expense which resulted from a reduction in unrecognized tax benefits during 2016 in connection with the settlements of tax examinations during the period.

Current tax expense of $59.1 million was recorded for 2015 as compared to a current tax expense of $24.6 million for 2014. The change in current tax was primarily due to a reduction in unrecognized tax benefits during 2014, which resulted from the expiration of statutes of limitations to assess taxes in the United Kingdom and several state jurisdictions. This decrease in unrecognized tax benefits resulted in a reduction to current tax expense of $35.4 million during 2015.

Deferred tax benefit of $98.1 million was recorded for 2016 compared with deferred tax expense of $27.8 million for 2015. The federal and state deferred tax benefits recorded in 2016 were primarily attributable to the reversal of certain U.S. deferred tax liabilities attributable to indefinite-lived intangible assets that were disposed of in connections with the sale of nine non-strategic U.S. outdoor markets during the first quarter of 2016. In addition, the foreign deferred tax benefit recorded in 2016 was primarily related to the $43.3 million deferred tax benefit for the release of valuation allowance against certain net operating loss carryforwards

107

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

in France. Due to positive evidence that now exists, the Company expects to realize the benefit of these net operating loss carryforwards in the future.

Deferred tax expense of $27.8 million was recorded for 2015 compared with deferred tax expense of $33.9 million for 2014. The change in deferred tax is primarily due to the valuation allowances recorded against the Company's federal and state net operating losses during 2015.

Significant components of the Company's deferred tax liabilities and assets as of December 31, 2016 and 2015 are as follows:

| (In thousands) | | 2016 | | 2015 |
|---|---|---|---|---|
| Deferred tax liabilities: | | | | |
| Intangibles and fixed assets | $ | 2,016,861 | $ | 2,173,491 |
| Long-term debt | | 37,205 | | 79,758 |
| Investments | | - | | 3,701 |
| Other | | 10,159 | | 11,540 |
| Total deferred tax liabilities | | 2,064,225 | | 2,268,490 |
| | | | | |
| Deferred tax assets: | | | | |
| Accrued expenses | | 155,037 | | 114,079 |
| Investments | | 5,458 | | - |
| Net operating loss carryforwards | | 1,384,175 | | 1,495,294 |
| Bad debt reserves | | 10,137 | | 9,256 |
| Other | | 43,545 | | 39,539 |
| Total gross deferred tax assets | | 1,598,352 | | 1,658,168 |
| Less: Valuation allowance | | 991,222 | | 944,576 |
| Total deferred tax assets | | 607,130 | | 713,592 |
| Net deferred tax liabilities | $ | 1,457,095 | $ | 1,554,898 |

During the fourth quarter of 2015, the Company elected early adoption of ASU No. 2015-17, *Income Taxes (Topic 740), Balance Sheet Classification of Deferred Taxes*. This update requires companies to classify all deferred tax assets and liabilities as noncurrent on the balance sheet instead of separating deferred taxes into current and noncurrent amounts.

The deferred tax liability related to intangibles and fixed assets primarily relates to the difference in book and tax basis of acquired FCC licenses, billboard permits and tax deductible goodwill created from the Company's various stock acquisitions. In accordance with ASC 350-10, *Intangibles-Goodwill and Other*, the Company does not amortize FCC licenses and billboard permits. As a result, this deferred tax liability will not reverse over time unless the Company recognizes future impairment charges related to its FCC licenses, permits and tax deductible goodwill or sells its FCC licenses or permits. As the Company continues to amortize its tax basis in its FCC licenses, permits and tax deductible goodwill, the deferred tax liability will increase over time. The Company's net foreign deferred tax assets for the period ending December 31, 2016 were $47.1 million and the net foreign tax liabilities for the period ending December 31, 2015 were $9.3 million.

At December 31, 2016, the Company had recorded net operating loss carryforwards (tax effected) for federal and state income tax purposes of approximately $1.2 billion, expiring in various amounts through 2035. The Company expects to realize the benefits of a portion of its deferred tax assets attributable to federal and state net operating losses based upon expected future taxable income from deferred tax liabilities that reverse in the relevant federal and state jurisdictions and carryforward periods. As of December 31, 2016, the Company had recorded a partial valuation allowance of $853.9 million against these deferred tax assets attributable to federal and state net operating losses, of which $61.5 million was recorded during the current period ended December 31, 2016. In addition, the Company recorded a net reduction of $14.8 million in valuation allowance against its foreign deferred tax assets during the year ended December 31, 2016. The net reduction is primarily due to a release of valuation allowances in France as a result of positive evidence that the net operating loss carryforwards are more likely than not to be utilized in future periods. At December 31, 2016, the Company had recorded $152.5 million (tax-effected) of deferred tax assets for foreign net operating loss carryforwards, which are offset in part by an associated valuation allowance of $103.3 million. Additional deferred tax valuation

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

allowance of $34.0 million offsets other foreign deferred tax assets that are not expected to be realized. Realization of these foreign deferred tax assets is dependent upon the Company's ability to generate future taxable income in appropriate tax jurisdictions and carryforward periods. Due to the Company's evaluation of all available evidence, including significant negative evidence of cumulative losses in these jurisdictions, the Company continues to record valuation allowances on the foreign deferred tax assets that are not expected to be realized. The Company expects to realize its remaining gross deferred tax assets based upon its assessment of deferred tax liabilities that will reverse in the same carryforward period and jurisdiction and are of the same character as the net operating loss carryforwards and temporary differences that give rise to the deferred tax assets. Any deferred tax liabilities associated with acquired FCC licenses, billboard permits and tax-deductible goodwill intangible assets are not relied upon as a source of future taxable income, as these intangible assets have an indefinite life.

At December 31, 2016, net deferred tax liabilities include a deferred tax asset of $28.6 million relating to stock-based compensation expense under ASC 718-10, *Compensation-Stock Compensation*. Full realization of this deferred tax asset requires stock options to be exercised at a price equaling or exceeding the sum of the grant price plus the fair value of the option at the grant date and restricted stock to vest at a price equaling or exceeding the fair market value at the grant date. Accordingly, there can be no assurance that the stock price of the Company's common stock will rise to levels sufficient to realize the entire deferred tax benefit currently reflected in its balance sheet.

Loss before income taxes:

| (In thousands) | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2016 | | 2015 | | 2014 |
| US | $ | (349,829) | $ | (700,376) | $ | (800,879) |
| Foreign | | 59,352 | | 49,843 | | 97,210 |
| Total loss before income taxes | $ | (290,477) | $ | (650,533) | $ | (703,669) |

The reconciliation of income tax computed at the U.S. federal statutory tax rates to the recorded income tax benefit (expense) is:

| (In thousands) | | | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2016 | | | 2015 | | 2014 | |
| | | Amount | Percent | | Amount | Percent | Amount | Percent |
| Income tax benefit at statutory rates | $ | 101,667 | 35.0% | $ | 227,686 | 35.0% | $ 246,284 | 35.0% |
| State income taxes, net of federal tax effect | | 6,372 | 2.2% | | 17,795 | 2.7% | 26,518 | 3.8% |
| Foreign income taxes | | (21,477) | (7.4)% | | (23,474) | (3.6)% | 11,074 | 1.6% |
| Nondeductible items | | (5,760) | (2.0)% | | (5,764) | (0.9)% | (5,533) | (0.8)% |
| Changes in valuation allowance and other estimates | | (31,229) | (10.7)% | | (302,935) | (46.6)% | (333,641) | (47.4)% |
| Other, net | | 901 | 0.3% | | (265) | -% | (3,191) | (0.5)% |
| Income tax benefit (expense) | $ | 50,474 | 17.4% | $ | (86,957) | (13.4)% | $ (58,489) | (8.3)% |

The Company's effective tax benefit rate for the year ended December 31, 2016 is 17.4%. The effective tax benefit rate for 2016 was impacted by the $43.3 million deferred tax benefit recorded in connection with the release of valuation allowance in France, which was offset by $54.7 million of tax expense attributable to the sale of our outdoor business in Australia. Additionally, the 2016 effective tax benefit rate was impacted by the $31.8 million valuation allowance recorded against a portion of current period federal and state deferred tax assets due to the uncertainty of the ability to realize those assets in future periods.

A tax expense was recorded for the year ended December 31, 2015 of (13.4)%. The effective tax rate for 2015 was impacted by the $305.3 million valuation allowance recorded during the period as additional deferred tax expense. The valuation allowance was recorded against a portion of the federal and state net operating losses due to the uncertainty of the ability to utilize those losses in future periods.

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A tax expense was recorded for the year ended December 31, 2014 of (8.3)%. The effective tax rate for 2014 was impacted by the $339.8 million valuation allowance recorded during the period as additional deferred tax expense. The valuation allowance was recorded against a portion of the federal and state net operating losses due to the uncertainty of the ability to utilize those losses in future periods. This expense was partially offset by $28.9 million in net tax benefits associated with a decrease in unrecognized tax benefits resulting from the expiration of statute of limitations to assess taxes in the United Kingdom and several state jurisdictions.

The Company provides for any related tax liability on undistributed earnings that the Company does not intend to be indefinitely reinvested outside the United States or would otherwise become taxable upon remittance within our foreign structure. Substantially all of the Company's undistributed international earnings are intended to be indefinitely reinvested in home country operations outside the United States. If any excess cash held by our foreign subsidiaries were needed to fund operations in the U.S., we could presently repatriate available funds without a requirement to accrue or pay U.S. taxes. This is a result of significant deficits, as calculated for tax law purposes, in our foreign earnings and profits, which gives us flexibility to make future cash distributions as non-taxable returns of capital.

The Company continues to record interest and penalties related to unrecognized tax benefits in current income tax expense. The total amount of interest accrued at December 31, 2016 and 2015 was $47.5 million and $45.0 million, respectively. The total amount of unrecognized tax benefits including accrued interest and penalties at December 31, 2016 and 2015 was $145.4 million and $148.2 million, respectively, of which $115.1 million and $113.6 million is included in "Other long-term liabilities" on the Company's consolidated balance sheets, respectively. In addition, $30.3 million and $34.6 million of unrecognized tax benefits are recorded net with the Company's deferred tax assets for its net operating losses as opposed to being recorded in "Other long-term liabilities" at December 31, 2016 and 2015, respectively. The total amount of unrecognized tax benefits at December 31, 2016 and 2015 that, if recognized, would impact the effective income tax rate is $53.8 million and $54.3 million, respectively.

| *(In thousands)* | | Years Ended December 31, | | |
|---|---|---|---|---|
| Unrecognized Tax Benefits | | 2016 | | 2015 |
| Balance at beginning of period | $ | 103,208 | $ | 106,914 |
| Increases for tax position taken in the current year | | 10,094 | | 9,856 |
| Increases for tax positions taken in previous years | | 3,024 | | 3,087 |
| Decreases for tax position taken in previous years | | (11,157) | | (8,534) |
| Decreases due to settlements with tax authorities | | (1,007) | | (3,821) |
| Decreases due to lapse of statute of limitations | | (6,200) | | (4,294) |
| Balance at end of period | $ | 97,962 | $ | 103,208 |

The Company and its subsidiaries file income tax returns in the United States federal jurisdiction and various state and foreign jurisdictions. During 2016, the company settled several tax examinations that resulted in the reduction of unrecognized tax benefits of $11.2 million, excluding interest, during the period. In addition, the statute of limitations for certain tax years expired in the United Kingdom and other jurisdictions resulting in the reduction to unrecognized tax benefits of $6.2 million, excluding interest. During 2015, the statute of limitations for certain tax years expired in the United Kingdom and several state jurisdictions resulting in a reduction to unrecognized tax benefits of $4.3 million, excluding interest. Also during 2015, the Company settled certain U.S. federal and state examinations with taxing authorities, resulting in decreases in unrecognized tax benefits relating to cash tax payments of $3.8 million. All federal income tax matters through 2010 are closed. The Company is currently in appeals with the IRS for the Company's tax returns for the 2011 and 2012 periods. Substantially all material state, local, and foreign income tax matters have been concluded for years through 2008.

110

IHEARTMEDIA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 8 - STOCKHOLDERS' DEFICIT

The Company reports its noncontrolling interests in consolidated subsidiaries as a component of equity separate from the Company's equity. The following table shows the changes in stockholders' deficit attributable to the Company and the noncontrolling interests of subsidiaries in which the Company has a majority, but not total, ownership interest:

| (In thousands) | The Company | Noncontrolling Interests | Consolidated |
|---|---|---|---|
| Balances as of January 1, 2016 | $ (10,784,296) | $ 177,615 | $ (10,606,681) |
| Net income (loss) | (296,318) | 56,315 | (240,003) |
| Dividends and other payments to noncontrolling interests | - | (70,412) | (70,412) |
| Purchase of additional noncontrolling interests | (1,224) | 1,224 | - |
| Disposal of noncontrolling interests | - | (36,846) | (36,846) |
| Share-based compensation | 2,848 | 10,238 | 13,086 |
| Foreign currency translation adjustments | 27,343 | (5,360) | 21,983 |
| Unrealized holding loss on marketable securities | (518) | (58) | (576) |
| Other adjustments to comprehensive loss | (10,622) | (1,192) | (11,814) |
| Reclassifications adjustments | 42,328 | 4,402 | 46,730 |
| Other, net | (199) | (743) | (942) |
| Balances as of December 31, 2016 | $ (11,020,658) | $ 135,183 | $ (10,885,475) |

| (In thousands) | The Company | Noncontrolling Interests | Consolidated |
|---|---|---|---|
| Balances as of January 1, 2015 | $ (9,889,348) | $ 224,140 | $ (9,665,208) |
| Net income (loss) | (754,621) | 17,131 | (737,490) |
| Dividends and other payments to noncontrolling interests | - | (52,384) | (52,384) |
| Purchase of additional noncontrolling interests | (40,819) | (1,978) | (42,797) |
| Share-based compensation | 2,564 | 8,359 | 10,923 |
| Foreign currency translation adjustments | (93,377) | (21,529) | (114,906) |
| Unrealized holding gain on marketable securities | 495 | 58 | 553 |
| Other adjustments to comprehensive loss | (9,253) | (1,013) | (10,266) |
| Reclassifications adjustments | 734 | 74 | 808 |
| Other, net | (671) | 4,757 | 4,086 |
| Balances as of December 31, 2015 | $ (10,784,296) | $ 177,615 | $ (10,606,681) |

**Stock Registration**

On June 24, 2015, we registered 4,000,000 shares of the Company's Class A common stock, par value $0.001 per share, for offer or sale under our 2015 Executive Long-Term Incentive Plan.

On July 27, 2015, the board of directors approved the issuance of 1,253,831 restricted shares to certain key individuals pursuant to our 2015 Executive Long-term Incentive Plan.

**Dividends**

The Company has not paid cash dividends since its formation and its ability to pay dividends is subject to restrictions should it seek to do so in the future. iHeartCommunications' debt financing arrangements include restrictions on its ability to pay dividends thereby limiting the Company's ability to pay dividends.

On December 20, 2015, the board of directors of CCOH declared a special cash dividend, which was paid on January 7, 2016 to its stockholders of record at the closing of business on January 4, 2016, in an aggregate amount equal to $217.8 million. Through

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

our subsidiaries we received $196.3 million of this dividend. The remaining dividend was paid to CCOH's public stockholders and was reflected as a use of cash for financing activities in the first quarter of 2016.

In the first quarter of 2016, CCOH sold nine non-strategic Americas outdoor markets for an aggregate purchase price of approximately $592.3 million in cash and certain advertising assets in Florida (the "Transactions").  On January 21, 2016, the board of directors of CCOH notified iHeartCommunications of its intent to make a demand for the repayment of $300.0 million outstanding on the Note (the "Demand") and declared special cash dividends in an aggregate amount of $540.0 million. CCOH made the Demand and the special cash dividend was paid on February 4, 2016. A portion of the proceeds of the Transactions, together with the proceeds from the concurrent $300.0 million repayment of the Note, were used to fund the dividends. We received $486.5 million of the dividend proceeds ($186.5 million net of iHeartCommunications' repayment of the Note) through three of our wholly-owned subsidiaries, and approximately $53.5 million was paid to the public stockholders of CCOH.

**Share-Based Compensation**

*Stock Options*

Prior to the merger, iHeartCommunications granted options to purchase its common stock to its employees and directors and its affiliates under its various equity incentive plans typically at no less than the fair value of the underlying stock on the date of grant. These options were granted for a term not exceeding ten years and were forfeited, except in certain circumstances, in the event the employee or director terminated his or her employment or relationship with iHeartCommunications or one of its affiliates. Prior to acceleration, if any, in connection with the merger, these options vested over a period of up to five years. All equity incentive plans contained anti-dilutive provisions that permitted an adjustment of the number of shares of iHeartCommunications' common stock represented by each option for any change in capitalization.

The Company has granted options to purchase its shares of Class A common stock to certain key executives under its equity incentive plan at no less than the fair value of the underlying stock on the date of grant. These options are granted for a term not to exceed ten years and are forfeited, except in certain circumstances, in the event the executive terminates his or her employment or relationship with the Company or one of its affiliates. Approximately three-fourths of the options outstanding at December 31, 2016 vest based solely on continued service over a period of up to five years with the remainder becoming eligible to vest over a period of up to five years if certain predetermined performance targets are met. The equity incentive plan contains antidilutive provisions that permit an adjustment for any change in capitalization.

The Company accounts for its share-based payments using the fair value recognition provisions of ASC 718-10. The fair value of the portion of options that vest based on continued service is estimated on the grant date using a Black-Scholes option-pricing model and the fair value of the remaining options which contain vesting provisions subject to service, market and performance conditions is estimated on the grant date using a Monte Carlo model. Expected volatilities were based on historical volatility of peer companies' stock, including the Company, over the expected life of the options. The expected life of the options granted represents the period of time that the options granted are expected to be outstanding. The Company used historical data to estimate option exercises and employee terminations within the valuation model. The Company includes estimated forfeitures in its compensation cost and updates the estimated forfeiture rate through the final vesting date of awards. The risk free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods equal to the expected life of the option. No options were granted during the years ended December 31, 2016, 2015 and 2014.

The following table presents a summary of the Company's stock options outstanding at and stock option activity during the year ended December 31, 2016 ("Price" reflects the weighted average exercise price per share):

112

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*(In thousands, except per share data)*

| | Options | | Price | Weighted Average Remaining Contractual Term |
|---|---|---|---|---|
| Outstanding, January 1, 2016 | 2,097 | $ | 35.03 | |
| Granted | - | | - | |
| Exercised | - | | - | |
| Forfeited | (3) | | 10.00 | |
| Expired | (2) | | 10.00 | |
| Outstanding, December 31, 2016 [1] | 2,092 | | 35.09 | 2.6 years |
| Exercisable | 1,549 | | 35.14 | 3.0 years |
| Expected to Vest | 522 | | 35.93 | 1.6 years |

(1)     Non-cash compensation expense has not been recorded with respect to 0.5 million shares as the vesting of these options is subject to performance conditions that have not yet been determined probable to meet.

A summary of the Company's unvested options and changes during the year ended December 31, 2016 is presented below:

*(In thousands, except per share data)*

| | Options | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested, January 1, 2016 | 682 | $ | 15.99 |
| Granted | - | | - |
| Vested [1] | (136) | | 1.39 |
| Forfeited | (3) | | 10.00 |
| Unvested, December 31, 2016 | 543 | | 19.74 |

(1)     The total fair value of the options vested during the years ended December 31, 2016, 2015 and 2014 was $0.2 million, $0.3 million and $0.3 million, respectively.

*Restricted Stock Awards*

The Company has granted restricted stock awards to certain of its employees and affiliates under its equity incentive plan. The restricted stock awards are restricted in transferability for a term of up to five years. Restricted stock awards are forfeited, except in certain circumstances, in the event the employee terminates his or her employment or relationship with the Company prior to the lapse of the restriction. Dividends or distributions paid in respect of unvested restricted stock awards will be held by the Company and paid to the recipients of the restricted stock awards upon vesting of the shares.

The following table presents a summary of the Company's restricted stock outstanding and restricted stock activity as of and during the year ended December 31, 2016 ("Price" reflects the weighted average share price at the date of grant):

*(In thousands, except per share data)*

| | Awards | | Price |
|---|---|---|---|
| Outstanding, January 1, 2016 | 5,070 | $ | 5.36 |
| Granted | 1,408 | | 1.02 |
| Vested (restriction lapsed) | (505) | | 5.20 |
| Forfeited | (201) | | 5.07 |
| Outstanding, December 31, 2016 | 5,772 | | 4.43 |

113

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**CCOH Share-Based Awards**

*CCOH Stock Options*

The Company's subsidiary, CCOH, has granted options to purchase shares of its Class A common stock to employees and directors of CCOH and its affiliates under its equity incentive plan at no less than the fair market value of the underlying stock on the date of grant. These options are granted for a term not exceeding ten years and are forfeited, except in certain circumstances, in the event the employee or director terminates his or her employment or relationship with CCOH or one of its affiliates. These options vest solely on continued service over a period of up to five years. The equity incentive stock plan contains anti-dilutive provisions that permit an adjustment for any change in capitalization.

The fair value of each option awarded on CCOH common stock is estimated on the date of grant using a Black-Scholes option-pricing model. Expected volatilities are based on historical volatility of CCOH's stock over the expected life of the options. The expected life of options granted represents the period of time that options granted are expected to be outstanding. CCOH uses historical data to estimate option exercises and employee terminations within the valuation model. CCOH includes estimated forfeitures in its compensation cost and updates the estimated forfeiture rate through the final vesting date of awards. The risk free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods equal to the expected life of the option.

The following assumptions were used to calculate the fair value of CCOH's options on the date of grant:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2016 | 2015 | 2014 |
| Expected volatility | 42% - 44% | 37% - 56% | 54% - 56% |
| Expected life in years | 6.3 | 6.3 | 6.3 |
| Risk-free interest rate | 1.12% - 1.41% | 1.70% - 2.07% | 1.73% - 2.08% |
| Dividend yield | -% | -% | -% |

The following table presents a summary of CCOH's stock options outstanding at and stock option activity during the year ended December 31, 2016:

| *(In thousands, except per share data)* | Options | Price(3) | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
| --- | --- | --- | --- | --- |
| Outstanding, January 1, 2016 | 5,348 | $ 7.86 | | |
| Granted [1] | 290 | 6.43 | | |
| Exercised [2] | (173) | 3.66 | | |
| Forfeited | (159) | 7.25 | | |
| Expired | (273) | 12.15 | | |
| Outstanding, December 31, 2016 | 5,033 | 7.71 | 4.9 years | $ 2,539 |
| Exercisable | 3,868 | 7.86 | 3.8 years | $ 2,526 |
| Expected to vest | 1,042 | 7.18 | 8.4 years | $ 12 |

(1)    The weighted average grant date fair value of CCOH options granted during the years ended December 31, 2016, 2015 and 2014 was $2.82, $4.25 and $4.69 per share, respectively.

(2)    Cash received from option exercises during the years ended December 31, 2016, 2015 and 2014 was $0.6 million, $3.8 million and $2.4 million, respectively. The total intrinsic value of the options exercised during the years ended December 31, 2016, 2015 and 2014 was $0.4 million, $2.8 million and $1.5 million, respectively.

(3)    Reflects the weighted average exercise price per share.

114

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A summary of CCOH's unvested options at and changes during the year ended December 31, 2016 is presented below:

| (In thousands, except per share data) | Options | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested, January 1, 2016 | 1,690 | $ | 4.27 |
| Granted | 290 | | 2.82 |
| Vested [1] | (657) | | 4.18 |
| Forfeited | (159) | | 4.22 |
| Unvested, December 31, 2016 | 1,164 | | 3.97 |

(1)     The total fair value of CCOH options vested during the years ended December 31, 2016, 2015 and 2014 was $2.7 million, $4.2 million and $6.1 million, respectively.

***CCOH Restricted Stock Awards***

CCOH has also granted both restricted stock and restricted stock unit awards to its employees and affiliates under its equity incentive plan. The restricted stock awards represent shares of Class A common stock that hold a legend which restricts their transferability for a term of up to five years. The restricted stock units represent the right to receive shares upon vesting, which is generally over a period of up to five years. Both restricted stock awards and restricted stock units are forfeited, except in certain circumstances, in the event the employee terminates his or her employment or relationship with CCOH prior to the lapse of the restriction.

The following table presents a summary of CCOH's restricted stock and restricted stock units outstanding at and activity during the year ended December 31, 2016 ("Price" reflects the weighted average share price at the date of grant):

| (In thousands, except per share data) | Awards | | Price |
|---|---|---|---|
| Outstanding, January 1, 2016 | 2,762 | $ | 8.43 |
| Granted | 1,510 | | 5.67 |
| Vested (restriction lapsed) | (1,198) | | 6.85 |
| Forfeited | (331) | | 8.19 |
| Outstanding, December 31, 2016 | 2,743 | | 7.63 |

**Share-Based Compensation Cost**

The share-based compensation cost is measured at the grant date based on the fair value of the award and is recognized as expense on a straight-line basis over the vesting period. Share-based compensation payments are recorded in corporate expenses and were $13.1 million, $10.9 million and $10.7 million, during the years ended December 31, 2016, 2015 and 2014, respectively.

The tax benefit related to the share-based compensation expense for the years ended December 31, 2016, 2015 and 2014 was $5.0 million, $4.2 million and $4.1 million, respectively.

As of December 31, 2016, there was $21.0 million of unrecognized compensation cost related to unvested share-based compensation arrangements that will vest based on service conditions. This cost is expected to be recognized over a weighted average period of approximately three years. In addition, as of December 31, 2016, there was $26.4 million of unrecognized compensation cost related to unvested share-based compensation arrangements that will vest based on market, performance and service conditions. This cost will be recognized when it becomes probable that the performance condition will be satisfied.

115

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Loss per Share**

The following table presents the computation of loss per share for the years ended December 31, 2016, 2015 and 2014:

| *(In thousands, except per share data)* | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2016 | | 2015 | | 2014 |
| NUMERATOR: | | | | | | |
| Net loss attributable to the Company - common shares | $ | (296,318) | $ | (754,621) | $ | (793,761) |
| | | | | | | |
| DENOMINATOR: | | | | | | |
| Weighted average common shares outstanding - basic | | 84,569 | | 84,278 | | 83,941 |
| Stock options and restricted stock[1]: | | - | | - | | - |
| Weighted average common shares outstanding - diluted | | 84,569 | | 84,278 | | 83,941 |
| | | | | | | |
| Net loss attributable to the Company per common share: | | | | | | |
| Basic | $ | (3.50) | $ | (8.95) | $ | (9.46) |
| Diluted | $ | (3.50) | $ | (8.95) | $ | (9.46) |

(1)    7.9 million, 7.2 million and 6.8 million stock options and restricted shares were outstanding at December 31, 2016, 2015 and 2014, respectively, that were not included in the computation of diluted earnings per share because to do so would have been anti-dilutive.

**Subsequent Event**

In December 2016, the Board of Directors and the Company's stockholders holding a majority of the votes entitled to be cast by all outstanding common stock of the Company approved a Fourth Amended and Restated Certificate of Incorporation (the "New Charter"), and the New Charter became effective on January 26, 2017 following the mailing of an Information Statement on Schedule 14C to the Company's stockholders. The New Charter authorizes the issuance of 200,000,000 shares of a new class of non-voting Class D Common Stock, par value $0.001 per share (the "Class D Common Stock"). The shares of Class D Common Stock authorized by the New Charter may be issued without further approval from the Company's stockholders. The New Charter also authorizes the issuance of 150,000,000 shares of "blank check" preferred stock, par value $0.001 per share (the "Preferred Stock"). The Board of Directors has the authority to establish one or more series of Preferred Stock and fix relative rights and preferences of any series of Preferred Stock, without any further approval from the Company's stockholders.

## NOTE 9 - EMPLOYEE STOCK AND SAVINGS PLANS

iHeartCommunications has various 401(k) savings and other plans for the purpose of providing retirement benefits for substantially all employees. Under these plans, an employee can make pre-tax contributions and iHeartCommunications will match a portion of such an employee's contribution. Employees vest in these iHeartCommunications matching contributions based upon their years of service to iHeartCommunications. Contributions of $30.9 million, $28.9 million and $32.1 million to these plans for the years ended December 31, 2016, 2015 and 2014, respectively, were expensed.

iHeartCommunications offers a non-qualified deferred compensation plan for a select group of management or highly compensated employees, under which such employees were able to make an annual election to defer up to 50% of their annual salary and up to 80% of their bonus before taxes. iHeartCommunications suspended all salary and bonus deferrals and company matching contributions to the deferred compensation plan on January 1, 2010. iHeartCommunications accounts for the plan in accordance with the provisions of ASC 710-10. Matching credits on amounts deferred may be made in iHeartCommunications' sole discretion and iHeartCommunications retains ownership of all assets until distributed. Participants in the plan have the opportunity to allocate their deferrals and any iHeartCommunications matching credits among different investment options, the performance of which is used to determine the amounts to be paid to participants under the plan. In accordance with the provisions of ASC 710-10, the assets and liabilities of the non-qualified deferred compensation plan are presented in "Other assets" and "Other long-term liabilities" in the accompanying consolidated balance sheets, respectively. The asset and liability under the deferred compensation plan at December 31, 2016 was approximately $10.7 million recorded in "Other assets" and $10.7 million recorded in "Other long-term

116

IHEARTMEDIA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

liabilities", respectively. The asset and liability under the deferred compensation plan at December 31, 2015 was approximately $10.4 million recorded in "Other assets" and $10.4 million recorded in "Other long-term liabilities", respectively.

## NOTE 10 - OTHER INFORMATION

The following table discloses the components of "Other income (expense)" for the years ended December 31, 2016, 2015 and 2014, respectively:

| (In thousands) | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2016 | | 2015 | | 2014 |
| Foreign exchange gain (loss) | $ | (69,880) | $ | 15,468 | $ | 15,554 |
| Other | | (3,222) | | (2,412) | | (6,450) |
| Total other income (expense), net | $ | (73,102) | $ | 13,056 | $ | 9,104 |

The following table discloses the increase (decrease) in other comprehensive income (loss) related to deferred income tax liabilities for the years ended December 31, 2016, 2015 and 2014, respectively:

| (In thousands) | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2016 | | 2015 | | 2014 |
| Foreign currency translation adjustments and other | $ | (1,044) | $ | 1,585 | $ | 2,559 |
| Total increase in deferred tax liabilities | $ | (1,044) | $ | 1,585 | $ | 2,559 |

The following table discloses the components of "Other current assets" as of December 31, 2016 and 2015, respectively:

| (In thousands) | As of December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| Inventory | $ | 22,068 | $ | 24,833 |
| Deposits | | 2,717 | | 3,184 |
| Other | | 30,280 | | 51,252 |
| Total other current assets | $ | 55,065 | $ | 79,269 |

The following table discloses the components of "Other assets" as of December 31, 2016 and 2015, respectively:

| (In thousands) | As of December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| Investments in, and advances to, nonconsolidated affiliates | $ | 14,477 | $ | 27,710 |
| Other investments | | 73,381 | | 61,128 |
| Notes receivable | | 132 | | 156 |
| Prepaid expenses | | - | | 7,932 |
| Deposits | | 20,963 | | 26,025 |
| Prepaid rent | | 70,603 | | 74,114 |
| Non-qualified plan assets | | 10,733 | | 10,385 |
| Other | | 37,161 | | 7,637 |
| Total other assets | $ | 227,450 | $ | 215,087 |

117

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table discloses the components of "Other long-term liabilities" as of December 31, 2016 and 2015, respectively:

| *(In thousands)* | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Unrecognized tax benefits | $ 115,078 | $ 113,563 |
| Asset retirement obligation | 42,067 | 47,574 |
| Non-qualified plan liabilities | 10,733 | 10,385 |
| Deferred income | 154,246 | 137,942 |
| Deferred rent | 155,339 | 141,911 |
| Employee related liabilities | 55,460 | 47,491 |
| Other | 39,054 | 27,705 |
| Total other long-term liabilities | $ 571,977 | $ 526,571 |

The following table discloses the components of "Accumulated other comprehensive loss," net of tax, as of December 31, 2016 and 2015, respectively:

| *(In thousands)* | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Cumulative currency translation adjustment | $ (319,696) | $ (389,367) |
| Cumulative unrealized gain on securities | 1,428 | 1,946 |
| Cumulative other adjustments | (37,608) | (26,986) |
| Total accumulated other comprehensive loss | $ (355,876) | $ (414,407) |

## NOTE 11 - SEGMENT DATA

The Company's reportable segments, which it believes best reflect how the Company is currently managed, are iHM, Americas outdoor advertising and International outdoor advertising. Revenue and expenses earned and charged between segments are recorded at estimated fair value and eliminated in consolidation. The iHM segment provides media and entertainment services via broadcast and digital delivery and also includes the Company's events and national syndication businesses. The Americas outdoor advertising segment consists of operations primarily in the United States, Canada and Latin America. The International outdoor advertising segment primarily includes operations in Europe and Asia. The Other category includes the Company's media representation business as well as other general support services and initiatives that are ancillary to the Company's other businesses. Corporate includes infrastructure and support, including information technology, human resources, legal, finance and administrative functions for each of the Company's reportable segments, as well as overall executive, administrative and support functions. Share-based payments are recorded in corporate expense.

118

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| (In thousands) | iHM | Americas Outdoor Advertising | International Outdoor Advertising | Other | Corporate and other reconciling items | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **Year Ended December 31, 2016** | | | | | | | |
| Revenue | $ 3,403,040 | $ 1,278,413 | $ 1,423,982 | $ 171,593 | $ - | $ (3,455) | $ 6,273,573 |
| Direct operating expenses | 975,463 | 570,310 | 865,259 | 1,255 | - | - | 2,412,287 |
| Selling, general and administrative expenses | 1,102,998 | 225,415 | 289,787 | 109,623 | - | (1,924) | 1,725,899 |
| Corporate expenses | - | - | - | - | 342,556 | (1,531) | 341,025 |
| Depreciation and amortization | 243,964 | 185,654 | 152,758 | 17,304 | 35,547 | - | 635,227 |
| Impairment charges | - | - | - | - | 8,000 | - | 8,000 |
| Other operating income, net | - | - | - | - | 353,556 | - | 353,556 |
| Operating income (loss) | $ 1,080,615 | $ 297,034 | $ 116,178 | $ 43,411 | $ (32,547) | $ - | $ 1,504,691 |
| Intersegment revenues | $ - | $ 3,455 | $ - | $ - | $ - | $ - | $ 3,455 |
| Segment assets | $ 7,392,872 | $ 3,175,355 | $ 1,342,356 | $ 237,435 | $ 714,445 | $ (216) | $ 12,862,247 |
| Capital expenditures | $ 73,221 | $ 81,401 | $ 143,788 | $ 2,460 | $ 13,847 | $ - | $ 314,717 |
| Share-based compensation expense | $ - | $ - | $ - | $ - | $ 13,086 | $ - | $ 13,086 |
| **Year Ended December 31, 2015** | | | | | | | |
| Revenue | $ 3,284,320 | $ 1,349,021 | $ 1,457,183 | $ 153,736 | $ - | $ (2,744) | $ 6,241,516 |
| Direct operating expenses | 972,937 | 597,382 | 897,520 | 3,274 | - | - | 2,471,113 |
| Selling, general and administrative expenses | 1,065,066 | 233,254 | 298,250 | 110,526 | - | (2,744) | 1,704,352 |
| Corporate expenses | - | - | - | - | 314,999 | - | 314,999 |
| Depreciation and amortization | 240,207 | 204,514 | 166,060 | 20,622 | 42,588 | - | 673,991 |
| Impairment charges | - | - | - | - | 21,631 | - | 21,631 |
| Other operating income, net | - | - | - | - | 94,001 | - | 94,001 |
| Operating income (loss) | $ 1,006,110 | $ 313,871 | $ 95,353 | $ 19,314 | $ (285,217) | $ - | $ 1,149,431 |
| Intersegment revenues | $ - | $ 2,744 | $ - | $ - | $ - | $ - | $ 2,744 |
| Segment assets | $ 7,522,998 | $ 3,567,764 | $ 1,573,161 | $ 229,067 | $ 976,417 | $ (196,292) | $ 13,673,115 |
| Capital expenditures | $ 63,814 | $ 82,165 | $ 132,554 | $ 2,039 | $ 15,808 | $ - | $ 296,380 |
| Share-based compensation expense | $ - | $ - | $ - | $ - | $ 10,923 | $ - | $ 10,923 |
| **Year Ended December 31, 2014** | | | | | | | |
| Revenue | $ 3,161,503 | $ 1,350,623 | $ 1,610,636 | $ 202,497 | $ - | $ (6,726) | $ 6,318,533 |
| Direct operating expenses | 932,172 | 605,771 | 991,117 | 14,255 | - | (3,280) | 2,540,035 |
| Selling, general and administrative expenses | 1,013,407 | 233,641 | 314,878 | 122,448 | - | (3,436) | 1,680,938 |
| Corporate expenses | - | - | - | - | 320,941 | (10) | 320,931 |
| Depreciation and amortization | 240,846 | 203,928 | 198,143 | 29,435 | 38,546 | - | 710,898 |
| Impairment charges | - | - | - | - | 24,176 | - | 24,176 |
| Other operating income, net | - | - | - | - | 40,031 | - | 40,031 |
| Operating income (loss) | $ 975,078 | $ 307,283 | $ 106,498 | $ 36,359 | $ (343,632) | $ - | $ 1,081,586 |
| Intersegment revenues | $ 10 | $ 3,436 | $ - | $ 3,280 | $ - | $ - | $ 6,726 |
| Segment assets | $ 7,700,435 | $ 3,648,735 | $ 1,680,598 | $ 266,880 | $ 542,931 | $ - | $ 13,839,579 |
| Capital expenditures | $ 53,914 | $ 109,727 | $ 117,480 | $ 2,233 | $ 34,810 | $ - | $ 318,164 |
| Share-based compensation expense | $ - | $ - | $ - | $ - | $ 10,713 | $ - | $ 10,713 |

Revenue of $1.6 billion, $1.6 billion and $1.8 billion derived from the Company's foreign operations are included in the data above for the years ended December 31, 2016, 2015 and 2014, respectively. Revenue of $4.7 billion, $4.6 billion and $4.5 billion derived

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

from the Company's U.S. operations are included in the data above for the years ended December 31, 2016, 2015 and 2014, respectively.

Identifiable long-lived assets of $540.4 million, $629.5 million and $682.7 million derived from the Company's foreign operations are included in the data above for the years ended December 31, 2016, 2015 and 2014, respectively. Identifiable long-lived assets of $1.4 billion, $1.6 billion and $2.0 billion derived from the Company's U.S. operations are included in the data above for the years ended December 31, 2016, 2015 and 2014, respectively.

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 12 - QUARTERLY RESULTS OF OPERATIONS (Unaudited)

*(In thousands, except per share data)*

| | Three Months Ended March 31, | | Three Months Ended June 30, | | Three Months Ended September 30, | | Three Months Ended December 31, | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 | 2016 | 2015 | 2016 | 2015 |
| Revenue | $ 1,363,505 | $ 1,344,564 | $ 1,618,532 | $ 1,599,859 | $ 1,570,418 | $ 1,579,514 | $ 1,721,118 | $ 1,717,579 |
| Operating expenses: | | | | | | | | |
| Direct operating expenses | 568,371 | 577,692 | 617,246 | 615,163 | 595,576 | 627,150 | 631,094 | 651,108 |
| Selling, general and administrative expenses | 425,568 | 416,881 | 434,581 | 424,562 | 421,700 | 429,426 | 444,050 | 433,483 |
| Corporate expenses | 77,879 | 77,422 | 87,650 | 80,295 | 86,779 | 74,775 | 88,717 | 82,507 |
| Depreciation and amortization | 155,456 | 170,453 | 162,144 | 168,394 | 158,453 | 166,320 | 159,174 | 168,824 |
| Impairment charges | - | - | - | - | 8,000 | 21,631 | - | - |
| Other operating income, net | 284,463 | (8,974) | (64,190) | 100,754 | (505) | 6,914 | 133,788 | (4,693) |
| Operating income | 420,694 | 93,142 | 252,721 | 412,199 | 299,405 | 267,126 | 531,871 | 376,964 |
| Interest expense | 463,950 | 441,771 | 465,991 | 452,957 | 459,852 | 453,921 | 460,189 | 456,847 |
| Gain (loss) on investments, net | - | 579 | - | - | (13,767) | (5,000) | 860 | - |
| Equity in earnings (loss) of nonconsolidated affiliates | (433) | 331 | (1,610) | (690) | 1,117 | (857) | (15,807) | 314 |
| Gain (loss) on extinguishment of debt | - | (2,201) | - | - | 157,556 | - | - | - |
| Other income (expense), net | (5,712) | 19,891 | (34,019) | 16,211 | (7,323) | (17,976) | (26,048) | (5,070) |
| Income (loss) before income taxes | (49,401) | (330,029) | (248,899) | (25,237) | (22,864) | (210,628) | 30,687 | (84,639) |
| Income tax benefit (expense) | (9,493) | (56,605) | (27,137) | (22,077) | (5,613) | (2,841) | 92,717 | (5,434) |
| Consolidated net income (loss) | (58,894) | (386,634) | (276,036) | (47,314) | (28,477) | (213,469) | 123,404 | (90,073) |
| Less amount attributable to noncontrolling interest | 29,621 | (1,668) | 2,858 | 7,152 | 6,474 | 8,448 | 17,362 | 3,199 |
| Net income (loss) attributable to the Company | $ (88,515) | $ (384,966) | $ (278,894) | $ (54,466) | $ (34,951) | $ (221,917) | $ 106,042 | $ (93,272) |
| | | | | | | | | |
| Net income (loss) to the Company per common share: | | | | | | | | |
| Basic | $ (1.05) | $ (4.58) | $ (3.30) | $ (0.65) | $ (0.41) | $ (2.63) | $ 1.25 | $ (1.11) |
| Diluted | $ (1.05) | $ (4.58) | $ (3.30) | $ (0.65) | $ (0.41) | $ (2.63) | $ 1.24 | $ (1.11) |

The Company's Class A common shares are quoted for trading on the OTC / Pink Sheets Bulletin Board under the symbol IHRT.

**IHEARTMEDIA, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 13 - CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

iHeartCommunications is a party to a management agreement with certain affiliates of Bain Capital Partners, LLC and Thomas H. Lee Partners, L.P. (together, the "Sponsors") and certain other parties pursuant to which such affiliates of the Sponsors will provide management and financial advisory services until 2018. These agreements require management fees to be paid to such affiliates of the Sponsors for such services at a rate not greater than $15.0 million per year, plus reimbursable expenses. For the years ended December 31, 2016, 2015 and 2014, the Company recognized management fees and reimbursable expenses of $15.3 million, $15.4 million and $15.2 million, respectively.

**Stock Purchases**

On August 9, 2010, iHeartCommunications announced that its board of directors approved a stock purchase program under which iHeartCommunications or its subsidiaries could purchase up to an aggregate of $100.0 million of the Company's Class A common stock and/or the Class A common stock of CCOH. The stock purchase program did not have a fixed expiration date and could be modified, suspended or terminated at any time at iHeartCommunications' discretion. As of December 31, 2014, an aggregate $34.2 million was available under this program. In January 2015, CC Finco, LLC ("CC Finco"), an indirect wholly-owned subsidiary of the Company, purchased 2,000,000 shares of CCOH's Class A common stock for $20.4 million. On April 2, 2015, CC Finco purchased an additional 2,172,946 shares of CCOH's Class A common stock for $22.2 million. As a result of this purchase, the stock purchase program concluded. The purchase of shares in excess of the amount available under the stock purchase program was separately approved by the board of directors. As of December 31, 2016, iHeartCommunications and its subsidiaries held 10,726,917 shares of CCOH's Class A Common Stock and all of CCOH's Class B common stock, which collectively represented 89.9% of the outstanding shares of CCOH's common stock on a fully-diluted basis, assuming the conversion of all of CCOH's Class B common stock into Class A common stock.

On December 3, 2015, Clear Channel Holdings, Inc. contributed 100,000,000 shares of CCOH's Class B Common Stock to Broader Media, LLC, an indirect wholly-owned subsidiary of the Company, as a capital contribution, to provide greater flexibility in support of future financing transactions, share dispositions and other similar transactions.

122

**ITEM 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not Applicable

**ITEM 9A. Controls and Procedures**

**Disclosure Controls and Procedures**

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of management, including our Chief Executive Officer and our Chief Financial Officer, we have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Our disclosure controls and procedures are designed to provide reasonable assurance that information we are required to disclose in reports that are filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified by the SEC. Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2016 at the reasonable assurance level.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed under the supervision of our Chief Executive Officer and Chief Financial Officer to provide reasonable assurance regarding the preparation and reliability of financial reporting and preparation of our financial statements for external purposes in accordance with generally accepted accounting principles.

There are inherent limitations to the effectiveness of any control system, however well designed, including the possibility of human error and the possible circumvention or overriding of controls. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Management must make judgments with respect to the relative cost and expected benefits of any specific control measure. The design of a control system also is based in part upon assumptions and judgments made by management about the likelihood of future events, and there can be no assurance that a control will be effective under all potential future conditions. As a result, even an effective system of internal control over financial reporting can provide no more than reasonable assurance with respect to the fair presentation of financial statements and the processes under which they were prepared.

As of December 31, 2016, management assessed the effectiveness of our internal control over financial reporting based on the criteria for effective internal control over financial reporting established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework). Based on the assessment, management determined that we maintained effective internal control over financial reporting as of December 31, 2016, based on those criteria.

Ernst & Young LLP, the independent registered public accounting firm that audited our consolidated financial statements included in this Annual Report on Form 10-K, has issued an attestation report on the effectiveness of our internal control over financial reporting as of December 31, 2016. The report, which expresses an unqualified opinion on the effectiveness of our internal control over financial reporting as of December 31, 2016, is included in this Item under the heading "Report of Independent Registered Public Accounting Firm."

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
iHeartMedia, Inc.

We have audited iHeartMedia, Inc. and subsidiaries' (the Company) internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of the Company as of December 31, 2016 and 2015, and the related consolidated statements of comprehensive loss, changes in stockholders' deficit and cash flows for each of the three years in the period ended December 31, 2016 and our report dated February 23, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
San Antonio, Texas
February 23, 2017

124

**ITEM 9B. Other Information**

Not Applicable

**PART III**

**ITEM 10. Directors, Executive Officers and Corporate Governance**

The information required by this item with respect to our executive officers is set forth at the end of Part I of this Annual Report on Form 10-K.

Our Code of Business Conduct and Ethics (the "Code of Conduct") applies to all of our officers, directors and employees, including our principal executive officer, principal financial officer and principal accounting officer. The Code of Conduct is publicly available on our internet website at www.iheartmedia.com. We intend to satisfy the disclosure requirements of Item 5.05 of Form 8-K regarding any amendment to, or waiver from, a provision of the Code of Conduct that applies to our principal executive officer, principal financial officer or principal accounting officer and relates to any element of the definition of code of ethics set forth in Item 406(b) of Regulation S-K by posting such information on our website at www.iheartmedia.com.

All other information required by this item is incorporated by reference to the information set forth in our Definitive Proxy Statement for our 2017 Annual Meeting of Stockholders (the "Definitive Proxy Statement"), which we expect to file with the SEC within 120 days after our fiscal year end.

**ITEM 11. Executive Compensation**

The information required by this item is incorporated by reference to our Definitive Proxy Statement, which we expect to file with the SEC within 120 days after our fiscal year end.

**ITEM 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

| Plan Category | Number of Securities to be issued upon exercise of outstanding options, warrants and rights | | Weighted-Average exercise price of outstanding options, warrants and rights (1) | | Number of Securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (A)) |
|---|---|---|---|---|---|
| Equity Compensation Plans approved by security holders[2] | 7,870,234[3] | $ | 35.09 | | 3,161,342 |
| Equity Compensation Plans not approved by security holders | - | | - | | - |
| **Total** | 7,870,234 | $ | 35.09 | | 3,161,342 |

(1)     The weighted-average exercise price is calculated based solely on the exercise prices of the outstanding options and does not reflect the shares that will be issued upon the vesting of outstanding awards of restricted stock, which have no exercise price.

(2)     Represents the 2008 Executive Incentive Plan and the 2015 Executive Long-Term Incentive Plan. The 2008 Executive Incentive Plan automatically terminated (other than with respect to outstanding awards) upon stockholder approval of the 2015 Executive Long-Term Incentive Plan at our Annual Stockholder Meeting held on May 18, 2015 and, as a result, there are no shares available for grant under the 2008 Executive Incentive Plan.

(3)     This number includes shares subject to outstanding awards granted, of which 2,092,126 shares are subject to outstanding options and 5,778,108 shares are subject to outstanding restricted shares.

All other information required by this item is incorporated by reference to our Definitive Proxy Statement, which we expect to file with the SEC within 120 days after our fiscal year end.

**ITEM 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this item is incorporated by reference to our Definitive Proxy Statement, which we expect to file with the SEC within 120 days after our fiscal year end.

**ITEM 14. Principal Accounting Fees and Services**

The information required by this item is incorporated by reference to our Definitive Proxy Statement, which we expect to file with the SEC within 120 days after our fiscal year end.

126

**PART IV**

**ITEM 15. Exhibits and Financial Statement Schedules**

(a)1. Financial Statements.

The following consolidated financial statements are included in Item 8:

Consolidated Balance Sheets as of December 31, 2016 and 2015.
Consolidated Statements of Comprehensive Loss for the Years Ended December 31, 2016, 2015 and 2014.
Consolidated Statements of Changes in Stockholders' Deficit for the Years Ended December 31, 2016, 2015 and 2014.
Consolidated Statements of Cash Flows for the Years Ended December 31, 2016, 2015 and 2014.
Notes to Consolidated Financial Statements

2. Financial Statement Schedule.

The following financial statement schedule for the years ended December 31, 2016, 2015 and 2014 and related report of independent auditors is filed as part of this report and should be read in conjunction with the consolidated financial statements.

Schedule II Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the Securities and Exchange Commission are not required under the related instructions or are inapplicable, and therefore have been omitted.

127

SCHEDULE II
VALUATION AND QUALIFYING ACCOUNTS

Allowance for Doubtful Accounts

*(In thousands)*

| Description | Balance at Beginning of period | Charges to Costs, Expenses and other | Write-off of Accounts Receivable | Other (1) | Balance at End of Period |
|---|---|---|---|---|---|
| Year ended December 31, 2014 | $ 47,745 | $ 14,167 | $ 27,014 | $ (2,502) | $ 32,396 |
| Year ended December 31, 2015 | $ 32,396 | $ 30,579 | $ 26,310 | $ (1,776) | $ 34,889 |
| Year ended December 31, 2016 | $ 34,889 | $ 27,390 | $ 27,898 | $ (499) | $ 33,882 |

(1)     Primarily foreign currency adjustments and acquisition and/or divestiture activity.

Deferred Tax Asset Valuation Allowance

*(In thousands)*

| Description | Balance at Beginning of Period | Charges to Costs, Expenses and other (1) | Reversal (2) | Adjustments (3) | Balance at end of Period |
|---|---|---|---|---|---|
| Year ended December 31, 2014 | $ 327,623 | $ 356,583 | $ (230) | $ (28,318) | $ 655,658 |
| Year ended December 31, 2015 | $ 655,658 | $ 314,098 | $ (457) | $ (24,723) | $ 944,576 |
| Year ended December 31, 2016 | $ 944,576 | $ 109,285 | $ (49,577) | $ (13,062) | $ 991,222 |

(1)     During 2014, 2015 and 2016, the Company recorded valuation allowances on deferred tax assets attributable to net operating losses in certain foreign jurisdictions. In addition, during 2015 and 2016 the Company recorded a valuation allowance of $305.3 million and $61.5 million, respectively, on a portion of its deferred tax assets attributable to federal and state net operating loss carryforwards due to the uncertainty of the ability to utilize those losses in future periods.

(2)     During 2014, 2015 and 2016, the Company realized the tax benefits associated with certain foreign deferred tax assets, primarily related to foreign loss carryforwards, on which a valuation allowance was previously recorded. The associated valuation allowance was reversed in the period in which, based on the weight of available evidence, it is more-likely-than-not that the deferred tax asset will be realized. During 2016, the Company released valuation allowances in France in the amount of $43.3 million.

(3)     During 2014, 2015 and 2016, the Company adjusted certain valuation allowances as a result of changes in tax rates in certain jurisdictions and as a result of the expiration of carryforward periods for net operating loss carryforwards.

128

3. Exhibits.

| Exhibit Number | Description |
| --- | --- |
| 3.1* | Fourth Amended and Restated Certificate of Incorporation of iHeartMedia, Inc. |
| 3.2 | Amended and Restated ByLaws of iHeartMedia, Inc. (Incorporated by reference to Exhibit 3.2 to the iHeartMedia, Inc. Registration Statement on Form S-4 (File No. 333-151345) filed on June 2, 2008). |
| 4.1 | Senior Indenture dated October 1, 1997, by and between iHeartCommunications, Inc. and The Bank of New York, as Trustee (Incorporated by reference to Exhibit 4.2 to the iHeartCommunications, Inc. Quarterly Report on Form 10-Q for the quarter ended September 30, 1997). |
| 4.2 | Third Supplemental Indenture dated June 16, 1998 to Senior Indenture dated October 1, 1997, by and between iHeartCommunications, Inc. and The Bank of New York, as Trustee (Incorporated by reference to Exhibit 4.2 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on August 28, 1998). |
| 4.3 | Nineteenth Supplemental Indenture dated December 16, 2004, to Senior Indenture dated October 1, 1997, by and between iHeartCommunications, Inc. and The Bank of New York, as Trustee (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on December 17, 2004). |
| 4.4 | Indenture, dated as of February 23, 2011, to Indenture dated as of February 23, 2011, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, the other guarantors party thereto, Wilmington Trust FSB, as Trustee, and the other agents party thereto (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on February 24, 2011). |
| 4.5 | Supplemental Indenture, dated as of June 14, 2011, to Indenture dated as of February 23, 2011, among iHeartCommunications, Inc. and Wilmington Trust FSB, as Trustee (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on June 14, 2011). |
| 4.6 | Indenture, dated as of October 25, 2012, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, U.S. Bank National Association, as trustee, and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 25, 2012). |
| 4.7 | Indenture, dated as of February 28, 2013, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, U.S. Bank National Association, as trustee, and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on March 1, 2013). |
| 4.8 | Indenture, dated as of June 21, 2013, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, Law Debenture Trust Company of New York, as trustee, and Deutsche Bank Trust Company Americas, as paying agent, registrar and transfer agent (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on June 21, 2013). |
| 4.9 | First Supplemental Indenture, dated as of December 16, 2013, to Indenture dated as of June 21, 2013, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, Law Debenture Trust Company of New York, as trustee, and Deutsche Bank Trust Company Americas, as paying agent, registrar and transfer agent (Incorporated by reference to Exhibit 4.26 to Amendment No. 1 to the iHeartCommunications, Inc. Registration Statement on Form S-4 (File No. 333-192614) filed on December 16, 2013). |
| 4.10 | Second Supplemental Indenture, dated as of December 24, 2013, to Indenture dated as of June 21, 2013, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, Law Debenture Trust Company of New York, as trustee, and Deutsche Bank Trust Company Americas, as paying agent, registrar and transfer agent (Incorporated by reference to Exhibit 4.28 to Amendment No. 2 to the iHeartCommunications, Inc. Registration Statement on Form S-4 (File No. 333-192614) filed on December 24, 2013). |

4.11    Indenture with respect to 7.625% Series A Senior Subordinated Notes due 2020, dated as of March 15, 2012, by and among Clear Channel Worldwide Holdings, Inc., Clear Channel Outdoor Holdings, Inc., Clear Channel Outdoor, Inc., the other guarantors party thereto and U.S. Bank National Association, as trustee (Incorporated by reference to Exhibit 4.1 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on March 16, 2012).

4.12    Indenture with respect to 7.625% Series B Senior Subordinated Notes due 2020, dated as of March 15, 2012, by and among Clear Channel Worldwide Holdings, Inc., Clear Channel Outdoor Holdings, Inc., Clear Channel Outdoor, Inc., the other guarantors party thereto and U.S. Bank National Association, as trustee (Incorporated by reference to Exhibit 4.2 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on March 16, 2012).

4.13    Indenture with respect to 6.50% Series A Senior Notes due 2022, dated as of November 19, 2012, by and among Clear Channel Worldwide Holdings, Inc., Clear Channel Outdoor Holdings, Inc., Clear Channel Outdoor, Inc., the other guarantors party thereto and U.S. Bank National Association, as trustee (Incorporated by reference to Exhibit 4.1 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on November 19, 2012).

4.14    Indenture with respect to 6.50% Series B Senior Notes due 2022, dated as of November 19, 2012, by and among Clear Channel Worldwide Holdings, Inc., Clear Channel Outdoor Holdings, Inc., Clear Channel Outdoor, Inc., the other guarantors party thereto and U.S. Bank National Association, as trustee (Incorporated by reference to Exhibit 4.2 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on November 19, 2012).

4.15    Indenture, dated as of May 1, 2014, among CCU Escrow Corporation and U.S. Bank National Association, as trustee (Incorporated by reference to Exhibit 4.2 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on June 6, 2014).

4.16    First Supplemental Indenture, dated as of June 6, 2014, to Indenture dated as of May 1, 2014, among iHeartCommunications, Inc. and U.S. Bank National Association, as trustee (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on June 6, 2014).

4.17    Third Supplemental Indenture, dated as of August 22, 2014, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, and Law Debenture Trust Company of New York, as trustee (incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Form 8-K filed on August 22, 2014).

4.18    Indenture, dated as of September 10, 2014, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent, and Deutsche Bank Trust Company Americas, as collateral agent (incorporated by reference to Exhibit 4.1 to iHeartCommunications, Inc.'s Current Report on Form 8-K filed on September 10, 2014).

4.19    First Supplemental Indenture, dated as of September 29, 2014, to Indenture dated as of September 10, 2014, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, certain subsidiary guarantors named therein, U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent and Deutsche Bank Trust Company Americas, as the collateral agent (incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on September 29, 2014).

4.20    Indenture, dated as of February 26, 2015, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent, and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on February 26, 2015).

4.21    Indenture, dated as of December 16, 2015, among Clear Channel International B.V., the guarantors party thereto, and U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent (incorporated by reference to Exhibit 4.1 to Clear Channel Outdoor Holdings, Inc.'s Current Report on Form 8-K filed on December 16, 2015).

| 4.22 | Fourth Supplemental Indenture, dated as of October 3, 2016, to Indenture dated as of June 21, 2013, between iHeartCommunications, Inc. and Law Debenture Trust Company of New York, as trustee (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 4, 2016). |
|---|---|
| 4.23 | Second Supplemental Indenture, dated as of November 28, 2016, to Indenture dated as of February 23, 2011, among certain subsidiary guarantors named therein, Wilmington Trust, National Association, as trustee, and Deutsche Bank Trust Company Americas, as collateral agent, paying agent, registrar, authentication agent and transfer agent (Incorporated by reference to Exhibit 4.23 to the iHeartCommunications, Inc. Annual Report on Form 10-K for the year ended December 31, 2016). |
| 4.24 | First Supplemental Indenture, dated as of November 28, 2016, to Indenture dated as of October 25, 2012, among certain subsidiary guarantors named therein, U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 4.24 to the iHeartCommunications, Inc. Annual Report on Form 10-K for the year ended December 31, 2016). |
| 4.25 | First Supplemental Indenture, dated as of November 28, 2016, to Indenture dated as of February 28, 2013, among certain subsidiary guarantors named therein, U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 4.25 to the iHeartCommunications, Inc. Annual Report on Form 10-K for the year ended December 31, 2016). |
| 4.26 | Second Supplemental Indenture, dated as of November 28, 2016, to Indenture dated as of September 10, 2014, among certain subsidiary guarantors named therein, U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 4.26 to the iHeartCommunications, Inc. Annual Report on Form 10-K for the year ended December 31, 2016). |
| 4.27 | First Supplemental Indenture, dated as of November 28, 2016, to Indenture dated as of February 26, 2015, among certain subsidiary guarantors named therein, U.S. Bank National Association, as trustee, paying agent, registrar, authentication agent and transfer agent and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 4.27 to the iHeartCommunications, Inc. Annual Report on Form 10-K for the year ended December 31, 2016). |
| 4.28 | Fifth Supplemental Indenture, dated as of November 28, 2016, to Indenture dated as of June 21, 2013, among certain subsidiary guarantors named therein and Law Debenture Trust Company of New York, as trustee (Incorporated by reference to Exhibit 4.28 to the iHeartCommunications, Inc. Annual Report on Form 10-K for the year ended December 31, 2016). |
| 4.29 | Sixth Supplemental Indenture, dated as of December 9, 2016, to Indenture dated as of June 21, 2013, between iHeartCommunications, Inc. and Delaware Trust Company, as trustee (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on December 12, 2016) |
| 4.30 | Second Supplemental Indenture, dated as of February 7, 2017, to Indenture dated as of February 28, 2013, among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, as guarantor, the other guarantors party thereto, and UMB Bank, National Association, as trustee (Incorporated by reference to Exhibit 4.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on February 7, 2017). |
| 4.31 | Registration Rights Agreement, dated February 7, 2017, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC as guarantor, the subsidiary guarantors party thereto, and Moelis & Company LLC, as dealer manager (Incorporated by reference to Exhibit 4.2 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on February 7, 2017). |
| 10.1 | Amended and Restated Credit Agreement, dated as of February 23, 2011, by and among iHeartCommunications, Inc., the subsidiary co-borrowers and foreign subsidiary revolving borrowers party thereto, iHeartMedia Capital I, LLC, Citibank, N.A., as Administrative Agent, the lenders from time to time party thereto and the other agents party thereto (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on February 24, 2011). |

10.2        Amendment No. 1 to Amended and Restated Credit Agreement, dated as of October 25, 2012, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, the subsidiary co-borrowers party thereto, the foreign subsidiary revolving borrowers thereto, Citibank, N.A. as Administrative Agent, the lenders from time to time party thereto and the other agents party thereto (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 25, 2012).

10.3        Collateral Sharing Agreement, dated as of October 25, 2012, by and among Citibank N.A. as Administrative Agent, U.S. Bank National Association, as trustee, and Deutsche Bank Trust Company Americas, as collateral agent (Incorporated by reference to Exhibit 10.2 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 25, 2012).

10.4        Amendment No. 2 to Amended and Restated Credit Agreement, dated as of May 31, 2013, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, the subsidiary co-borrowers party thereto, the foreign subsidiary revolving borrowers thereto, Citibank, N.A. as Administrative Agent, the lenders from time to time party thereto and the other agents party thereto (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on June 4, 2013).

10.5        Amendment No. 3 to Amended and Restated Credit Agreement, dated as of December 18, 2013, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, the subsidiary co-borrowers party thereto, the foreign subsidiary revolving borrowers thereto, Citibank, N.A., as Administrative Agent, the lenders from time to time party thereto and the other agents party thereto (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on December 18, 2013).

10.6        Amended and Restated Credit Agreement, dated as of December 24, 2012, by and among iHeartCommunications, Inc., iHeartMedia Capital I, LLC, the subsidiary borrowers party thereto, Citibank, N.A., as Administrative Agent, the lenders from time to time party thereto and the other agents party thereto (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on December 27, 2012).

10.7        Revolving Promissory Note dated November 10, 2005 payable by iHeartCommunications, Inc. to Clear Channel Outdoor Holdings, Inc. in the original principal amount of $1,000,000,000 (Incorporated by reference to Exhibit 10.8 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2005).

10.8        First Amendment, dated as of December 23, 2009, to the Revolving Promissory Note, dated as of November 10, 2005, by iHeartCommunications, Inc., as Maker, to Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.41 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2009).

10.9        Second Amendment, dated as of October 23, 2013, to the Revolving Promissory Note, dated as of November 10, 2005, by iHeartCommunications, Inc., as Maker, to Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 23, 2013).

10.10       Revolving Promissory Note dated November 10, 2005 payable by Clear Channel Outdoor Holdings, Inc. to iHeartCommunications, Inc. in the original principal amount of $1,000,000,000 (Incorporated by reference to Exhibit 10.7 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2005).

10.11       First Amendment, dated as of December 23, 2009, to the Revolving Promissory Note, dated as of November 10, 2005, by Clear Channel Outdoor Holdings, Inc., as Maker, to iHeartCommunications, Inc. (Incorporated by reference to Exhibit 10.42 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2009).

10.12       Master Agreement dated November 16, 2005 between Clear Channel Outdoor Holdings, Inc. and iHeartCommunications, Inc. (Incorporated by reference to Exhibit 10.1 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2005).

10.13       Corporate Services Agreement dated November 16, 2005 between Clear Channel Outdoor Holdings, Inc. and iHeartMedia Management Services, L.P. (Incorporated by reference to Exhibit 10.3 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2005).

10.14 Tax Matters Agreement dated November 10, 2005 between Clear Channel Outdoor Holdings, Inc. and iHeartCommunications, Inc. (Incorporated by reference to Exhibit 10.4 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2005).

10.15 Employee Matters Agreement dated November 10, 2005 between Clear Channel Outdoor Holdings, Inc. and iHeartCommunications, Inc. (Incorporated by reference to Exhibit 10.5 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2005).

10.16 Amended and Restated License Agreement dated November 10, 2005 between iHM Identity, Inc. and Outdoor Management Services, Inc. (Incorporated by reference to Exhibit 10.5 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2005).

10.17 First Amended and Restated Management Agreement, dated as of July 28, 2008, by and among iHeartMedia, Inc., BT Triple Crown Merger Co., Inc., B Triple Crown Finco, LLC, T Triple Crown Finco, LLC, THL Managers VI, LLC and Bain Capital Partners, LLC (Incorporated by reference to Exhibit 10.1 to the iHeartMedia, Inc. Current Report on Form 8-K filed on July 30, 2008).

10.18 Amended and Restated Voting Agreement dated as of May 13, 2008 by and among BT Triple Crown Merger Co., Inc., B Triple Crown Finco, LLC, T Triple Crown Finco, LLC, iHeartMedia, Inc., Highfields Capital I LP, Highfields Capital II LP, Highfields Capital III LP and Highfields Capital Management LP (Incorporated by reference to Annex E to the iHeartMedia, Inc. Registration Statement on Form S-4 (File No. 333-151345) filed on June 2, 2008).

10.19 Voting Agreement dated as of May 13, 2008 by and among BT Triple Crown Merger Co., Inc., B Triple Crown Finco, LLC, T Triple Crown Finco, LLC, iHeartMedia, Inc., Abrams Capital Partners I, LP, Abrams Capital Partners II, LP, Whitecrest Partners, LP, Abrams Capital International, Ltd. and Riva Capital Partners, LP (Incorporated by reference to Annex F to the iHeartMedia, Inc. Registration Statement on Form S-4 (File No. 333-151345) filed on June 2, 2008).

10.20§ Stockholders Agreement, dated as of July 29, 2008, by and among iHeartMedia, Inc., BT Triple Crown Merger Co., Inc., Clear Channel Capital IV, LLC, Clear Channel Capital V, L.P., L. Lowry Mays, Randall T. Mays, Mark P. Mays, LLM Partners, Ltd., MPM Partners, Ltd. and RTM Partners, Ltd. (Incorporated by reference to Exhibit 10.2 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2009).

10.21§ Side Letter Agreement, dated as of July 29, 2008, among iHeartMedia, Inc., Clear Channel Capital IV, LLC, Clear Channel Capital V, L.P., L. Lowry Mays, Mark P. Mays, Randall T. Mays, LLM Partners, Ltd., MPM Partners Ltd. and RTM Partners, Ltd. (Incorporated by reference to Exhibit 10.3 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2009).

10.22 Affiliate Transactions Agreement, dated as of July 30, 2008, by and among iHeartMedia, Inc., Bain Capital Fund IX, L.P., Thomas H. Lee Equity Fund VI, L.P. and BT Triple Crown Merger Co., Inc. (Incorporated by reference to Exhibit 99.6 to the iHeartMedia, Inc. Form 8-A Registration Statement filed on July 30, 2008).

10.23§ Side Letter Agreement, dated as of December 22, 2009, by and among iHeartMedia, Inc., Clear Channel Capital IV, LLC, Clear Channel Capital V, L.P., Randall T. Mays and RTM Partners, Ltd. (Incorporated by reference to Exhibit 99.3 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on December 29, 2009).

10.24§ Agreement Regarding Aircraft, dated May 31, 2013, by and among iHeartCommunications, Inc., Mark P. Mays, Randall T. Mays and L. Lowry Mays (Incorporated by reference to Exhibit 10.1 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended June 30, 2013).

10.25§ Stock Purchase Agreement dated as of November 15, 2010 by and among iHeartMedia, Inc., Clear Channel Capital IV, LLC, Clear Channel Capital V, L.P. and Pittman CC LLC (Incorporated by reference to Exhibit 10.3 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended September 30, 2011).

10.26§ Aircraft Lease Agreement dated as of November 16, 2011 by and between Yet Again Inc. and iHeartMedia + Entertainment, Inc. (Incorporated by reference to Exhibit 10.23 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2011).

10.27§ Aircraft Lease Agreement dated as of December 23, 2013 by and between FalconAgain Inc. and iHeartMedia + Entertainment, Inc. (Incorporated by reference to Exhibit 10.23 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2013).

10.28§    Letter Agreement dated as of January 13, 2014 by and between FalconAgain Inc. and iHeartMedia + Entertainment, Inc. (Incorporated by reference to Exhibit 10.24 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2013).

10.29§    Clear Channel 2008 Executive Incentive Plan (the "CC Executive Incentive Plan") (Incorporated by reference to Exhibit 10.26 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2009).

10.30§    Amendment No. 1 to the CC Executive Incentive Plan, effective as of July 1, 2013 (Incorporated by reference to Exhibit 10.1 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended September 30, 2013).

10.31§    Form of Senior Executive Option Agreement under the CC Executive Incentive Plan (Incorporated by reference to Exhibit 10.20 to the iHeartMedia, Inc. Current Report on Form 8-K filed on July 30, 2008).

10.32§    Form of Senior Executive Restricted Stock Award Agreement under the CC Executive Incentive Plan (Incorporated by reference to Exhibit 10.21 to the iHeartMedia, Inc. Current Report on Form 8-K filed on July 30, 2008).

10.33§    Form of Senior Management Option Agreement under the CC Executive Incentive Plan (Incorporated by reference to Exhibit 10.22 to the iHeartMedia, Inc. Current Report on Form 8-K filed on July 30, 2008).

10.34§    Form of Executive Option Agreement under the CC Executive Incentive Plan (Incorporated by reference to Exhibit 10.23 to the iHeartMedia, Inc. Current Report on Form 8-K filed on July 30, 2008).

10.35§    Clear Channel Employee Equity Investment Program (Incorporated by reference to Exhibit 10.24 to the iHeartMedia, Inc. Current Report on Form 8-K filed on July 30, 2008).

10.36§    iHeartMedia, Inc. 2008 Annual Incentive Plan (Incorporated by reference to Exhibit 10.32 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2009).

10.37§    Clear Channel Outdoor Holdings, Inc. 2005 Stock Incentive Plan, as amended and restated (the "CCOH Stock Incentive Plan") (Incorporated by reference to Exhibit 10.2 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on April 30, 2007).

10.38§    First Form of Option Agreement under the CCOH Stock Incentive Plan (Incorporated by reference to Exhibit 10.2 to the Clear Channel Outdoor Holdings, Inc. Registration Statement on Form S-8 (File No. 333-130229) filed on December 9, 2005).

10.39§    Form of Option Agreement under the CCOH Stock Incentive Plan (approved February 21, 2011) (Incorporated by reference to Exhibit 10.33 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2011).

10.40§    Form of Restricted Stock Award Agreement under the CCOH Stock Incentive Plan (Incorporated by reference to Exhibit 10.3 to the Clear Channel Outdoor Holdings, Inc. Registration Statement on Form S-8 (File No. 333-130229) filed on December 9, 2005).

10.41§    Form of Restricted Stock Unit Award Agreement under the CCOH Stock Incentive Plan (Incorporated by reference to Exhibit 10.16 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2010).

10.42§    Clear Channel Outdoor Holdings, Inc. 2012 Stock Incentive Plan (the "CCOH 2012 Stock Incentive Plan") (Incorporated by reference to Exhibit 99.1 to the Clear Channel Outdoor Holdings, Inc. Registration Statement on Form S-8 (File No. 333-181514) filed on May 18, 2012).

10.43§    Form of Option Agreement under the CCOH 2012 Stock Incentive Plan (Incorporated by reference to Exhibit 10.25 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2015).

10.44§    Form of Restricted Stock Award Agreement under the CCOH 2012 Stock Incentive Plan (Incorporated by reference to Exhibit 10.26 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2015).

10.45§     Form of Restricted Stock Unit Award Agreement under the CCOH 2012 Stock Incentive Plan (Incorporated by reference to Exhibit 10.27 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2015).

10.46§     Clear Channel Outdoor Holdings, Inc. Amended and Restated 2006 Annual Incentive Plan (Incorporated by reference to Appendix B to the Clear Channel Outdoor Holdings, Inc. Definitive Proxy Statement on Schedule 14A for its 2012 Annual Meeting of Stockholders filed on April 9, 2012).

10.47§     Relocation Policy - Chief Executive Officer and Direct Reports (Guaranteed Purchase Offer) (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 12, 2010).

10.48§     Relocation Policy - Chief Executive Officer and Direct Reports (Buyer Value Option) (Incorporated by reference to Exhibit 10.2 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 12, 2010).

10.49§     Relocation Policy - Function Head Direct Reports (Incorporated by reference to Exhibit 10.3 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on October 12, 2010).

10.50§     Form of iHeartMedia, Inc. and iHeartCommunications, Inc. Indemnification Agreement (Incorporated by reference to Exhibit 10.26 to the iHeartMedia, Inc. Current Report on Form 8-K filed on July 30, 2008).

10.51§     Indemnification Agreement by and among iHeartMedia, Inc., iHeartCommunications, Inc. and Robert W. Pittman dated September 18, 2012 (Incorporated by reference to Exhibit 10.3 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended September 30, 2012).

10.52§     Form of Clear Channel Outdoor Holdings, Inc. Independent Director Indemnification Agreement (Incorporated by reference to Exhibit 10.1 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on June 3, 2009).

10.53§     Form of Clear Channel Outdoor Holdings, Inc. Affiliate Director Indemnification Agreement (Incorporated by reference to Exhibit 10.2 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on June 3, 2009).

10.54§     Indemnification Agreement by and among Clear Channel Outdoor Holdings, Inc. and Robert W. Pittman dated September 18, 2012 (Incorporated by reference to Exhibit 10.4 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended September 30, 2012).

10.55§     Indemnification Agreement by and among Clear Channel Outdoor Holdings, Inc. and Robert H. Walls, Jr. dated September 5, 2012 (Incorporated by reference to Exhibit 10.6 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended September 30, 2012).

10.56§     Amended and Restated Employment Agreement, dated as of January 13, 2014 between Robert Pittman and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.1 to the iHeartMedia, Inc. Current Report on Form 8-K filed on January 13, 2014).

10.57§     Employment Agreement by and between iHeartMedia, Inc. and Richard J. Bressler, dated July 29, 2013 (Incorporated by reference to Exhibit 10.1 to the iHeartMedia, Inc. Current Report on Form 8-K/A filed on August 2, 2013).

10.58§     Employment Agreement, dated as of January 1, 2010, between Robert H. Walls, Jr., and iHeartMedia Management Services, Inc. (Incorporated by reference to Exhibit 10.1 to the iHeartCommunications, Inc. Current Report on Form 8-K filed on January 5, 2010).

10.59§     Employment Agreement, effective as of January 24, 2012, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.1 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K/A filed on July 27, 2012).

10.60§     Amendment No. 1 to Employment Agreement, effective as of March 2, 2015, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (incorporated by reference to Exhibit 10.1 to the Clear Channel Outdoor Holdings, Inc. Quarterly Report on Form 10-Q for the quarter ended March 31, 2015).

10.61§         Amendment No. 2 to Employment Agreement, effective as of December 17, 2015, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (incorporated by reference to Exhibit 10.38 to Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2015).

10.62§         Form of Amendment to Senior Executive Option Agreement under the CC Executive Incentive Plan, dated as of October 14, 2008 (Incorporated by reference to Exhibit 10.56 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2011).

10.63§         Form of Executive Option Agreement under the CC Executive Incentive Plan, dated as of December 31, 2010, between Robert H. Walls, Jr. and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.44 to the iHeartCommunications, Inc. Annual Report on Form 10-K for the year ended December 31, 2010).

10.64§         Form of Executive Option Agreement under the CC Executive Incentive Plan, dated as of May 19, 2011, between Scott D. Hamilton and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.63 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2011).

10.65§         Executive Option Agreement under the CC Executive Incentive Plan, dated as of October 2, 2011, between Robert W. Pittman and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.2 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended September 30, 2011).

10.66§         Amendment to the Executive Option Agreement under the CC Executive Incentive Plan, dated as of January 13, 2014, between Robert W. Pittman and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.2 to the iHeartMedia, Inc. Current Report on Form 8-K filed on January 13, 2014).

10.67§         Form of Restricted Stock Agreement under the CC Executive Incentive Plan, dated October 15, 2012, between Robert W. Pittman and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.74 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2012).

10.68§         Form of Restricted Stock Agreement under the CC Executive Incentive Plan, dated October 15, 2012, between Robert H. Walls, Jr. and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.75 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2012).

10.69§         Form of Restricted Stock Agreement under the CC Executive Incentive Plan, dated October 22, 2012, between Scott D. Hamilton and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.77 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2012).

10.70§         Form of Restricted Stock Agreement under the CC Executive Incentive Plan, dated October 22, 2012, between Robert H. Walls, Jr. and iHeartMedia, Inc. (Incorporated by reference to Exhibit 10.78 to the iHeartMedia, Inc. Annual Report on Form 10-K for the year ended December 31, 2012).

10.71§         Restricted Stock Agreement under the CC Executive Incentive Plan, dated January 13, 2014, between Robert W. Pittman and iHeartMedia, Inc. (Incorporated by reference to Exhibit C of Exhibit 10.1 to the iHeartMedia, Inc. Current Report on Form 8-K filed on January 13, 2014).

10.72§         Form of Stock Option Agreement under the CCOH Stock Incentive Plan, dated September 17, 2009, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.34 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2010).

10.73§         Form of Amended and Restated Stock Option Agreement under the CCOH Stock Incentive Plan, dated as of August 11, 2011, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.1 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on August 12, 2011).

10.74§         Form of Stock Option Agreement under the CCOH Stock Incentive Plan, dated December 13, 2010, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.35 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2010).

10.75§         Form of Restricted Stock Unit Agreement under the CCOH Stock Incentive Plan, dated December 20, 2010, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.36 to the Clear Channel Outdoor Holdings, Inc. Annual Report on Form 10-K for the year ended December 31, 2010).

| | |
|---|---|
| 10.76§ | Form of Restricted Stock Unit Agreement under the CCOH Stock Incentive Plan, dated March 26, 2012, between Robert H. Walls, Jr. and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.3 to the iHeartMedia, Inc. Quarterly Report on Form 10-Q for the quarter ended March 31, 2012). |
| 10.77§ | Form of Restricted Stock Unit Agreement under the CCOH 2012 Stock Incentive Plan, dated July 26, 2012, between C. William Eccleshare and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit 10.2 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K/A filed on July 27, 2012). |
| 10.78§ | Restricted Stock Award Agreement under the CCOH 2012 Stock Incentive Plan, dated January 13, 2014, between Robert W. Pittman and Clear Channel Outdoor Holdings, Inc. (Incorporated by reference to Exhibit D of Exhibit 10.1 to the iHeartMedia, Inc. Current Report on Form 8-K filed on January 13, 2014). |
| 10.79 | Stipulation of Settlement, dated as of July 8, 2013, among legal counsel for iHeartCommunications, Inc. and the other named defendants, the special litigation committee of the board of directors of Clear Channel Outdoor Holdings, Inc. and the plaintiffs (Incorporated by reference to Exhibit 10.1 to the Clear Channel Outdoor Holdings, Inc. Current Report on Form 8-K filed on July 9, 2013). |
| 10.80§ | Employment Agreement by and between iHeartMedia Management Services, Inc. and Scott D. Hamilton, dated May 20, 2014 (Incorporated by reference to Exhibit 10.1 to the iHeartMedia, Inc. Current Report on Form 8-K filed on June 25, 2014). |
| 10.81§ | Employment Agreement by and between iHeartMedia Management Services, Inc. and Steven J. Macri dated October 7, 2013. |
| 10.82§ | Employment Agreement, effective as of March 3, 2015, between Scott Wells and Clear Channel Outdoor Holdings, Inc. (incorporated by reference to Exhibit 10.2 to the Clear Channel Outdoor Holdings, Inc. Quarterly Report on Form 10-Q for the quarter ended March 31, 2015). |
| 10.83 | Subordination Agreement, dated as of December 16, 2015, among Clear Channel International B.V., the guarantors party thereto, U.S. Bank National Association, as trustee, and the subordinated creditors party thereto (incorporated by reference to Exhibit 10.1 to Clear Channel Outdoor Holdings, Inc.'s Current Report on 8-K filed on December 16, 2015). |
| 10.84§ | iHeartMedia, Inc. 2015 Executive Long-Term Incentive Plan (Incorporated by reference to Appendix A to the iHeartMedia, Inc. definitive proxy statement on Schedule 14A for its 2015 Annual Meeting of Stockholders filed March 31, 2015). |
| 10.85§ | iHeartMedia, Inc. 2015 Supplemental Incentive Plan (Incorporated by reference to Appendix B to the iHeartMedia, Inc. definitive proxy statement on Schedule 14A for its 2015 Annual Meeting of Stockholders filed March 31, 2015). |
| 10.86§ | iHeartMedia, Inc. 2015 Executive Incentive Plan (Incorporated by reference to Appendix C to the iHeartMedia, Inc. definitive proxy statement on Schedule 14A for its 2015 Annual Meeting of Stockholders filed March 31, 2015). |
| 10.87*§ | Form of Retention Bonus Agreement. |
| 10.88*§ | iHeartMedia, Inc. 2017 Key Employee Incentive Plan. |
| 21* | Subsidiaries. |
| 23* | Consent of Ernst & Young LLP. |
| 24* | Power of Attorney (included on signature page). |
| 31.1* | Certification Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |

| 32.1** | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document. |
| 101.SCH* | XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document. |

---

\* Filed herewith.

\*\* This exhibit is furnished herewith and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liability of that section, and shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934.

§ A management contract or compensatory plan or arrangement required to be filed as an exhibit pursuant to Item 601 of Regulation S-K.

**ITEM 16. Form 10-K Summary**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 23, 2017.

**IHEARTMEDIA, INC.**

By: /s/ Robert W. Pittman

Robert W. Pittman

Chairman and Chief Executive Officer

**Power of Attorney**

Each person whose signature appears below authorizes Robert W. Pittman, Richard J. Bressler and Scott D. Hamilton, or any one of them, each of whom may act without joinder of the others, to execute in the name of each such person who is then an officer or director of the Registrant and to file any amendments to this Annual Report on Form 10-K necessary or advisable to enable the Registrant to comply with the Securities Exchange Act of 1934, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, which amendments may make such changes in such report as such attorney-in-fact may deem appropriate.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

139

| Name | Title | Date |
|---|---|---|
| /s/ Robert W. Pittman<br>Robert W. Pittman | Chairman and Chief Executive Officer (Principal Executive Officer) and Director | February 23, 2017 |
| /s/ Richard J. Bressler<br>Richard J. Bressler | President, Chief Operating Officer, Chief Financial Officer (Principal Financial Officer) and Director | February 23, 2017 |
| /s/ Scott D. Hamilton<br>Scott D. Hamilton | Senior Vice President, Chief Accounting Officer (Principal Accounting Officer) and Assistant Secretary | February 23, 2017 |
| /s/ David C. Abrams<br>David C. Abrams | Director | February 23, 2017 |
| /s/ Irving L. Azoff<br>Irving L. Azoff | Director | February 23, 2017 |
| /s/ Jonathan Belitsos<br>Jonathan Belitsos | Director | February 23, 2017 |
| /s/ Frederic F. Brace<br>Frederic F. Brace | Director | February 23, 2017 |
| /s/ James C. Carlisle<br>James C. Carlisle | Director | February 23, 2017 |
| /s/ John P. Connaughton<br>John P. Connaughton | Director | February 23, 2017 |
| /s/ Charles H. Cremens<br>Charles H. Cremens | Director | February 23, 2017 |
| /s/ Matthew J. Freeman<br>Matthew J. Freeman | Director | February 23, 2017 |
| /s/ Laura Grattan<br>Laura Grattan | Director | February 23, 2017 |
| /s/ Blair E. Hendrix<br>Blair E. Hendrix | Director | February 23, 2017 |
| /s/ Jonathon S. Jacobson<br>Jonathon S. Jacobson | Director | February 23, 2017 |
| /s/ Scott M. Sperling<br>Scott M. Sperling | Director | February 23, 2017 |

# EXHIBIT 6

**WHITE & CASE**

July 9, 2018

VIA E-MAIL

Yates M. French
Kirkland & Ellis LLP
300 North LaSalle,
Chicago, Illinois 60654

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

**whitecase.com**

Re: *Wilmington Savings Fund Society, FSB v. iHeartCommunications, Inc., et al.*, No. 18-03052

Dear Mr. French:

We write on behalf of Plaintiff Wilmington Savings Fund Society, FSB ("WSFS") to memorialize the meet and confer discussions on July 3, 2018 between White & Case LLP ("W&C") as counsel for WSFS and Kirkland & Ellis LLP ("K&E") as counsel for Defendants iHeartCommunications, Inc. *et al.* ("Defendants") regarding: (i) the search terms used to collect for review documents potentially responsive to WSFS's First Set of Document Requests to Defendants; and (ii) Defendants' Responses to WSFS's Second Set of Document Requests to Defendants.

**I.      Search Terms for WSFS's First Set of Document Requests**

K&E agreed with W&C's proposed revisions to K&E's search terms, which W&C sent to K&E on June 25, 2018, with the following two exceptions:

K&E proposed eliminating the word "Holdings" as a term from certain search strings. K&E stated that when the search technicians used the term "Holdings" to mine the custodians' documents, this additional word brought in too many false positive matches. After considering K&E's proposal, W&C agrees to this proposal.

K&E also proposed narrowing the cutoff date range for all existing search terms, such that K&E would not search for documents created after the commencement of the Texas declaratory judgment actions in the 57th District Court and 438th District Court of Bexar County, Texas, on December 12, 2016. After considering K&E's proposal, W&C does not agree to this date limitation. As the instructions to WSFS' Requests note, unless otherwise indicated in a particular request, the time period covered by the requests extends to the present. WSFS is particularly interested in non-privileged documents responsive to its requests from the months leading up to the petition date, and Defendants have provided no basis for excluding such documents. To the extent your concern is that documents from after December 12, 2016 will contain a disproportionately high number of privileged documents, we are willing to consider limitations on the search terms designed to exclude privileged documents (i.e., excluding internal documents with certain law firm's or lawyers' names), but there is no justification for a blanket exclusion of documents after December 12, 2016.

AMERICAS 95082872

WHITE & CASE

Yates M. French
July 9, 2018

## II.    WSFS's Second Set of Document Requests

As a general matter, W&C noted during the meet and confer discussion that even if Defendants know the location of responsive documents, WSFS's agreement as to search terms does not relieve Defendants of their burden to conduct a good faith search for other documents that might be located elsewhere. Defendants acknowledged that they have a responsibility to conduct a good faith search and that, to the extent they are aware of responsive documents that would not be captured by the agreed search parameters, or locations where such responsive documents are likely to be found, they will produce such documents. Similarly, even where Defendants have proposed a targeted search for certain requests, to the extent they locate documents responsive to such requests using search terms for other requests, such documents must be produced.

Request 1

This Request seeks information sufficient to show the value of the preferential transfer that iHeartCommunications, Inc. alleges in its Counterclaim III occurred or would occur. Defendants agreed to produce Defendants' most recent balance sheet showing the book value of Defendants' current assets. Subject to the right to revisit this request as future discovery may warrant, WSFS agrees to Defendants' proposal.

Request 2

This Request seeks documents and communications regarding Defendants' decision not to grant the Equal and Ratable Mortgages at any and all pertinent times, including but not limited to upon the demand made by the Ad Hoc Group of Legacy Noteholders as referenced in paragraph 73 of the Complaint. Defendants agreed that they would produce documents responsive to this request, and that their production would not be limited to documents related to the allegation made in paragraph 73 of the Complaint. Defendants stated their belief that any documents that this Request captures would likely be caught by the proposed search terms for WSFS's First Set of Document Requests. Upon consideration, WSFS agrees that no additional search terms are required for this request

Request 3

This Request seeks statements of assets and liabilities as of (i) the date each Principal Properties Security Agreement was executed, (ii) December 15, 2016, and (iii) the date of each annual compliance certificate delivered in the fiscal year following the incurrence of each issue of PGNs. Defendants stated that it would be burdensome to collect documents on the exact dates as outlined in the Request, and proposed that publicly available quarterly reports should be sufficient. After considering Defendants' proposal, WSFS tentatively agrees that such quarterly reporting may be sufficient, subject to the right to revisit this issue if such reporting proves to be insufficient or as future discovery may otherwise warrant.

Request 4

This Request seeks documents sufficient to show whether iHeartCommunications, Inc. was insolvent or in the zone of insolvency as of December 2016. Defendants stated that this Request is duplicative of Request 3. WSFS agreed to revert on whether documents produced in response to Request 3 would be sufficient, or whether Defendants must produce additional documents responsive to this request. WSFS confirms that the Request contemplates documents beyond those contemplated by Request 3 and believes that other documents responsive to this Request would include documents regarding: fair market value (as

2

WHITE & CASE

Yates M. French
July 9, 2018

opposed to book value) of iHeartCommunications, Inc. (including, but not limited to, valuation reports; marketing reports; and any documents concerning the value of the company in a marketing process); whether iHeartCommunications, Inc. was paying debts as they become due (including, but not limited to, documents showing whether iHeartCommunications, Inc. was making late payment on debts, was defaulting on loans or other obligations, reducing support staff, downsizing office space, increasing its borrowings on lines of credit, not making dividends to shareholders, cancelling services, or selling assets to raise cash); and any documents stating, representing, or opining that iHeartCommunications, Inc. was either solvent or insolvent.

Request 5

This Request seeks documents showing any mortgage, pledge, lien, encumbrance, charge or security interest of any kind, including a conditional or contingent lien, on the Springing Lien Collateral, in favor of the PGN Holders, from January 1, 2011 to present. Defendants stated that this Request has been already fulfilled to date by the production of five PPSA closing binders. To the extent that Defendants represent that the closing binders reflect all mortgages, pledges, liens, encumbrances, charges or security interests of any kind, including any conditional or contingent liens, on the Springing Lien Collateral, in favor of the PGN Holders, WSFS agrees that Defendants have satisfied or will satisfy their obligation with respect to this request, subject to the right to revisit this request as discovery may warrant.

Request 6

This Request seeks documents relating to the negotiation of the Equal and Ratable Clause in the Legacy Indenture, without date restriction. Defendants stated that they do not have any electronically stored information ("ESI") related to this Request from any time before 2006, but that Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") represented Defendants before 2006 and so might have ESI or other documents from that time period. Defendants stated that they are waiting to hear from Akin Gump about whether Akin Gump possesses any ESI or documents from before 2006.

Request 7

This Request seeks documents relating to the negotiation of the Existing Notes Condition in the Credit Agreement and the Springing Lien Condition in the PGN Indentures, without date restriction. Defendants have agreed to produce documents responsive to this Request. Upon consideration, WSFS agrees that this request is covered by the existing search terms.

Request 8

This Request seeks documents regarding the formation and decision-making process of the special committee of independent directors who decided that iHeartCommunications, Inc. would not redeem the Repurchased 2016 Legacy Notes, including all documents showing whether the special committee was aware at the time of its decision that Clear Channel Holdings, Inc. would not enforce its rights against iHeartCommunications, Inc. with respect to the Repurchased 2016 Legacy Notes. Defendants agreed to produce documents responsive to this Request and believed that the existing search terms would be sufficient. WSFS agreed to revert about potential additional search terms. Defendants also stated that Munger Tolles & Olson LLP is going to produce post-special committee formation documents, and that Defendants also likely have some pre-special committee formation documents to produce. WSFS believes that with respect to Munger Tolles & Olson LLP's efforts to produce post-special committee formation documents, in addition to a targeted collection, Defendants should also use the search terms

WHITE & CASE

Yates M. French
July 9, 2018

from the sixth agreed search in connection with WSFS's First Request for Production.[1]  WSFS believes that the same search terms should be used for Defendants' production of pre-special committee formation documents.

Request 9

This Request seeks documents regarding the formation and maintenance of each of the Defendants in the adversary proceeding as separate and distinct entities, including documents regarding the control (or lack thereof) exercised by iHeartCommunications, Inc. over the Subsidiary Debtor Defendants.  Defendants stated that they plan to produce documents relating to the formation of each of the entities including the articles of incorporation, registration statements, and similar documents.  WSFS stated that its request contemplates documents related not only to formation but also to maintenance of Defendants as separate entities (or not), but agreed to revert on proposed search strategies that would capture the information sought by this Request.  WSFS believes that the following documents, or documents concerning the following subjects, would be responsive to this Request: minutes of the boards of directors; resolutions of the boards of directors; operating agreements; records approving any loans to any Subsidiary Debtor Defendants or any manager of any Subsidiary Debtor Defendants; loan agreements between iHeartCommunications, Inc. and any of the Subsidiary Debtor Defendants; bylaws and resolutions approving same; records of affirmative votes or decision by directors, including those done by unanimous written consent; documents showing the money or property or other capitalization contributed to the Subsidiary Debtor Defendants in exchange for common stock or any other ownership interest in the Subsidiary Debtor Defendants, and the documents showing the issuance of such common stock or other ownership interest; the identity of the directors of each Defendant; the identity of the officers and managers of each Defendant; how the entities interacted; how each entity made decisions generally and specifically with respect to whether to enter into the Principal Property Security Agreements; records of dividends paid by the Subsidiary Debtor Defendants; documents either showing discretion exercised by the Subsidiary Debtor Defendants or obeying instructions from their parent; commingling of funds of any of iHeartCommunications and the Subsidiary Debtor Defendants; payment by a Subsidiary Debtor Defendant of iHeartCommunication, Inc.'s expenses; or whether any of the Subsidiary Debtor Defendants employed employees separate from iHeartCommunications, Inc.

Request 10

This Request seeks documents and information sufficient to detail each step that iHeartCommunications, Inc. took to prevent the redemption of the Repurchased 2016 Legacy Notes.  Defendants agreed to produce documents responsive to this Request.  WSFS generally agrees that a targeted collection is appropriate, subject to an agreement on parameters.  Please respond with a written description of how you propose to make such a targeted collection.

---

[1] That sixth agreed search is: ("Senior Indenture" OR "Legacy Indenture" OR "1997 Indenture" OR "2016s" OR "2016's" OR "Legacies" OR "Legacy Notes" OR "due 2016" OR "Existing Notes Indenture" OR "Existing Notes" OR "Legacy Notes Indenture" OR "57m" OR "57.1m" OR "55.5m" OR "CC Finco" OR "CC Holdings" OR "Clear Channel Holdings") W/50 (transfer! OR purchas! OR buy! OR bought OR repurchas! OR re-purchas! OR discount! OR yield! OR "CC Finco" OR CCFinco OR "CC Holdings" OR "Clear Channel Holdings" OR "CCH" OR "outstanding" OR cancel! OR CUSIP or "mature" or "maturity").

4

WHITE & CASE

Yates M. French
July 9, 2018

Request 11

This Request seeks documents concerning the steps taken by Clear Channel Holdings, Inc., iHeartCommunications, Inc., and the Subsidiary Debtor Defendants in connection with the decision by iHeartCommunications, Inc. not to redeem the Repurchased 2016 Legacy Notes and/or the act of not redeeming the Repurchased 2016 Legacy Notes, including without limitation any documents or communications by or between Clear Channel Holdings, Inc., iHeartCommunications, Inc., and/or any Subsidiary Debtor Defendants concerning the same.  Defendants stated that they believe that this Request is duplicative of Request 10.  Upon consideration, WSFS points out that that this request is broader in that it seeks "all documents" related to this subject matter.  However, WSFS agrees that the agreed search string included above in footnote 1 is sufficient for this request.

Request 12

This Request seeks documents and communications with any third parties (including without limitation, the Depositary Trust Company, indenture trustees, administrative or other agents under any of iHeartCommunications, Inc. or the Subsidiary Debtor Defendants' debt instruments) concerning the decision by iHeartCommunications, Inc. not to redeem the Repurchased 2016 Legacy Notes and/or the act of not redeeming the Repurchased 2016 Legacy Notes.  Defendants stated that they believe that this Request will be captured by the proposed search terms for WSFS's First Set of Document Requests. WSFS agrees that no additional search terms are required.

Request 13

This Request seeks documents, resolutions, meeting minutes, or other proceedings recorded by any of iHeartCommunications, Inc. and the Subsidiary Debtor Defendants' boards of directors or any committee thereof concerning the decision by iHeartCommunications, Inc. not to redeem the Repurchased 2016 Legacy Notes and/or the act of not redeeming the Repurchased 2016 Legacy Notes.  Defendants agreed to produce documents responsive to this Request.


We look forward to continuing to work with you to resolve the outstanding issues.

Sincerely,

*/s/ Colin T. West*

**Colin T. West**