

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/15/2019

| | | |
|---|---|---|
| IN RE: | § | |
| **IHEARTMEDIA, INC.,** *et al* | § | **CASE NO: 18-31274** |
| Debtors. | § | |
| | § | **CHAPTER 11** |
| | § | |
| **WILMINGTON SAVINGS FUND** | § | |
| **SOCIETY, FSB, SOLELY IN ITS** | § | |
| **CAPACITY AS SUCCESSOR INDENTURE** | § | |
| **TRUSTEE TO THE 6.875% SENIOR** | § | |
| **NOTES DUE 2018 AND 7.25% SENIOR** | § | |
| **NOTES DUE 2027, AND NOT IN ITS** | § | |
| **INDIVIDUAL CAP** | § | |
| Plaintiffs | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 18-03052** |
| | § | |
| **IHEARTCOMMUNICATIONS, INC.,** | § | |
| **F/K/A CLEAR CHANNEL** | § | |
| **COMMUNICATIONS, INC.,** *et al* | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Wilmington Savings Fund Society, FSB, the successor indenture trustee to the 2016, 2018, and 2027 Legacy Notes, filed this adversary proceeding against iHeartCommunications, Inc. *et al* in order to protect the Legacy Noteholders' rights to equal and ratable treatment based on a "Springing Lien" that exists under its bond indenture. Wilmington seeks to vindicate its rights through the imposition of an equitable lien or a constructive trust, or through damages for unjust enrichment or tortious interference.

iHeart, its subsidiary defendants, and the Senior Creditors holding the May 13, 2008 Term Loans and various Priority Guaranteed Notes oppose the relief Wilmington seeks, arguing that the complaint is based upon baseless factual allegations, and that the relief sought is fatally flawed under controlling law.

The Court holds that the Springing Lien in the PGN Indenture has not been triggered, and the relief Wilmington seeks is denied.

## Background

*Creation of the Legacy Indentures*

On October 1, 1997, iHeartCommunications, Inc. ("iHeart") entered into a Senior Indenture (the "Legacy Indenture") with Bank of New York Mellon Trust Co., N.A. ("BNY Mellon Trust").  BNY was Wilmington's predecessor in interest.  (ECF No. 236 at 15).

Under the Legacy Indenture, iHeart issued three Legacy Notes: the 5.50% Senior Notes due in 2016 with a principal amount of $250,000,000.00 (the "2016 Legacy Notes"); the 6.875% Senior Notes due in 2018 with a principal amount of $175,000,000.00 (the "2018 Legacy Notes"); and the 2027 Senior Notes with a principal amount of $300,000,000.00 (the "2027 Legacy Notes").  (ECF No. 236 at 15).

Section 1006 of the Legacy Indenture contains an Equal and Ratable Clause which restricts iHeart's rights to grant certain liens unless equal and ratable liens are granted to the Legacy Noteholders.  This restriction applies to restrict the ability of iHeart or an iHeart Subsidiary to mortgage any stock or indebtedness of a Restricted Subsidiary or to encumber Principal Property.  (ECF No. 1-1 at 39).  The full text of Section 1006 is:

> Section 1006. Limitation on Mortgages. [iHeart] will not, nor will it permit any Restricted Subsidiary to, create, assume, incur or suffer to exist (i) any Mortgage upon any stock or indebtedness of any Restricted Subsidiary . . . and (ii) any Mortgage upon any Principal Property, whether owned or leased on the date of this Indenture, or thereafter acquired, to secure any Debt of the Company or any other person (other than the Securities) without in any such case making effective provision whereby all of the Securities Outstanding shall be *directly secured equally and ratably* with such Debt.

(ECF No. 1-1 at 39) (emphasis added).  The Legacy Indenture broadly defines a Mortgage as "any mortgage, pledge, lien, encumbrance, charge or security interest of any kind."  (ECF No. 1-

1 at 7).  Principal Property is "any radio broadcasting, television broadcasting or outdoor advertising property located in the United States owned or leased by the Company or any Subsidiary." (ECF No. 1-1 at 8).

The initial dispute between iHeart and Wilmington is whether Section 1006 serves to grant a lien to Wilmington or serves to prohibit iHeart from granting liens to others.  The Court sees no ambiguity in the language of Section 1006.  It is a prohibition and not a grant.

Section 1006 also lists two exceptions of allowed Mortgages which would not trigger the Equal and Ratable Clause: (i) all Permitted Mortgages as defined in the Legacy indenture, and (ii) Mortgages on Principal Property "if the aggregate amount of all Debt then outstanding secured by such Mortgage and all similar Mortgages does not exceed 15% of the total consolidated stockholders' equity…" (ECF No. 1-1 at 39–40).

The Legacy Notes issued across the three series totaled $725,000,000.00.  (*See* ECF No. 236 at 15).

*2008 Leveraged Buyout*

In 2008, iHeart was acquired by two private equity firms through a leveraged buyout which necessitated the acquisition of additional debt.  (ECF No. 236 at 17).  To facilitate the buyout process, iHeart entered into a credit agreement and a series of Term Loans on May 13, 2008.  (ECF No. 234 at 15).  The Term Loans were guaranteed by iHeart's subsidiaries and Principal Property Security Agreements ("PPSAs") were issued.  One PPSA granted security interests over Principal Property belonging to iHeart's subsidiaries which secured debt corresponding to 15% of the shareholder's equity.  (ECF No. 234 at 15).  This security interest was specifically identified in Section 1006 of the Legacy Indenture and did not trigger the Equal and Ratable Clause.  (ECF No. 1-1 at 39).

A second Term Loan PPSA granted a right to a lien which would encumber iHeart's equity interest in its subsidiaries and all Principal Property; however, the lien rights were not triggered until the balance of outstanding Legacy Notes dropped below $500,000,000.00.  (ECF No. 234 at 15).  The parties have referred to this arrangement interchangeably as a "Springing Lien" or a "Collateral Flip."  For convenience, the Court adopts the term "Springing Lien" throughout this opinion.

No security interest on Principal Property existed (beyond the 15% equity exception referenced above) until and unless the amount of outstanding Legacy Notes fell below $500,000,000.00.  The Springing Lien, in combination with the Legacy Indenture's Equal and Ratable Clause, forms the basis of the dispute between the parties.

Between 2011 and 2015, iHeart refinanced the Term Loan debt by issuing five Priority Guaranteed Notes ("PGNs").  (ECF No. 236 at 17).  The PGNs did not rely on the 15% equity exception.  Instead, the agreements granted identical Springing Liens which would be triggered if the balance of Legacy Notes dropped below $500,000,000.00.  (ECF No. 234 at 16).  The PGN PPSAs also allowed for the filing of "all asset" UCC-1 financing statements.  (ECF No. 236 at 18).

*iHeart's Acquisition of Certain Legacy Notes*

Shortly after the leveraged buyout, the United States economy entered into an economic recession.  The recession, along with other factors, placed substantial economic pressure on iHeart.  iHeart's leveraged capital structure further exacerbated this financial pressure, and despite attempts to refinance this debt, iHeart's debt began to trade on the public markets at a substantial discount from par.  (ECF No. 236 at 20).

iHeart created CC Finco, LLC, an indirect iHeart subsidiary, to purchase securities (at a discount on the open market) issued by iHeart and its affiliates.  (ECF No. 231 at 19).  On October 20, 2014, CC Finco purchased $57,100,000.00 in outstanding 2016 Legacy Notes on the open market.  (ECF No. 231 at 19).  CC Finco then transferred this portion of the 2016 Legacy Notes to Clear Channel Holdings ("CC Holdings"), a direct iHeart subsidiary.  (ECF No. 231 at 19).  This purchase was part of a larger financial strategy to manage iHeart's balance sheet by purchasing multiple debt instruments at market discounts.  (ECF No. 251 at 35).

iHeart's subsidiaries still held the $57.1 million of 2016 Legacy Notes as the December 15, 2016 bond maturity date approached for the 2016 Legacy Notes.  (ECF No. 236 at 22).  On October 5, 2016, iHeart's Board of Directors appointed Frederic Brace and Charles Cremens to serve on a special committee and determine the best strategy for iHeart to pursue with regard to the maturing 2016 Legacy Notes.  (ECF No. 234 at 20).  The committee retained independent legal and financial advisors and examined multiple options ranging from having a third party hold the Notes, delaying the Springing Lien, or filing for bankruptcy before the maturity date. (ECF No. 234 at 20).

Ultimately, iHeart's Special Committee determined to pursue a third course of action— continue paying interest on the $57.1 million of 2016 Legacy Notes but refuse to pay principal even after the maturity date passed.  (ECF No. 234 at 20).  This split the $250,000,000.00 of 2016 Legacy Notes into two classes: $192.9 million, which would be paid and retired upon maturity, and $57.1 million, which would remain with iHeart's subsidiary.  (ECF No. 234 at 21). To allow for the payment and retirement of the $192.9 million in bonds, iHeart obtained a new

CUSIP number[1] for the portion of the $57.1 million of Legacy 2016 Notes which it retained, while the balance of the 2016 Legacy Notes were paid and retired.  (ECF No. 234 at 21).

### Aftermath of iHeart's Decision

When iHeart decided to retain the $57.1 million of 2016 Legacy Notes, it also began litigation in Texas state district court, seeking a declaratory judgment that the $57.1 million of 2016 Legacy Notes remained outstanding and had not triggered the Springing Liens in the PGN PPSAs in December 2016.  (ECF No. 234 at 22).

iHeart's Texas state court suit ran parallel with extensive negotiations surrounding its restructuring process and potential bankruptcy filing.  (ECF No. 236 at 25).  Wilmington alleges that it first learned of the PGN PPSAs during negotiations with iHeart in November 2017 and was surprised to learn that it was classified with junior debtholders.  (ECF No. 236 at 25–26). Wilmington demanded that iHeart grant a mortgage consistent with the terms of the Equal and Ratable Clause in the Legacy Indenture.  (ECF No. 236 at 26).  After iHeart refused this demand, Wilmington filed suit in New York state court on February 28, 2018.  (ECF No. 236 at 26). However, both state court suits were stayed after iHeart filed for bankruptcy on March 14, 2018. (Case No. 18-31274; ECF No. 1).

### Wilmington's Claims

As the Legacy Indenture Trustee, Wilmington alleges that the transactions surrounding the issuance of the PGN PPSAs and the subsequent acquisition of $57.1 million of the 2016 Legacy Notes by iHeart's subsidiaries were performed in secret to avoid alerting Wilmington of its potential rights under the Legacy Indenture's Equal and Ratable Clause.  (ECF No. 236 at 25). They further argue that the $57.1 million of 2016 Legacy Notes, which iHeart acquired, are no

---

[1] CUSIP refers to the Committee on Uniform Security Identification Procedures, which issues unique nine-digit verification numbers to identify securities.  (*See* ECF No. 234 at 21).

longer outstanding.  (ECF No. 236 at 34).  If that position is sustained, then the Springing Liens in the PGNs would have been triggered and the Legacy Noteholders would have been entitled to equal and ratable treatment.  (ECF No. 236 at 38–39).

Wilmington argues that as a result of iHeart's issuance of the PGN PPSAs and acquisition of $57.1 million of 2016 Legacy Notes, it is entitled to a range of equitable remedies in the form of the imposition of an equitable lien or a constructive trust, or in the form of damages for unjust enrichment or tortious interference.  (ECF No. 236 at 44).

<em>iHeart's Portrayal of the Transactions</em>

Conversely, iHeart views Wilmington's claims as an attempt by a creditor whose interests were unsecured and subordinated to deviate from the absolute priority rule and litigate its way to a greater recovery than their contractual entitlement.  (ECF No. 234 at 9).

iHeart claims that the issuance of the PGN Notes and PGN PPSAs were fully disclosed in public SEC and court filings as well as in materials sent directly to Bank of New York Mellon, Wilmington's predecessor in the Legacy Notes.  (ECF 234 at 17).

iHeart also disputes Wilmington's interpretation of the acquisition of the $57.1 million of 2016 Legacy Notes, characterizing it as part of a larger program used to buy back debt traded at below par value for later resale.  (ECF No. 234 at 19).  In iHeart's view, the $57.1 million of 2016 Legacy Notes remains outstanding because they were never cancelled, redeemed, or retired.  As a result, the Springing Lien remains untriggered, which negates the argument that equal and ratable liens should be issued.  (ECF No. 234 at 34–35).

Rather than a series of covert transactions to stymie Noteholders' interests, iHeart portrays its decision not to retire the 2016 Legacy Notes as a calculated business judgment decision, determined after careful examination of all possible alternatives.  (ECF No. 234 at 26–

27).  iHeart alleges that its decision to keep the 2016 Legacy Notes outstanding was done to maintain the financial health and viability of the company in the face of impending restructuring and a potential bankruptcy filing.  (ECF No. 234 at 20–21)

*Senior Creditor's Portrayal of the Transactions*

The Senior Creditors are intervening defendants comprised of U.S. Bank, N.A., in its capacity as the indenture trustee for the PGN Notes.  (ECF No. 231 at 2).  The Senior Creditors' position on this dispute straddles those of iHeart and Wilmington.  The Senior Creditors argue that Wilmington's equitable claims against iHeart are an attempt by an unsecured creditor to increase its recovery in iHeart's bankruptcy case.  (ECF No. 231 at 11).

However, they also argue that iHeart's actions regarding the $57.1 million of 2016 Legacy Notes were done solely for the purpose of avoiding the Springing Lien Trigger.  (ECF No. 231 at 58).  They further purport that as of the maturity date on December 16, 2017, the 2016 Legacy Notes are no longer outstanding, and the Senior Creditors received a Springing Lien over iHeart's Principal Property.  (ECF No. 231 at 55).

Consequently, the Senior Creditors claim that the PPSAs' Springing Lien entitles them to a security interest in iHeart's principal property which Wilmington may not dilute with its claims.  However, the Senior Creditors have settled with iHeart, subject to confirmation of iHeart's proposed plan.  If the plan is confirmed, the Senior Creditors will withdraw their position.

*iHeart Files for Bankruptcy*

On March 4, 2014, iHeart filed its chapter 11 bankruptcy petition.  (*See* Case No. 18-31274; ECF No. 1).  This stayed both iHeart's Texas litigation as well as Wilmington's New York litigation.  Wilmington filed an adversary proceeding in iHeart's bankruptcy case, arguing

its claims for tortious interference and equitable liens on March 21, 2018.  (*See* ECF No. 1).  The

Senior Creditors filed a motion to intervene on April 5, 2018, which the Court granted on April

12, 2018.  (*See* ECF Nos. 44, 65).

On May 15, 2018, iHeart and the Senior Creditors (including the PGN Noteholders)

announced a proposed stipulation whereby the Senior Creditors agreed that, for purposes of

confirming iHeart's amended proposed plan of reorganization, the Springing Lien Trigger Date

had not yet occurred.  (ECF No. 118 at 6).  The parties agreed that the stipulation would

terminate "upon the termination of the RSA[2] by any party to the RSA."  (ECF No. 118 at 6).

Also, "upon termination, this Stipulation shall be null and void, and shall have no prejudice to

any of the Parties in any matter thereafter."  (ECF No. 118 at 6).  Wilmington filed a response to

the proposed stipulation asserting its rights to establish that the Springing Lien was triggered and

that the stipulation should not impair those rights.  (*See* ECF No. 120).

The Court held a status conference on the proposed stipulation on May 30, 2018, and

addressed the issue of whether the legal or factual triggering of the Springing Lien would bar

iHeart and the Senior Creditors' proposed stipulation.  (*See* ECF No. 128).  The Court concluded

that the issue of whether the Springing Lien was triggered was a factual issue which would be

determined through an evidentiary hearing.  (ECF No. 128 at 49).

At a subsequent status conference, October 24, 2018 was selected as the evidentiary

hearing date.  (ECF No. 144 at 42).  After the parties presented their evidence and closed their

cases in chief, the Court took the matter under advisement.

---

[2] The RSA is a Restructuring Support Agreement that contains the material terms of the proposed plan.  As of the date of this Memorandum Opinion, the Court has neither confirmed the plan nor approved the RSA.

## Jurisdiction

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

## Choice of Law

The threshold issue facing the Court is whether New York or Texas law applies to determine the outcome of this dispute. The choice of law is material to this dispute because Wilmington has alleged the prevention doctrine as a cause of action. (ECF No. 236 at 28–30). New York and Texas law differ in that New York law recognizes the prevention doctrine as an independent cause of action, while Texas law applies it only within the context of a breach of contract or tortious interference. *See Consol. Edison, Inc., v. Ne. Util.*, 426 F.3d 524, 528 (2d Cir. 2005); *Albemarle Corp. v. MEMC Elec. Materials, Inc.*, 685 F. Supp.2d 652, 656 (S.D. Tex. 2010).

iHeart claims that the determination of this lawsuit is based on Wilmington's alleged claims which are founded on Texas law. (ECF No. 234 at 31). In iHeart's view, the equitable relief Wilmington seeks is based on Texas causes of action and its tortious interference claim is grounded in its contacts with a Texas corporation and alleged misrepresentations that purportedly occurred in Texas. (ECF No. 234 at 32–33). Wilmington and the Senior Creditors both claim that New York law applies to this proceeding since both the Legacy and PGN Indentures have specific choice of law provisions which state that New York law governs. (ECF No. 236 at 27, n. 56; ECF No. 231 at 30).

The terms of both the Legacy and PGN Indentures contain choice of law provisions[3] which apply New York law for their interpretation and governance.  (ECF Nos. 1-1 at 12; 85-1 at 132).  The Court will apply New York law to the interpretation of the contracts.

The Court must separately determine the appropriate forum for Wilmington's alleged extracontractual causes of action.  The Court's jurisdiction in this case arises from 28 U.S.C. § 1334(a).  Thus, the Court sits in federal question rather than diversity jurisdiction.  *Tow v. Rafizadeh (In re Cyrus II P'ship)*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008).  Courts confronted with a choice of law issue in the context of bankruptcy must decide whether to apply federal law or the law of the forum.  *Woods-Trucker Leasing Corp. of Ga. V. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981).  The Fifth Circuit has yet to resolve this issue.  *In re Mirant*, 675 F.3d 530, 536 (5th Cir. 2012); *Woods-Trucker Leasing*, 642 F.2d at 748.  This Court confronted a similar issue in *Cyrus II*, 413 B.R. at 613–14.  In *Cyrus II*, fraudulent transfer claims were asserted under the Bankruptcy Code, the Ohio Fraudulent Transfers Act, and the Texas Fraudulent Transfers Act.  *Id.* at 611.  After analyzing relevant case law from other Circuits, this Court concluded that the question of whether the forum's choice of law rules apply is based on whether important federal bankruptcy law was invoked by the cause of action.  *Id.* at 614.  In this dispute, Wilmington's alleged causes of action arise outside of the Bankruptcy Code and are based on state law causes of action such as tortious interference, unjust enrichment, and the prevention doctrine.  (*See* ECF No. 236 at 44).  Accordingly, the Court applies the choice of law rules of Texas, the applicable forum, to determine the applicable law for Wilmington's causes of action.

---

[3] Section 112 of the Legacy Indenture states, "This Indenture shall be construed in accordance with and governed by the laws of the State of New York."  Section 13.08 of the PGN Indenture states, "This indenture, the Notes, the Security Documents, and any Guarantee will be governed by and construed in accordance with the laws of the state of New York."

Texas law then turns to an issue-by-issue choice of law analysis. *Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999). Choice of law for each issue is determined according to the factors set forth in the Restatement's "most significant relationship" test. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).

iHeart argues that Wilmington's equitable lien and constructive trust claims are remedies governed by Texas law, which is the applicable forum. (ECF No. 234 at 31). This argument has merit because "where the parties contractually choose the law of a state other than the forum state, matters of remedy and procedure are nonetheless governed by the law of the forum state." *In re Wells Fargo Bank Minn. N.A.*, 115 S.W.3d 600, 605 n.7 (Tex. App.—Houston [14th Dist.] 2003). In this case, although the Indentures agree that New York law controls the interpretation and governance of the contracts, the equitable lien and constructive trust Wilmington seeks are remedial in nature, and Texas law determines their application. *In re Wells Fargo Bank Minn.*, 115 S.W.3d at 605 n.7; *In re Primera Energy, LLC*, 579 B.R. 75, 182 (Bankr. W.D. Tex. 2017) ("The Court has found that an equitable lien is a remedy that may be used in conjunction with the imposition of a constructive trust.").

Wilmington seeks an equitable lien or constructive trust as remedies for its alleged claim of unjust enrichment. (ECF No. 236 at 49). The "most significant relationship" test in the Restatement (Second) of Conflict of Laws § 221 examines five factors: (i) the place where a relationship between the parties was centered, (ii) the place where the benefit or enrichment was received, (iii) the place where the act conferring the benefit or enrichment was done, (iv) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (v) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Wilmington alleges that when iHeart subsidiaries actively prevented the Springing Lien from triggering, their actions allowed them to unfairly benefit to Wilmington's detriment. (ECF No. 236 at 48). Actions such as iHeart's decision not to retire the 2016 Legacy Notes and the alteration of CUSIP numbers to avoid triggering the Springing Lien occurred in iHeart's Texas offices. (Stolle Deposition at 104, 11). Although both iHeart and Wilmington are nation-wide entities with offices located through the country, the business conducted between iHeart and Wilmington was transacted between Wilmington's Houston branch and iHeart's San Antonio headquarters. (*See* Coleman Deposition at 141) (stating that Wilmington's client services manager for iHeart is based in Houston, Texas). Given the significant contacts with Texas in Wilmington's allegations, the most significant relationship test weighs in favor of applying Texas law to Wilmington's claim for unjust enrichment.

Wilmington's tortious interference claim against iHeart and its subsidiaries is based on an allegation that iHeart and its subsidiaries knowingly entered into the PGN PPSAs in violation of the Legacy Indenture. (ECF No. 236 at 49). The applicable law for a cause of action in tort is determined under the "most significant relationship" test which examines: (i) the place where the injury occurred, (ii) the place where the conduct causing the injury occurred, (iii) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (iv) the place where the relationship, if any, between the parties is centered. Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971); *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000).

The PGN PPSAs that form Wilmington's alleged cause of action cover Principal Property, consisting of iHeart's subsidiaries, all of which are Delaware corporations with their corporate headquarters located in San Antonio, Texas. (*See* Case No. 18-31274; ECF No. 1 at

23).  Accordingly, the site of the alleged injury, the domicile of the contracting parties, and the place where the relationship between the parties is centered weighs in favor of applying Texas law to Wilmington's claim for tortious interference.

New York law will be applied to the contractual claims.  Texas law will be applied to the extra-contractual claims.

## Analysis

### *Springing Lien Trigger*

The main issue in this dispute turns on whether the Springing Lien in the PGN PPSAs was triggered.  Wilmington and the Senior Creditors argue that the $57.1 million of 2016 Legacy Notes are no longer outstanding, which then triggers the Springing Lien because the number of outstanding 2016 Legacy Notes falls below the $500 million threshold in the PGN PPSAs.  (ECF Nos. 231 at 55; 236 at 34).  Wilmington claims that the $57.1 million of 2016 Legacy Notes that are owned by iHeart's subsidiaries were extinguished at maturity as a matter of law and contract interpretation.  (ECF No. 236 at 36).  The Senior Creditors similarly argue that the substance of iHeart's transactions and representations supports treating the 2016 Legacy Notes as retired which in turn triggers the Springing Lien.  (ECF No. 231 at 55-60).

If Wilmington is correct and the PGN Springing Lien was triggered, then it would naturally follow that the "equal and ratable" clause was breached as to the Legacy Noteholders.

iHeart responds that under the terms of the Legacy and PGN Indentures, the 2016 Legacy Notes remain outstanding and that its decision to retain the 2016 Legacy Notes past maturity was a business judgment decision performed with the company's best interests and creditors in mind. (ECF No. 234 at 34–40).

As presented in detail below, the Springing Lien in the PGN Indenture was not triggered when iHeart's subsidiaries acquired or retained the $57.1 million in 2016 Legacy Notes.  If the Springing Lien was not triggered, the "equal and ratable" clause was not breached.

*Prevention Doctrine*

The Prevention Doctrine is an equitable doctrine designed to preclude wrongful conduct that thwarts the occurrence of a condition under a contract.  Wilmington's first argument is that under the equitable prevention doctrine, the Court should disregard iHeart's actions, which prevented the Springing Lien from triggering, because they were done with the sole purpose of thwarting the Equal and Ratable clause in the Legacy Indenture.  (ECF No. 236 at 28–30).  iHeart responds that Texas law does not recognize the prevention doctrine in the context of a lender and borrower and that Wilmington has failed to establish the requisite bad faith for the prevention doctrine to apply.  (ECF No. 234 at 34).

Texas courts do not apply the doctrine of prevented performance as an *independent* cause of action.  *Albemarle Corp. v. MEMC Elec. Materials, Inc.*, 685 F. Supp.2d 652, 656 (S.D. Tex. 2010).  However, Texas courts recognize the equitable doctrine of prevented performance as a rule of contract law within a cause of action for breach of contract or tortious interference.  *See Rich v. McMullan*, 506 S.W.2d 745, 747 (Tex. Civ. App.—San Antonio 1974); *Flour Enters. v. Conex Int'l Corp.*, 273 S.W.3d 426, 442–43 (Tex. App.—Beaumont 2008).  As iHeart suggests, the Court was unable to locate a single instance of the prevention doctrine applied in the context of a lender or borrower.  Nevertheless, Texas cases establish that prevented performance applies to contractual disputes, which the Legacy and PGN Indentures fall within.  *Dorsett v. Cross*, 106 S.W.3d 213, 217–18 (Tex. App.—Houston [1st Dist.] 2003); *Rich*, 506 S.W.2d at 747; *Flour Enters.*, 273 S.W.3d at 442–43; *Albemarle Corp.*, 685 F. Supp.2d at 656.  Accordingly, the

doctrine of prevented performance may apply within the context of Wilmington's claim for tortious interference under Texas law if iHeart engaged in wrongful conduct that demands an equitable remedy.

A condition precedent is an "act or event that must take place before performance of a contractual obligation is due." *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007). The Springing Lien Trigger falls within the definition of a condition precedent because when "the aggregate principal amount of the Legacy Notes outstanding is $500,000,000 or less," a security interest is then granted in stock of Restricted Subsidiaries and in Principal Property. (ECF No. 231-1 at 61). When contractual obligations depend on the fulfillment of a condition, the doctrine of prevented performance deems that condition as fulfilled if a party wrongfully prevents that condition. *Dorsett*, 106 S.W.3d at 217. However, performance of a condition must be satisfactory "in the exercise of honest judgment," which in turn is a question of good faith. *Id.* (citing *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180, 185 (Tex. Civ. App.—Houston [1st Dist.] 1979)).

Wilmington and the Senior Creditors both argue that the steps iHeart took to avoid triggering the Springing Lien amount to bad faith. (ECF Nos. 236 at 22–26; 231 at 55–60). As evidence for their argument, Wilmington and the Senior Creditors cite to iHeart creating CC Holding, a new affiliate, solely to repurchase the 2016 Legacy Notes. (ECF No. 236 at 23). iHeart then allegedly initiated a series of transactions which included splitting the 2016 Legacy Notes into two classes, creating new CUSIP numbers, and other purported sham transactions to ensure that the subsidiary would never demand repayment for the outstanding 2016 Legacy Notes. (ECF No. 236 at 24). iHeart responds that each of these alleged sham transactions were

made in good faith and were a product of decisions that served the best interests of the company. (ECF No. 234 at 26).

At the October 24, 2018 hearing, Brian Coleman, iHeart's Senior Vice President and Treasurer presented credible testimony which placed iHeart's decision to repurchase the outstanding 2016 Legacy Notes in the context of a much larger debt repurchase program.  Under the larger debt repurchase program, iHeart acquired nearly $3 billion of iHeart's debt and generated nearly $1 billion in profit for the company.  (ECF No. 251 at 35).  Coleman testified that across this buyback program, all debt was treated as outstanding unless it was formally retired.  (ECF No. 251 at 80–82).  Additionally, iHeart's decision to purchase $57.1 million of 2016 Legacy Notes was the product of finding Notes available to purchase at a discount, rather than an attempt to delay triggering the Springing Lien.  (ECF No. 251 at 82–83).

Context plays an important role in determining a party's motivation.  The doctrine of prevented performance is applicable when a party performs actions for the purpose of thwarting a contract.  *Flour Enters.*, 273 S.W.3d at 442–43 (holding that prevented performance requires that "the defendant's intent must be to effect a breach of the contract").  It is undisputed that the evidentiary record reflects that CC Finco's acquisition of the $57.1 million of 2016 Legacy Notes was *not* done to thwart the Springing Lien.  Rather, it was part of the routine course of iHeart's business to acquire its own debt at a discount.  (ECF No. 251 at 35, 82–83).

The issue of whether the treatment of that debt through the assignment of the new CUSIP number and the subsequent non-payment of the debt is a closer call.

Coleman testified to iHeart's reasons for assigning a new CUSIP number to the $57.1 million of 2016 Legacy Notes it continued to hold after maturity.  The new CUSIP number was created solely to allow the balance of the 2016 Legacy Notes to be retired.  (ECF No. 251 at

100–101).  This situation represents the only time iHeart held debt and then obtained a new CUSIP number to avoid payment at maturity.  (ECF No. 251 at 102).  Coleman also testified that iHeart's independent Special Committee had final authority to decide to obtain a new CUSIP number for the retained debt, providing oversight for the decision in question.  (ECF No. 251 at 103).

Similarly, Coleman presented credible testimony regarding iHeart's decision to change the 2016 Legacy Notes' paying agent from Bank of NY Mellon to an iHeart subsidiary, iHeart Media Tower Holdings.  Coleman described this as a financial decision, which avoided payment obligations to a third-party paying agent since iHeart's subsidiary could perform the same services without incurring cost.  (ECF No. 251 at 102).

Charles Cremens and Frederic Brace, who were appointed to serve on iHeart's independent Special Committee, provided additional testimony, placing iHeart's decision to retain the 2016 Legacy Notes in the context of iHeart's potential bankruptcy filing.  Their testimony described the importance of delaying the Springing Lien Trigger in order to preserve collateral and allow for meaningful negotiations with other creditors.  (ECF No. 251 at 146).  These goals were achieved, because iHeart's decision yielded a one-year runway prior to its bankruptcy filing.  (ECF No. 251 at 213).  During this time, iHeart achieved substantial consensus on the terms of its restructuring support agreement and obtained agreements with a large segment of its creditor pool.  (ECF No. 251 at 213).  According to Cremens's testimony, allowing the debt to mature would have necessitated an earlier bankruptcy filing and resulted in fewer negotiating options for iHeart.  (ECF No. 251 at 210).

Although it is a close call, the Court is persuaded by Cremens's and Brace's testimony. They testified that the Special Committee would have never authorized the payment of the debt

so as to allow the triggering of the Springing Lien.  Had they not found a way to avoid paying

the $57.1 million of maturing 2016 Legacy Notes, iHeart would have filed a bankruptcy petition

in 2016.  (ECF No. 251 at 209).  The witnesses were concerned about a domino effect if the

$57.1 million of Legacy Notes were paid at maturity:

- The unencumbered assets would be subject to the Springing Lien in favor of the PGN Notes;

- The Legacy Note Holders would be able to declare a default, or be entitled to their own equal and ratable lien;

- The assets would be substantially encumbered by the Springing and Equal and Ratable liens;

- The substantially encumbered assets would be unavailable for use and pledge in a chapter 11 bankruptcy case; and

- Without substantial unencumbered assets, the probability of a successful reorganization would be diminished.

(ECF No. 251 at 210–211).

They testified that the Special Committee considered several alternatives, none of which

included repayment of 100% of the debt at maturity.  (ECF No. 251 at 201).

There is no evidence to contradict these witnesses, and the Court finds them to be

overwhelmingly credible.

The Court concludes that the non-payment of the $57.1 million at maturity was

undertaken as an alternative to bankruptcy.  Had a bankruptcy petition been filed prior to the

maturity date, there would have been no credible argument that the Springing Lien had been

triggered.

Under either alternative (bankruptcy or non-payment), the Springing Lien would not have

been triggered.  iHeart's failure to avoid payment at maturity would have triggered a bankruptcy

petition rather than the Springing Liens.  When the purpose of the avoidance of maturity was

legitimate and in good faith—such as avoiding the need to file a freefall bankruptcy case—the equitable doctrine of prevention will not be applied.

During the October 24, 2018 trial, Coleman also testified that iHeart's decision to retain the $57.1 million of 2016 Legacy Notes was unique compared to the rest of the $3 billion debt, which was all retired as of the October 24, 2018 trial.  (ECF No. 251 at 116).  Viewed in isolation, this single fact could cast doubt on whether iHeart's decision was the product of good faith business judgment.  Yet, this single fact cannot be decisive without also considering the balance of testimony presented.  It is impossible to ignore the volume of evidence demonstrating that retaining the 2016 Legacy Notes was a business decision, necessary to preserve iHeart's remaining value and negotiating position in light of an imminent bankruptcy filing.

The Court concludes that iHeart's decision not to pay the $57.1 million at maturity was a product of good faith business judgment.  The decision was made to prevent an immediate bankruptcy filing.  The equitable doctrine of prevented performance does not provide the relief Wilmington seeks.  *Dorsett*, 106 S.W.3d at 217.

*Whether the Notes Are Outstanding as a Matter of Law*

Wilmington's argues that as a matter of law, once iHeart repurchased the same debt it previously issued, that debt was extinguished upon maturity.  (ECF No. 236 at 36).  Wilmington's argument is based on the premise that "a person cannot be a creditor to himself." (ECF No. 236 at 36).  iHeart's response to Wilmington cites cases holding that debt held by a company remains outstanding until formal actions are taken to cancel that debt.  (ECF No. 234 at 36).  In iHeart's view, since it has not taken the required steps to affirmatively cancel the 2016 Legacy Notes it holds, they remain outstanding.  (ECF No. 234 at 36).

The cases Wilmington cites to support its position are distinguishable from its proposition that a note held by the issuer at maturity is no longer outstanding.  In *New York Trust Co. v. Palmer*, the bonds, which were held by the issuer, were previously retired prior to the issuer attempting to pledge the bonds as collateral for a second time.  101 F.2d 1, 4 (2d Cir. 1939).  Rather than address whether an *outstanding bond* was extinguished at maturity if held by the issuer, the Second Circuit addressed "whether the retired bonds . . . should be incorporated into the claim."  *Id.*

Wilmington also cites *Fidelity & Columbia Trust Co. v. Louisville Ry. Co.*, to support its argument that debt held by an issuer is extinguished on maturity.  81 S.W.2d 896, 898 (Ky. 1935).  However, this case is also distinguishable because it dealt with a debt issuer's attempt to repurchase notes after they had already matured, while iHeart reacquired the 2016 Legacy Notes prior to their maturity date.  *Id.* at 899.  In *Fidelity*, the Kentucky Court of Appeals later stated: "that a corporation could purchase its bonds and reissue them if an intention to keep them alive was manifested."  *Id.*  Rather than support Wilmington's view, *Fidelity* aligns more closely with iHeart's argument because iHeart has taken affirmative steps to treat the bonds as outstanding by paying and accruing interest after maturity.  (ECF No. 234 at 36).

iHeart cites *Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, in support of its argument that the 2016 Legacy Notes remain outstanding until it takes the necessary steps to cancel the Notes.  996 A.2d 324, 336 (Del. Ch. 2010); (ECF No. 234 at 36).  However, the indenture at issue in *Concord* specifically exempted cancelled notes from the definition of "outstanding."  *Id.* at 336.  Based on this exception to the definition of "outstanding" in the indenture, the Delaware court held that the notes in question were no longer outstanding.  *Id.* at 339.

iHeart urges the Court to conclude that because a note ceases to be outstanding upon cancellation, the opposite must also be true and that "notes held by an issuer's subsidiary do not automatically cease to be outstanding."  (ECF No. 234 at 36).  As iHeart argues, the terms of the Legacy Indenture mirror those in *Concord* and specifically exempt Notes delivered to the Indenture Trustee for cancellation from the definition of "Outstanding."  (ECF No. 1-1 at 7).  However, the factual situation in this dispute is distinguishable from that in *Concord*, which examined when and if cancellation became effective for notes delivered to an indenture trustee.  *Concord*, 996 A.2d at 339.  Conversely, in this dispute, iHeart continues to hold the 2016 Legacy Notes and has made no attempts to cancel them, which under Section 309 of the Legacy Indenture would require that iHeart pay, redeem, transfer, convert, or exchange the Notes.  (ECF No. 1-1 at 18).

The 2016 Legacy Notes were not acquired by iHeart, but by iHeart's subsidiary, CC Finco.  (ECF No. 231 at 19).  There is no evidence that this subsidiary is not a bona fide entity.  There is evidence that financial reporting was done on a consolidated basis.  (ECF No. 251 at 54).  To the extent that the Notes were held by a bona fide subsidiary, then iHeart did not directly acquire the notes.  The concept that debt is extinguished when an issuer acquires it own debt would be inapplicable.

The Court now turns to the terms of the Indentures to determine this whether this issue is governed by the Indentures.

*Whether the Notes are Outstanding Under the Terms of the Indentures*

Wilmington and the Senior Creditors alternatively argue that as a matter of contract interpretation, the Springing Lien was triggered under the Legacy and PGN Indentures.  (ECF Nos. 231 at 55–60; 236 at 30–36).  Wilmington argues that absent a clear definition of

"outstanding" in the PGN Indenture, the Court should conclude that the 2016 Legacy Notes were retired based on the parties' original intent and iHeart's actions and treatment of the 2016 Legacy Notes.  (ECF No. 236 at 34).  iHeart's response cites the definition of "outstanding" in the PGN Indenture to support its claim that the 2016 Legacy Notes remain outstanding because they were not cancelled.  (ECF No. 234 at 35).

Section 112 of the Legacy Indenture and Section 13.08 of the PGN Indenture include choice of law provisions which both select New York as the governing law.  (ECF Nos. 1-1 at 12; 85-1 at 132).  "Under New York law, a written contact is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language that they have employed."  *Broad v. Rockwell International Corporation*, 642 F.2d 929, 946 (5th Cir.1981).  A court must fairly and reasonably interpret the contract consistently with its intended purpose.  *Id.*  However, what the parties intended is only relevant to the extent that such intentions are evidenced by the language of the contract.  *Id.* at 947.

When a contract provision is unambiguous on its face and the intention of the parties is clear, extrinsic matters should not be considered.  *Id.*; *see also R/S Assoc. v. New York Job Devel. Auth.*, 98 N.Y.2d 29, 33 (N.Y. App. Div. 2002) (holding that unless the court finds ambiguity, evidence outside the four corners of the contract is generally inadmissible).  Moreover, extrinsic evidence is not admissible to create ambiguity in a contract which is complete, clear and unambiguous on its face.  *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, (N.Y. 1990).  Words and phrases should be given their plain meaning.  *Broad*, 642 F.2d at 947.  "The parties having agreed upon their own terms and conditions, 'the courts cannot change them and must not permit them to be violated or disregarded.'"  *Metropolitan Life Ins. Co. v. RJR Nabisco,*

*Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (quoting *Whiteside v. North American Accident Ins. Co.*, 200 N.Y. 320, 326 (N.Y. 1911)).

The PGN Indenture controls whether the Springing Lien was triggered and defines the Springing Lien Trigger Date as the date when "the aggregate principal amount of the Legacy Notes outstanding is $500,000,000 or less." (ECF No. 231-1 at 116). Wilmington argues that because "Outstanding" is not defined within the PGN Indenture itself, the Court should look to the intent and expectations of the parties when the Indenture was created. (ECF No. 236 at 33). Wilmington further claims that treating the 2016 Legacy Notes as outstanding is contrary to the intent of the parties because when held by iHeart, no enforceable payment obligation exists. (ECF No. 236 at 34).

The Court should not speculate about the parties' intentions when the unambiguous documents provide the answer.

Wilmington's view is directly contradicted by the unambiguous terms of the PGN Indenture. The PGN Indenture specifically identifies and defines both "Legacy Notes" and "Legacy Notes Indenture" to refer to the original Indenture issued in 1997 (and subsequent amendments). (Senior Creditors Exhibit No. 7 at 30). The Legacy Indenture then defines when those securities are outstanding. (ECF No. 1-1 at 7, 17). Based on the text of the PGN Indenture, the appropriate way to determine the "amount of the Legacy Notes outstanding" referenced in the Springing Lien Trigger Date is to refer to the definition of "Outstanding" contained in the Legacy Indenture. The Legacy Indenture defines "Outstanding" securities as "all such Securities theretofore authenticated and delivered under this Indenture" with three exceptions: (i) cancelled Notes, (ii) Notes for which payment was made to the Trustee or Paying Agent, and (iii) Notes exchanged under Section 306 of the Legacy Indenture due to loss,

mutilation, or theft.  (ECF No. 1-1 at 7, 17).  It is undisputed that these three exceptions do not apply to the $57.1 million of 2016 Legacy Notes iHeart retains.  Additionally, no provisions cited within the Legacy or PGN indentures prohibit iHeart from owning the 2016 Legacy Notes or holding them past maturity.

The Senior Creditors claim that iHeart made material changes to the $57.1 million of 2016 Legacy Notes—changing the paying agent, introducing a new CUSIP number, and refusing to pay at maturity—which place this portion of the Notes outside the definition of "Legacy Notes" contemplated in the PGN Indenture.  (ECF No. 231 at 55).  Yet, the PGN Indenture incorporates all amendments and supplements within the definition of "Legacy Notes Indenture." (Senior Creditors' Exhibit No. 7 at 30).   The inclusions of the terms "amended and supplemented" indicates that the parties anticipated potential changes to the 2016 Legacy Notes, and that such changes would not alter the classification of the debt within the PGN Indenture.

The Senior Creditors also point to the definition of "Outstanding" in the Legacy Indenture to support their claim that the Springing Lien was triggered.  (ECF No. 231 at 62). They specifically cite a section which states: "In determining whether the Holders of the requisite principal mount of such Securities Outstanding have given any request, demand, authorization, direction, notice, consent or waiver hereunder . . . (ii) *Securities owned by the Company . . . shall be disregarded and deemed not to be Outstanding*."  (ECF No. 231 at 62).  In the Senior Creditors' view, because iHeart, as a holder of the Notes, is barred from exerting certain rights, the Notes in effect are no longer outstanding.  (ECF No. 231 at 61–62).

Because the Notes were to be disregarded and deemed not outstanding for the purposes of voting on requests and demands, they were (by negative implication) outstanding for other purposes.  *Claimant ID 100218776 v. B.P. Exploration & Prod., Inc.,* 712 F. App'x 372, 376

(5th Cir. 2017) (per curiam) (holding that under *expressio unius*, "specification of the one implies the exclusion of the other").

The definition of "Outstanding" in the Legacy Indenture contradicts the Senior Creditors' argument.  If the 2016 Legacy Notes were no longer outstanding after iHeart acquired them, there would be no purpose for excluding them to determine the operative number of Outstanding Notes for administrative purposes.  (ECF No. 1-1 at 7).  Adopting the Senior Creditors' view would also nullify the intended purpose of the carve out in the definition, in violation of applicable contract interpretation standard.  *Broad*, 642 F.2d at 947.  Under the terms of the Legacy and PGN Indentures, the $57.1 million of 2016 Legacy Notes remain outstanding and the Springing Lien Trigger Date did not occur when the Notes matured.

Wilmington and the Senior Creditors also argue that iHeart's own treatment of the 2016 Legacy Notes justifies rendering them as no longer outstanding.  (ECF Nos. 231 at 58; 236 at 34–35).  Wilmington's evidence for this theory consists of iHeart's public SEC filings and disclosures, its plan to pay interest on the 2016 Notes only through maturity, and that CC Holdings was a mere shell controlled by iHeart.  (ECF Nos. 231 at 59–63; 236 at 34–35).  Even after iHeart elected to avoid triggering the Springing Lien, this decision was a product of its business judgment and was not prohibited under the plain terms of its indentures.  The allegedly misleading public filings were a product of iHeart's SEC reporting and corporate accounting groups and reflect financial statements consolidated across multiple affiliates rather than a nefarious attempt to mislead.  (ECF No. 251 at 99–100).  It is undisputed that—for consolidated financial reporting purposes—iHeart properly offset the intercompany payable and receivable.  Consequently, despite Wilmington's and the Senior Creditors' arguments, the Court concludes that the Springing Lien was not triggered after the 2016 Legacy Notes matured.

*Unjust Enrichment*

Wilmington's claims to an equitable lien or constructive trust are based on its cause of action for unjust enrichment against iHeart.  (ECF No. 236 at 48).  Wilmington argues that iHeart's issuance of the PGN PPSAs, along with the actions it took to avoid triggering the PPSA's Springing Lien resulted in profit to iHeart at Wilmington's expense.  (ECF No. 236 at 48).  iHeart responds that Wilmington's claim for unjust enrichment is barred by the express contract rule because the terms of the Legacy Indenture prohibit applying any quasi-contractual remedy.  (ECF No. 234 at 44).

Unjust enrichment occurs when a party wrongfully or passively receives a benefit which would be unconscionable to retain.  *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009).  Unjust enrichment is the result of a party utilizing fraud, duress, or undue advantage to obtain a benefit.  *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  To remedy the unjust benefit, a quasi-contractual relationship is conferred in cases where no contract exists between the parties.  *Lee v. Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist] 2013).  However, unjust enrichment is an equitable doctrine and may allow a recovery in cases where "a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons."  *French v. Moore*, 169 S.W.3d 1, 11 (Tex. App.—Houston [1st Dist.] 2004).  Because unjust enrichment creates a quasi-contract to remedy unjust benefit, it does not apply when "a valid, express contract covers the subject matter of the parties' dispute."  *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

iHeart argues that the Legacy Indenture between the parties governs this dispute and the Court cannot apply a quasi-contractual theory to remedy the wrong Wilmington alleges.  (ECF

No. 234 at 44).   The Texas Supreme Court examined this question in *Fortune Prod. Co. v. Conoco, Inc.*, which involved a dispute between field producers of natural gas and its purchaser. 52 S.W.3d at 673.   A fraction of residual natural gas products collected in the natural gas gathering systems, which the producers were compensated for along with the bulk of natural gas they sold.   *Id.* at 683.   However, the purchaser later decided to separate compensation for the residual natural gas, lowering the producers' overall payments.   *Id.*   The producers claimed that the purchaser's failure to include the residual gas in the overall volume of natural gas resulted in unjust enrichment to the purchaser.   *Id.*   The producer countered that contractual agreements between the parties governed the "entire gas stream," foreclosing the producer's right to an equitable remedy since a contractual one already existed between the parties.   *Id.*

For certain producers, the Texas Supreme Court held that specific contractual definitions and terms governed the handling of the residual liquids such that the contracts dictated the purchaser's obligations for "gas delivered."   *Id.* at 674.   However, written contracts were not in place for other producers and the Texas Supreme Court could not discern whether these producers were compensated for the entire gas stream or not.   *Id.*   For these producers, the purchaser could not provide evidence of a contract that dictated the terms of the purported wrong, so unjust enrichment was applicable.   *Id.* at 685.

To determine whether Wilmington's unjust enrichment claim is barred by the express contract rule, it is helpful to examine the act that led to Wilmington's alleged unjust enrichment claims.   Part of the alleged wrong Wilmington claims is based on the Equal and Ratable Clause in Section 1006 of the Legacy Indenture, stating that iHeart will not allow a mortgage on the stock of a Restricted Subsidiary or Principal Property, without granting outstanding Legacy Noteholders equal and ratable treatment.   (ECF No. 236 at 15).   Wilmington alleges that iHeart

violated this provision when it granted the Springing Lien in the PGN PPSAs without providing the Legacy Notes with a similar security interest.  (ECF No. 236 at 18).  Similar to the natural gas contracts in *Fortune Prod.*, Section 1006 prohibits granting a lien to the PGN noteholders without affording the Legacy Noteholders equal treatment.  As iHeart suggests, importing a quasi-contractual recovery is impossible to remedy this alleged unjust benefit because Section 1006 of the Legacy Indenture expressly defines the responsibilities of the parties as well as the appropriate remedies.  Thus, Wilmington's unjust enrichment claim is barred by the express contract rule.

Even if Wilmington's unjust enrichment claim were not barred by the express contract rule, Wilmington must establish that iHeart's enrichment was *unjust* rather than the product of a bad bargain or the consequence of contractually authorized actions.  *Burlington N. R. Co. v. SW. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996).  Returning to the October 24, 2018 hearing, the credible testimony presented by executives from iHeart and the Special Committee demonstrated that iHeart decided to delay triggering the Springing Lien to preserve its remaining value and negotiating power for its pending bankruptcy filing.  As set forth above, the alternative to "no-lien outside of bankruptcy" was "no-lien inside of bankruptcy."  Under this circumstance, there was no enrichment at all.  Moreover, this business decision is distinguishable from the grossly inequitable conduct required to satisfy a claim for unjust enrichment.  *Id.* at 92, n. 6.  As discussed earlier, the terms of both the PGN and Legacy Indentures allowed iHeart to purchase and retain the 2016 Legacy Notes, which the terms of the Legacy Indenture define as Outstanding.  (ECF No. 1-1 at 7; Senior Creditors' Exhibit No. 7 at 30).  Accordingly, Wilmington's claim for unjust enrichment is denied.

*Equitable Lien and Constructive Trust*

Wilmington argues that it has a right to an equitable lien as a remedy for iHeart's alleged breach of the equal and ratable clause in the Legacy Indenture.  (ECF No. 236 at 42–48).  An equitable lien requires that a party show: (i) an express or implied agreement which demonstrates a clear intent to create a security interest in order to secure an obligation between the parties; (ii) that the parties intended specific property to secure the payment; and (iii) the aggrieved party has no adequate remedy at law.  *In re RONFIN Series C Bonds Sec. Interest Litig.*, 182 F.3d 366, 371 (5th Cir. 1999).

Wilmington argues that the Legacy Indenture's equal and ratable clause reflects a clear intent to grant a lien.  (ECF No. 236 at 45).  Thus, when the PGN Noteholders received a Springing Lien over Principal Property in the PGN Indenture, iHeart was bound to afford the Legacy Noteholders the same right.  (ECF No. 236 at 45–46).  iHeart responds that Wilmington cannot satisfy the first two elements of an equitable trust because the equal and ratable clause fails to create a definite security interest and the Legacy Indenture fails to sufficiently identify specific property to serve as collateral.  (ECF No. 234 at 46–47).

Addressing iHeart's argument regarding the second element of an equitable lien, "Principal Property" is specifically defined in both the PGN and Legacy Indentures as "any radio broadcasting, television broadcasting or outdoor advertising property located in the United States owned or leased by the Company or any Subsidiary."  (ECF No. 1-1 at 8; Senior Creditors' Exhibit No. 7 at 38).  iHeart claims that this security interest mirrors that in *RONFIN* and fails because "the property must be distinguished from the general assets of the debtor."  (ECF No. 234 at 46).  However, the security interest in RONFIN identified collateral which was subject to the debtor's "plenary control" and "[at] no point was any particular property or set of properties

specifically fixed as the debt's potential source of satisfaction."  182 F.3d at 372.  Under the terms of these Indentures, the definition of "Principal Property" identifies a clear set of assets which may serve as collateral for the purported liens in question.  Unlike the collateral in *RONFIN*, this property is not subject to substitution by iHeart, satisfying the specificity required for an equitable lien.  As a result, Wilmington has satisfied the second element of an equitable lien.

Wilmington must also prove that the parties intended to create a security interest between the parties.  *Id.* at 371.  Wilmington argues that the equal and ratable clause sufficiently demonstrates the parties' intent to create a lien.  (ECF No. 236 at 45–46).  iHeart responds that the negative pledge in the Equal and Ratable Clause is an agreement not to perform an action rather than intent to do so.  (ECF No. 234 at 46).  The Court agrees.  Nowhere does the indenture grant a lien; it prohibits a pledge.

Alternatively, the Court concludes that an equitable lien is imposed to correct an injustice done to an aggrieved party.  *In re Tex. State Optical*, 188 B.R. 552 (Bankr. E.D. Tex. 1995).  In this case, the Court has concluded that the Springing Lien was not triggered after iHeart continued to hold the 2016 Legacy Notes past the maturity date.  As a result, the PGN Noteholders never received a security interest in Principal Property and iHeart did not breach the Legacy Indenture's Equal and Ratable Clause.  Thus, Wilmington suffered no injustice or injury which would justify imposing an equitable lien.

Similarly, a constructive trust is an equitable tool courts may apply to "prevent unjust enrichment."  *In re UTSA Apartments 8, LLC*, 886 F.3d 473, 488 (5th Cir. 2018) (quoting *Baker Botts, LLP v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007)).  Obtaining a constructive trust under Texas law requires establishing three elements: (i) breach of a special

trust, fiduciary relationship, or actual fraud, (ii) unjust enrichment, and (iii) tracing to a specific res. *Id.* Due to its equitable nature, the decision of whether to impose a constructive trust is left to the discretion of the reviewing court. *Longview Energy Co. v. Huff Energy Fund, LP*, 533 S.W.3d 866, 874 (Tex. 2017).

In order to obtain a constructive trust under Texas law, a party must prove that unjust enrichment occurred. Wilmington contends that iHeart's decision to keep the 2016 Legacy Notes outstanding amounts to bad faith and resulted in iHeart's unjust enrichment at Wilmington's expense. However, as discussed earlier, the testimony presented at the October 24, 2018 hearing revealed that iHeart's actions were not the product of a bad faith decision to delay Wilmington's security interest, but rather a calculated business judgment decision, which was the product of its financial situation and potential bankruptcy filing. As a result, Wilmington has failed to prove the element of unjust enrichment required for a constructive trust.

## *Tortious Interference*

Wilmington also alleges that it has a valid claim for tortious interference against iHeart's subsidiaries. (ECF No. 236 at 49). Wilmington claims that the Legacy Indenture formed a valid contract and that Wilmington was damaged when the PGN PPSAs were issued in breach of the Legacy Indenture. (ECF No. 236 at 49–50). iHeart responds that Wilmington's claim for tortious interference fails as a matter of law because a subsidiary cannot interfere with its parent's contracts. (ECF No. 234 at 44).

Texas law recognizes two causes of action for tortious interference based upon whether alleged interference occurs with existing contracts or to prospective business relationships. *In re Dallas Roadster, Ltd.*, 846 F.3d 112, 123 (5th Cir. 2017). Although not specified, Wilmington's

claim fits within a claim for tortious interference with an existing relationship, which must satisfy four elements: (i) an existing contract, (ii) a willful or intentional act of interference, (iii) which proximately causes damage, and (iv) such damage occurred.  *ACS Investors, Inc. v. McLaughlin*, 943 S.W.3d 426, 430 (Tex. 1997).

As a general rule, tortious interference cannot occur as a result of the "internally coordinated conduct of a corporation and one of its unincorporated divisions."  *Copper Weld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770 (1984); *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) (recognizing a "general rule barring tortious interference claims when the inducing and breaching parties are one and the same"); *Cleveland Reg'l Med. Ctr., LP v. Celtic Prop.*, 332 S.W.3d 322, 347–48 (Tex. App.—Beaumont 2010).   In *Copperweld*, the Supreme Court further explained, "[a] parent and its wholly owned subsidiary have a complete unity of interest. . . .  [T]he subsidiary acts for the benefit of the parent, its sole shareholder."  467 U.S. at 771–72 (footnote omitted).  To establish that willful or intentional interference has occurred, a party must be a "stranger to the contract."  *Cleveland Reg'l Med. Ctr.*, 323 S.W.3d at 346.

Here, the parties which Wilmington alleges tortiously interfered with the Legacy Indenture are iHeart's subsidiaries.  (*See* ECF Nos. 231-1 at 98; 236 at 49).  Although there is case law which suggests that a subsidiary could interfere with a corporation's contract, the cited case applies when the interests of the two diverge.  *Valores Corporativos, S.A. de C.V. v. McLane Co., Inc.*, 945 S.W.2d 160, 167–68 (Tex. App.—San Antonio, 1997) (holding that while a parent and subsidiary's interests are usually aligned, "circumstances may arise in which the financial interests of neither motivate the interference").  In this case, both iHeart's and its subsidiaries' interests are aligned.  Wilmington, which bears the burden of proof, introduced no evidence to show that the interests were not aligned.  The subsidiaries held iHeart's most

valuable assets and iHeart made a business judgment decision to ensure they were not subject to the Springing Lien in the PGN Indenture.  As a result, neither iHeart nor its subsidiaries' interests diverged, and neither could interfere with iHeart's obligations under the Legacy Indenture.

Alternatively, even if the case law distinguishing tortious interference between parents and subsidiaries were ignored, Wilmington would remain without a claim.  Wilmington's alleged damages arose from the loss of a security interest granted under the Legacy Indenture's Equal and Ratable Clause derived from the issuance of PGN PPSAs.  (ECF No. 236 at 49).  However, as the Court concluded earlier, the Springing Lien was not triggered when iHeart held the 2016 Legacy Notes after maturity.  Accordingly, no security interest was granted over Principal Property and no damage resulted to Wilmington.  Without damage arising from the issuance of the PGN PPSAs, Wilmington has failed to carry its burden regarding a claim for tortious interference under Texas law.  *McLaughlin*, 943 S.W.3d at 430.

### *Affirmative Defenses*

iHeart and the Senior Creditors asserted an array of affirmative defenses against Wilmington, arguing that its causes of action are barred by the statute of limitations, laches, and possible avoidance of any equitable lien granted under the Bankruptcy Code.  (*See* ECF Nos. 231 at 48–54; 234 at 48).  However, Wilmington has failed to establish its alleged causes of action, rendering these affirmative defenses moot.

## **Conclusion**

The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED **January 15, 2019.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE